1:14-CV-1577

# EXHIBIT "H"

# INSURANCE COMPLAIT

MARC M. SELTZER (54534)
mseltzer@susmangodfrey.com
RYAN C. KIRKPATRICK (243824)
rkirkpatrick@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

ANDREW J. ENTWISTLE
aentwistle@entwistle-law.com
ARTHUR V. NEALON
anealon@entwistle-law.com
ROBERT N. CAPPUCCI
rcappuucci@entwistle-law.com
JONATHAN H. BEEMER
jbeemer@entwistle-law.com
JOSHUA K. PORTER
jporter@entwistle-law.com
ENTWISTLE & CAPPUCCI LLP
280 Park Avenue, 26th Floor West
New York, NY 10017
Telephone: (212) 894-7200
Facsimile: (212) 894-7272

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| CENTAUR CLASSIC CONVERTIBLE ARBITRAGE FUND LTD., ARGENT CLASSIC CONVERTIBLE ARBITRAGE FUND II L.P., ARGENT LOWLEV CONVERTIBLE ARBITRAGE FUND II LLC, CENTAUR LOWLEV ARBITRAGE FUND LTD., ARGENTUM MULTI-STRATEGY FUND LLC, ARGENTUM MULTI-STRATEGY FUND LTD., HFR CA GLOBAL SELECT MASTER TRUST, ACUITY MASTER FUND, LTD., CARLYLE MULTI-STRATEGY MASTER FUND | Case No. CV 10-5699 MRP (MANx)<br><br>**SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

LIQUIDATING TRUST, LYXOR/ACUITY FUND LIMITED, POLYGON GLOBAL OPPORTUNITIES MASTER FUND, RHAPSODY FUND, L.P., ARPEGGIO FUND, NUVEEN MULTI-STRATEGY INCOME AND GROWTH FUND, NUVEEN MULTI-STRATEGY INCOME AND GROWTH FUND 2, RADCLIFFE SPC, LTD., TEMPO MASTER FUND L.P., CANYON CAPITAL ARBITRAGE MASTER FUND, LTD., THE CANYON VALUE REALIZATION FUND (CAYMAN), LTD., CANYON VALUE REALIZATION MAC 18, LTD., CANYON VALUE REALIZATION FUND, L.P., LYXOR/CANYON CAPITAL ARBITRAGE FUND LIMITED, GLG MARKET NEUTRAL FUND, MOHICAN VCA MASTER FUND, LTD., ADI ARBITRAGES ABSOLU, ADI CONVERT ABSOLU, ADI CONVEX, ADI CONVEX ABSOLU, KALLISTA CB ARBITRAGE FUND LIMITED, CASAM ADI CB ARBITRAGE LIMITED, DELTA INSTITUTIONAL, L.P., DELTA ONSHORE, L.P., DELTA PLEIADES, L.P., DELTA OFFSHORE MASTER, LTD., RHP MASTER FUND, LTD., HFR CA LAZARD RATHMORE MASTER TRUST, RAMIUS CONVERTIBLE ARBITRAGE MASTER FUND LTD., RCG PB, LTD., S.A.C. ARBITRAGE FUND, LLC, STARK MASTER FUND LTD., SANDELMAN PARTNERS MULTISTRATEGY MASTER FUND LTD., SANDELMAN PARTNERS OPPORTUNITY MASTER FUND

L.P., CAMULOS MASTER FUND L.P., CONCORDIA PARTNERS L.P., CONCORDIA INSTITUTIONAL MULTI-STRATEGIES LTD.,

Plaintiffs,

vs.

COUNTRYWIDE FINANCIAL CORPORATION, ANGELO R. MOZILO, DAVID SAMBOL, and ERIC P. SIERACKI,

Defendants.

# TABLE OF CONTENTS

I. SUMMARY OF THE ACTION ... 3
II. JURISDICTION AND VENUE ... 11
III. THE PARTIES ... 12
A. Plaintiffs and Their Direct Reliance on Defendants' Material Misrepresentations and Omissions ... 12
1. The Argent Funds ... 12
a. Centaur Classic Convertible Arbitrage Fund Ltd. ... 12
b. Argent Classic Convertible Arbitrage Fund II L.P. ... 14
c. Argent LowLev Convertible Arbitrage Fund II LLC ... 16
d. Centaur LowLev Arbitrage Fund Ltd. ... 17
e. Argentum Multi-Strategy Fund LLC ... 18
f. Argentum Multi-Strategy Fund Ltd. ... 19
g. HFR CA Global Select Master Trust ... 21
2. The Acuity Funds ... 22
a. Acuity Master Fund, Ltd. ... 22
b. Carlyle Multi-Strategy Master Fund Liquidating Trust ... 24
c. Lyxor/Acuity Fund Ltd. ... 26
3. Polygon Global Opportunities Master Fund ... 28
4. The Symphony Funds ... 29
a. Rhapsody Fund, L.P. ... 29
b. Arpeggio Fund ... 31
c. Nuveen Multi-Strategy Income and Growth Fund ... 32
d. Nuveen Multi-Strategy Income and Growth Fund 2 ... 33
5. Radcliffe SPC, Ltd. ... 35
6. Tempo Master Fund L.P. ... 37
7. The Canyon Funds ... 38
a. Canyon Capital Arbitrage Master Fund, Ltd. ... 38
b. The Canyon Value Realization Fund (Cayman), Ltd. ... 40
c. Canyon Value Realization MAC 18, Ltd. ... 41
d. Canyon Value Realization Fund, L.P. ... 42
e. Lyxor/Canyon Capital Arbitrage Fund Limited ... 44
8. GLG Market Neutral Fund ... 45

9. Mohican VCA Master Fund, Ltd. .......... 47
10. The OFI Funds .......... 48
a. ADI Arbitrages Absolu .......... 48
b. ADI Convert Absolu .......... 50
c. ADI Convex .......... 51
d. ADI Convex Absolu .......... 52
e. Kallista CB Arbitrage Fund Limited .......... 54
11. CASAM ADI CB Arbitrage Limited .......... 55
12. The Trafelet Delta Funds .......... 57
a. Delta Institutional, L.P. .......... 57
b. Delta Onshore, L.P. .......... 58
c. Delta Pleiades, L.P. .......... 59
d. Delta Offshore Master, Ltd. .......... 60
13. RHP Master Fund, Ltd. .......... 62
14. HFR CA Lazard Rathmore Master Trust .......... 63
15. The Ramius Funds .......... 64
a. Ramius Convertible Arbitrage Master Fund Ltd. .......... 64
b. RCG PB, Ltd. .......... 66
16. S.A.C. Arbitrage Fund, LLC .......... 67
17. Stark Master Fuud Ltd. .......... 69
18. The Sandelman Funds .......... 71
a. Sandelman Partners Multi-Strategy Master Fund, Ltd. .......... 71
b. Sandelman Partners Opportunity Master Fund, L.P. .......... 73
19. Camulos Master Fund L.P. .......... 75
20. The Concordia Funds .......... 76
a. Concordia Partners L.P. .......... 76
b. Concordia Institutional Multi-Strategies Ltd. .......... 77
B. The Contractual Pnt Right and Tender Offer .......... 79
C. Defendants .......... 79
1. Countrywide Financial Corporation .......... 79
2. The Individual Defendants .......... 80
a. Angelo R. Mozilo .......... 81
b. David Sambol .......... 82



1475577v1/010471
EC.44161.1

c. Eric P. Sieracki ..... 83
IV. BACKGROUND ..... 84
A. Countrywide's Business Operations And Aggressive Growth Strategy ..... 84
1. Countrywide's Business Segments ..... 84
a. The Mortgage Banking Segment ..... 85
b. The Banking Segment ..... 86
c. The Capital Markets Segment ..... 87
2. Countrywide's Loan Types ..... 87
a. Prime Mortgage Loans ..... 88
b. Prime Home Equity Loans ..... 89
c. Nonprime Mortgage Loans ..... 90
B. Defendants Provided Inherently High-Risk Loans to Unqualified Borrowers, Exposing the Company to Significant Credit Losses ..... 93
1. Defendants Originated Stated Income, Or "No-doc" Loans, Without Requiring Snpporting Documentation to Verify the Borrower's Income ..... 97
2. Defendants Provided "Piggyback" Loans Permitting Borrowers to Finance the Entire Home Value ..... 97
C. Countrywide's Substantial Credit and Liquidity Risks ..... 99
1. Countrywide Faced Substantial Liquidity Risks From the Company's Dependence on Financing To Fund Loan Originations and Purchases ..... 99
2. Countrywide's Credit Risk ..... 100
a. Credit Risk From Subordinated Retained Interests ..... 100
b. Credit Risk From Representations and Warranties ..... 102
V. COUNTRYWIDE'S MAY 2007 DEBENTURES OFFERING ..... 103
VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ..... 105
A. Material Misrepresentations and Omissions Of Material Fact In The 2006 Form 10-K ..... 106
1. Countrywide's Loan Quality ..... 106
2. Conntrywide's Credit and Loan Underwriting Practices ..... 109
3. Countrywide's Portfolio of Loans Held for Investment ..... 114
4. Countrywide's Allowance for Loan Losses ..... 115
5. Countrywide's Valuation and Impairment of Retained Interests in Loans Sold ..... 118
6. Countrywide's Valuation and Impairment of MSRs ..... 119



1475577v1/010471
EC.44161.1

7. Countrywide's "Representations and Warranties" ... 122
8. Countrywide's Liquidity ... 125
9. Countrywide's Internal Controls ... 126
10. Countrywide's Purported Risk Factors ... 132
B. Material Misrepresentations and Omissions Of Material Fact In The First Quarter 2007 Form 10-Q ... 136
1. Countrywide's Loan Quality ... 137
2. Countrywide's Credit and Loan Underwriting Practices ... 137
3. Countrywide's LHI and Allowance for Loan Losses ... 138
4. Countrywide's Retained Interests and Related Impairment of Retained Interests in Loans Sold ... 140
5. Countrywide's Valuation and Impairment of MSRs ... 141
6. Countrywide's "Representations and Warranties" ... 141
7. Countrywide's Liquidity ... 143
8. Countrywide's Internal Controls ... 144
9. Countrywide's Purported Risk Factors ... 145
VII. DEFENDANTS' PARTIAL DISCLOSURES OF PREVIOUSLY MISREPRESENTED AND/OR CONCEALED MATERIAL FACTS AND CONTINUING MATERIAL MISREPRESENTATIONS AND OMISSIONS ... 145
A. The July 24, 2007 Press Release and Conference Call ... 146
1. Continuing Misrepresentations and Omissions Regarding Countrywide's Loan Quality and Underwriting Practices ... 150
2. Continuing Misrepresentations and Omissions Regarding the Value of Countrywide's LHI, MSRs and Retained Interests in Securitized Loans ... 151
3. Continuing Misrepresentations and Omissions Regarding Countrywide's Liquidity ... 152
B. The August 2, 2007 Press Release and August 6, 2007 Form 8-K ... 153
C. Continuing Misrepresentations and Omissions of Material Fact In The Second Quarter 2007 Form 10-Q ... 154
1. Countrywide's Loan Quality ... 156
2. Countrywide's Credit and Loan Underwriting Practices ... 157
3. Countrywide's Valuation and Impairment of MSRs ... 157
4. Countrywide's "Representations and Warranties" ... 158
5. Countrywide's Internal Controls ... 159
6. Countrywide's Risk Factors ... 160

D. The August 16, 2007 Press Release ..... 161

E. The September 7, 2007 Press Release ..... 163

F. The October 24, 2007 Form 8-K ..... 164

G. The October 26, 2007 Press Release and Conference Call ..... 165

H. The Third Quarter 2007 Form 10-Q ..... 168

I. The November 13, 2007 Press Release ..... 171

J. Countrywide Rumored as Headed for Bankruptcy ..... 172

VIII. POST-RELEVANT PERIOD EVENTS ..... 173

A. Federal and State Investigations Into Defendants' Conduct ..... 173

B. Bank of America Agrees to Purchase Countrywide and the Company Continues to Suffer Under the Weight of its Misrepresented Imprudent Lending ..... 176

IX. DEFENDANTS' GAAP AND INTERNAL CONTROL VIOLATIONS ..... 177

A. Defendants Misstated the Company's Allowance for Loan Losses and Earnings by Failing to Reserve for Losses Arising From Probable Delinquencies and Defaults ..... 179

1. Defendants Violated GAAP by Failing to Adequately Increase Countrywide's Allowance For Loan Losses Resulting From the Company's Shift to Origination of High-Risk Loans and Declining Home Values ..... 182

2. Defendants Violated GAAP by Failing to Adequately Increase the Allowance for Loan Losses for Rising Delinquencies and Defaults ..... 184

B. Defendants Misstated Earnings by Failing to Timely Record Impairment on Retained Interests and MSRs ..... 188

1. Subordinated Retained Interests and Liability For Future Draw Obligations on HELOCs ..... 188

2. Mortgage Servicing Rights ..... 191

C. Defendants Misstated Liabilities and Earnings by Failing to Adequately Accrue for Losses Resulting From Breaches of Representations and Warranties ..... 193

D. Defendants' Failure to Disclose the True Risk Arising from the Company's Inherently High-Risk Loan Practices Violated GAAP and SEC Regulations ..... 195

E. Defendants' Internal Control Violations ..... 201

X. ADDITIONAL SCIENTER ALLEGATIONS ..... 205

A. Internal Company Documents Demonstrate The Individual Defendants' Knowledge of the Risks That Countrywide's Overly Aggressive and Poorly Underwritten Loans Posed to the Company ..... 206



1475577v1/010471
EC.44161.1

B. The Individual Defendants Knew That Countrywide Had Substantially Loosened its Lending Standards to Provide High-Risk Affordability Loans to Sub-Prime Borrowers ..... 216

1. The "Exception Processing System" Revealed Countrywide's Significant Credit Risk Exposure From Production of High-Risk Affordability Loans ..... 218

2. The Individual Defendants Knew That Countrywide Unconditionally Approved High-Risk Affordability Loans to Non-Qualified Borrowers to Materially Boost the Company's Loan Volume ..... 219

3. Countrywide Failed To Comply With Underwriting Regulations Issued By Federal Bank Regulatory Agencies ..... 220

4. The Individual Defendants Closely Monitored Countrywide's Lending Practices and Credit Risk Exposure During the Relevant Period ..... 222

a. Credit Committee ..... 223

b. Asset/Liability Committee ..... 223

c. Earnings Forecasting Committee ..... 224

d. Finance Committee ..... 225

e. Audit and Ethies Committee ..... 226

5. The Individidnal Defendants Knowingly Ignored Numerous Market Warnings of Accelerated Delinquencies and Defaults and Rapidly Declining Home Values ..... 228

a. The Individual Defendants Knew That Steep Declines in Home Prices, Beginning In Late 2005, Would Lead to Heightened Loan Defaults ..... 229

b. The Individual Defendants Knew of Rising Delinquencies and Foreclosures in the Company's Subprime Loan Portfolio During the Relevant Period ..... 232

c. The Individual Defendants Knew That Competing Mortgage Companies Were Collapsing as a Result of the Rise in Defanlts and Delinquencies on Snbprime Loans ..... 235

C. Defendants Were Motivated to Commit tbe Fraud Alleged Herein ..... 237

1. The Individual Defendants Were Motivated to Commit the Fraud Alleged Herein to Profit From Insider Sales ..... 237

2. The Individual Defendants Were Motivated to Engage in Massive Stock Buy-Back Programs in Order to Inflate the Company's Stock Price and Conceal the Company's True Loss Exposure ..... 243



1475577v1/010471
EC.44161.1

Case MDL No. 2265 Document 1-12 Filed 05/23/11 Page 11 of 283

3. The Individual Defendants Were Motivated to Artificially Inflate the Value of Countrywide's Stock To Receive Massive Incentive-Based Compensation ..... 245

XI. LOSS CAUSATION ..... 247

XII. GROUP PLEADING ..... 261

XIII. NO STATUTORY SAFE HARBOR ..... 261

XIV. TOLLING OF THE STATUTE OF LIMITATIONS ..... 262

XV. CLAIMS FOR RELIEF ..... 262

FIRST CLAIM FOR RELIEF ..... 262

Violation of § 10(b) of The Securities Exchange Act of 1934 and Rule 10b-5 Promulgated Thereunder Against All Defendants ..... 262

SECOND CLAIM FOR RELIEF ..... 265

Violation of § 20(a) of The Securities Exchange Act of 1934 Against the Individual Defendants ..... 265

PRAYER FOR RELIEF ..... 268

JURY DEMAND ..... 1

Case MDL No. 2265 Document 1-12 Filed 05/23/11 Page 12 of 283

Plaintiffs Centaur Classic Convertible Arbitrage Fund Ltd., Argent Classic Convertible Arbitrage Fund II L.P., Argent LowLev Convertible Arbitrage Fund II LLC, Centaur LowLev Arbitrage Fund Ltd., Argentum Multi-Strategy Fund LLC, Argentum Multi-Strategy Fund Ltd., HFR CA Global Select Master Trust, Acuity Master Fund, Ltd., Carlyle Multi-Strategy Master Fund Liquidating Trust, Lyxor/Acuity Fund Limited, Polygon Global Opportunities Master Fund, Rhapsody Fund, L.P., Arpeggio Fund, Nuveen Multi-Strategy Income and Growth Fund, Nuveen Multi-Strategy Income and Growth Fund 2, Radcliffe SPC, Ltd., Tempo Master Fund L.P., Canyon Capital Arbitrage Master Fund, Ltd., The Canyon Value Realization Fund (Cayman), Ltd., Canyon Value Realization MAC 18, Ltd., Canyon Value Realization Fund, L.P., Lyxor/Canyon Capital Arbitrage Fund Limited, GLG Market Neutral Fund, Mohican VCA Master Fund, Ltd., ADI Arbitrages Absolu, ADI Convert Absolu, ADI Convex, ADI Convex Absolu, Kallista CB Arbitrage Fund Limited, CASAM ADI CB Arbitrage Limited, Delta Institutional, L.P., Delta Onshore, L.P., Delta Pleiades, L.P., Delta Offshore Master, Ltd., RHP Master Fund, Ltd., HFR CA Lazard Rathmore Master Trust, Ramius Convertible Arbitrage Master Fund Ltd., RCG PB, Ltd., S.A.C. Arbitrage Fund, LLC, Stark Master Fund Ltd., Sandelman Partners Multistrategy Master Fund Ltd., Sandelman Partners Opportunity Master Fund L.P.,[1] Camulos Master Fund L.P., Concordia Partners L.P., and Concordia Institutional Multi-Strategies Ltd. (collectively, the "Plaintiffs") by their undersigned attorneys, make the following allegations against Defendants (as defined below) upon information and belief based upon an investigation conducted by and under the supervision of counsel for

---

[1] Second Amended Complaint submitted pursuant to Order dated February 22, 2011 (entered February 23, 2011) permitting joinder of Sandelman Partners Multistrategy Master Fund Ltd. and Sandelman Partners Opportunity Master Fund L.P.

Plaintiffs. Allegations as to Plaintiffs' own acts are based upon Plaintiffs' personal knowledge. Among the materials analyzed and reviewed in conjunction with Plaintiffs' investigation are:

(i) the Offering Memorandum, dated May 16, 2007 (the "Offering Memorandum"), issued by Countrywide Financial Corporation ("Countrywide" or the "Company") in connection with the offering (the "May 2007 Debentures Offering" or "Offering") of Countrywide Series A Floating Rate Convertible Senior Debentures Due 2037 (the "Series A Debentures") and Countrywide Series B Floating Rate Convertible Senior Debentures Due 2037 (the "Series B Debentures") (collectively, the "Debentures");

(ii) Countrywide's filings with the Securities and Exchange Commission ("SEC");

(iii) press releases and other public statements issued by Defendants;

(iv) publicly available internal Company documents and e-mails;

(v) news articles and analysts' reports concerning Countrywide and/or the Debentures;

(vi) transcripts from conference calls held with securities analysts;

(vii) relevant federal banking regulations;

(viii) relevant Congressional hearing transcripts;

(ix) industry statistics and publications;

(x) official records of regulatory actions taken by federal and state authorities with respect to Countrywide and/or the Individual Defendants named herein; and

(xi) official records in related actions.

Many additional facts supporting the allegations herein are known only to Defendants and are within their exclusive custody and control. Plaintiffs believe that additional evidentiary support for the allegations herein will be uncovered after a reasonable opportunity to conduct discovery.

Each Plaintiff purchased Countrywide Series A and/or Series B Debentures in the Offering and/or in the aftermarket from May 16, 2007 through November 21, 2007 (the "Relevant Period") and suffered damages as a result.

# I. SUMMARY OF THE ACTION

1. This action arises from Defendants' misrepresentation and deliberate concealment of material facts concerning Countrywide's mortgage underwriting practices, the quality of its loans, and the dire risks that Defendants' irresponsibly aggressive lending campaign posed to the Company. Plaintiffs relied upon Defendants' materially misleading statements in purchasing the Countrywide Debentures discussed herein at artificially inflated prices during the Relevant Period. (*See* Section III.A, *infra*.) By this action, Plaintiffs seek to recover damages they suffered when Defendants finally disclosed previously misrepresented and omitted material facts, substantially eroding the Debentures' value.

2. During the Relevant Period, Countrywide was one of the leading mortgage lenders in the United States. As alleged below in Section IV, Defendants pursued a reckless strategy to increase the Company's market share and to earn

elevated fees by providing residential mortgage loans to unqualified borrowers, *i.e.* subprime mortgages. Countrywide not only originated subprime loans for sale on the secondary market, but also retained massive volumes of these volatile loans on the Company's balance sheet.

3. While concealing the true extent and impact of its dependence upon selling high-risk and low quality loans, Countrywide sought billions of dollars of investor capital to finance its operations. In connection with these efforts, Countrywide announced on May 16, 2007 that it was issuing the Debentures in a $4 billion offering. (*See* Section V, *infra.*)

4. As alleged below in Section VI, Defendants misrepresented and omitted material facts concerning Countrywide's business practices, performance and prospects in the SEC filings incorporated into the Offering Memorandum. Defendants' materially false and misleading statements artificially inflated the Debentures' prices.

5. Beginning on July 24, 2007, Defendants gradually disclosed the truth underlying certain previously misrepresented and/or concealed facts concerning the Company's subprime mortgage underwriting practices and related risks. Upon these partial disclosures, in which Defendants continued to misrepresent material facts, the Debentures' value declined in a series of material steps, directly causing Plaintiffs' losses. (*See* Section VII, *infra.*)

6. Defendants' misconduct alleged herein not only decimated the Debentures' value, but also triggered regulatory investigations and forced Countrywide to the brink of bankruptcy. Ultimately, Countrywide could no longer exist independently, and agreed to a fire-sale acquisition by Bank of America Corporation ("Bank of America"). (*See* Section VIII, *infra.*)

7. The financial statements that Countrywide issued during the Relevant Period violated Generally Accepted Accounting Principles ("GAAP"). (*See* Section IX, *infra.*) In issuing these financial statements, and in making the other

Case MDL No. 2265 Document 1-12 Filed 05/23/11 Page 16 of 283

material misstatements alleged herein, Defendants knew or were deliberately reckless in disregarding that their statements concerning Countrywide's business practices, performance, and prospects misrepresented and omitted material facts. (*See* Section X, *infra.*) Defendants' numerous GAAP violations further support the inference that Defendants acted with scienter in making materially false and misleading statements during the Relevant Period.

8. Defendants Angelo R. Mozilo ("Mozilo") and David Sambol ("Sambol") sold a combined 1,220,125 shares of Countrywide common stock and received $45,795,551 in aggregate proceeds from the May 16, 2007 announcement of the Offering through the Company's first partial disclosure of previously misrepresented and concealed material facts on July 24, 2007. Remarkably, these insider stock sales occurred at the same time that Defendants deliberately inflated the value of the Company's shares by using approximately $863 million of the Offering proceeds to repurchase Countrywide common stock.

9. As detailed below in Section X.C., Defendants' insider stock sales took place while Defendants knew -- as their contemporaneous e-mails reveal -- that the Company faced severe undisclosed risks from its poorly underwritten loans, particularly Pay-Option Adjustable Rate mortgages ("pay-option ARMs") and subprime second mortgages.

10. On June 4, 2009, the SEC filed a civil complaint against Defendants Mozilo, Sambol and Sieracki in the United States District Court for the Central District of California (the "SEC Action"). The complaint in the SEC Action charged each of the Individual Defendants with securities fraud based upon many of the same misrepresentations and omissions alleged herein. The SEC also charged Defendant Mozilo with illegal insider trading based upon his deliberate manipulation of stock trading plans while in possession of material nonpublic information. On November 3, 2009, the court denied Defendants' motions to

dismiss the SEC's complaint, and on September 16, 2010, the court substantially denied Defendants' motions for summary judgment.

11. On October 15, 2010, the court approved a settlement between Defendants and the SEC (the "SEC Settlement") which required Defendant Mozilo to pay a record $67.5 million in penalties and disgorgement for misleading investors. The SEC Settlement also permanently bars Mozilo from ever again serving as an officer or director of a publically traded company. As part of the SEC Settlement, Defendants Sambol and Sieracki were assessed penalties and disgorgement of $5.52 million and $130,000, respectively, and Defendant Sambol is barred from serving as an officer or director of a publicly traded company for three years.

12. Defendants Misrepresented and Omitted Material Facts In Documents Incorporated Into the Offering Memorandum

13. In July 2003, Defendant Mozilo charted a course for Countrywide to increase its share of the United States residential mortgage market from 13% to 30%. Defendant Mozilo proclaimed that his goal was for Countrywide to "dominate the purchase market and get [the Company's] overall market share to the ultimate 30% by 2006-2007."

14. Subprime loans, which carried interest rates that were typically two or three percentage points higher than traditional fixed-rate mortgages, were at the heart of Countrywide's expansion strategy. Not only could the Company earn greater fees from such loans, but they also had increased value on the secondary market based upon the higher interest rates and resulting cash flows available to investors.

15. To "defeat" its competition, Countrywide expanded its already-loose underwriting guidelines, and provided loans to virtually all prospective borrowers, regardless of risk. Indeed, the Company's Chief Risk Officer, John P. McMurray ("McMurray") authored an August 6, 2007 e-mail acknowledging that Countrywide

Case MDL No. 2265 Document 1-12 Filed 05/23/11 Page 18 of 283

"has long followed a guiding principles [sic] of 'matching' (products, guidelines, etc.) and no brokering." By matching the most aggressive (and least prudent) underwriting standards in the market, Countrywide assumed ultimately crippling credit risks.

16. Countrywide routinely offered high-risk mortgage loans based upon a borrower's bare assertion of his or her income -- even when Defendants knew that the borrower was lying. In this regard, Defendant Mozilo admitted in a June 1, 2006 e-mail to Defendant Sambol and others that the Company originated the majority of its pay-option ARMs on a stated-income (*i.e.* no documentation) basis and that there was "evidence" that borrowers were providing oral income representations that "do[] not match up with IRS records."

17. Despite this, Defendants falsely claimed in the Company's 2006 Form 10-K, filed with the SEC on March 1, 2007 and explicitly incorporated into the Offering Memorandum, that Countrywide's pay-option ARMs were "prudently underwritten."

18. Countrywide also improperly offered "piggyback," or second mortgages, to enable unqualified borrowers to finance 100% or more of the purported value of a home through two separate loans, often without any borrower down payment. Defendants claimed in Countrywide's 2006 Form 10-K that Countrywide "consistently produc[ed] quality mortgages" and "manage[d] credit risk through credit policy, underwriting, quality control and surveillance activities." Defendants similarly claimed in the 2007 First Quarter Form 10-Q that "[w]e assess a loan's quality by considering the borrower's credit profile and the quality of collateral securing the loan." Defendants' contemporaneous internal communications reveal that these representations were false.

19. For example, Defendant Mozilo stated the following concerning the Company's piggyback loans in an April 17, 2006 e-mail to Defendant Sambol and others: "In all of my years in the business I have never seen a more toxic product . .

Case MDL No. 2265 Document 1-12 Filed 05/23/11 Page 19 of 283

. the FICOs are below 600, below 500 and some below 400 compounded by the fact that these are 100% loans which must always be written off in the event of foreclosure." Defendant Mozilo's references to low Fair Isaac Corporation ("FICO") scores highlighted his concerns over the mounting volume of loans that the Company knowingly provided to borrowers with weak credit profiles.

20. Countrywide also retained on its balance sheet substantial volumes of these admittedly "toxic" mortgage loans pending sale on the secondary market and for investment purposes. The Company's balance sheet exposure to these mortgage products grew in both size and risk as the market for mortgage-backed securities evaporated during the Relevant Period. Defendants knew, but failed to disclose, that the Company's lending activity and the intensifying market downturn were wreaking havoc on Countrywide and its borrowers.

21. For example, Defendant Mozilo's March 28, 2006 e-mail to Defendants Sambol and Sieracki noted that growing delinquencies in the Company's pay-option ARM portfolio, which comprised a substantial portion of the loans Countrywide held for investment ("LHI"), posed "serious problems that could cause Countrywide to "face both financial and regulatory consequences."

22. In his June 1, 2006 e-mail to Defendant Sambol and others, Defendant Mozilo further acknowledged that Countrywide's risky pay-option ARMs were subject to likely rate increases that would cause "a payment shock which is going to be difficult if not impossible for [borrowers] to manage." For this reason, Mozilo recognized in June 2006 that Countrywide "should take a careful look at [its] reserves and begin to assume the worst."

23. In a September 26, 2006 e-mail to Defendants Sambol and Sieracki, Defendant Mozilo similarly urged that that the Company should begin divesting its pay-option ARMs. According to Defendant Mozilo, Countrywide had "no way, with any reasonable certainty, to assess the real risk of holding these loans" and was

"flying blind on how these loans will perform in a stressed environment of higher unemployment, reduced values and slowing home sales."

24. Although they recognized numerous problems arising from the Company's lending practices before the Relevant Period began, Defendants neither effectively addressed nor disclosed these known threats to the Company's viability in the 2006 Form 10-K or in the First Quarter 2007 Form 10-Q, which were incorporated into the Offering Memorandum. Even when they began to correct Countrywide's prior misstatements later in the Relevant Period, Defendants continued to misrepresent and omit material facts.

25. Beginning on July 24, 2007, Defendants gradually disclosed certain previously misrepresented and concealed material facts concerning Countrywide's underwriting practices and subprime mortgage exposure. Although Defendants continued to misrepresent material facts concerning Countrywide's business practices and liquidity, their partial corrective disclosures removed portions of the artificial inflation from the Debentures' prices.

26. For example, Countrywide's July 24, 2007 Press Release announcing the Company's Second Quarter 2007 financial results, and the related conference call with analysts held the same day, revealed that Countrywide used a broad definition of "prime" loan. While borrowers with FICO scores of 660 or less are typically considered "subprime," Countrywide's McMurray stated that the Company's definition of prime "covers a very vast spectrum" and referred to "prime loan[s] with FICOs in the low 500s." McMurray further indicated that "a prime loan with FICOs in the low 500s is going to be over 30 times more likely to be seriously delinquent than a prime loan with an 800 FICO."

27. In connection with the July 24, 2007 Press Release, Defendants also admitted that Countrywide's stated income (no documentation) loans were responsible for serious delinquencies and defaults. Defendants, however, falsely

claimed that Countrywide was tightening its credit guidelines and that it had eliminated several of the Company's riskiest loan types.

28. Yet, months later in the Company's October 26, 2007 Press Release and during a related conference call held the same day, Defendants began to admit, among other things, that Countrywide: (i) did not implement a "wholesale revamping and tightening" of its underwriting guidelines until the third quarter of 2007; and (ii) had not entirely eliminated high-risk and reduced documentation subprime loans, including pay-option ARMs. In fact, Countrywide continued to originate high-risk loans throughout the second and third quarters of 2007, causing Countrywide to report in its November 13, 2007 Press Release a massive 43.2% increase in delinquencies and a 54.7% increase in foreclosures in the Company's loan portfolio during October 2007 as compared to October 2006.

29. Despite making positive statements during the Relevant Period concerning the Company's liquidity position, Defendants began to acknowledge in Countrywide's 2007 Second Quarter Form 10-Q, filed with the SEC on August 9, 2007, that the Company faced certain liquidity risks from its misrepresented underwriting practices.

30. In an effort to reassure investors about the Company's liquidity position, Countrywide announced on August 16, 2007 that it drew down its entire $11.5 billion emergency credit facility to "supplement[] its liquidity funding position." Defendants, nevertheless, falsely maintained through the end of the Relevant Period on November 21, 2007 that the Company was adequately capitalized and would return to profitability in the fourth quarter of 2007.

31. As set forth below in Section XI, during (and after) the Relevant Period, purchases and sales of the Debentures were executed through large financial institutions that acted as "market makers" for the Debentures. Numerous times every day, these market makers disseminated real-time bid and ask quotes, which were firm offers to institutions such as Plaintiffs to buy or sell the Debentures at the

quoted prices. During the course of any given trading day, as the market makers executed transactions in the Debentures, they adjusted and reissued their bid and ask prices based on investor interest at a given price. In addition, the market makers adjusted their prices based on public information about Countrywide also being assimilated by investors, including statements released by the Company, media reports, and information provided to certain market makers by their fixed-income and equity research analysts covering Countrywide.

32. Countrywide's gradual partial disclosures of previously misrepresented and/or concealed material facts, beginning on July 24, 2007, when digested by the market makers and their customers such as Plaintiffs, caused the price of the Series A Debentures to drop in incremental steps from the Offering price by $231.69 per Debenture, or approximately 23.35%, to close at $760.45 per Debenture on November 21, 2007. Similarly, the price of the Series B Debentures incrementally declined from their Offering price by $264.69 per Debenture, or approximately 26.84%, to close at $721.12 per Debenture on November 21, 2007. Consequently, Plaintiffs suffered millions of dollars in damages on their Debenture transactions.

## II. JURISDICTION AND VENUE

33. This action arises under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), as amended, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule l0b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

34. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

35. In connection with the acts, transactions, and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, and interstate telephone communications.

36. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Many of the acts alleged herein, including the dissemination of materially false and misleading information in connection with the sale of a security, occurred in this District.

## III. THE PARTIES

### A. Plaintiffs and Their Direct Reliance on Defendants' Material Misrepresentations and Omissions

#### 1. The Argent Fnnds

##### a. Centanr Classic Convertible Arbitrage Fund Ltd.

37. Plaintiff Centaur Classic Convertible Arbitrage Fund Ltd. (f/k/a Argent Classic Convertible Arbitrage Fund Ltd.) ("Centaur Ltd.") is a company organized under the laws of the Cayman Islands, with a principal place of business located at Ugland House, South Church Street, George Town, Grand Cayman KY1-1104, Cayman Islands.

38. Centaur Ltd. and the other Argent Funds (as defined below) purchased Countrywide Series A and B Debentures during the Relevant Period through their investment manager and/or investment adviser, Argent Management Co. LLC ("Argent Management"), and were damaged thereby. Argent Management had investment discretion and was authorized to purchase and sell securities on behalf of Centaur Ltd. and the other Argent Funds, within the guidelines set by the Argent Funds, including the Debentures purchased during the Relevant Period.

39. Argent Management caused Centaur Ltd. to purchase the Debentures based on Argent Management's review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) Offering Memorandum; (ii) Countrywide's 2006 Form 10-K, incorporated by reference into the Offering Memorandum and filed with the SEC on March 1, 2007 (the "2006 Form 10-K"); (iii) Countrywide's Form 10-Q for the first quarter of 2007, incorporated by reference into the Offering Memorandum and filed with the

SEC on May 9, 2007 (the "First Quarter 2007 Form 10-Q"); (iv) Countrywide's press release announcing the Company's financial results for the second quarter of 2007, filed on Form 8-K with the SEC on July 24, 2007 (the "July 24, 2007 Press Release"); (v) Countrywide's Form 10-Q for the second quarter of 2007, filed with the SEC on August 9, 2007 (the "Second Quarter 2007 Form 10-Q"); (vi) Countrywide's press release announcing the Company's draw on its credit facilities, filed on Form 8-K with the SEC on August 16, 2007 (the "August 16, 2007 Press Release"); and (vii) Countrywide's press release dated September 7, 2007 announcing workforce reduction measures at the Company (the "September 7, 2007 Press Release").

40. On behalf of Centaur Ltd., Argent Management read, reviewed and directly relied upon the following material misrepresentations, among others, by Defendants (organized here by subject matter for ease of reference), alleged below in Sections VI and VII and contained in the documents listed in ¶ 38, concerning: (i) the quality of Countrywide's mortgage loan portfolio (*see infra* ¶¶ 384-86, 389, 453-55, 498, 513-15); (ii) Countrywide's credit and loan underwriting practices (*see infra* ¶¶ 391, 394-95, 397-99, 457-58, 498, 517); (iii) Countrywide's liquidity (*see infra* ¶¶ 431-32, 477-78, 503-04, 511, 533-34, 537); (iv) Countrywide's portfolio of loans held-for-investment (*see infra* ¶¶ 401-03, 460, 500); (v) the valuation and impairment of Countrywide's retained interests in loans sold for securitization (*see infra* ¶¶ 410-12, 465-67, 500-01); (vi) the valuation and impairment of Countrywide's mortgage servicing rights (*see infra* ¶¶ 416-20, 469-70, 500, 518-19); (vii) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market (*see infra* ¶¶ 423-27, 472-75, 521-22, 524-25); and (viii) Countrywide's internal control procedures for mortgage origination and financial reporting (*see infra* ¶¶ 435, 438-43, 480-81, 527-28).

41. Plaintiff Centaur Ltd.'s purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit A.1 hereto.[2] As detailed in the far-right column of Exhibit A.1, in making each purchase during the Relevant Period, Plaintiff Centaur Ltd. relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase.

42. Calculated under the damages methodology set forth in subsections (e)(1) and (e)(2) of 15 U.S.C. § 78u-4 (the Private Securities Litigation Reform Act of 1995 (the "PSLRA")) (the "PSLRA Methodology"), Centaur Ltd. suffered damages on irs Series A and Series B Debenture transactions of at least $4,287,531.75 and $5,473,322.68, respectively.[3]

**b. Argent Classic Convertible Arbitrage Fund II L.P.**

43. Plaintiff Argent Classic Convertible Arbitrage Fund II L.P. ("Argent L.P.") is a limited partnership organized under the laws of the State of Delaware, with a principal place of business located at 500 West Putnam Avenue, Greenwich, Connecticut 06830.

44. Argent Management caused Argent L.P. to purchase the Debentures based on Argent Management's review of, and direct reliance upon, the Company

---

[2] Each Plaintiff's purchases and sales of Debentures during the Relevant Period are set forth in Exhibits A.1 through T.3. Exhibits A.1 through T.3 also include each Plaintiff's sales of Debentures after the Relevant Period, if any, attributable on a first-in first-out ("FIFO") basis to purchases by that Plaintiff during the Relevant period (*i.e.*, all sales after the Relevant Period sufficient to "zero out" the Relevant Period purchases). Plaintiffs do not seek recovery for Debenture purchases made after the Relevant Period, if any. Accordingly, Exhibits A.1 through T.3 do not include any purchases made by Plaintiffs after the Relevant Period or any sales attributable to those purchases.

[3] Plaintiffs respectfully reserve the right to advance other damage theories, supported by expert analysis, during discovery and at trial.

information and representations contained in the following documents: the (i) Offering Memorandum; (ii) 2006 Form 10-K; (iii) First Quarter 2007 Form 10-Q; (iv) July 24, 2007 Press Release; (v) Second Quarter 2007 Form 10-Q; (vi) August 16, 2007 Press Release; and (vii) September 7, 2007 Press Release.

45. On behalf of Argent L.P., Argent Management read, reviewed and directly relied upon the following material misrepresentations, among others, by Defendants (organized here by subject matter for ease of reference), alleged below in Sections VI and VII and contained in the documents listed in ¶ 42, concerning: (i) the quality of Countrywide's mortgage loan portfolio (*see infra* ¶¶ 384-86, 389, 453-55, 498, 513-15); (ii) Countrywide's credit and loan underwriting practices (*see infra* ¶¶ 391, 394-95, 397-99, 457-58, 498, 517); (iii) Countrywide's liquidity (*see infra* ¶¶ 431-32, 477-78, 503-04, 511, 533-34, 537); (iv) Countrywide's portfolio of loans held-for-investment (*see infra* ¶¶ 401-03, 460, 500); (v) the valuation and impairment of Countrywide's retained interests in loans sold for securitization (*see infra* ¶¶ 410-12, 465-67, 500-01); (vi) the valuation and impairment of Countrywide's mortgage servicing rights (*see infra* ¶¶ 416-20, 469-70, 500, 518-19); (vii) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market (*see infra* ¶¶ 423-27, 472-75, 521-22, 524-25); and (viii) Countrywide's internal control procedures for mortgage origination and financial reporting (*see infra* ¶¶ 435, 438-43, 480-81, 527-28).

46. Plaintiff Argent L.P.'s purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit A.2 hereto. As detailed in the far-right column of Exhibit A.2, in making each purchase during the Relevant Period, Plaintiff Argent L.P. relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase.

47. Calculated under the PSLRA Methodology, Argent L.P. suffered damages on its Series A and Series B Debenture transactions of at least $139,007.37 and $160,694.73, respectively.

**c. Argent LowLev Convertible Arbitrage Fund II LLC**

48. Plaintiff Argent LowLev Convertible Arbitrage Fund II LLC ("Argent LowLev") is a limited liability company organized under the laws of the State of Delaware, with a principal place of business located at 500 West Putnam Avenue, Greenwich, Connecticut 06830.

49. Argent Management caused Argent LowLev to purchase the Debentures based on Argent Management's review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) Offering Memorandum; (ii) 2006 Form 10-K; (iii) First Quarter 2007 Form 10-Q; and (iv) July 24, 2007 Press Release.

50. On behalf of Argent LowLev, Argent Management read, reviewed and directly relied upon the following material misrepresentations, among others, by Defendants (organized here by subject matter for ease of reference), alleged below in Sections VI and VII and contained in the documents listed in ¶ 46, concerning: (i) the quality of Countrywide's mortgage loan portfolio (*see infra* ¶¶ 384-86, 389, 453-55, 498); (ii) Countrywide's credit and loan underwriting practices (*see infra* ¶¶ 391, 394-95, 397-99, 457-58, 498); (iii) Countrywide's liquidity (*see infra* ¶¶ 431-32, 477-78, 503-04); (iv) Countrywide's portfolio of loans held-for-investment (*see infra* ¶¶ 401-03, 460, 500); (v) the valuation and impairment of Countrywide's retained interests in loans sold for securitization (*see infra* ¶¶ 410-12, 465-67, 500-01); (vi) the valuation and impairment of Countrywide's mortgage servicing rights (*see infra* ¶¶ 416-20, 469-70, 500); (vii) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market (*see infra* ¶¶ 423-27, 472-75); and (viii) Countrywide's internal control procedures for mortgage origination and financial reporting (*see infra* ¶¶ 435, 438-43, 480-81).

51. Plaintiff Argent LowLev's purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit A.3 hereto. As detailed in the far-right column of Exhibit A.3, in making each purchase during the Relevant Period, Plaintiff Argent LowLev relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase. Calculated under the PSLRA Methodology, Argent LowLev suffered damages on its Series A and Series B Debenture transactions of at least $32,548.97 and $21,710.82, respectively.

#### d. Centaur LowLev Arbitrage Fund Ltd.

52. Plaintiff Centaur LowLev Arbitrage Fund Ltd. (f/k/a Argent LowLev Convertible Arbitrage Fund Ltd.) ("Centaur LowLev Ltd.") is a company organized under the laws of the Cayman Islands, with a principal place of business located at Ugland House, South Church Street, George Town, Grand Cayman KY1-1104, Cayman Islands.

53. Argent Management caused Centaur LowLev Ltd. to purchase the Debentures based on Argent Management's review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) Offering Memorandum; (ii) 2006 Form 10-K; (iii) First Quarter 2007 Form 10-Q; and (iv) July 24, 2007 Press Release.

54. On behalf of Centaur LowLev Ltd., Argent Management read, reviewed and directly relied upon the following material misrepresentations by Defendants (organized here by subject matter for ease of reference), among others, alleged below in Sections VI and VII and contained in the documents listed in ¶ 50, concerning: (i) the quality of Countrywide's mortgage loan portfolio (*see infra* ¶¶ 384-86, 389, 453-55, 498); (ii) Countrywide's credit and loan underwriting practices (*see infra* ¶¶ 391, 394-95, 397-99, 457-58, 498); (iii) Countrywide's liquidity (*see infra* ¶¶ 431-32, 477-78, 503-04); (iv) Countrywide's portfolio of loans held-for-investment (*see infra* ¶¶ 401-03, 460, 500); (v) the valuation and

impairment of Countrywide's retained interests in loans sold for securitization (*see infra* ¶¶ 410-12, 465-67, 500-01); (vi) the valuation and impairment of Countrywide's mortgage servicing rights (*see infra* ¶¶ 416-20, 469-70, 500); (vii) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market (*see infra* ¶¶ 423-27, 472-75); and (viii) Countrywide's internal control procedures for mortgage origination and financial reporting (*see infra* ¶¶ 435, 438-43, 480-81).

55. Plaintiff Centaur LowLev Ltd.'s purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit A.4 hereto. As detailed in the far-right column of Exhibit A.4, in making each purchase during the Relevant Period, Plaintiff Centaur LowLev Ltd. relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase.

56. Calculated under the PSLRA Methodology, Centaur LowLev Ltd. suffered damages on its Series A and Series B Debenture transactions of at least $1,399,258.23 and $922,084.01, respectively.

**e. Argentum Multi-Strategy Fund LLC**

57. Plaintiff Argentum Multi-Strategy Fund LLC ("Argentum LLC") is a limited liability company organized under the laws of the State of Delaware, with a principal place of business located at 500 West Putnam Avenue, Greenwich, Connecticut 06830.

58. Argent Management caused Argentum LLC to purchase the Debentures based on Argent Management's review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) Offering Memorandum; (ii) 2006 Form 10-K; (iii) First Quarter 2007 Form 10-Q; (iv) July 24, 2007 Press Release; (v) Second Quarter 2007 Form 10-Q; (vi) Second Quarter 2007 Form 10-Q; and (vii) August 16, 2007 Press Release.

59. On behalf of Argentum LLC, Argent Management read, reviewed and directly relied upon the following material misrepresentations by Defendants (organized here by subject matter for ease of reference), among others, alleged below in Sections VI and VII and contained in the documents listed in ¶ 54, concerning: (i) the quality of Countrywide's mortgage loan portfolio (*see infra* ¶¶ 384-86, 389, 453-55, 498, 513-15); (ii) Countrywide's credit and loan underwriting practices (*see infra* ¶¶ 391, 394-95, 397-99, 457-58, 498, 517); (iii) Countrywide's liquidity (*see infra* ¶¶ 431-32, 477-78, 503-04, 511, 533-34); (iv) Countrywide's portfolio of loans held-for-investment (*see infra* ¶¶ 401-03, 460, 500); (v) the valuation and impairment of Countrywide's retained interests in loans sold for securitization (*see infra* ¶¶ 410-12, 465-67, 500-01); (vi) the valuation and impairment of Countrywide's mortgage servicing rights (*see infra* ¶¶ 416-20, 469-70, 500, 518-19); (vii) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market (*see infra* ¶¶ 423-27, 472-75, 521-22, 524-25); and (viii) Countrywide's internal control procedures for mortgage origination and financial reporting (*see infra* ¶¶ 435, 438-43, 480-81, 527-28).

60. Plaintiff Argentum LLC's purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit A.5 hereto. As detailed in the far-right column of Exhibit A.5, in making each purchase during the Relevant Period, Plaintiff Argentum LLC relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase. Calculated under the PSLRA Methodology, Argentum LLC suffered damages on its Series A and Series B Debenture transactions of at least $32,549.11 and $37,226.57, respectively.

**f. Argentum Multi-Strategy Fund Ltd.**

61. Plaintiff Argentum Multi-Strategy Fund Ltd. ("Argentum Ltd.") is a company organized under the laws of the Cayman Islands, with a principal place of

business located at Ugland House, South Church Street, George Town, Grand Cayman KY1-1104, Cayman Islands.

62. Argent Management caused Argentum Ltd. to purchase the Debentures based on Argent Management's review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) Offering Memorandum; (ii) 2006 Form 10-K; (iii) First Quarter 2007 Form 10-Q; (iv) July 24, 2007 Press Release; (v) Second Quarter 2007 Form 10-Q; (vi) August 16, 2007 Press Release; and (vii) September 7, 2007 Press Release.

63. On behalf of Argentum Ltd., Argent Management read, reviewed and directly relied upon the following material misrepresentations by Defendants (organized here by subject matter for ease of reference), among others, alleged below in Sections VI and VII and contained in the documents listed in ¶ 58, concerning: (i) the quality of Countrywide's mortgage loan portfolio (*see infra* ¶¶ 384-86, 389, 453-55, 498, 513-15); (ii) Countrywide's credit and loan underwriting practices (*see infra* ¶¶ 391, 394-95, 397-99, 457-58, 498, 517); (iii) Countrywide's liquidity (*see infra* ¶¶ 431-32, 477-78, 503-04, 511, 533-34, 537); (iv) Countrywide's portfolio of loans held-for-investment (*see infra* ¶¶ 401-03, 460, 500); (v) the valuation and impairment of Countrywide's retained interests in loans sold for securitization (*see infra* ¶¶ 410-12, 465-67, 500-01); (vi) the valuation and impairment of Countrywide's mortgage servicing rights (*see infra* ¶¶ 416-20, 469-70, 500, 518-19); (vii) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market (*see infra* ¶¶ 423-27, 472-75, 521-22, 524-25); and (viii) Countrywide's internal control procedures for mortgage origination and financial reporting (*see infra* ¶¶ 435, 438-43, 480-81, 527-28).

64. Plaintiff Argentum Ltd.'s purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit A.6 hereto. As detailed in the far-right column of Exhibit A.6, in making each purchase during the Relevant Period,

Plaintiff Argentum Ltd. relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase. Calculated under the PSLRA Methodology, Argentum Ltd. suffered damages on its Series A and Series B Debenture transactions of at least $56,258.93 and $117,377.12, respectively.

**g. HFR CA Global Select Master Trust**

65. Plaintiff HFR CA Global Select Master Trust ("HFR Argent") is a trust organized under the laws of Bermuda, with a principal place of business located in Bermuda.

66. Argent Management caused HFR Argent to purchase the Debentures based on Argent Management's review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) Offering Memorandum; (ii) 2006 Form 10-K; (iii) First Quarter 2007 Form 10-Q; (iv) July 24, 2007 Press Release; (v) Second Quarter 2007 Form 10-Q; (vi) August 16, 2007 Press Release; and (vii) September 7, 2007 Press Release.

67. On behalf of HFR Argent, Argent Management read, reviewed and directly relied upon the following material misrepresentations by Defendants (organized here by subject matter for ease of reference), among others, alleged below in Sections VI and VII and contained in the documents listed in ¶ 66, concerning: (i) the quality of Countrywide's mortgage loan portfolio (*see infra* ¶¶ 384-86, 389, 453-55, 498, 513-15); (ii) Countrywide's credit and loan underwriting practices (*see infra* ¶¶ 391, 394-95, 397-99, 457-58, 498, 517); (iii) Countrywide's liquidity (*see infra* ¶¶ 431-32, 477-78, 503-04, 511, 533-34, 537); (iv) Countrywide's portfolio of loans held-for-investment (*see infra* ¶¶ 401-03, 460, 500); (v) the valuation and impairment of Countrywide's retained interests in loans sold for securitization (*see infra* ¶¶ 410-12, 465-67, 500-01); (vi) the valuation and impairment of Countrywide's mortgage servicing rights (*see infra* ¶¶ 416-20, 469-70, 500, 518-19); (vii) the representations and warranties Countrywide made in

connection with its sale of loans into the secondary market (*see infra* ¶¶ 423-27, 472-75, 521-22, 524-25); and (viii) Countrywide's internal control procedures for mortgage origination and financial reporting (*see infra* ¶¶ 435, 438-43, 480-81, 527-28).

68. Plaintiff HFR Argent's purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit A.7 hereto. As detailed in the far-right column of Exhibit A.8, in making each purchase during the Relevant Period, Plaintiff HFR Argent directly relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase. Calculated under the PSLRA Methodology, HFR Argent suffered damages on its Series A and Series B Debenture transactions of at least $162,478.88 and $346,186.19, respectively.

69. Plaintiffs (i) Centaur Ltd., (ii) Argent L.P., (iii) Argent LowLev, (iv) Centaur LowLev Ltd., (v) Argentum LLC, (vi) Argentum Ltd., and (viii) HFR Argent are referred to collectively herein as the "Argent Funds."

70. Argent Management and the Argent Funds did not know, and had no reason to know, that Defendants' statements upon which they relied in the documents listed in ¶¶ 38, 42, 46, 50, 54, 58 and 66 were materially false and misleading and omitted material facts as alleged herein. The Argent Funds would not have purchased any of the Countrywide Debentures, or would not have purchased them at the prices they did, had they known that Defendants' statements in these documents were materially false and misleading and omitted material facts.

### 2. The Acuity Funds

#### a. Acuity Master Fund, Ltd.

71. Plaintiff Acuity Master Fund, Ltd. ("Acuity Master Fund") is a company organized under the laws of the British Virgin Islands, with a principal place of business located at 4 Greenwich Office Park, Greenwich, Connecticut 06831.

72. Acuity Master Fund and the other Acuity Funds (as defined below) purchased Countrywide Series A and B Debentures during the Relevant Period through their investment manager and/or investment adviser, Acuity Capital Management, LLC ("Acuity Capital"), and were damaged thereby. Acuity Capital had investment discretion and was authorized to purchase and sell securities on behalf of Acuity Master Fund and the other Acuity Funds, within the guidelines set by the Acuity Funds, including the Debentures purchased during the Relevant Period.

73. Acuity Capital caused Acuity Master Fund to purchase the Debentures based on Acuity Capital's review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) Offering Memorandum; (ii) 2006 Form 10-K; (iii) First Quarter 2007 Form 10-Q; (iv) July 24, 2007 Press Release; (v) August 2, 2007 Countrywide press release entitled "Countrywide Comments on Its Strong Funding Liquidity and Financial Condition" (the "August 2, 2007 Press Release"); (vi) Countrywide press release disclosing the Company's short-term liquidity sources, filed on Form 8-K with the SEC on August 6, 2007 (the "August 6, 2007 Form 8-K"); (vii) Second Quarter 2007 Form 10-Q; (viii) August 16, 2007 Press Release; (ix) September 7, 2007 Press Release; and (x) October 26, 2007 Countrywide press release announcing financial results for the third quarter of 2007 (the "October 26, 2007 Press Release").

74. On behalf of Acuity Master Fund, Acuity Capital read, reviewed and directly relied upon the following material misrepresentations by Defendants (organized here by subject matter for ease of reference), among others, alleged below in Sections VI and VII and contained in the documents listed in ¶ 73, concerning: (i) the quality of Countrywide's mortgage loan portfolio (*see infra* ¶¶ 384-86, 389, 453-55, 498, 513-15); (ii) Countrywide's credit and loan underwriting practices (*see infra* ¶¶ 391, 394-95, 397-99, 457-58, 498, 517); (iii) Countrywide's

liquidity (*see infra* ¶¶ 431-32, 477-78, 503-04, 506, 507, 511, 533-34, 537, 552); (iv) Countrywide's portfolio of loans held-for-investment (*see infra* ¶¶ 401-03, 460, 500); (v) Countrywide's allowance for loan losses (*see infra* ¶¶ 406-07, 461-63); (vi) the valuation and impairment of Countrywide's retained interests in loans sold for securitization (*see infra* ¶¶ 410-12, 465-67, 500-01); (vii) the valuation and impairment of Countrywide's mortgage servicing rights (*see infra* ¶¶ 416-20, 469-70, 500, 518-19); (viii) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market (*see infra* ¶¶ 423-27, 472-75, 521-22, 524-25, 550); (ix) Countrywide's internal control procedures for mortgage origination and financial reporting (*see infra* ¶¶ 435, 438-43, 480-81, 527-28); and (x) credit and borrower risk factors associated with the Company (*see infra* ¶¶ 445, 448, 483, 530).

75. Plaintiff Acuity Master Fund's purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit B.1 hereto. As detailed in the far-right column of Exhibit B.1, in making each purchase during the Relevant Period, Plaintiff Acuity Master Fund relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase. Calculated under the PSLRA Methodology, Acuity Master Fund suffered damages on its Series A and Series B Debenture transactions of at least $453,284.50 and $1,176,417.24, respectively.

**b. Carlyle Multi-Strategy Master Fund Liquidating Trust**

76. Plaintiff Carlyle Multi-Strategy Master Fund Liquidating Trust (the "Carlyle Trust") is a trust organized under the laws of the State of Delaware, with a principal place of business located at Rodney Square North, 1100 North Market Street, Wilmington, DE 19890-0001. The Carlyle Trust was formed to hold the remaining assets of the Carlyle Multi-Strategy Master Fund, Ltd. (the "Carlyle

Master Fund") upon dissolution of the Carlyle Master Fund. Both the Carlyle Trust and the Carlyle Master Fund are referred to collectively herein as "Carlyle."

77. Acuity Capital caused Carlyle to purchase the Debentures based on Acuity Capital's review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) Offering Memorandum; (ii) 2006 Form 10-K; (iii) First Quarter 2007 Form 10-Q; (iv) July 24, 2007 Press Release; (v) August 2, 2007 Press Release; (vi) August 6, 2007 Form 8-K; (vii) Second Quarter 2007 Form 10-Q; (viii) August 16, 2007 Press Release; (ix) September 7, 2007 Press Release; and (x) October 26, 2007 Press Release.

78. On behalf of Carlyle, Acuity Capital read, reviewed and directly relied upon the following material misrepresentations by Defendants (organized here by subject matter for ease of reference), among others, alleged below in Sections VI and VII and contained in the documents listed in ¶ 77, concerning: (i) the quality of Countrywide's mortgage loan portfolio (*see infra* ¶¶ 384-86, 389, 453-55, 498, 513-15); (ii) Countrywide's credit and loan underwriting practices (*see infra* ¶¶ 391, 394-95, 397-99, 457-58, 498, 517); (iii) Countrywide's liquidity (*see infra* ¶¶ 431-32, 477-78, 503-04, 506, 507, 511, 533-34, 537, 552); (iv) Countrywide's portfolio of loans held-for-investment (*see infra* ¶¶ 401-03, 460, 500); (v) Countrywide's allowance for loan losses (*see infra* ¶¶ 406-07, 461-63); (vi) the valuation and impairment of Countrywide's retained interests in loans sold for securitization (*see infra* ¶¶ 410-12, 465-67, 500-01); (vii) the valuation and impairment of Countrywide's mortgage servicing rights (*see infra* ¶¶ 416-20, 469-70, 500, 518-19); (viii) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market (*see infra* ¶¶ 423-27, 472-75, 521-22, 524-25, 550); (ix) Countrywide's internal control procedures for mortgage origination and financial reporting (*see infra* ¶¶ 435, 438-43, 480-81, 527-28); and

(x) credit and borrower risk factors associated with the Company (*see infra* ¶¶ 445, 448, 483, 530).

79. Plaintiff Carlyle's purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit B.2 hereto. As detailed in the far-right column of Exhibit B.2, in making each purchase during the Relevant Period, Plaintiff Carlyle relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase. Calculated under the PSLRA Methodology, Carlyle suffered damages on its Series A and Series B Debenture transactions of at least $232,536.20 and $866,059.31, respectively.

**c. Lyxor/Acuity Fund Ltd.**

80. Plaintiff Lyxor/Acuity Fund Ltd. ("Lyxor/Acuity") is a multi-class investment company with limited liability incorporated under the Companies (Jersey) Law 1991, with a registered address at 18 Esplanade, St Helier, JE4 8RT Jersey, Channel Islands.

81. Acuity Capital caused Lyxor/Acuity to purchase the Debentures based on Acuity Capital's review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) Offering Memorandum; (ii) 2006 Form 10-K; (iii) First Quarter 2007 Form 10-Q; (iv) July 24, 2007 Press Release; (v) August 2, 2007 Press Release; (vi) August 6, 2007 Form 8-K; (vii) Second Quarter 2007 Form 10-Q; (viii) August 16, 2007 Press Release; (ix) September 7, 2007 Press Release; and (x) October 26, 2007 Press Release.

82. On behalf of Lyxor/Acuity, Acuity Capital read, reviewed and directly relied upon the following material misrepresentations by Defendants (organized here by subject matter for ease of reference), among others, alleged below in Sections VI and VII and contained in the documents listed in ¶ 81, concerning: (i) the quality of Countrywide's mortgage loan portfolio (*see infra* ¶¶ 384-86, 389,

Case MDL No. 2265 Document 1-12 Filed 05/23/11 Page 38 of 283

453-55, 498, 513-15); (ii) Countrywide's credit and loan underwriting practices (*see infra* ¶¶ 391, 394-95, 397-99, 457-58, 498, 517); (iii) Countrywide's liquidity (*see infra* ¶¶ 431-32, 477-78, 503-04, 506, 507, 511, 533-34, 537, 552); (iv) Countrywide's portfolio of loans held-for-investment (*see infra* ¶¶ 401-03, 460, 500); (v) Countrywide's allowance for loan losses (*see infra* ¶¶ 406-07, 461-63); (vi) the valuation and impairment of Countrywide's retained interests in loans sold for securitization (*see infra* ¶¶ 410-12, 465-67, 500-01); (vii) the valuation and impairment of Countrywide's mortgage servicing rights (*see infra* ¶¶ 416-20, 469-70, 500, 518-19); (viii) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market (*see infra* ¶¶ 423-27, 472-75, 521-22, 524-25, 550); (ix) Countrywide's internal control procedures for mortgage origination and financial reporting (*see infra* ¶¶ 435, 438-43, 480-81, 527-28); and (x) credit and borrower risk factors associated with the Company (*see infra* ¶¶ 445, 448, 483, 530).

83. Plaintiff Lyxor/Acuity's purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit B.3 hereto. As detailed in the far-right column of Exhibit B.3, in making each purehase during the Relevant Period, Plaintiff Lyxor/Acuity relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase. Calculated under the PSLRA Methodology, Lyxor/Acuity suffered damages on its Series A and Series B Debenture transactions of at least $496,776.30 and $1,135,974.56, respectively.

84. Plaintiffs (i) Acuity Master Fund, (ii) Carlyle, and (iii) Lyxor/Acuity are referred to collectively herein as the "Acuity Funds."

85. Acuity Capital and the Acuity Funds did not know, and had no reason to know, that Defendants' statements upon which they relied in the documents listed in ¶¶ 73, 77 and 81 were materially false and misleading and omitted material facts as alleged herein. The Acuity Funds would not have purchased any of the

Countrywide Debentures, or would not have purchased them at the prices they did, had they known that Defendants' statements in these documents were materially false and misleading and omitted material facts.

**3. Polygon Global Opportunities Master Fund**

86. Plaintiff Polygon Global Opportunities Master Fund ("Polygon") is an exempted company organized under the laws of the Cayman Islands, with a principal place of business located at 89 Nexus Way, Camana Bay, Grand Cayman KY1-9007, Cayman Islands.

87. Polygon purchased the Countrywide Series A and B Debentures during the Relevant Period through its investment managers Polygon Investment Partners LP ("Polygon Investment LP") and Polygon Investment Partners LLP ("Polygon Investment LLP"), and was damaged thereby. Both Polygon Investment LP and Polygon Investment LLP had shared investment discretion and were authorized to purchase and sell securities on behalf of Polygon, within the guidelines set by Polygon, including Debentures purchased during the Relevant Period.

88. Polygon Investment LP and Polygon Investment LLP caused Polygon to purchase the Countrywide Debentures based on their review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) Offering Memorandum; (ii) 2006 Form 10-K; and (iii) First Quarter 2007 Form 10-Q.

89. On behalf of Polygon, Polygon Investment LP and Polygon Investment LLP read, reviewed and directly relied upon the following material representations by Defendants (organized here by subject matter for ease of reference), among others, alleged below in Section VI and contained in the documents listed in ¶ 88, concerning: (i) the quality of Countrywide's mortgage loan portfolio (*see infra* ¶¶ 384-86, 389, 453-55); (ii) Countrywide's credit and loan underwriting practices (*see infra* ¶¶ 391, 394-95, 397-99, 457-58); (iii) Countrywide's allowance for loan losses (*see infra* ¶¶ 406-07, 461-63); (iv)

Countrywide's internal control procedures for mortgage origination and financial reporting (*see infra* ¶¶ 435, 438-43, 480-81); and (v) the credit and borrower risk factors associated with the Company (*see infra* ¶¶ 445, 448, 483).

90. Plaintiff Polygon's purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit C hereto. As detailed in the far-right column of Exhibit C, in making each purchase during the Relevant Period, Plaintiff Polygon relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase. Calculated under the PSLRA Methodology, Polygon suffered damages on its Series A and Series B Debenture transactions of at least $284,263.33 and $4,181,323.16, respectively.

91. Polygon, Polygon Investment LP, and Polygon Investment LLP did not know, and had no reason to know, that Defendants' statements upon which they relied contained in the documents listed in ¶ 88 were materially false and misleading and omitted material facts as alleged herein. Polygon would not have purchased any of the Countrywide Debentures, or would not have purchased them at the prices it did, had it known that Defendants' statements in these documents were materially false and misleading and omitted material facts.

**4. The Symphony Funds**

**a. Rhapsody Fund, L.P.**

92. Plaintiff Rhapsody Fund, L.P. (the "Rhapsody Fund") is a limited partnership organized under the laws of the State of California, with a principal place of business located at 555 California Street, San Francisco, California 94104.

93. Rhapsody Fund and the other Symphony Funds (as defined below) purchased the Countrywide Series A and B Debentures during the Relevant Period through their investment manager, Symphony Asset Management, LLC ("Symphony"), and were damaged thereby. Symphony had investment discretion and was authorized to purchase and sell securities on behalf of Rhapsody Fund and

Case MDL No. 2265 Document 1-12 Filed 05/23/11 Page 41 of 283

the other Symphony Funds, within the guidelines set by the Symphony Funds, including the Debentures purchased during the Relevant Period.

94. Symphony caused Rhapsody Fund to purchase the Debentures based on Symphony's review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) 2006 Form 10-K; (ii) First Quarter 2007 Form 10-Q; (iii) July 24, 2007 Press Release; (iv) August 2, 2007 Press Release; (v) August 6, 2007 Form 8-K; (vi) Second Quarter 2007 Form 10-Q; (vii) August 16, 2007 Press Release; and (viii) September 7, 2007 Press Release.

95. On behalf of Rhapsody Fund, Symphony read, reviewed and directly relied upon the following material misrepresentations by Defendants (organized here by subject matter for ease of reference), among others, alleged below in Sections VI and VI and contained in the documents listed in ¶ 94, concerning: (i) the quality of Countrywide's mortgage loan portfolio (*see infra* ¶¶ 384-86, 389, 453-55, 498, 513-15); (ii) Countrywide's credit and loan underwriting practices (*see infra* ¶¶ 391, 394-95, 397-99, 457-58, 498, 517); (iii) Countrywide's liquidity (*see infra* ¶¶ 431-32, 477-78, 503-04, 506, 507, 511, 533-34, 537); (iv) Countrywide's portfolio of loans held-for-investment (*see infra* ¶¶ 401-03, 460, 500); (v) Countrywide's allowance for loan losses (*see infra* ¶¶ 406-07, 461-63); (vi) the valuation and impairment of Countrywide's retained interests in loans sold for securitization (*see infra* ¶¶ 410-12, 465-67, 500-01); (vii) the valuation and impairment of Countrywide's mortgage servicing rights (*see infra* ¶¶ 416-20, 469-70, 500, 518-19); (viii) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market (*see infra* ¶¶ 423-27, 472-75, 521-22, 524-25); (ix) Countrywide's internal control procedures for mortgage origination and financial reporting (*see infra* ¶¶ 435, 438-43, 480-81, 527-28); and (x) credit and borrower risk factors associated with the Company (*see infra* ¶¶ 445, 448, 483, 530).

96. Plaintiff Rhapsody Fund's purchases and sales of the Debentures during the Relevant Period arc set forth in Exhibit D.1 hereto. As detailed in the far-right column of Exhibit D.1, in making each purchase during the Relevant Period, Plaintiff Rhapsody Fund relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase. Calculated under the PSLRA Methodology, Rhapsody Fund suffered damages on its Series A and Series B Debenture transactions of at least $708,352.99 and $1,141,129.11, respeetively.

**b. Arpeggio Fund**

97. Plaintiff Arpeggio Fund (the "Arpeggio Fund") is an exempted company organized under the laws of the Cayman Islands, with a principal place of business located at 555 California Street, San Francisco, California 94104.

98. Symphony caused Arpeggio Fund to purchase the Debentures based on Symphony's review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) 2006 Form 10-K; (ii) First Quarter 2007 Form 10-Q; (iii) July 24, 2007 Press Release; (iv) August 2, 2007 Press Release; (v) August 6, 2007 Form 8-K; (vi) Second Quarter 2007 Form 10-Q; (vii) August 16, 2007 Press Release; and (viii) September 7, 2007 Press Release.

99. On behalf of Arpeggio Fund, Symphony read, reviewed and directly relied upon the following material misrepresentations by Defendants (organized here by subject matter for ease of reference), among others, alleged below in Sections VI and VII and contained in the documents listed in ¶ 98, concerning: (i) the quality of Countrywide's mortgage loan portfolio (*see infra* ¶¶ 384-86, 389, 453-55, 498, 513-15); (ii) Countrywide's credit and loan underwriting practices (*see infra* ¶¶ 391, 394-95, 397-99, 457-58, 498, 517); (iii) Countrywide's liquidity (*see infra* ¶¶ 431-32, 477-78, 503-04, 506, 507, 511, 533-34, 537); (iv) Countrywide's portfolio of loans beld-for-investment (*see infra* ¶¶ 401-03, 460,



1475577v1/010471

500); (v) Countrywide's allowance for loan losses (*see infra* ¶¶ 406-07, 461-63); (vi) the valuation and impairment of Countrywide's retained interests in loans sold for securitization (*see infra* ¶¶ 410-12, 465-67, 500-01); (vii) the valuation and impairment of Countrywide's mortgage servicing rights (*see infra* ¶¶ 416-20, 469-70, 500, 518-19); (viii) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market (*see infra* ¶¶ 423-27, 472-75, 521-22, 524-25); (ix) Countrywide's internal control procedures for mortgage origination and financial reporting (*see infra* ¶¶ 435, 438-43, 480-81, 527-28); and (x) credit and borrower risk factors associated with the Company (*see infra* ¶¶ 445, 448, 483, 530).

100. Plaintiff Arpeggio Fund's purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit D.2 hereto. As detailed in the far-right column of Exhibit D.2, in making each purchase during the Relevant Period, Plaintiff Arpeggio Fund relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase. Calculated under the PSLRA Methodology, Arpeggio Fund suffered damages on its Series A and Series B Debenture transactions of at least $311,403.04 and $458,884.49, respectively.

**c. Nuveen Multi-Strategy Income and Growth Fund**

101. Plaintiff Nuveen Multi-Strategy Income and Growth Fund ("Nuveen") is a business trust organized under the laws of the State of Massachusetts, with a principal place of business located at 333 West Wacker Drive, Chicago, Illinois 60606.

102. Symphony caused Nuveen to purchase the Debentures based on Symphony's review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) 2006 Form 10-K; and (ii) First Quarter 2007 Form 10-Q.

103. On behalf of Nuveen, Symphony read, reviewed and directly relied upon the following material misrepresentations by Defendants (organized here by subject matter for ease of reference), among others, alleged below in Section VI and contained in the documents listed in ¶ 102, concerning: (i) the quality of Countrywide's mortgage loan portfolio (*see infra* ¶¶ 384-86, 389, 453-55); (ii) Countrywide's credit and loan underwriting practices (*see infra* ¶¶ 391, 394-95, 397-99, 457-58); (iii) Countrywide's liquidity (*see infra* ¶¶ 431-32, 477-78); (iv) Countrywide's portfolio of loans held-for-investment (*see infra* ¶¶ 401-03, 460); (v) Countrywide's allowance for loan losses (*see infra* ¶¶ 406-07, 461-63); (vi) the valuation and impairment of Countrywide's retained interests in loans sold for securitization (*see infra* ¶¶ 410-12, 465-67); (vii) the valuation and impairment of Countrywide's mortgage servicing rights (*see infra* ¶¶ 416-20, 469-70); (viii) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market (*see infra* ¶¶ 423-27, 472-75); (ix) Countrywide's internal control procedures for mortgage origination and financial reporting (*see infra* ¶¶ 435, 438-43, 480-81); and (x) credit and borrower risk factors associated with the Company (*see infra* ¶¶ 445, 448, 483).

104. Plaintiff Nuveen's purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit D.3 hereto. As detailed in the far-right column of Exhibit D.3, in making each purchase during the Relevant Period, Plaintiff Nuveen relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase. Calculated under the PSLRA Methodology, Nuveen suffered damages on its Series A Debenture transactions of at least $455,031.46.

**d. Nuveen Multi-Strategy Income and Growth Fnnd 2**

105. Plaintiff Nuveen Multi-Strategy Income and Growth Fund 2 ("Nuveen 2") is a business trust organized under the laws of State of Massacbusetts, with a

principal place of business located at 333 West Wacker Drive, Chicago, Illinois 60606.

106. Symphony caused Nuveen 2 to purchase the Debentures based on Symphony's review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) 2006 Form 10-K; and (ii) First Quarter 2007 Form 10-Q.

107. On behalf of Nuveen 2, Symphony read, reviewed and directly relied upon the following material misrepresentations by Defendants (organized here by subject matter for ease of reference), among others, alleged below in Section VI and contained in the documents listed in ¶ 106, concerning: (i) the quality of Countrywide's mortgage loan portfolio (*see infra* ¶¶ 384-86, 389, 453-55); (ii) Countrywide's credit and loan underwriting practices (*see infra* ¶¶ 391, 394-95, 397-99, 457-58); (iii) Countrywide's liquidity (*see infra* ¶¶ 431-32, 477-78); (iv) Countrywide's portfolio of loans held-for-investment (*see infra* ¶¶ 401-03, 460); (v) Countrywide's allowance for loan losses (*see infra* ¶¶ 406-07, 461-63); (vi) the valuation and impairment of Countrywide's retained interests in loans sold for securitization (*see infra* ¶¶ 410-12, 465-67); (vii) the valuation and impairment of Countrywide's mortgage servicing rights (*see infra* ¶¶ 416-20, 469-70); (viii) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market (*see infra* ¶¶ 423-27, 472-75); (ix) Countrywide's internal control procedures for mortgage origination and financial reporting (*see infra* ¶¶ 435, 438-43, 480-81); and (x) credit and borrower risk factors associated with the Company (*see infra* ¶¶ 445, 448, 483).

108. Plaintiff Nuveen 2's purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit D.4 hereto. As detailed in the far-right column of Exhibit D.4, in making each purchase during the Relevant Period, Plaintiff Nuveen 2 relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase. Calculated

under the PSLRA Methodology, Nuveen 2 suffered damages on its Series A Debenture transactions of at least $654,378.32.

109. Plaintiffs (i) Rhapsody Fund, (ii) Arpeggio Fund, (iii) Nuveen, and (iv) Nuveen 2 are referred to collectively herein as the "Symphony Funds."

110. Symphony and the Symphony Funds did not know, and had no reason to know, that Defendants' statements upon which they relied in the documents listed in ¶¶ 94, 98, 102 and 106 were materially false and misleading and omitted material facts as alleged herein. The Symphony Funds would not have purchased any of the Countrywide Debentures, or would not have purchased them at the prices they did, had they known that Defendants' statements in these documents were materially false and misleading and omitted material facts.

**5. Radcliffe SPC, Ltd.**

111. Plaintiff Radcliffe SPC, Ltd. ("Radcliffe") is an exempted company organized under the laws of the Cayman Islands, with a principal place of business located at 87 Mary Street, George Town, Grand Cayman KY1-9001, Cayman Islands.

112. Radcliffe purchased the Countrywide Series A and B Debentures during the Relevant Period through its investment manager, RG Capital Management, L.P. ("RG Capital"), and was damaged thereby. RG Capital had investment discretion and was authorized to purchase and sell securities on behalf of Radcliffe, within the guidelines set by Radcliffe, including the Debentures purchased during the Relevant Period.

113. RG Capital caused Radcliffe to purchase the Debentures based on RG Capital's review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) Offering Memorandum; (ii) 2006 Form 10-K; (iii) First Quarter 2007 10-Q; (iv) July 24, 2007 Press Release; (v) August 2, 2007 Press Release; (vi) August 6, 2007 Form 8-K; (vii) Second Quarter 2007 Form 10-Q; (viii) August 16, 2007 Press Release; (ix)

September 7, 2007 Press Release; (x) October 26, 2007 Press Release; and (xi) Countrywide's Form 10-Q for the third quarter of 2007, filed with the SEC on November 9, 2007 (the "Third Quarter 2007 Form 10-Q").

114. On behalf of Radcliffe, RG Capital read, reviewed and directly relied upon the following material misrepresentations by Defendants (organized here by subject matter for ease of reference), among others, alleged below in Sections VI and VII and contained in the documents listed in ¶ 113, concerning: (i) the quality of Countrywide's mortgage loan portfolio (*see infra* ¶¶ 384-86, 389, 453-55, 498, 513-15); (ii) Countrywide's credit and loan underwriting practices (*see infra* ¶¶ 391, 394-95, 397-99, 457-58, 498, 517); (iii) Countrywide's liquidity (*see infra* ¶¶ 431-32, 477-78, 503-04, 506, 507, 511, 533-34, 537, 552, 562); (iv) Countrywide's portfolio of loans held-for-investment (*see infra* ¶¶ 401-03, 460, 500); (v) Countrywide's allowance for loan losses (*see infra* ¶¶ 406-07, 461-63); (vi) the valuation and impairment of Countrywide's retained interests in loans sold for securitization (*see infra* ¶¶ 410-12, 465-67, 500-01); (vii) the valuation and impairment of Countrywide's mortgage servicing rights (*see infra* ¶¶ 416-20, 469-70, 500, 518-19); (viii) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market (*see infra* ¶¶ 423-27, 472-75, 521-22, 524-25, 550); (ix) Countrywide's internal control procedures for mortgage origination and financial reporting (*see infra* ¶¶ 435, 438-43, 480-81, 527-28, 555); and (x) credit and borrower risk factors associated with the Company (*see infra* ¶¶ 445, 448, 483, 530).

115. Plaintiff Radcliffe's purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit E hereto. As detailed in the far-right column of Exhibit E, in making each purchase during the Relevant Period, Plaintiff Radcliffe relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase. Calculated under

the PSLRA Methodology, Radcliffe suffered damages on its Series A and Series B Debenture transactions of at least $3,354,417.01 and $2,800,400.29, respectively.

116. RG Capital and Radcliffe did not know, and had no reason to know, that Defendants' statements upon which they relied in the documents listed in ¶ 113 were materially false and misleading and omitted material facts as alleged herein. Radcliffe would not have purchased any of the Countrywide Debentures, or would not have purchased them at the prices it did, had it known that Defendants' statements in these documents were materially false and misleading and omitted material facts.

**6. Tempo Master Fund L.P.**

117. Plaintiff Tempo Master Fund L.P. ("Tempo") is a limited partnership organized under the laws of the Cayman Islands, with a principal place of business located at 2 Greenwich Plaza, Greenwich, Connecticut 06830.

118. Tempo purchased the Countrywide Series A and B Debentures during the Relevant Period through its investment manager, JD Capital Management LLC ("JD Capital"), and was damaged thereby. JD Capital had investment discretion and was authorized to purchase and sell securities on behalf of Tempo, within the guidelines set by Tempo, including the Debentures purchased during the Relevant Period.

119. JD Capital caused Tempo to purchase the Debentures based on JD Capital's review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) Offering Memorandum; (ii) 2006 Form 10-K; and (iii) First Quarter 2007 Form 10-Q.

120. On behalf of Tempo, JD Capital read, reviewed and directly relied upon the following material misrepresentations by Defendants (organized here by subject matter for ease of reference), among others, alleged below in Section VI and contained in the documents listed in ¶ 119, concerning: (i) the quality of Countrywide's mortgage loan portfolio (*see infra* ¶¶ 384-86, 389, 453-55); (ii)



1475577v1/010471

Countrywide's credit and loan underwriting practices (*see infra* ¶¶ 391, 394-95, 397-99, 457-58); (iii) Countrywide's liquidity (*see infra* ¶¶ 431-32, 477-78); (iv) Countrywide's allowance for loan losses (*see infra* ¶¶ 406-07, 461-63); and (v) the credit and borrower risk factors associated witb the Company (*see infra* ¶¶ 445, 448, 483).

121. Plaintiff Tempo's purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit F bereto. As detailed in the far-right column of Exhihit F, in making each purchase during the Relevant Period, Plaintiff Tempo relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase. Calculated under the PSLRA Methodology, Tempo suffered damages on its Series A and Series B Debenture transactions of at least $3,285,621.50 and $5,234,215.49, respectively.

122. Tempo and JD Capital did not know, and had no reason to know, that Defendants' statements upon which they relied in the documents listed in ¶ 119 were materially false and misleading and omitted material facts as alleged herein. Tempo would not have purchased any of the Countrywide Debentures, or would not have purchased them at the prices it did, had it known that Defendants' statements in these documents were materially false and misleading and omitted material facts.

**7. The Canyon Funds**

**a. Canyon Capital Arbitrage Master Fund, Ltd.**

123. Plaintiff Canyon Capital Arbitrage Master Fund, Ltd. ("Canyon Arbitrage") is an exempted company organized under the laws of the Cayman Islands, with a principal place of business located at 89 Nexus Way, Camana Bay, Grand Cayman KY1-9007, Cayman Islands.

124. Canyon Arbitrage and the other Canyon Funds (as defined below) purchased the Countrywide Series A and B Debentures during the Relevant Period through their iuvestment manager, Canyon Capital Advisors LLC ("Canyon

Capital"), and were damaged thereby. Canyon Capital had investment discretion and was authorized to purchase and sell securities on behalf of Canyon Arbitrage and the other Canyon Funds, within the guidelines set by the Canyon Funds, including the Debentures purchased during the Relevant Period.

125. Canyon Capital caused Canyon Arbitrage to purchase the Debentures based on Canyon Capital's review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) Offering Memorandum; (ii) 2006 Form 10-K; and (iii) First Quarter 2007 Form 10-Q.

126. On behalf of Canyon Arbitrage, Canyon Capital read, reviewed and directly relied upon the following material misrepresentations by Defendants (organized here by subject matter for ease of reference), among others, alleged below in Section VI and contained in the documents listed in ¶ 125, concerning: (i) the quality of Countrywide's mortgage loan portfolio (*see infra* ¶¶ 384-86, 389, 453-55); (ii) Countrywide's credit and loan underwriting practices (*see infra* ¶¶ 391, 394-95, 397-99, 457-58); (iii) Countrywide's liquidity (*see infra* ¶¶ 431-32, 477-78); (iv) Countrywide's portfolio of loans held-for-investment (*see infra* ¶¶ 401-03, 460); (v) Conntrywide's allowance for loan losses (*see infra* ¶¶ 406-07, 461-63); (vi) the valuation and impairment of Countrywide's retained interests in loans sold for securitization (*see infra* ¶¶ 410-12, 465-67); (vii) the valuation and impairment of Countrywide's mortgage servicing rights (*see infra* ¶¶ 416-20, 469-70); (viii) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market (*see infra* ¶¶ 423-27, 472-75); (ix) Countrywide's internal control procedures for mortgage origination and financial reporting (*see infra* ¶¶ 435, 438-43, 480-81); and (x) credit and borrower risk factors associated with the Company (*see infra* ¶¶ 445, 448, 483).

127. Plaintiff Canyon Arbitrage's purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit G.1 hereto. As detailed in the

far-right column of Exhibit G.1, in making each purchase during the Relevant Period, Plaintiff Canyon Arbitrage relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase. Calculated under the PSLRA Methodology, Canyon Arbitrage suffered damages on its Series A and Series B Debenture transactions of at least $1,595,650.80 and $326,453.75, respectively.

**b. The Canyon Value Realization Fund (Cayman), Ltd.**

128. Plaintiff The Canyon Value Realization Fund (Cayman), Ltd. ("Canyon Value (Cayman)") is an exempted company organized under the laws of the Cayman Islands, with a principal place of business located at 89 Nexus Way, Camana Bay, Grand Cayman KY1-9007, Cayman Islands.

129. Canyon Capital caused Canyon Value (Cayman) to purchase the Debentures based on Canyon Capital's review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) Offering Memorandum; (ii) 2006 Form 10-K; and (iii) First Quarter 2007 Form 10-Q.

130. On behalf of Canyon Value (Cayman), Canyon Capital read, reviewed and directly relied upon the following material misrepresentations by Defendants (organized here by subject matter for ease of reference), among others, alleged below in Section VI and contained in the documents listed in ¶ 129, concerning: (i) the quality of Countrywide's mortgage loan portfolio (*see infra* ¶¶ 384-86, 389, 453-55); (ii) Countrywide's credit and loan underwriting practices (*see infra* ¶¶ 391, 394-95, 397-99, 457-58); (iii) Countrywide's liquidity (*see infra* ¶¶ 431-32, 477-78); (iv) Countrywide's portfolio of loans held-for-investment (*see infra* ¶¶ 401-03, 460); (v) Countrywide's allowance for loan losses (*see infra* ¶¶ 406-07, 461-63); (vi) the valuation and impairment of Countrywide's retained interests in loans sold for securitization (*see infra* ¶¶ 410-12, 465-67); (vii) the valuation and impairment of Countrywide's mortgage servicing rights (*see infra* ¶¶ 416-20, 469-

70); (viii) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market (*see infra* ¶¶ 423-27, 472-75); (ix) Countrywide's internal control procedures for mortgage origination and financial reporting (*see infra* ¶¶ 435, 438-43, 480-81); and (x) credit and borrower risk factors associated with the Company (*see infra* ¶¶ 445, 448, 483).

131. Plaintiff Canyon Value (Cayman)'s purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit G.2 hereto. As detailed in the far-right column of Exhibit G.2, in making each purchase during the Relevant Period, Plaintiff Canyon Value (Cayman) relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase. Calculated under the PSLRA Methodology, Canyon Value (Cayman) suffered damages on its Series A and Series B Debenture transactions of at least $1,561,320.15 and $382,417.25, respectively.

**c. Canyon Value Realization MAC 18, Ltd.**

132. Plaintiff Canyon Value Realization MAC 18, Ltd. ("Canyon MAC") is an exempted company organized under the laws of the Cayman Islands, with a principal place of business located at Regatta Office Park, West Bay Road, Grand Cayman KY1-1205, Cayman Islands.

133. Canyon Capital caused Canyon MAC to purchase the Debentures based on Canyon Capital's review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) Offering Memorandum; (ii) 2006 Form 10-K; and (iii) First Quarter 2007 Form 10-Q.

134. On behalf of Canyon MAC, Canyon Capital read, reviewed and directly relied upon the following material misrepresentations by Defendants (organized here by subject matter for ease of reference), among others, alleged below in Section VI and contained in the documents listed in ¶ 133, concerning: (i) the quality of Countrywide's mortgage loan portfolio (*see infra* ¶¶ 384-86, 389,

453-55); (ii) Countrywide's credit and loan underwriting practices (*see infra* ¶¶ 391, 394-95, 397-99, 457-58); (iii) Countrywide's liquidity (*see infra* ¶¶ 431-32, 477-78); (iv) Countrywide's portfolio of loans held-for-investment (*see infra* ¶¶ 401-03, 460); (v) Countrywide's allowance for loan losses (*see infra* ¶¶ 406-07, 461-63); (vi) the valuation and impairment of Countrywide's retained interests in loans sold for securitization (*see infra* ¶¶ 410-12, 465-67); (vii) the valuation and impairment of Countrywide's mortgage servicing rights (*see infra* ¶¶ 416-20, 469-70); (viii) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market (*see infra* ¶¶ 423-27, 472-75); (ix) Countrywide's internal control procedures for mortgage origination and financial reporting (*see infra* ¶¶ 435, 438-43, 480-81); and (x) credit and borrower risk factors associated with the Company (*see infra* ¶¶ 445, 448, 483).

135. Plaintiff Canyon MAC's purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit G.3 hereto. As detailed in the far-right column of Exhibit G.3, in making each pnrchase during the Relevant Period, Plaintiff MAC relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase. Calculated under the PSLRA Methodology, Canyon MAC suffered damages on its Series A and Series B Debenture transactions of at least $112,838.90 and $27,981.75, respectively.

**d. Canyon Value Realization Fund, L.P.**

136. Plaintiff Canyon Value Realization Fund, L.P. ("Canyon Value") is a limited partnership organized under the laws of the State of Delaware, with a principal place of business located 615 South DuPont Highway, Dover, Delaware 19901.

137. Canyon Capital caused Canyon Value to purchase the Debentures based on Canyon Capital's review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i)

Offering Memorandum; (ii) 2006 Form 10-K; and (iii) First Quarter 2007 Form 10-Q.

138. On behalf of Canyon Value, Canyon Capital read, reviewed and directly relied upon the following material misrepresentations by Defendants (organized here by subject matter for ease of reference), among others, alleged below in Section VI and contained in the documents listed in ¶ 137, concerning: (i) the quality of Countrywide's mortgage loan portfolio (*see infra* ¶¶ 384-86, 389, 453-55); (ii) Countrywide's credit and loan underwriting practices (*see infra* ¶¶ 391, 394-95, 397-99, 457-58); (iii) Countrywide's liquidity (*see infra* ¶¶ 431-32, 477-78); (iv) Countrywide's portfolio of loans held-for-investment (*see infra* ¶¶ 401-03, 460); (v) Countrywide's allowance for loan losses (*see infra* ¶¶ 406-07, 461-63); (vi) the valuation and impairment of Countrywide's retained interests in loans sold for securitization (*see infra* ¶¶ 410-12, 465-67); (vii) the valuation and impairment of Countrywide's mortgage servicing rights (*see infra* ¶¶ 416-20, 469-70); (viii) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market (*see infra* ¶¶ 423-27, 472-75); (ix) Countrywide's internal control procedures for mortgage origination and financial reporting (*see infra* ¶¶ 435, 438-43, 480-81); and (x) credit and borrower risk factors associated with the Company (*see infra* ¶¶ 445, 448, 483).

139. Plaintiff Canyon Value's purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit G.4 hereto. As detailed in the far-right column of Exhibit G.4, in making each purchase during the Relevant Period, Plaintiff Canyon Value relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase. Calculated under the PSLRA Methodology, Canyon Value suffered damages on its Series A and Series B Debenture transactions of at least $607,639.30 and $149,236.00, respectively.

**e. Lyxor/Canyon Capital Arbitrage Fund Limited**

140. Plaintiff Lyxor/Canyon Capital Arbitrage Fund Limited ("Lyxor/Canyon") is a multi-class investment company with limited liability incorporated under the Companies (Jersey) Law 1991, with a registered address at 18 Esplanade, St Helier, JE4 8RT Jersey, Channel Islands.

141. Canyon Capital caused Lyxor/Canyon to purchase the Debentures based on Canyon Capital's review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) Offering Memorandum; (ii) 2006 Form 10-K; and (iii) First Quarter 2007 Form 10-Q.

142. On behalf of Lyxor/Canyon, Canyon Capital read, reviewed and directly relied upon the following material misrepresentations by Defendants (organized here by subject matter for ease of reference), among others, alleged below in Section VI and contained in the documents listed in ¶ 141, concerning: (i) the quality of Countrywide's mortgage loan portfolio (*see infra* ¶¶ 384-86, 389, 453-55); (ii) Countrywide's credit and loan underwriting practices (*see infra* ¶¶ 391, 394-95, 397-99, 457-58); (iii) Countrywide's liquidity (*see infra* ¶¶ 431-32, 477-78); (iv) Countrywide's portfolio of loans held-for-investment (*see infra* ¶¶ 401-03, 460); (v) Countrywide's allowance for loan losses (*see infra* ¶¶ 406-07, 461-63); (vi) the valuation and impairment of Countrywide's retained interests in loans sold for securitization (*see infra* ¶¶ 410-12, 465-67); (vii) the valuation and impairment of Countrywide's mortgage servicing rights (*see infra* ¶¶ 416-20, 469-70); (viii) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market (*see infra* ¶¶ 423-27, 472-75); (ix) Countrywide's internal control procedures for mortgage origination and financial reporting (*see infra* ¶¶ 435, 438-43, 480-81); and (x) credit and borrower risk factors associated with the Company (*see infra* ¶¶ 445, 448, 483).

143. Plaintiff Lyxor/Canyon's purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit G.5 hereto. As detailed in the far-right column of Exhibit G.5, in making each purchase during the Relevant Period, Plaintiff Lyxor/Canyon relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase. Calculated under the PSLRA Methodology, Lyxor/Canyon suffered damages on its Series A and Series B Debenture transactions of at least $468,176.85 and $46,632.50, respectively.

144. Plaintiffs (i) Canyon Arbitrage, (ii) Canyon Value (Cayman), (iii) Canyon MAC, (iv) Canyon Value, and (v) Lyxor/Canyon are referred to collectively herein as the "Canyon Funds."

145. Canyon Capital and the Canyon Funds did not know, and had no reason to know, that Defendants' statements upon which they relied in the documents listed in ¶¶ 125, 129, 133, 137 and 141 were materially false and misleading and omitted material facts as alleged herein. The Canyon Funds would not have purchased any of the Countrywide Debentures, or would not have purchased them at the prices they did, had they known that Defendants' statements in these documents were materially false and misleading and omitted material facts.

**8. GLG Market Neutral Fuud**

146. Plaintiff GLG Market Neutral Fund ("GLG") is an exempted company organized under the laws of the Cayman Islands, with a principal place of business located at 87 Mary Street, George Town, Grand Cayman, KY1-9001, Cayman Islands.

147. GLG purchased the Countrywide Series A and B Debentures during the Relevant Period through its investment manager GLG Partners LP ("GLG Partners"), and was damaged thereby. GLG Partners had investment discretion and was authorized to purchase and sell securities on behalf of GLG, within the

guidelines set by GLG, including the Debentures purchased during the Relevant Period.

148. GLG Partners caused GLG to purchase the Debentures based on GLG Partners' review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) Offering Memorandum; (ii) July 24, 2007 Press Release; (iii) August 16, 2007 Press Release; and (iv) October 26, 2007 Press Release.

149. On behalf of GLG, GLG Partners read, reviewed and directly relied upon the following material misrepresentations by Defendants, among others, concerning the Company's liquidity, alleged below in Sections VI and VII and contained in the documents listed in ¶ 148: *see infra* ¶¶ 503-04, 533-34, 552.

150. Plaintiff GLG's purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit H hereto. As detailed in the far-right column of Exhibit H, in making each purchase during the Relevant Period, Plaintiff GLG relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase. Calculated under the PSLRA Methodology, GLG suffered damages on its Series A and Series B Debenture transactions of at least $3,069,015.00 and $4,208,179.24, respectively.

151. GLG and GLG Partners did not know, and had no reason to know, that Defendants' statements upon which they relied contained in the documents listed in ¶ 148 were materially false and misleading and omitted material facts as alleged herein. GLG would not have purchased any of the Countrywide Debentures, or would not have purchased them at the prices it did, had it known that Defendants' statements in these documents were materially false and misleading and omitted material facts.

### 9. Mohican VCA Master Fund, Ltd.

152. Plaintiff Mohican VCA Master Fund, Ltd. ("Mohican") an exempted company organized under the laws of the Cayman Islands, with a principal place of business located at 21 Railroad Avenue, Cooperstown, New York 13326.

153. Mohican purchased the Countrywide Series A and B Debentures during the Relevant Period through its investment manager Mohican Financial Management LLC ("Mohican Financial"), and was damaged thereby. Mohican Financial had investment discretion and was authorized to purchase and sell securities on behalf of Mohican, within the guidelines set by Mohican, including the Debentures purchased during the Relevant Period.

154. Mohican Financial caused Mohican to purchase the Debentures based on Mohican Financial's review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) Offering Memorandum; (ii) 2006 Form 10-K; (iii) First Quarter 2007 Form 10-Q; (iv) July 24, 2007 Press Release; (v) August 2, 2007 Press Release; and (vi) August 6, 2007 Form 8-K.

155. On behalf of Mohican, Mohican Financial read, reviewed and directly relied upon the following material misrepresentations by Defendants (organized here by subject matter for ease of reference), among others, alleged below in Sections VI and VII and contained in the documents listed in ¶ 154, concerning: (i) the quality of Countrywide's mortgage loan portfolio (*see infra* ¶¶ 384-86, 389, 453-55, 498); (ii) Countrywide's credit and loan underwriting practices (*see infra* ¶¶ 391, 394-95, 397-99, 457-58, 498); (iii) Countrywide's liquidity (*see infra* ¶¶ 431-32, 477-78, 503-04, 506, 507); (iv) Countrywide's portfolio of loans held-for-investment (*see infra* ¶¶ 401-03, 460, 500); (v) Countrywide's allowance for loan losses (*see infra* ¶¶ 406-07, 461-63); (vi) the valuation and impairment of Countrywide's retained interests in loans sold for securitization (*see infra* ¶¶ 410-12, 465-67, 500-01); (vii) the valuation and impairment of Countrywide's mortgage

servicing rights (*see infra* ¶¶ 416-20, 469-70, 500); (viii) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market (*see infra* ¶¶ 423-27, 472-75); (ix) Countrywide's internal control procedures for mortgage origination and financial reporting (*see infra* ¶¶ 435, 438-43, 480-81); and (x) credit and borrower risk factors associated with the Company (*see infra* ¶¶ 445, 448, 483).

156. Plaintiff Mohican's purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit I hereto. As detailed in the far-right column of Exhibit I, in making each purchase during the Relevant Period, Plaintiff Mohican relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase. Calculated under the PSLRA Methodology, Mohican suffered damages on its Series A and Series B Debenture transactions of at least $286,012.00 and $220,442.00, respectively.

157. Mohican Financial and Mohican did not know, and had no reason to know, that Defendants' statements upon which they relied in the documents listed in ¶ 154 were materially false and misleading and omitted material facts as alleged herein. Mohican would not have purchased any of the Countrywide Debentures, or would not have purchased them at the prices it did, had it known that Defendants' statements in these documents were materially false and misleading and omitted material facts.

### 10. The OFI Funds

#### a. ADI Arbitrages Absolu

158. Plaintiff ADI Arbitrages Absolu ("ADI Arbitrages") is a trust organized under the laws of France, with a principal place of business located at 1, rue Vernier, 75017 Paris.

159. ADI Arbitrages and the other OFI Funds (as defined below) purchased the Countrywide Series A and B Debentures during the Relevant Period through their investment manager, ADI – Alternative Investments S.A. (n/k/a OFI Asset

Management) ("ADI"), and were damaged thereby. ADI had investment discretion and was authorized to purchase and sell securities on behalf of ADI Arbitrages and the other OFI Funds, within the guidelines set by the OFI Funds, including the Debentures purchased during the Relevant Period.

160. ADI caused ADI Arbitrages to purchase the Debentures based on ADI's review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) Offering Memorandum; (ii) 2006 Form 10-K; (iii) First Quarter 2007 Form 10-Q; (iv) July 24, 2007 Press Release; (v) August 2, 2007 Press Release; (vi) August 16, 2007 Press Release; and (vii) September 7, 2007 Press Release.

161. On behalf of ADI Arbitrages, ADI read, reviewed and directly relied upon the following material misrepresentations by Defendants (organized here by subject matter for ease of reference), among others, alleged below in Sections VI and VII and contained in the documents listed in ¶ 160, concerning: (i) the quality of Countrywide's mortgage loan portfolio (*see infra* ¶¶ 384-86, 389, 453-55, 498); (ii) Countrywide's credit and loan underwriting practices (*see infra* ¶¶ 391, 394-95, 397-99, 457-58, 498); (iii) Countrywide's liquidity (*see infra* ¶¶ 431-32, 477-78, 503-04, 506, 533-34, 537); (iv) Countrywide's portfolio of loans held-for-investment (*see infra* ¶¶ 401-03, 460, 500); (v) Countrywide's allowance for loan losses (*see infra* ¶¶ 406-07, 461-63); (vi) the valuation and impairment of Countrywide's retained interests in loans sold for securitization (*see infra* ¶¶ 410-12, 465-67, 500-01); (vii) the valuation and impairment of Countrywide's mortgage servicing rights (*see infra* ¶¶ 416-20, 469-70, 500); (viii) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market (*see infra* ¶¶ 423-27, 472-75); (ix) Countrywide's internal control procedures for mortgage origination and financial reporting (*see infra* ¶¶ 435, 438-43, 480-81); and (x) credit and borrower risk factors associated with the Company (*see infra* ¶¶ 445, 448, 483).

162. Plaintiff ADI Arbitrages' purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit J.1 hereto. As detailed in the far-right column of Exhibit J.1, in making each purchase during the Relevant Period, Plaintiff ADI Arbitrage relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase. Calculated under the PSLRA Methodology, ADI Arbitrage suffered damages on its Series A and Series B Debenture transactions of at least $8,650.59 and $237,486.63, respectively.

**b. ADI Convert Absolu**

163. Plaintiff ADI Convert Absolu ("ADI Convert") is a trust organized under the laws of France, with a principal place of business located at 1, rue Vernier, 75017 Paris.

164. ADI caused ADI Convert to purchase the Debentures based on ADI's review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) Offering Memorandum; (ii) 2006 Form 10-K; and (iii) First Quarter 2007 Form 10-Q.

165. On behalf of ADI Convert, ADI read, reviewed and directly relied upon the following material misrepresentations by Defendants (organized here by subject matter for ease of reference), among others, alleged below in Section VI and contained in the documents listed in ¶ 164, concerning: (i) the quality of Countrywide's mortgage loan portfolio (*see infra* ¶¶ 384-86, 389, 453-55); (ii) Countrywide's credit and loan underwriting practices (*see infra* ¶¶ 391, 394-95, 397-99, 457-58); (iii) Countrywide's liquidity (*see infra* ¶¶ 431-32, 477-78); (iv) Countrywide's portfolio of loans held-for-investment (*see infra* ¶¶ 401-03, 460); (v) Countrywide's allowance for loan losses (*see infra* ¶¶ 406-07, 461-63); (vi) the valuation and impairment of Countrywide's retained interests in loans sold for securitization (*see infra* ¶¶ 410-12, 465-67); (vii) the valuation and impairment of Countrywide's mortgage servicing rights (*see infra* ¶¶ 416-20, 469-70); (viii) the

representations and warranties Countrywide made in connection with its sale of loans into the secondary market (*see infra* ¶¶ 423-27, 472-75); (ix) Countrywide's internal control procedures for mortgage origination and financial reporting (*see infra* ¶¶ 435, 438-43, 480-81); and (x) credit and borrower risk factors associated with the Company (*see infra* ¶¶ 445, 448, 483).

166. Plaintiff ADI Convert's purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit J.2 hereto. As detailed in the far-right column of Exhibit J.2, in making each purchase during the Relevant Period, Plaintiff ADI Convert relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase. Calculated under the PSLRA Methodology, ADI Convert suffered damages on its Series A Debenture transactions of at least $620,948.41.

**c. ADI Convex**

167. Plaintiff ADI Convex is a trust organized under the laws of France, with a principal place of business located at 1, rue Vernier, 75017 Paris.

168. ADI caused ADI Convex to purchase the Debentures based on ADI's review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) Offering Memorandum; (ii) 2006 Form 10-K; (iii) First Quarter 2007 Form 10-Q; (iv) July 24, 2007 Press Release; (v) August 2, 2007 Press Release; (vi) August 16, 2007 Press Release, and (vii) September 7, 2007 Press Release.

169. On behalf of ADI Convex, ADI read, reviewed and directly relied upon the following material misrepresentations by Defendants (organized here by subject matter for ease of reference), among others, alleged below in Sections VI and VII and contained in the documents listed in ¶ 168, concerning: (i) the quality of Countrywide's mortgage loan portfolio (*see infra* ¶¶ 384-86, 389, 453-55, 498, 513-15); (ii) Countrywide's credit and loan underwriting practices (*see infra* ¶¶ 391, 394-95, 397-99, 457-58, 498, 517); (iii) Countrywide's liquidity (*see infra* ¶¶

431-32, 477-78, 503-04, 506, 511, 533-34, 537); (iv) Countrywide's portfolio of loans held-for-investment (*see infra* ¶¶ 401-03, 460, 500); (v) Countrywide's allowance for loan losses (*see infra* ¶¶ 406-07, 461-63); (vi) the valuation and impairment of Countrywide's retained interests in loans sold for securitization (*see infra* ¶¶ 410-12, 465-67, 500-01); (vii) the valuation and impairment of Countrywide's mortgage servicing rights (*see infra* ¶¶ 416-20, 469-70, 500, 518-19); (viii) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market (*see infra* ¶¶ 423-27, 472-75, 521-22, 524-25); (ix) Countrywide's internal control procedures for mortgage origination and financial reporting (*see infra* ¶¶ 435, 438-43, 480-81, 527-28); and (x) credit and borrower risk factors associated with the Company (*see infra* ¶¶ 445, 448, 483, 530).

170. Plaintiff ADI Convex's purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit J.3 hereto. As detailed in the far-right column of Exhibit J.3, in making each purchase during the Relevant Period, Plaintiff ADI Convex relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase. Calculated under the PSLRA Methodology, ADI Convex suffered damages on its Series A and Series B Debenture transactions of at least $603,823.18 and $203,112.63, respectively.

**d. ADI Convex Absolu**

171. Plaintiff ADI Convex Absolu ("ADI Absolu") is a trust organized under the laws of France, with a principal place of business located at 1, rue Vernier, 75017 Paris.

172. ADI caused ADI Convex Absolu to purchase the Debentures based on ADI's review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) Offering Memorandum; (ii) 2006 Form 10-K; (iii) First Quarter 2007 Form 10-Q; (iv) July

24, 2007 Press Release; (v) August 2, 2007 Press Release; (vi) August 16, 2007 Press Release, and (vii) September 7, 2007 Press Release.

173. On behalf of ADI Convex Absolu, ADI read, reviewed and directly relied upon the following material misrepresentations by Defendants (organized here by subject matter for ease of reference), among others, alleged below in Sections VI and VII and contained in the documents listed in ¶ 172, concerning: (i) the quality of Countrywide's mortgage loan portfolio (*see infra* ¶¶ 384-86, 389, 453-55, 498); (ii) Countrywide's credit and loan underwriting practices (*see infra* ¶¶ 391, 394-95, 397-99, 457-58, 498); (iii) Countrywide's liquidity (*see infra* ¶¶ 431-32, 477-78, 503-04, 506, 533-34, 537); (iv) Countrywide's portfolio of loans held-for-investment (*see infra* ¶¶ 401-03, 460, 500); (v) Countrywide's allowance for loan losses (*see infra* ¶¶ 406-07, 461-63); (vi) the valuation and impairment of Countrywide's retained interests in loans sold for securitization (*see infra* ¶¶ 410-12, 465-67, 500-01); (vii) the valuation and impairment of Countrywide's mortgage servicing rights (*see infra* ¶¶ 416-20, 469-70, 500); (viii) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market (*see infra* ¶¶ 423-27, 472-75); (ix) Countrywide's internal control procedures for mortgage origination and financial reporting (*see infra* ¶¶ 435, 438-43, 480-81); and (x) credit and borrower risk factors associated with the Company (*see infra* ¶¶ 445, 448, 483).

174. Plaintiff ADI Convex Absolu's purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit J.4 hereto. As detailed in the far-right column of Exhibit J.4, in making each purchase during the Relevant Period, Plaintiff ADI Convex Absolu relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase. Calculated under the PSLRA Methodology, ADI Convex Absolu suffered damages on its Series B Debenture transactions of at least $353,889.23.

**e. Kallista CB Arbitrage Fund Limited**

175. Plaintiff Kallista CB Arbitrage Fund Limited ("Kallista") is a company organized under the laws of the Cayman Islands, with a principal place of business located at Ugland House, South Church Street, George Town, Grand Cayman KY1-1104, Cayman Islands.

176. ADI caused Kallista to purchase the Debentures based on ADI's review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) Offering Memorandum; (ii) 2006 Form 10-K; (iii) First Quarter 2007 Form 10-Q; (iv) July 24, 2007 Press Release; (v) August 2, 2007 Press Release; (vi) August 16, 2007 Press Release, and (vii) September 7, 2007 Press Release.

177. On behalf of Kallista, ADI read, reviewed and directly relied upon the following material misrepresentations by Defendants (organized here by subject matter for ease of reference), among others, alleged below in Sections VI and VII and contained in the documents listed in ¶ 176, concerning: (i) the quality of Countrywide's mortgage loan portfolio (*see infra* ¶¶ 384-86, 389, 453-55, 498); (ii) Countrywide's credit and loan underwriting practices (*see infra* ¶¶ 391, 394-95, 397-99, 457-58, 498); (iii) Countrywide's liquidity (*see infra* ¶¶ 431-32, 477-78, 503-04, 506, 533-34, 537); (iv) Countrywide's portfolio of loans held-for-investment (*see infra* ¶¶ 401-03, 460, 500); (v) Countrywide's allowance for loan losses (*see infra* ¶¶ 406-07, 461-63); (vi) the valuation and impairment of Countrywide's retained interests in loans sold for securitization (*see infra* ¶¶ 410-12, 465-67, 500-01); (vii) the valuation and impairment of Countrywide's mortgage servicing rights (*see infra* ¶¶ 416-20, 469-70, 500); (viii) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market (*see infra* ¶¶ 423-27, 472-75); (ix) Countrywide's internal control procedures for mortgage origination and financial reporting (*see infra* ¶¶ 435, 438-

43, 480-81); and (x) credit and borrower risk factors associated with the Company (*see infra* ¶¶ 445, 448, 483).

178. Plaintiff Kallista's purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit J.5 hereto. As detailed in the far-right column of Exhibit J.5, in making each purchase during the Relevant Period, Plaintiff Kallista relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase. Calculated under the PSLRA Methodology, Kallista suffered damages on its Series A and Series B Debenture transactions of at least $1,581,014.42 and $730,481.08, respectively.

179. Plaintiffs (i) ADI Arbitrages, (ii) ADI Convert, (iii) ADI Convex, (iv) ADI Absolu, and (v) Kallista are referred to collectively herein as the "OFI Funds."

180. ADI and the OFI Funds did not know, and had no reason to know, that Defendants' statements upon which they relied in the documents listed in ¶¶ 160, 164, 168, 172 and 176 were materially false and misleading and omitted material facts as alleged herein. The OFI Funds would not have purchased any of the Countrywide Debentures, or would not have purchased them at the prices they did, had they known that Defendants' statements in these documents were materially false and misleading and omitted material facts.

**11. CASAM ADI CB Arbitrage Limited**

181. Plaintiff CASAM ADI CB Arbitrage Limited ("CASAM") is an exempted company organized under the laws of the Cayman Islands, with a principal place of business located at Ugland House, South Church Street, George Town, Grand Cayman KY1-1104, Cayman Islands.

182. CASAM purchased the Countrywide Series A and B Debentures during the Relevant Period through its investment manager, ADI, and was damaged thereby. ADI had investment discretion and was authorized to purchase and sell

Case MDL No. 2265 Document 1-12 Filed 05/23/11 Page 67 of 283

securities on behalf of CASAM, within the guidelines set by CASAM, including the Debentures purchased during the Relevant Period.

183. ADI caused CASAM to purchase the Debentures based on ADI's review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) Offering Memorandum; (ii) 2006 Form 10-K; (iii) First Quarter 2007 Form 10-Q; (iv) July 24, 2007 Press Release; (v) August 2, 2007 Press Release; (vi) August 16, 2007 Press Release; and (vii) September 7, 2007 Press Release.

184. On behalf of CASAM, ADI read, reviewed and directly relied upon the following material misrepresentations by Defendants (organized here by subject matter for ease of reference), among others, alleged below in Sections VI and VII and contained in the documents listed in ¶ 183, concerning: (i) the quality of Countrywide's mortgage loan portfolio (*see infra* ¶¶ 384-86, 389, 453-55, 498); (ii) Countrywide's credit and loan underwriting practices (*see infra* ¶¶ 391, 394-95, 397-99, 457-58, 498); (iii) Countrywide's liquidity (*see infra* ¶¶ 431-32, 477-78, 503-04, 506, 533-34, 537); (iv) Countrywide's portfolio of loans held-for-investment (*see infra* ¶¶ 401-03, 460, 500); (v) Countrywide's allowance for loan losses (*see infra* ¶¶ 406-07, 461-63); (vi) the valuation and impairment of Countrywide's retained interests in loans sold for securitization (*see infra* ¶¶ 410-12, 465-67, 500-01); (vii) the valuation and impairment of Countrywide's mortgage servicing rights (*see infra* ¶¶ 416-20, 469-70, 500); (viii) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market (*see infra* ¶¶ 423-27, 472-75); (ix) Countrywide's internal control procedures for mortgage origination and financial reporting (*see infra* ¶¶ 435, 438-43, 480-81); and (x) credit and borrower risk factors associated with the Company (*see infra* ¶¶ 445, 448, 483).

185. Plaintiff CASAM's purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit K hereto. As detailed in the far-right

column of Exhibit K, in making each purchase during the Relevant Period, Plaintiff CASAM relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase. Calculated under the PSLRA Methodology, CASAM suffered damages on its Series A and Series B Debenture transactions of at least $722,252.26 and $329,295.48, respeetively.

186. ADI and CASAM did not know, and had no reason to know, that Defendants' statements upon which they relied in the documents listed in ¶ 183 were materially false and misleading and omitted material facts as alleged herein. CASAM would not have purchased any of the Countrywide Debentures, or would not have purchased them at the prices it did, had it known that Defendants' statements in these documents were materially false and misleading and omitted material facts.

### 12. The Trafelet Delta Funds

#### a. Delta Institutional, L.P.

187. Plaintiff Delta Institutional, L.P. ("Delta Institutional") is a limited partnership organized under the laws of the State of Delaware, with a principal place of business located at 900 Third Avenue, New York, New York 10022.

188. Delta Institutional and the other Trafelet Delta Funds (as defined below) purchased the Countrywide Series A Debentures during the Relevant Period through their investment manager, Trafelet Capital Management, L.P. ("Trafelet Capital"), and were damaged thereby. Trafelet Capital had investment discretion and was authorized to purchase and sell securities on behalf of Delta Institutional and the other Trafelet Delta Funds, within the guidelines set by the Trafelet Delta Funds, including the Debentures purchased during the Relevant Period.

189. Trafelet Capital caused Delta Institutional to purchase the Debentures based on Trafelet Capital's review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) August 2, 2007 Press Release; (ii) the August 6, 2007 Form 8-K; (iii) Second

Quarter 2007 Form 10-Q; (iv) August 16, 2007 Press Release; and (v) September 7, 2007 Press Release.

190. On behalf of each of Delta Institutional, Trafelet Capital read, reviewed and directly relied upon the following material misrepresentations by Defendants (organized here by subject matter for ease of reference), among others, alleged below in Section VII and contained in the documents listed in ¶ 189, concerning: (i) the quality of Countrywide's mortgage loan portfolio (*see infra* ¶¶ 513-15); (ii) Countrywide's credit and loan underwriting practices (*see infra* ¶ 517); (iii) Countrywide's liquidity (*see infra* ¶¶ 506, 507, 511, 533-34, 537); (iv) the valuation and impairment of Countrywide's mortgage servicing rights (*see infra* ¶¶ 518-19); (v) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market (*see infra* ¶¶ 521-22, 524-25); and (vi) the credit and borrower risk factors associated with the Company (*see infra* ¶ 530).

191. Plaintiff Delta Institutional's purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit L.1 hereto. As detailed in the far-right column of Exhibit L.1, in making each purchase during the Relevant Period, Plaintiff Delta Institutional relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase. Calculated under the PSLRA Methodology, Delta Institutional suffered damages on its Series A Debenture transactions of at least $2,370,662.21.

**b. Delta Onshore, L.P.**

192. Plaintiff Delta Onshore, L.P. ("Delta Onshore") is a limited partnership organized under the laws of the State of Delaware, with a principal place of business located at 900 Third Avenue, New York, New York 10022.

193. Trafelet Capital caused Delta Onshore to purchase the Debentures based on Trafelet Capital's review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i)

Case MDL No. 2265 Document 1-12 Filed 05/23/11 Page 70 of 283

August 2, 2007 Press Release; (ii) the August 6, 2007 Form 8-K; (iii) Second Quarter 2007 Form 10-Q; (iv) August 16, 2007 Press Release; and (v) September 7, 2007 Press Release.

194. On behalf of each of Delta Onshore, Trafelet Capital read, reviewed and directly relied upon the following material misrepresentations by Defendants (organized here by subject matter for ease of reference), among others, alleged below in Section VII and contained in the documents listed in ¶ 193, concerning: (i) the quality of Countrywide's mortgage loan portfolio (*see infra* ¶¶ 513-15); (ii) Countrywide's credit and loan underwriting practices (*see infra* ¶ 517); (iii) Countrywide's liquidity (*see infra* ¶¶ 506, 507, 511, 533-34, 537); (iv) the valuation and impairment of Countrywide's mortgage servicing rights (*see infra* ¶¶ 518-19); (v) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market (*see infra* ¶¶ 521-22, 524-25); and (vi) the credit and borrower risk factors associated with the Company (*see infra* ¶ 530).

195. Plaintiff Delta Onshore's purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit L.2 hereto. As detailed in the far-right column of Exhibit L.2, in making each purchase during the Relevant Period, Plaintiff Delta Onshore relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase. Calculated under the PSLRA Methodology, Delta Onshore suffered damages on its Series A Debenture transactions of at least $230,804.74.

**c. Delta Pleiades, L.P.**

196. Plaintiff Delta Pleiades, L.P. ("Delta Pleiades") is a limited partnership organized under the laws of the State of Delaware, with a principal place of business located at 900 Third Avenue, New York, New York 10022.

197. Trafelet Capital caused Delta Pleiades to purchase the Debentures based on Trafelet Capital's review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i)

August 2, 2007 Press Release; (ii) the August 6, 2007 Form 8-K; (iii) Second Quarter 2007 Form 10-Q; (iv) August 16, 2007 Press Release; and (v) September 7, 2007 Press Release.

198. On behalf of each of Delta Pleiades, Trafelet Capital read, reviewed and directly relied upon the following material misrepresentations by Defendants (organized here by subject matter for ease of reference), among others, alleged below in Section VII and contained in the documents listed in ¶ 197, concerning: (i) the quality of Countrywide's mortgage loan portfolio (*see infra* ¶¶ 513-15); (ii) Countrywide's credit and loan underwriting practices (*see infra* ¶ 517); (iii) Countrywide's liquidity (*see infra* ¶¶ 506, 507, 511, 533-34, 537); (iv) the valuation and impairment of Countrywide's mortgage servicing rights (*see infra* ¶¶ 518-19); (v) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market (*see infra* ¶¶ 521-22, 524-25); and (vi) the credit and borrower risk factors associated with the Company (*see infra* ¶ 530).

199. Plaintiff Delta Pleiades' purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit L.3 hereto. As detailed in the far-right column of Exhibit L.3, in making each purchase during the Relevant Period, Plaintiff Delta Pleiades relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase. Calculated under the PSLRA Methodology, Delta Pleiades suffered damages on its Series A Debenture transactions of at least $289,013.66.

**d. Delta Offshore Master, Ltd.**

200. Plaintiff Delta Offshore Master, Ltd. ("Delta Offshore") is a company organized under the laws of the Cayman Islands, with a principal place of business located at Queensgate House, South Church Street, George Town, Grand Cayman KY1-1108, Cayman Islands.

201. Trafelet Capital caused Delta Offshore to purchase the Debentures based on Trafelet Capital's review of, and direct reliance upon, the Company

information and representations contained in the following documents: the (i) August 2, 2007 Press Release; (ii) the August 6, 2007 Form 8-K; (iii) Second Quarter 2007 Form 10-Q; (iv) August 16, 2007 Press Release; and (v) September 7, 2007 Press Release.

202. On behalf of each of Delta Offshore, Trafelet Capital read, reviewed and directly relied upon the following material misrepresentations by Defendants (organized here by subject matter for ease of reference), among others, alleged below in Section VII and contained in the documents listed in ¶ 201, concerning: (i) the quality of Countrywide's mortgage loan portfolio (*see infra* ¶¶ 513-15); (ii) Countrywide's credit and loan underwriting practices (*see infra* ¶ 517); (iii) Countrywide's liquidity (*see infra* ¶¶ 506, 507, 511, 533-34, 537); (iv) the valuation and impairment of Countrywide's mortgage servicing rights (*see infra* ¶¶ 518-19); (v) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market (*see infra* ¶¶ 521-22, 524-25); and (vi) the credit and borrower risk factors associated with the Company (*see infra* ¶ 530).

203. Plaintiff Delta Offshore's purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit L.4 hereto. As detailed in the far-right column of Exhibit L.4, in making each purchase during the Relevant Period, Plaintiff Delta Institutional relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase. Calculated under the PSLRA Methodology, Delta Offshore suffered damages on its Series A Debenture transactions of at least $3,546,349.21.

204. Plaintiffs (i) Delta Institutional, (ii) Delta Onshore, (iii) Delta Pleiades, and (iv) Delta Offshore are referred to collectively herein as the "Trafelet Delta Funds."

205. Trafelet Capital and the Trafelet Delta Funds did not know, and had no reason to know, that Defendants' statements upon which they relied in the documents listed in ¶¶ 189, 193, 197 and 201 were materially false and misleading

and omitted material facts as alleged herein. The Trafelet Delta Funds would not have purchased any of the Countrywide Debentures, or would not have purchased them at the prices they did, had they known that Defendants' statements in these documents were materially false and misleading and omitted material facts.

### 13. RHP Master Fund, Ltd.

206. Plaintiff RHP Master Fund, Ltd. ("RHP") is an exempted company organized under the laws of the Cayman Islands, with a principal place of business located at P.O. Box 1234, Queensgate House, South Church Street, Grand Cayman KY1-1108, Cayman Islands.

207. RHP purchased the Countrywide Series A and B Debentures during the Relevant Period through its investment manager Rock Hill Investment Management, L.P. ("Rock Hill"), and was damaged thereby. Rock Hill had investment discretion and was authorized to purchase and sell securities on behalf of RHP, within the guidelines set by RHP, including the Debentures purchased during the Relevant Period.

208. Rock Hill caused RHP to purchase the Countrywide Debentures based on Rock Hill's review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) Offering Memorandum; (ii) 2006 Form 10-K; and (iii) First Quarter 2007 Form 10-Q.

209. On behalf of RHP, Rock Hill read, reviewed and directly relied upon the following material misrepresentations by Defendants (organized here by subject matter for ease of reference), among others, alleged below in Section VI and contained in the documents listed in ¶ 208, concerning: (i) the quality of Conntrywide's mortgage loan portfolio (*see infra* ¶¶ 384-86, 389, 453-55); (ii) Countrywide's credit and loan underwriting practices (*see infra* ¶¶ 391, 394-95, 397-99, 457-58); (iii) Countrywide's liquidity (*see infra* ¶¶ 431-32, 477-78); (iv) Countrywide's portfolio of loans held-for-investment (*see infra* ¶¶ 401-03, 460); (v) Countrywide's allowance for loan losses (*see infra* ¶¶ 406-07, 461-63); and (vi) the

credit and borrower risk factors associated with the Company (*see infra* ¶¶ 445, 448, 483).

210. RHP's purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit M hereto. As detailed in the far-right column of Exhibit M, in making each purchase during the Relevant Period, Plaintiff RHP relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase. Calculated under the PSLRA Methodology, RHP suffered damages on its Series A and Series B Debenture transactions of at least $43,625.00 and $2,890,199.84, respectively.

211. RHP and Rock Hill did not know, and had no reason to know, that Defendants' statements upon which they relied contained in the documents listed in ¶ 208 were materially false and misleading and omitted material facts as alleged herein. RHP would not have purchased any of the Countrywide Debentures, or would not have purchased them at the prices it did, had it known that Defendants' statements in these documents were materially false and misleading and omitted material facts.

**14. HFR CA Lazard Rathmore Master Trust**

212. Plaintiff HFR CA Lazard Rathmore Master Trust (f/k/a HFR RVA Lazard Rathmore Master Trust) ("HFR Lazard") is a trust organized under the laws of Bermuda, with a principal place of business located at 65 Front Street, Hamilton HM12, Bermuda.

213. HFR Lazard purchased the Countrywide Series A Debentures during the Relevant Period through its trading manager Lazard Asset Management, LLC ("Lazard"), and was damaged thereby. Lazard had investment discretion and was authorized to purchase and sell securities on behalf of HFR Lazard, within the guidelines set by HFR Lazard, including the Debentures purchased during the Relevant Period.

214. Lazard caused HFR Lazard to purchase the Debentures based on Lazard's company practice of reviewing and relying on all recent SEC filings and press releases by a securities issuer such as Countrywide before making a purchase decision, which in this case would have included: the (i) Offering Memorandum; (ii) 2006 Form 10-K; (iii) First Quarter 2007 Form 10-Q; (iv) July 24, 2007 Press Release; (v) August 2, 2007 Press Release; and (vi) August 6, 2007 Form 8-K.

215. In accordance with its company practice, on behalf of HFR Lazard, Lazard would have read, reviewed and relied upon the material misrepresentations by Defendants, among others, alleged below in Sections VI and VII and contained in the documents listed in ¶ 214, concerning Countrywide's liquidity (*see infra* ¶¶ 431-32, 477-78, 503-04, 506, 507).

216. HFR Lazard's purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit N hereto. As detailed in the far-right column of Exhibit N, HFR Lazard's company practice would be to rely on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase. Calculated under the PSLRA Methodology, HFR Lazard suffered damages on its purchases Series A Debenture transactions of at least $48,542.83.

217. Lazard and HFR Lazard did not know, and had no reason to know, that Defendants' statements in the documents listed in ¶ 214 were materially false and misleading and omitted material facts as alleged herein. HFR Lazard would not have purchased any of the Countrywide Debentures, or would not have purchased them at the prices it did, had it known that Defendants' public statements were materially false and misleading and omitted material facts.

### 15. The Ramius Funds

#### a. Ramius Convertible Arbitrage Master Fund Ltd.

218. Plaintiff Ramius Convertible Arbitrage Master Fund Ltd. (f/k/a RCG Latitude Master Fund, Ltd.) ("Ramius") is an exempted company organized under

the laws of the Cayman Islands, with a principal place of business located at Regatta Office Park, Winward 1, Grand Cayman KY1-1205, Cayman Islands.

219. Ramius and the other Ramius Fund (as defined below) purchased the Countrywide Series A and B Debentures during the Relevant Period through their investment manager, Ramius Advisors LLC ("Ramius Advisors"), and were damaged thereby. Ramius Advisors had investment discretion and was authorized to purchase and sell securities on behalf of Ramius and the other Ramius Fund, within the guidelines set by the Ramius Funds, including the Debentures purchased during the Relevant Period.

220. Ramius Advisors caused Ramius to purchase the Countrywide Debentures based on Ramius Advisors' review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) Offering Memorandum; (ii) 2006 Form 10-K; (iii) First Quarter 2007 Form 10-Q; (iv) July 24, 2007 Press Release; (v) August 2, 2007 Press Release; (vi) Second Quarter 2007 Form 10-Q; (vii) August 16, 2007 Press Release; (viii) September 7, 2007 Press Release; and (ix) October 26, 2007 Press Release.

221. On behalf of Ramius, Ramius Advisors read, reviewed and directly relied upon the following material misrepresentations by Defendants (organized here by subject matter for ease of reference), among others, alleged below in Sections VI and VII and contained in the documents listed in ¶ 220, concerning: (i) the quality of Countrywide's mortgage loan portfolio (*see infra* ¶¶ 384-86, 389, 453-55, 498, 513-15); (ii) Countrywide's liquidity (*see infra* ¶¶ 431-32, 477-78, 503-04, 506, 511, 533-34, 537, 552); (iii) Countrywide's portfolio of loans held-for-investment (*see infra* ¶¶ 401-03, 460, 500); (iv) the valuation and impairment of Countrywide's retained interests in loans sold for securitizations (*see infra* ¶¶ 410-12, 465-67, 500-01); and (v) the credit and borrower risk factors associated with the Company (*see infra* ¶¶ 445, 448, 483, 530).

222. Ramius' purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit O.1 hereto. As detailed in the far-right column of Exhibit O.1, in making each purchase during the Relevant Period, Plaintiff Ramius relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase. Calculated under the PSLRA Methodology, Ramius suffered damages on its Series A Debenture transactions of at least $2,657,827.20.

**b. RCG PB, Ltd.**

223. Plaintiff RCG PB, Ltd. ("RCG") is an exempted company organized under the laws of the Cayman Islands, with a principal place of business located at Regatta Office Park, Winward 1, Grand Cayman KY1-1205, Cayman Islands.

224. Ramius Advisors caused RCG to purchase the Countrywide Debentures based on Ramius Advisors' review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) Offering Memorandum; (ii) 2006 Form 10-K; (iii) First Quarter 2007 Form 10-Q; (iv) July 24, 2007 Press Release; (v) August 2, 2007 Press Release; (vi) Second Quarter 2007 Form 10-Q; (vii) August 16, 2007 Press Release; (viii) September 7, 2007 Press Release; and (ix) October 26, 2007 Press Release.

225. On behalf of RCG, Ramius Advisors read, reviewed and directly relied upon the following material misrepresentations by Defendants (organized here by subject matter for ease of reference), among others, alleged below in Sections VI and VII and contained in the documents listed in ¶ 224, concerning: (i) the quality of Countrywide's mortgage loan portfolio (*see infra* ¶¶ 384-86, 389, 453-55, 498, 513-15); (ii) Countrywide's liquidity (*see infra* ¶¶ 431-32, 477-78, 503-04, 506, 511, 533-34, 537, 552); (iii) Countrywide's portfolio of loans held-for-investment (*see infra* ¶¶ 401-03, 460, 500); (iv) the valuation and impairment of Countrywide's retained interests in loans sold for securitizations (*see infra* ¶¶ 410-12, 465-67, 500-

01); and (v) the credit and borrower risk factors associated with the Company (*see infra* ¶¶ 445, 448, 483, 530).

226. RCG's purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit O.2 hereto. As detailed in the far-right column of Exhibit O.2, in making each purchase during the Relevant Period, Plaintiff RCG relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase. Calculated under the PSLRA Methodology, RCG suffered damages on its Series A Debenture transactions of at least $1,628,399.20.

227. Plaintiffs (i) Ramius and (ii) RCG are referred to collectively herein as the "Ramius Funds."

228. Ramius Advisors and the Ramius Funds did not know, and had no reason to know, that Defendants' statements upon which they relied in the documents listed in ¶¶ 220 and 224 were materially false and misleading and omitted material facts as alleged herein. The Ramius Funds would not have purchased any of the Countrywide Debentures, or would not have purchased them at the prices they did, had they known that Defendants' statements in these documents were materially false and misleading and omitted material facts.

**16. S.A.C. Arbitrage Fund, LLC**

229. Plaintiff S.A.C. Arbitrage Fund, LLC ("S.A.C. Arbitrage") is a limited liability company organized under the laws of Anguilla, British West Indies, with a principal place of business located at Mitchell House, Box 174, The Valley, Anguilla, British West Indies.

230. S.A.C. Arbitrage purchased the Countrywide Series A and B Debentures during the Relevant Period through its investment manager at the time, S.A.C. Capital Advisors, LLC ("S.A.C. Capital"), and was damaged thereby. S.A.C. Capital had investment discretion and was authorized to pnrchase and sell

securities on behalf of S.A.C. Arbitrage, within the guidelines set by S.A.C. Arbitrage, including the Debentures purchased during the Relevant Period.

231. S.A.C. Capital caused S.A.C. Arbitrage to purchase the Debentures based on S.A.C. Capital's review of, and direct reliance upon, the information and representations contained in the Company's earnings conference calls, SEC filings, press releases and other publicly available materials during the Relevant Period specifically including, but not limited to the following documents: the (i) Offering Memorandum; (ii) 2006 Form 10-K; (iii) First Quarter 2007 Form 10-Q; (iv) July 24, 2007 Press Release; (v) August 2, 2007 Press Release; (vi) August 6, 2007 Form 8-K; (vii) Second Quarter 2007 Form 10-Q; and (viii) August 16, 2007 Press Release.

232. On behalf of S.A.C. Arbitrage, S.A.C. Capital read, reviewed and directly relied upon the following material misrepresentations by Defendants (organized here by subject matter for ease of reference), among others, alleged below in Sections VI and VII and contained in the documents listed in ¶ 231, concerning: (i) the quality of Countrywide's mortgage loan portfolio (*see infra* ¶¶ 384-86, 389, 453-55, 498, 513-15); (ii) Countrywide's credit and loan underwriting practices (*see infra* ¶¶ 391, 394-95, 397-99, 457-58, 498, 517); (iii) Countrywide's liquidity (*see infra* ¶¶ 431-32, 477-78, 503-04, 506, 507, 511, 533-34); (iv) Countrywide's portfolio of loans held-for-investment (*see infra* ¶¶ 401-03, 460, 500); (v) Countrywide's allowance for loan losses (*see infra* ¶¶ 406-07, 461-63); (vi) the valuation and impairment of Countrywide's retained interests in loans sold for securitization (*see infra* ¶¶ 410-12, 465-67, 500-01); (vii) the valuation and impairment of Countrywide's mortgage servicing rights (*see infra* ¶¶ 416-20, 469-70, 500, 518-19); (viii) Countrywide's internal control procedures for mortgage origination and financial reporting (*see infra* ¶¶ 435, 438-43, 480-81, 527-28); and (ix) credit and borrower risk factors associated with the Company (*see infra* ¶¶ 445, 448, 483, 530).

233. S.A.C. Arbitrage's purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit P hereto. As detailed in the far-right column of Exhibit P, in making each purchase during the Relevant Period, Plaintiff S.A.C. Arbitrage relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase.

234. The Series B Debentures were subject to a tender offer by Countrywide in late 2008. The limited set of transactions set forth in bold in Exhibit P indicate purchases of Debentures which S.A.C. Arbitrage tendered back to Countrywide at $980.00 per Debenture in December 2008. Calculated under the PSLRA Methodology, S.A.C. Arbitrage suffered damages on its Series A and Series B Debenture transactions of at least $10,154,400.33, and $9,491,221.98, respectively.

235. S.A.C. Capital and S.A.C. Arbitrage did not know, and had no reason to know, that Defendants' statements upon which they relied in the documents listed in ¶ 231 were materially false and misleading and omitted material facts as alleged herein. S.A.C. Arbitrage would not have purchased any of the Countrywide Debentures, or would not have purchased them at the prices it did, had it known that Defendants' statements in these documents were materially false and misleading and omitted material facts.

**17. Stark Master Fund Ltd.**

236. Plaintiff Stark Master Fund Ltd. ("Stark") is a corporation organized under the laws of the British Virgin Islands, with a principal place of business located in Tortola, British Virgin Islands.

237. Stark purchased the Countrywide Series A and B Debentures during the Relevant Period at the direction of its investment manager Stark Offshore Management LLC ("Stark Offshore"), and was damaged thereby. Stark Offshore had investment discretion and was authorized to purchase and sell securities on

behalf of Stark, within the guidelines set by Stark, including the Debentures purchased during the Relevant Period.

238. Stark Offshore caused Stark to purchase the Debentures based on Stark Offshore's review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) 2006 Form 10-K; (ii) First Quarter 2007 Form 10-Q; (iii) July 24, 2007 Press Release; (iv) August 2, 2007 Press Release; (v) August 6, 2007 Form 8-K; (vi) Second Quarter 2007 Form 10-Q; (vii) September 7, 2007 Press Release; (viii) October 26, 2007 Press Release; and (ix) Third Quarter 2007 Form 10-Q.

239. On behalf of Stark, Stark Offshore read, reviewed and directly relied upon the following material misrepresentations by Defendants (organized here by subject matter for ease of reference), among others, alleged below in Sections VI and VII and contained in the documents listed in ¶ 238, concerning: (i) the quality of Countrywide's mortgage loan portfolio (*see infra* ¶¶ 384-86, 389, 453-55, 498, 513-15); (ii) Countrywide's credit and loan underwriting practices (*see infra* ¶¶ 391, 394-95, 397-99, 457-58, 498, 517); (iii) Countrywide's liquidity (*see infra* ¶¶ 431-32, 477-78, 503-04, 506, 507, 511, 537, 552, 562); (iv) Countrywide's portfolio of loans held-for-investment (*see infra* ¶¶ 401-03, 460, 500); (v) Countrywide's allowance for loan losses (*see infra* ¶¶ 406-07, 461-63); (vi) the valuation and impairment of Countrywide's retained interests in loans sold for securitization (*see infra* ¶¶ 410-12, 465-67, 500-01); (vii) the valuation and impairment of Countrywide's mortgage servicing rights (*see infra* ¶¶ 416-20, 469-70, 500, 518-19); (viii) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market (*see infra* ¶¶ 423-27, 472-75, 521-22, 524-25, 550); (ix) Countrywide's internal control procedures for mortgage origination and financial reporting (*see infra* ¶¶ 435, 438-43, 480-81, 527-28, 555); and (x) credit and borrower risk factors associated with the Company (*see infra* ¶¶ 445, 448, 483, 530).

240. Stark's purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit Q hereto. As detailed in the far-right column of Exhibit Q, in making each purchase during the Relevant Period, Plaintiff Stark relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase.

241. The Series A Debentures were subject to a contractual put right. The limited set of transactions set forth in bold in Exhibit Q indicate purchases of Debentures upon which Stark ultimately exercised its put right at par in October 2008. Calculated under the PSLRA Methodology, Stark suffered damages on its Series A and Series B Debenture transactions of at least $38,035,512.51, and $2,818,621.16, respectively.

242. Stark Offshore and Stark did not know, and had no reason to know, that Defendants' statements upon which they relied in the documents listed in ¶ 238 were materially false and misleading and omitted material facts as alleged herein. Stark would not have purchased any of the Countrywide Debentures, or would not have purchased them at the prices it did, had it known that Defendants' statements in these documents were materially false and misleading and omitted material facts.

**18. The Sandelman Funds**

**a. Sandelman Partners Multi-Strategy Master Fund, Ltd.**

243. Plaintiff Sandelman Partners Multi-Strategy Master Fund, Ltd. ("Sandelman Multi") is a company organized under the laws of the Cayman Islands, with a principal place of business located at 500 Park Avenue, Third Floor, New York, New York, 10022.

244. Sandelman Multi and the other Sandelman Fund (as defined below) purchased Countrywide Series A and B Debentures during the Relevant Period through their investment manager, Sandelman Partners, LLC ("Sandelman Management"), and were damaged thereby. Sandelman Management had

investment discretion and was authorized to purchase and sell securities on behalf of Sandelman Multi and the other Sandelman Fund, within the guidelines set by the Sandelman Funds, including the Debentures purchased during the Relevant Period.

245. Sandelman Management caused Sandelman Multi to purchase the Debentures based on Sandelman Management's review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) Offering Memorandum; (ii) 2006 Form 10-K; (iii) First Quarter 2007 Form 10-Q; (iv) July 24, 2007 Press Release; (v) August 2, 2007 Press Release; (vi) August 6, 2007 Form 8-K; (vii) Second Quarter 2007 Form 10-Q; (viii) August 16, 2007 Press Release; (ix) September 7, 2007 Press Release; and (x) October 26, 2007 Press Release.

246. On behalf of Sandelman Multi, Sandelman Management read, reviewed and directly relied upon the following material misrepresentations by Defendants (organized here by subject matter for ease of reference), among others, alleged below in Sections VI and VII and contained in the documents listed in ¶ 245, concerning: (i) the quality of Countrywide's mortgage loan portfolio (*see infra* ¶¶ 384-86, 389, 453-55, 498, 513-15); (ii) Countrywide's credit and loan underwriting practices (*see infra* ¶¶ 391, 394-95, 397-99, 457-58, 498, 517); (iii) Countrywide's liquidity (*see infra* ¶¶ 431-32, 477-78, 503-04, 506, 507, 511, 533-34, 537, 552); (iv) Countrywide's portfolio of loans held-for-investment (*see infra* ¶¶ 401-03, 460, 500); (v) Countrywide's allowance for loan losses (*see infra* ¶¶ 406-07, 461-63); (vi) the valuation and impairment of Countrywide's retained interests in loans sold for securitization (*see infra* ¶¶ 410-12, 465-67, 500-01); (vii) the valuation and impairment of Countrywide's mortgage servicing rights (*see infra* ¶¶ 416-20, 469-70, 500, 518-19); (viii) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market (*see infra* ¶¶ 423-27, 472-75, 521-22, 524-25, 550); (ix) Countrywide's internal control procedures for mortgage origination and financial reporting (*see infra* ¶¶

435, 438-43, 480-81, 527-28); and (x) credit and borrower risk factors associated with the Company (*see infra* ¶¶ 445, 448, 483, 530).

247. Plaintiff Sandelman Multi's purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit R.1 hereto. As detailed in the far-right column of Exhibit R.1, in making each purchase during the Relevant Period, Plaintiff Sandelman Multi relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase. Calculated under the PSLRA Methodology, Sandelman Multi suffered damages on its Series A and Series B Debenture transactions of at least $1,471,715.51 and $117,945.88, respectively.

**b. Sandelman Partners Opportunity Master Fund, L.P.**

248. Plaintiff Sandelman Partners Opportunity Master Fund, L.P. ("Sandelman Opportunity") is a limited partnership organized under the laws of the Cayman Islands, with a principal place of business located at 500 Park Avenue, Third Floor, New York, New York, 10022.

249. Sandelman Management caused Sandelman Opportunity to purchase the Debentures based on Sandelman Management's review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) Offering Memorandum; (ii) 2006 Form 10-K; (iii) First Quarter 2007 Form 10-Q; (iv) July 24, 2007 Press Release; (v) August 2, 2007 Press Release; (vi) August 6, 2007 Form 8-K; (vii) Second Quarter 2007 Form 10-Q; (viii) August 16, 2007 Press Release; (ix) September 7, 2007 Press Release; and (x) October 26, 2007 Press Release.

250. On behalf of Sandelman Opportunity, Sandelman Management read, reviewed and directly relied upon the following material misrepresentations by Defendants (organized here by subject matter for ease of reference), among others, alleged below in Sections VI and VII and contained in the documents listed in ¶ 249, concerning: (i) the quality of Countrywide's mortgage loan portfolio (*see*

*infra* ¶¶ 384-86, 389, 453-55, 498, 513-15); (ii) Countrywide's credit and loan underwriting practices (*see infra* ¶¶ 391, 394-95, 397-99, 457-58, 498, 517); (iii) Countrywide's liquidity (*see infra* ¶¶ 431-32, 477-78, 503-04, 506, 507, 511, 533-34, 537, 552); (iv) Countrywide's portfolio of loans held-for-investment (*see infra* ¶¶ 401-03, 460, 500); (v) Countrywide's allowance for loan losses (*see*, *infra*, ¶¶ 406-07, 461-63); (vi) the valuation and impairment of Countrywide's retained interests in loans sold for securitization (*see infra* ¶¶ 410-12, 465-67, 500-01); (vii) the valuation and impairment of Countrywide's mortgage servicing rights (*see infra* ¶¶ 416-20, 469-70, 500, 518-19); (viii) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market (*see infra* ¶¶ 423-27, 472-75, 521-22, 524-25, 550); (ix) Countrywide's internal control procedures for mortgage origination and financial reporting (*see infra* ¶¶ 435, 438-43, 480-81, 527-28); and (x) credit and borrower risk factors associated with the Company (*see infra* ¶¶ 445, 448, 483, 530).

251. Plaintiff Sandelman Opportunity's purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit R.2 hereto. As detailed in the far-right column of Exhibit R.2, in making each purchase during the Relevant Period, Plaintiff Sandelman Opportunity relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase. Calculated under the PSLRA Methodology, Sandelman Opportunity suffered damages on its Series A and Series B Debenture transactions of at least $17,941,305.05 and $1,485,776.00, respectively.

252. Plaintiffs (i) Sandelman Multi and (ii) Sandelman Opportunity are referred to collectively herein as the "Sandelman Funds."

253. Sandelman Management and the Sandelman Funds did not know, and had no reason to know, that Defendants' statements upon which they relied in the documents listed in ¶¶ 245 and 249 were materially false and misleading and omitted material facts as alleged herein. The Sandelman Funds would not have

purchased any of the Countrywide Debentures, or would not have purchased them at the prices they did, had they known that Defendants' statements in these documents were materially false and misleading and omitted material facts.

**19. Camulos Master Fund L.P.**

254. Plaintiff Camulos Master Fund L.P. ("Camulos") is an exempted limited partnership organized under the laws of the Cayman Islands, with a principal place of business located at 3 Landmark Square, Stamford, Connecticut 06901.

255. Camulos purchased the Countrywide Series A and B Debentures during the Relevant Period through its investment manager Camulos Capital L.P. ("Camulos Capital"), and was damaged thereby. Camulos Capital had investment discretion and was authorized to purchase and sell securities on behalf of Camulos, within the guidelines set by Camulos, including the Debentures purchased during the Relevant Period.

256. Camulos Capital caused Camulos to purchase the Countrywide Debentures based on Camulos Capital's review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) Offering Memorandum; (ii) 2006 Form 10-K; (iii) First Quarter 2007 Form 10-Q; and (iv) Second Quarter 2007 Form 10-Q.

257. On behalf of Camulos, Camulos Capital read, reviewed and directly relied upon the following material misrepresentations by Defendants (organized here by subject matter for ease of reference), among others, alleged below in Sections VI and VII and contained in the documents listed in ¶ 256, concerning: (i) the quality of Countrywide's mortgage loan portfolio (*see infra* ¶¶ 384-86, 389, 453-55, 513-14); (ii) Countrywide's credit and loan underwriting practices (*see infra* ¶¶ 391, 394-95, 397-99, 457-58, 517); (iii) Countrywide's liquidity (*see infra* ¶¶ 431-32, 477-78, 511); (iv) Countrywide's allowance for loan losses (*see infra* ¶¶ 406-07, 461-63); (v) the valuation and impairment of Countrywide's retained

interests in loans sold for securitization (*see infra* ¶¶ 410-12, 465-67); (vi) the valuation and impairment of Countrywide's mortgage servicing rights (*see infra* ¶¶ 416-20, 469-70, 518-19); (vii) the representations and warranties Countrywide made in connection with its sale of loans into the secondary market (*see infra* ¶¶ 423-27, 472-75, 521-22, 524-25); (viii) Countrywide's internal control procedures for mortgage origination and financial reporting (*see infra* ¶¶ 435, 438-43, 480-81, 527-28); and (ix) credit and borrower risk factors associated with the Company (*see infra* ¶¶ 445, 448, 483, 530).

258. Camulos' purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit S hereto. In making each purchase during the Relevant Period, Plaintiff Camulos relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase. Calculated under the PSLRA Methodology, Camulos suffered damages on its Series A and Series B Debenture transactions of at least $442,882.78 and $284,238.15, respectively.

259. Camulos Capital and Camulos did not know, and had no reason to know, that Defendants' statements upon which they relied in the documents listed in ¶ 256 were materially false and misleading and omitted material facts as alleged herein. Camulos would not have purchased any of the Countrywide Debentures, or would not have purchased them at the prices it did, had it known that Defendants' statements in these documents were materially false and misleading and omitted material facts.

**20. The Concordia Funds**

**a. Concordia Partners L.P.**

260. Plaintiff Concordia Partners L.P. ("Concordia Partners") is a limited partnership organized under the laws of Bermuda, with a principal place of business located at 2 Church Street, Hamilton HM11, Bermuda.

261. Concordia Partners and the other Concordia Funds (as defined below) purchased the Countrywide Series B Debentures during the Relevant Period through their investment manager, Concordia Advisors LLC ("Concordia Advisors"), and were damaged thereby. Concordia Advisors had investment discretion and was authorized to purchase and sell securities on behalf of Concordia Partners and the other Concordia Funds, within the guidelines set by the Concordia Funds, including the Debentures purchased during the Relevant Period.

262. Concordia Advisors caused Concordia Partners to purchase the Debentures based on Concordia Advisors' review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) Offering Memorandum; (ii) 2006 Form 10-K; and (iii) First Quarter 2007 Form 10-Q.

263. On behalf of Concordia Partners, Concordia Advisors read, reviewed and directly relied upon the following material misrepresentations by Defendants, among others, alleged below in Section VI and contained in the documents listed in ¶ 262, concerning credit and borrower risk factors associated with the Company (*see infra* ¶¶ 445, 448, 483).

264. Concordia Partners' purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit T.1 hereto. In making each purchase during the Relevant Period, Plaintiff Concordia Partners relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase. Calculated under the PSLRA Methodology, Concordia Partners suffered damages on its Series B Debenture transactions of at least $373,304.76.

**b. Concordia Institutional Multi-Strategies Ltd.**

265. Plaintiff Concordia Institutional Multi-Strategies Ltd. ("Concordia Institutional") is a company organized under the laws of Bermuda, with a principal place of business located at 2 Church Street, Hamilton HM11, Bermuda.

266. Concordia Advisors caused Concordia Institutional to purchase the Debentures based on Concordia Advisors' review of, and direct reliance upon, the Company information and representations contained in the following documents: the (i) Offering Memorandum; (ii) 2006 Form 10-K; and (iii) First Quarter 2007 Form 10-Q.

267. On behalf of Concordia Institutional, Concordia Advisors read, reviewed and directly relied upon the following material misrepresentations by Defendants, among others, alleged below in Section VI and contained in the documents listed in ¶ 266, concerning credit and borrower risk factors associated with the Company (*see infra* ¶¶ 445, 448, 483).

268. Concordia Institutional's purchases and sales of the Debentures during the Relevant Period are set forth in Exhibit T.2 hereto. In making each purchase during the Relevant Period, Plaintiff Concordia Institutional relied on, among other things, each statement contained in the cited paragraphs made by Defendants prior to the date of that purchase. Calculated under the PSLRA Methodology, Concordia Institutional suffered damages on its Series B Debenture transactions of at least $223,982.85.

269. *Paragraph Reserved*

270. *Paragraph Reserved*

271. *Paragraph Reserved*

272. *Paragraph Reserved*

273. Plaintiffs (i) Concordia Partners and (ii) Concordia Institutional are referred to collectively herein as the "Concordia Funds."

274. Concordia Advisors and the Concordia Funds did not know, and had no reason to know, that Defendants' statements upon which they relied in the documents listed in ¶¶ 262 and 266 were materially false and misleading and omitted material facts as alleged herein. The Concordia Funds would not have purchased any of the Countrywide Debentures, or would not have purchased them

at the prices they did, had they known that Defendants' statements in these documents were materially false and misleading and omitted material facts.

### B. The Contractual Put Right and Tender Offer

275. The Series A Debentures were subject to a contractual put right that was exercisable on October 15, 2008. Other than Plaintiff Stark as set forth above, none of the other Plaintiffs exercised their put right with respect to any Series A Debentures they purchased during the Relevant Period.

276. The Series B Debentures were subject to a tender offer by the Company at $980.00 per Debenture between October 20, 2008 and December 3, 2008. Other than Plaintiff S.A.C. Arbitrage as set forth above, none of the other Plaintiffs participated in the tender offer with respect to any Series B Debentures they purchased during the Relevant Period.

### C. Defendants

#### 1. Countrywide Financial Corporation

277. During the Relevant Period, Defendant Countrywide was incorporated under the laws of the State of Delaware, with a principal place of business located at 4500 Park Granada Boulevard, Calabasas, California 91302. Countrywide common shares traded on the NYSE under the symbol "CFC" during the Relevant Period. Throughout the Relevant Period, Countrywide engaged in mortgage lending and other finance-related operations focused primarily on real estate finance.

278. During the Relevant Period, the Company was one of the largest originators of subprime loans in the country. In addition, during this period, Countrywide was the largest mortgage lender in the United States. It boasted of being a "leader in nearly every aspect of real estate finance," and was considered, based on its reports to the investing public, one of the best performing financial services companies over the past 25 years, earning high rankings as a Fortune 500 company beginning in 2000.

279. Following the merger between Bank of America and Countrywide in July 2008, Countrywide became a wholly-owned subsidiary of Bank of America.

**2. The Individual Defendants**

280. Each of the Individual Defendants (defined below) had the duty to make full, candid and timely disclosures of all material facts relating to Countrywide's business, operations, performance and prospects. Among other things, the Individual Defendants were required to:

(i) conduct and supervise Countrywide's business in accordance with all applicable laws and regulations;

(ii) supervise the preparation of the Company's SEC filings and approve any publicly-issued reports concerning Countrywide's financial reporting and results;

(iii) ensure that Countrywide established and followed adequate management and accounting internal controls; and

(iv) refrain from obtaining personal benefits, at the expense of the public purchasers of Countrywide securities, including the Debentures, by misappropriating proprietary non-public information concerning Countrywide.

281. As senior officers and controlling persons of a publicly-held company governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's performance, operations, business and prospects, and to correct any previously issued statements that were or had become materially misleading or untrue.

282. As a result of the Individual Defendants' failure to fulfill the foregoing obligations, the prices of Countrywide Debentures were artificially inflated during the Relevant Period. In response to the gradual emergence of the truth, the prices of

Countrywide Debentures fell in precipitous steps. As a direct and proximate result of the Individual Defendants' wrongdoing, Plaintiffs were injured.

**a. Angelo R. Mozilo**

283. Defendant Mozilo, Countrywide's co-founder, was at all relevant times, Chairman of the Company's Board of Directors ("Board of Directors" or "Board") and Chief Executive Officer ("CEO"). Mozilo became a member of the Company's Board in 1969, and served as President of the Company from March 2000 through December 2003. Mozilo also served as President of the Mortgage Bankers Association of America (the "MBAA") from 1991 to 1992 and served on the MBAA's board of directors during that same period. The MBAA is a national association based in Washington, D.C. representing the real estate finance industry.

284. During the Relevant Period, Mozilo made materially false and misleading direct public statements in, inter alia, the July 24, 2007 Press Release and the October 26, 2007 Press Release. Defendant Mozilo also signed and/or certified the following documents that the Company filed with the SEC during the Relevant Period, which contained materially false and misleading statements and/or omissions of material facts: the (i) 2006 Form 10-K; (ii) First Quarter 2007 Form 10-Q; (iii) Second Quarter 2007 Form 10-Q; and the (iv) Third Quarter 2007 Form 10-Q. Defendant Mozilo assisted in the preparation of Countrywide's materially false and misleading press releases and false and misleading SEC filings, which were incorporated by reference into the offering documents for the Debentures, including the Offering Memorandum.

285. During the Relevant Period, Defendant Mozilo sold approximately 2,299,588 of his shares of Countrywide common stock for proceeds of over $69 million, while in the possession of material adverse information about Countrywide which had not been disclosed to the investing public, including Plaintiffs. In addition, Mozilo received total compensation in 2007, 2006 and 2005 of $10.8

million, $51.8 million and $22.9 million, respectively, based almost exclusively on the Company's reported financial performance.

**b. David Sambol**

286. Defendant Sambol was, at all relevant times, Countrywide's President and Chief Operating Officer ("COO"). Sambol also served as President and Chief Executive Officer of Countrywide Bank, FSB ("Countrywide Bank"). From 2004 to 2006, Sambol served as Executive Managing Director for the Company's Business Segment Operations. In 2004, Defendant Sambol took over the Company's core lending operations. At a time of skyrocketing home prices and fierce competition among lenders to attract borrowers, Defendant Sambol spearheaded Countrywide's growth through origination of (and retaining interests in) inherently high-risk, non-traditional loans to increase loan volume and capture a high percentage of the mortgage lending market. Leading Countrywide's core business operations, Sambol had oversight responsibility for Countrywide Bank, Countrywide Insurance Group, Countrywide Capital Markets and Countrywide Global Operations. In 2007, Sambol served as Chairman and CEO of Countrywide Home Loans ("CHL"), in which he was previously President and COO from 2004 to 2006. In September 2007, Sambol became a director of Countrywide.

287. Defendant Sambol signed the following documents that the Company filed with the SEC during the Relevant Period, which contained materially false and misleading statements and/or omissions of material facts: the (i) First Quarter 2007 Form 10-Q; (ii) Second Quarter 2007 Form 10-Q; and the (iii) Third Quarter 2007 Form 10-Q. Defendant Sambol assisted in the preparation of Countrywide's materially false and misleading press releases and SEC filings which were incorporated by reference into the offering documents for the Debentures, including the Offering Memorandum.

288. During the Relevant Period, Defendant Sambol sold approximately 36,125 of his shares of Countrywide common stock for proceeds of approximately

$1.3 million, while in the possession of material adverse information about Countrywide which had not been disclosed to the investing public, including Plaintiffs. In addition, Sambol received total compensation in 2007, 2006 and 2005 of $10.4 million, $12.0 million and $6.4 million, respectively, based almost exclusively on the Company's reported financial performance.

**c. Eric P. Sieracki**

289. Defendant Sieracki was, at all relevant times, Executive Managing Director and Chief Financial Officer ("CFO") of Countrywide and Countrywide Bank. He was also a voting member of the Executive Strategy Committee of the Company's Board of Directors. At all relevant times, Defendant Sieracki was responsible for overseeing the Company's major financial departments, including corporate accounting, treasury, financial planning, strategic planning and taxation. He also served as the Company's senior manager in the areas of investor relations, corporate development and equity capital activities. During the Relevant Period, Defendant Sieracki sold approximately 2,902 shares of his Countrywide common stock for proceeds of approximately $113,000, while in possession of material adverse information about Countrywide which had not been disclosed to the investing public, including Plaintiffs.

290. Sieracki made materially false and misleading public statements in the August 2, 2007 Press Release. Defendant Sieracki also signed and/or certified the following documents that the Company filed with the SEC during the Relevant Period, which contained materially false and misleading statements and/or omissions of material facts: the (i) 2006 Form 10-K; (ii) First Quarter 2007 Form 10-Q; (iii) Second Quarter 2007 Form 10-Q; (iv) Third Quarter 2007 Form 10-Q; and the (v) August 6, 2007 Form 8-K. Defendant Sieracki assisted in the preparation of Countrywide's materially false and misleading press releases and SEC filings which were incorporated by reference into the offering documents for the Debentures, including the Offering Memorandum.

291. Defendant Sieracki received total compensation in 2006 and 2007 of approximately $2.6 million and $2.9 million, respectively, based almost exclusively on the Company's reported financial performance.

292. Defendants Mozilo, Sambol, and Sieracki are collectively referred to herein as the "Individual Defendants." Defendant Countrywide and the Individual Defendants are collectively referred to herein as "Defendants."

## IV. BACKGROUND

### A. Countrywide's Business Operations And Aggressive Growth Strategy

293. Countrywide, co-founded by Defendant Mozilo and David Loeb in 1969, was a California-based holding company. During the Relevant Period, Countrywide and its subsidiaries engaged in mortgage lending and other finance-related operations focused primarily on real estate lending.

294. Beginning in 2003, Defendant Mozilo implemented an aggressive growth strategy, calling for Countrywide to capture an unprecedented 30% of the national residential loan market at a time when the Company's market share was only 13%. Mozilo publicly announced this Company directive on a July 22, 2003 conference call with analysts during which Mozilo stated that Countrywide's goal was "to dominate the purchase market and to get [the Company's] overall market share to the ultimate 30% by 2006-2007."

#### 1. Couutrywide's Business Segments

295. During the Relevant Period, Countrywide managed its business through five business segments, including: (i) the Mortgage Banking Segment; (ii) the Banking Segment; and (iii) the Capital Markets Segment.

296. The Mortgage Banking, Banking and Capital Markets Segments comprised more than 90% of Countrywide's pre-tax earnings and revenue prior to and during the Relevant Period. Thus, virtually all of the value of an investment in

Countrywide derived from the Company's ability to carry on its mortgage-related business.

**a. The Mortgage Banking Segment**

297. The Company described its Mortgage Banking Segment as its "core business." Countrywide's Mortgage Banking Segment, comprised of the Loan Production, Loan Servicing and Closing Services sectors, originated, purchased, sold and serviced non-commercial mortgage loans nationwide. For the years-ended December 31, 2006, 2005 and 2004, respectively, the Mortgage Banking Segment comprised approximately $2.06 billion (48%), $2.4 billion (59%) and $2.3 billion (65%), respectively, of the Company's pre-tax income.

298. Countrywide sold most of the mortgage loans that it originated in the secondary mortgage market, primarily in the form of securitized loans. The Company typically retained the rights to service those loans, known as mortgage servicing rights ("MSRs"), pursuant to contractual agreements between Countrywide and the investors/purchasers of Countrywide's loans.

299. According to the 2006 Form 10-K, Countrywide's contractual mortgage servicing obligations included, among other services, the collection and remittance of loan payments, responding to customer inquiries, accounting for principal and interest, holding custodial (impound) funds for payment of property taxes and insurance premiums, counseling delinquent mortgagors and supervising foreclosures and property dispositions.

300. Countrywide also often retained a financial interest in the underlying loans it securitized ("retained interest"), which entitled the Company to the remaining interest payments received into the securitization pools after all required payments had been paid to other investors of higher priority.

301. Defendants represented in the Company's 2006 Form 10-K, incorporated by reference in the Offering Memorandum, that Countrywide's "senior financial management exercise[d] extensive and active oversight" over the

Case MDL No. 2265 Document 1-12 Filed 05/23/11 Page 97 of 283

valuation of MSRs and retained interests. The Company recognized MSRs and retained interests as assets in Countrywide's financial statements at the time of sale when the servicing rights and/or retained interests were contractually separated from the loans.

302. Pursuant to applicable accounting rules, Countrywide was required to report its MSR and retained interest assets at fair value on the balance sheet. In the event of borrower delinquency or default on the underlying loans, the Company was further required by GAAP to reduce the value of its MSRs and retained interests to recognize impairment of those assets. As discussed below in Section IX, Countrywide failed to comply with their obligations in this regard.

### b. The Banking Segment

303. For the years-ended December 31, 2006, 2005 and 2004, respectively, the Banking Segment comprised approximately $1.38 billion (32%), $1.1 billion (26%) and $582 million (16%), respectively, of the Company's pre-tax income.

304. The Banking Segment purportedly invested in "prime" residential mortgage loans and "prime" home equity loans and home equity lines of credit ("HELOCs") that it obtained from the Loan Production sector of the Company's Mortgage Banking Segment and, to a lesser extent, mortgages issued by third parties.

305. As demonstrated in the chart below, Defendants significantly increased the Company's loans held-for-investment ("LHI") from 2002 through 2006.

| **For the Years-ended (in billions)** | **2006** | **2005** | **2004** | **2003** | **2002** |
|---|---|---|---|---|---|
| Loans Held-For-Investment | $78.3 | $70.1 | $39.9 | $26.4 | $6.1 |

306. In the Company's 2006 Form 10-K, Defendants represented that the bank loan portfolio of LHI consisted "primarily of Prime Mortgage and Prime Home Equity Loans." Pay-option ARM loans, as alleged herein, constituted a

substantial portion of the Company's LHI. The Company's pay-option ARMs were not "prime" loans. As Defendant Mozilo admitted in a September 26, 2006 e-mail to Defendants Sambol and Sieracki, the Company was "flying blind on how these loans will perform in a stressed environment."

**c. The Capital Markets Segment**

307. The Capital Markets Segment operated an institutional broker-dealer that specialized in underwriting and trading mortgage-backed securities. For the years-ended December 31, 2006, 2005 and 2004, the Capital Market Segment comprised approximately $554 million (13%), $451.6 million (11%) and $479.1 million (13%), respectively, of the Company's pre-tax income.

**2. Countrywide's Loan Types**

308. Countrywide's residential loans included: (i) Prime Mortgage Loans; (ii) Prime Home Equity Loans; and (iii) Nonprime Mortgage Loans (e.g., Alternate-A ("Alt-A") and subprime loans).

309. With respect to the credit quality of Countrywide's loan portfolio, Defendants made repeated public assurances in the various documents incorporated into the Offering Memorandum that Countrywide's underwriting standards "ensure[d] consistent production of quality mortgages" and "ongoing access to the secondary mortgage market . . . ." Defendants also represented that the Company's loans were "prudently underwritten."

310. As demonstrated in the chart below, Countrywide significantly increased its origination of inherently high-risk, nonprime and home equity loans to boost the Company's loan volume and beat the competition, while at the same time decreasing its prime loan originations.

| | **December 31,** | | | |
|---|---|---|---|---|
| | **2003** | **2004** | **2005** | **2006** |
| % Prime Loans | 91.2% | 80.2% | 81.2% | 79.8% |

| | | | | |
|---|---|---|---|---|
| % Home Equity Loans | 4.1% | 8.5% | 8.9% | 10.2% |
| % Nonprime Loans | 4.6% | 10.9% | 8.9% | 8.7% |

**a. Prime Mortgage Loans**

311. Prime Mortgage Loans are purportedly prime, first-lien mortgage loans, secured by the value of the underlying properties. The MBAA (Mortgage Bankers Association of America) defines prime loans as loans to people who have ample income and high credit scores and who have made a substantial down payment. Historically, a substantial down payment meant at least 20% of the purchase price.

312. The most widely accepted measure of creditworthiness in the credit industry is the "FICO" score, developed by the Fair Isaac Corporation. Under the FICO scoring system, borrowers are assigned a credit score ranging from 300 to 850, with 850 being the most creditworthy. In determining the borrower's overall creditworthiness, the FICO score primarily takes into account the borrower's payment history, current indebtedness, length of credit history, recently-established credit and types of credit used. According to Fitch Ratings, FICO scores are the "best single indicator" of mortgage default risk. Thus, the lower the FICO score, the greater risk of borrower default.

313. Defendants affirmed the purportedly high credit quality of Countrywide's loan portfolio in the 2006 Form 10-K by stating that the "majority of [Countrywide's] loan production consists of Prime Mortgage Loans," its loans were "prudently underwritten" and that, for example, some inherently risky loan types, such as pay-options and HELOCs had "average original" FICO scores of 718 and 733, respectively, as of December 31, 2006. Defendants made similar affirmations in the First Quarter 2007 Form 10-Q, filed just days before the May 2007 Debentures Offering. Those representations were materially false and

misleading. For example, as Defendant Mozilo admitted in a June 1, 2006 e-mail to Defendant Sambol and others, 20% of the Company's pay-option ARM loans were issued to borrowers with FICO scores of 700 or less.

**b. Prime Home Equity Loans**

314. Prime Home Equity Loans, which included HELOCs, are purportedly prime second-lien mortgage loans secured by the difference between the value of the home and the first-lien mortgage. Home equity loans and lines of credit are inherently riskier than traditional prime loans because they are only protected by a second lien.

315. Prior to and during the Relevant Period, Countrywide generally securitized the prime home equity loans it originated into private-label asset-backed securities with limited recourse through retention of "subordinated interest" assets.

316. With respect to HELOC securitizations specifically, the Company was obligated to advance money to borrowers at some time in the future when the borrower requested a subsequent draw on their line of credit. The Company was then reimbursed for its advances under HELOCs from the cash flows in the securitization pool. Therefore, the Company's securitization activities resulted in assets, i.e., retained interests, and potential liabilities, i.e., obligations to fund home equity line of credit draws.

317. Defendants represented to investors in the 2006 Form 10-K, incorporated by reference in the Offering Memorandum, that the average original FICO score for the Company's HELOCs was 733. As detailed below in Section VI, this representation was materially false and misleading. Among other things, Defendant Mozilo admitted in an April 17, 2006 e-mail to Defendant Sambol, that these products were "toxic" because borrower FICO scores were "below 600, below 500 and some below 400…."

318. As discussed further below, in the event of borrower default, home equity loans and lines of credit often end up being a total loss because the first-lien



1475577v1/010471

holder takes all of the proceeds from liquidation through the sale of the home that collateralized the loan, leaving the home equity lender with nothing. Additionally, in the event of borrower default, fewer cash flows are received into the securitization pools to fund the Company's reimbursements, subjecting Countrywide to further risk of loss.

### c. Nonprime Mortgage Loans

319. The Company's Nonprime Mortgage Loans consisted primarily of subprime loans and Alt-A loans. Alt-A loans are defined as loans to creditworthy applicants who have some other defect that makes the loan riskier than a traditional prime loan, including lack of documentation to prove income or assets, or little or no down payment.

320. According to the Expanded Guidance for Subprime Lending Programs, (the "Expanded Guidance"), issued jointly on January 31, 2001 by the U.S. Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation ("FDIC") and the Office of Thrift Supervision ("OTS"), "[t]he term 'subprime' refers to the credit characteristics of individual borrowers."

321. The FDIC defines subprime loans as loans to borrowers with one or more of the following characteristics: (i) FICO score of 660 or below; (ii) two or more 30-day delinquencies in the past 12 months or one or more 60-day delinquencies in the past 24 months; (iii) judgment, foreclosure, repossession or charge-off in the past 24 months; (iv) bankruptcy in the past five years; or (v) debt service-to-income ratio of 50% or greater.

322. Consistent with the FDIC definition, and according to the widely-accepted definition of subprime in the mortgage lending industry, borrowers with FICO scores below 660 are considered to be "subprime." For example, the Expanded Guidance defines subprime loans as loans with a "[r]elatively high default probability as evidenced by, for example, a credit bureau risk score (FICO)

of 660 or below (depending on the product/collateral), or other bureau or proprietary scores with an equivalent default probability likelihood[.]" Similarly, Standard & Poor's Rating Services ("S&P"), one of the principal credit rating agencies, defines subprime as a borrower with a history of delinquency or other credit problems or "a FICO credit score of 659 or below."

323. As demonstrated in the chart below, and confirmed in internal Company documents, during the three calendar years prior to the Relevant Period, Countrywide significantly increased its origination of subprime loans.

| **(in billions)** | **2003** | **2004** | **2005** | **2006** |
|---|---|---|---|---|
| Total loan origination | $434.9 | $363.4 | $499.3 | $468.2 |
| Nonprime loan origination | $19.8 | $39.4 | $44.6 | $40.6 |
| Nonprime loan as % of Total | 4.6% | 10.9% | 8.9% | 8.7% |

324. Countrywide focused on subprime loans because those loans were higbly lucrative to the Company.

325. As reported in an August 26, 2007 New York Times article, according to former employees who worked in different units of the Company (e.g., prime and subprime units), as well as internal Company documents, Countrywide's entire operations, from its computer systems to its incentive pay structure and financing arrangements, were designed to generate maximum profits, no matter the risk.

326. The August 26, 2007 New York Times article revealed that Countrywide's subprime loans generated the highest fees for the Company because those loans carried interest rates that were typically two or three percentage points higher than traditional, fixed-rate mortgage loans. In addition, internal Company documents cited in the New York Times article show that Countrywide's profit from subprime loans ranged from 5% on small loans of $100,000 to $200,000, to 3% on loans of $350,000 to $500,000. Moreover, the New York Times article

further stated that, according to a former Countrywide employee, profit margins on subprime loans that imposed heavy burdens on borrowers, like high prepayment penalties reached as much as 15% of the loan's value. Prepayment penalties generated $268 million of Countrywide's revenue in 2006, an increase of $56 million, or 26% from $212 million in 2005.

327. Investors were willing to pay more money for the Company's mortgage securities backed by subprime loans because, as a result of higher interest rates charged on those loans, subprime loans generated a larger cash flow and, thus, higher return on investment. Subprime loans with prepayment penalties were particularly lucrative for investors because it was too costly for borrowers to repay the loans early and, thus, borrowers were essentially "locked in" to the full term of the loans. This lock-in guaranteed investors a predictable income stream from the higher interest rates charged for those loans.

328. Defendants encouraged Countrywide employees to engage in aggressive and imprudent lending practices through a highly lucrative commission structure, promising significant financial incentives for employees who sold the most subprime loans. According to a former Countrywide mortgage sales representative cited in an August 16, 2007 Los Angeles Times article "[t]he whole commission structure in both prime and subprime was designed to reward salespeople for pushing whatever programs Countrywide made the most money on in the secondary market." This sales representative further disclosed that the higher the interest rate on the loan, the greater the commission.

329. Thus, according to a former Countrywide loan officer responsible for originating loans, who joined Countrywide's subprime unit in 2004 and is cited in the August 26, 2007 New York Times article, it was not uncommon for a Countrywide loan officer to sell 20 subprime loans per week. This loan officer characterized the subprime market as "a feeding frenzy," explaining that as fast as the loans could be signed, they were sold to investors.

330. Moreover, according to the above Countrywide loan officer cited in the August 26, 2007 New York Times article, adding a three-year prepayment penalty to a loan generated an extra 1% of the loan's value in commissions. Persuading borrowers to add a home equity line of credit to a loan carried extra commissions of .25% according to the former Countrywide mortgage loan officer. Brokers who peddled subprime loans received commissions of .50% of the loan's value versus .20% for Alt-A loans.

**B. Defendants Provided Inherently High-Risk Loans to Unqualified Borrowers, Exposing the Company to Significant Credit Losses**

331. In 2004, Defendants abandoned the Company's stated lending practices and began sacrificing loan quality for quantity by offering high-risk, non-traditional "affordability" loans, primarily to non-creditworthy borrowers, without requiring adequate supporting documentation to verify the borrower's income or collateral on the loan in order to capture a 30% market share. As alleged below in Section X, these systemic changes in Countrywide's underwriting and lending practices came from the top down and pervaded virtually every office of the Company. Such lending practices, which were not disclosed publicly to investors until July 2007, by their very nature, resulted in high-risk loans that were highly likely to fail and cause significant losses to the Company and, ultimately, to investors.

332. Countrywide's high-risk "affordability" loans primarily consisted of the following loans: (1) adjustable rate mortgage (ARM) loans; (2) interest-only loans; (3) HELOCs; and (4) pay-option ARMs.

333. As demonstrated in the chart below, Defendants significantly increased origination of high-risk affordability loans in the years preceding the Relevant Period.

| | For the year-ended December 31, |
|---|---|

| (in billions) | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|
| Total loan originations | $434.9 | $363.4 | $499.3 | $468.2 |
| ARM loans as % of total originations | N/A | 49% | 52.4% | 52.3% |
| Pay-option ARM loans as % of total originations | N/A | 6% | 19% | 14% |
| HELOCs as % of total originations | 4.16% | 8.5% | 8.98% | 10.23% |

334. Pay-option ARM loans provide the borrower with the "option" to make monthly loan repayments of: (i) principal and interest; (ii) only the monthly interest accrued on the loan; or (iii) a fraction of the monthly interest accrued on the loan. If the borrower elects to make the minimum required monthly payment, the difference between the monthly interest accrued and the loan payment (e.g., a portion of the interest accrued) is added to the remaining outstanding principal loan balance, causing the principal to increase so that borrowers owe more than the original principal loan amount. This phenomenon is known in the mortgage lending industry as "negative amortization."

335. Countrywide primarily focused on originating pay-option ARM loans because such loans were the most profitable. Specifically, once the introductory "teaser"-rates on pay-option ARMs expired, the interest rate was typically higher than other types of loans. Internal Company documents, dated March 2007, and cited in the August 26, 2007 New York Times article, show that Countrywide made more than a 4% gross margin on such loans, as compared to 2% on loans backed by the Federal Housing Administration ("FHA").

336. Unlike traditional mortgages where a borrower's failure to make the required minimum monthly interest payment would be characterized as a delinquency and considered a precursor to a default, a failure to pay the minimum

Case MDL No. 2265 Document 1-12 Filed 05/23/11 Page 106 of 283

monthly interest payment on a pay-option ARM loan was considered by Countrywide to be a "positive" event given "negative amortization".

337. When a borrower "chose" not to pay the full monthly interest due, Countrywide added the interest to the outstanding principal balance of the loan as deferred interest earnings in the Company's financial statements.

338. Pay-option ARMs come with "negative amortization caps," which limit the amount of missed interest that can be rolled into the principal balance, typically 110 to 125% of the original loan balance. When a borrower hits that cap, the loan's interest rate is subject to reset and the borrower is required to pay down a portion of the principal, further increasing the likelihood of default on negative amortizing pay-option ARM loans.

339. When evaluating a borrower's ability to repay a pay-option ARM, Countrywide was required to evaluate the customer's ability to repay the loan on the much higher, fully amortized rate, rather than the loan's low initial "teaser" rate. A fully-amortized rate equals the sum of the current index rate plus the margin applicable to the loan.

340. In the 2006 Form 10-K Defendants claimed that Countrywide had "prudently underwritten" its pay-option ARMs, with the application of a standard under which borrowers "meet secondary debt-service ratio tests based on their making the fully amortizing loan payment assuming the loan's interest rate is fully indexed."

341. However, in a May 2007 letter to the OTS' Chief Counsel from Mary Jane M. Seebach, Countrywide's Managing Director for Public Affairs (the "May 2007 Letter"), Defendants admitted that Countrywide judged its customers' creditworthiness for subprime adjustable mortgages on whether they could afford payments at a loan's low initial "teaser" rate, not at the higher rates that might kick in two or three years later. In fact, Countrywide disclosed that in the fourth quarter of 2006, approximately 60% of Countrywide borrowers of subprime adjustable

Case MDL No. 2265 Document 1-12 Filed 05/23/11 Page 107 of 283

mortgages would not have qualified for their mortgages based on the higher rates. Moreover, the May 2007 letter stated that 25% of the pay-option ARM loan borrowers would not have qualified for any mortgage that Countrywide offered.

342. Despite Defendants' claims that the Company was primarily a "prime" lender, the May 2007 Letter stated that "[f]or Countrywide, the percentage of people using subprime loans to purchase homes almost doubled from 20% in 2002 to 38% in 2006." Even this admission, however, does not reveal the full extent of Countrywide's subprime lending. As Defendants would admit during the July 24, 2007 Conference Call ("defined below), Countrywide improperly included in its "prime" category loans to borrowers with FICO scores as low as 500.

343. In a July 27, 2007 analyst report discussing Countrywide's disappointing second quarter 2007 results in the July 24, 2007 Press Release (the "July 27, 2007 Analyst Report"), Stifel, Nicolaus & Co., Inc. questioned its own "sanguine views" on the Company's credit exposure. The July 27, 2007 also Analyst Report confirmed that the Company's underwriting standards declined from 2005 through late 2006, with only minimal improvement in 2007.

344. Significantly, the July 27, 2007 Analyst Report further enumerated the gravity of Countrywide's improper lending practices and expanded definition of "prime" by stating that almost 20% of Countrywide's prime home equity loans in the first two quarters of 2007 were actually given to subprime borrowers with FICO scores of less than 660. In addition, almost 23% of the prime home equity loans in those quarters had a CLTV greater than 100%. In analyst Chris Brendler's view, "the increasing share of sub-660 FICO, 100%+ CLTV, and second home/non-owner occupied loans [was] disturbing." Another startling fact revealed in the July 27, 2007 Analyst Report was that in the first two quarters of 2007, 78% of Countrywide's home equity loans were reduced documentation loans.

345. Countrywide's inherently high-risk loans carried significant additional undisclosed default risks because Countrywide offered such loans mainly to non-

creditworthy borrowers as "stated income" loans and/or "piggyback" loans. These additional undisclosed risks further exacerbated the significant default risk embedded in the Company's affordability loans.

**1. Defendants Originated Stated Income, Or "No-doc" Loans, Without Requiring Supporting Documentation to Verify the Borrower's Income**

346. Stated income loans are loans in which the borrower provides little or no documentation to substantiate his or her income and assets and, thus, creditworthiness and ability to repay the loan. Rather, stated income loans are based upon the borrower's bare representations about the borrower's ability to repay the loan. As reported in a September 19, 2007 Los Angeles Times article, such loans were known in the mortgage lending industry as "liar loans" because "[i]t was widely assumed that many of the borrowers didn't document their incomes because they were lying."

347. Countrywide's stated income, or no documentation loan program was called "Fast & Easy," where borrowers who met certain criteria were allowed documentation waivers.

348. Defendants knew or recklessly disregarded that low or no documentation loans, particularly when provided to subprime borrowers, were more likely to contain material misrepresentations because those borrowers could not otherwise qualify for a loan and, thus, were at an increased risk of default. In fact, Defendant Mozilo confirmed in a June 1, 2006 e-mail to Defendant Sambol and others that he knew that borrower stated income amounts did "not match up with IRS records."

**2. Defendants Provided "Piggyback" Loans Permitting Borrowers to Finance the Entire Home Value**

349. Prior to and during the Relevant Period, Countrywide also originated "piggyback" mortgages, which allowed borrowers to finance up to 100% of a home's value without making a significant down payment or paying for private

mortgage insurance. In the case of piggyhack loans, the borrower finances the home purchase through two loans, instead of the traditional comhination of a down payment and a first mortgage. For example, Countrywide would give the borrower one mortgage for 80% of the home's value and a second mortgage (e.g. a HELOC) for the remaining amount of the purchase price, for a combined loan-to-value ("CLTV") ratio of up to 100%.

350. Piggyback loans are inherently high-risk loans because the borrowers invest little or none of their own money. The borrowers are also particularly vulnerahle to any downturn in the housing market given that they have little or no equity in the property. Accordingly, the borrowers are more likely to default on the loans than borrowers who paid a down payment of 20% or more and, therefore, have a significant investment in the home. Moreover, piggyhack loans typically carry a much larger interest rate, adding a further risk of default.

351. According to an October 24, 2007 Wall Street Journal article, a UBS AG survey (the "UBS Survey") reported that Countrywide "allowed borrowers to put down as little as 5% of a home's price and offered 'piggyback mortgages,'" resulting in the borrower financing more than 80% of a home's value without paying for private mortgage insurance. According to the UBS Survey, "[b]y 2006, nearly 29% of the pay-option ARMs originated by Countrywide and packaged into mortgage securities had a combined loan-to-value ratio of 90% or more, up from just 15% in 2004." This meant that the borrower held only 10% or less equity interest in the home and, thus, Countrywide, as the lender, was significantly exposed should the borrower default on the loan.

352. Prior to and during the Relevant Period, Defendants provided piggyback loans with CLTV ratios as high as 110% to subprime borrowers, in lieu of requiring the borrower to purchase private mortgage insurance. Thus, Countrywide was not insured on these high-risk loans should borrowers default on the loans.

### C. Countrywide's Substantial Credit and Liquidity Risks

353. As the largest mortgage lender in the country during the Relevant Period, Countrywide had "significant" financing needs in order to operate and finance its business operations. Thus, the credit quality of the mortgage loans Countrywide originated and then packaged into securities was of paramount importance to the Company's ability to sell its loans to investors and to maintain sufficient liquidity levels.

354. As discussed below, Countrywide's primary source of credit risk -- the risk of borrower default and the risk that liquidating collateral underlying the loan will raise adequate funds to repay the loan balance -- arose from the Company's continuing investment and/or obligations in the securitized loans retained in the form of credit-enhancing subordinated interests (retained interests) and representations and warranties issued in connection with those securitized loans.

355. As a result of the Company's imprudent lending practices described above, during the Relevant Period, it became increasingly difficult for Countrywide to sell the loans it originated in the secondary market, thereby forcing the Company into a debilitating liquidity crisis.

#### 1. Countrywide Faced Substantial Liquidity Risks From the Company's Dependence on Financing To Fund Loau Originations and Purchases

356. In order to fund the billions of dollars of loans that Countrywide originated and purchased for investment, the Company was required to maintain the highest level of liquidity. Countrywide's 2006 Form 10-K defined "liquidity risk" as the risk that the Company will be "unable to meet [its] obligations as they come due because of an inability to liquidate assets or obtain adequate funding without significantly lowering market prices because of inadequate market depth or market disruptions." As a result of Countrywide's imprudent lending practices, the Company was subject to significant undisclosed liquidity risks prior to and during the Relevant Period.

357. Countrywide's short-term financing needs arose primarily from the Company's holding of mortgage loans pending sale, trading activities of its broker-dealers and its warehouse lending business. The Company typically met its short-term financing needs primarily through issuing unsecured commercial paper, medium-term notes and asset-backed commercial paper in the corporate debt market "[d]ue to their efficiency and low cost." Thus, according to the 2006 Form 10-K, in order to maintain ongoing access to the public debt markets, "it [was] critical for [Countrywide] to maintain an investment-grade credit rating." Any downgrade in the Company's credit rating below "investment-grade" or risk of such a downgrade would have likely required Countrywide to resort to an alternative, more costly source of financing, such as bank lines of credit.

358. Countrywide's long-term financing needs arose primarily from investments in the Company's mortgage loan portfolio, MSRs and retained interests. Prior to and throughout the Relevant Period, Countrywide relied heavily upon the secondary market to meet the Company's long-term capital requirements. Because Countrywide depended upon the secondary market to finance its operations, the credit quality of the Company's loan portfolio was critical to its ability to sell those assets and maintain liquidity.

### 2. Countrywide's Credit Risk

#### a. Credit Risk From Subordinated Retaiued Interests

359. In addition to originating high-risk loans, Countrywide exposed itself to even greater credit risk by retaining interests in the loans the Company securitized (retained interests).

360. According to the Company's 2006 Form 10-K, the Company's sales and securitizations of prime residential loans were "generally structured without recourse." Thus, the majority of Countrywide's credit risk lay with prime home equity and nonprime loan securitizations.

361. The Company's prime home equity and nonprime loans were structured with recourse through the retention of subordinated retained interests, meaning Countrywide was in a first loss position. Under its first loss position, the Company's entire future cash flows accruing from the underlying loans related to the subordinated retained interests were subject to absorption of losses due to credit risk. According to relevant accounting principles, Countrywide was required to state its subordinated retained interests at fair value, and adjust the carrying value of its retained interest assets on a quarterly basis for any impairment losses that occurred.

362. Retained interests typically become impaired when borrowers of the underlying loans in the securitization pools are delinquent and/or default on their loans, thereby causing the value of the securities to decline.

363. Impairment also occurs when borrowers fail to fulfill their repayment obligations relating to draws on the borrowers' HELOCs. Specifically, Countrywide incurs losses when delinquencies or defaults exceed a specified threshold or duration set forth in the contractual terms of the securities, a phenomenon known as "rapid amortization." In the case of rapid amortization, reimbursement of the Company's advances for subsequent draws on HELOCs become subordinated to the claims of all other parties to the securitization and the Company receives reimbursement (from liquidation of the underlying collateral) only after other parties in the securitization have received all of the cash flows to which they are entitled. Rapid amortization status has the effect of extending the time period for which the Company's advances are outstanding and, thus, left Countrywide vulnerable to the risk of incurring credit losses when borrowers did not repay the funds advanced on the draw.

364. Because Countrywide was in a first loss position, the Company was at risk to absorb a disproportionately high percentage of losses realized on the securitized mortgage pools underlying the subordinated retained interests.

365. In the documents incorporated by reference into the Offering Memorandum, Defendants claimed that the Company managed credit risk through "underwriting standards, which include assessing both a borrower's quality and the adequacy of collateral" and purportedly limited the risk of incurring credit losses by "structuring [Countrywide's] operations to ensure consistent production of quality mortgages."

**b. Credit Risk From Representations and Warranties**

366. In connection with loans Countrywide sold in the form of asset-backed securities, the Company was also subject to credit losses arising from representations and warranties made to investors concerning Countrywide's underwriting standards for loan origination.

367. The Company's representations and warranties included, among other representations: (i) Countrywide's ownership of the loan; (ii) the loan's compliance with any applicable loan criteria established by the buyer (e.g., loan balance limits, property type, delinquency status); and (iii) the loan's compliance with applicable local, state and federal laws. Moreover, Countrywide's representations and warranties were generally not subject to stated limits.

368. Estimated losses for representations and warranties during the Relevant Period were recorded upon the sale of the loans as an adjustment to gain or loss on sale of loans and securities (reducing net income) and a corresponding liability. According to the 2006 Form 10-K, such credit losses were determined by evaluating lifetime credit losses, default rates and loss severities, which were based upon historical experience developed from the mortgage loan servicing portfolio, and purportedly adjusted for current market factors.

369. In the event of an actual breach of a representation or warranty, or if a borrower defaulted early in the term of the loan, the investor/purchaser could require Countrywide to repurchase the mortgage loans or indemnify the investor, resulting in a loss to Countrywide. Thus, Countrywide was at risk to fully absorb

losses on the underlying loans. If the Company was required to repurchase the loans, it classified them as LHI (loans held for investment) on its balance sheet and subsequently reduced the carrying value of such investments by future estimated losses recorded in the Company's offsetting allowance for loan losses.

## V. COUNTRYWIDE'S MAY 2007 DEBENTURES OFFERING

370. On May 16, 2007, Countrywide announced that it had priced the issuance of $2 billion Series A and $2 billion Series B Floating Rate Convertible Senior Debentures for sale by the Joint Book Running Managers: Lehman Brothers Inc. ("Lehman"); Citigroup Global Markets Inc. ("Citigroup"); and Bank of America Securities LLC ("BofA Securities").

371. The Debentures were sold pursuant to the Offering Memorandum to qualified institutional buyers ("QIBs") under SEC Rule 144A. QIBs are defined by SEC Rule 144A as institutional investors that in the aggregate own or invest on a discretionary basis at least $100 million in securities and broker/dealers that in the aggregate own or invest on a discretionary basis at least $10 million in securities. See 17 C.F.R. § 230.144.

372. The Offering Memorandum stated, among other things, that "Countrywide Financial Corporation is offering" the Debentures at issue in this action. The cover page further stated in large bold print that the Debentures were "Fully and Unconditionally Guaranteed by Countrywide Home Loans, Inc." (the issuer's primary mortgage banking subsidiary). Moreover, the Offering Memorandum specifically stated that the proceeds received from the Offering, which were estimated at "approximately $3.96 billion" after expenses, would be used to repurchase "approximately $863 million" of Countrywide's common stock, as well as for "general corporate purposes."

373. The statements contained in the Offering Memorandum and those contained in the documents incorporated by reference therein (signed by the Individual Defendants) were issued by and attributable to the Defendants.

374. The Offering Memorandum described the Debentures and set forth the terms of the Offering. In this regard, the Offering Memorandum stated that the Debentures were senior unsecured obligations of Countrywide and were to bear interest at a floating rate equal to three-month LIBOR, reset quarterly, minus 3.5% for the Series A Debentures, and 2.25% for the Series B Debentures. Interest payments were to be made at quarterly intervals commencing July 15, 2007. Both series of Debentures had stated maturity dates of 2037.

375. Pursuant to the terms of the Offering Memorandum under the section entitled "Conversion Rights", the Debentures were convertible into Countrywide common stock under certain events prior to maturity such that for each $1,000 principal amount of the Debentures converted, the holder would receive cash and common stock at an initial conversion rate of 19.0734 shares of common stock for the Series A Debentures and 17.1003 shares for the Series B Debentures, representing an initial conversion price of $52.43 and $58.48 per share, respectively.

376. The conversion terms of the Debentures caused the Debentures to trade during the Relevant Period in correlation to Countrywide common shares, in that any appreciation or diminution in the NYSE listed prior of Countrywide common stock would render the Debentures more or less valuable due to the conversion feature. In addition to Defendants' materially false and misleading statements identified below in Sections VI and VII, Plaintiffs justifiably relied on the prices of Countrywide common stock, which reflected all available material information concerning Countrywide and its businesses.

377. The Offering Memorandum also explicitly incorporated by reference certain documents that Countrywide filed with the SEC:

> We incorporate by reference the documents listed below and any future filings we make with the SEC under Sections 13(a), 13(c), 14, or 15(d) of the

Securities Exchange Act of 1934 . . . : Annual Report on Form 10-K for the year ended December 31, 2006. Quarterly Report on Form 10-Q for the quarter ended March 31, 2007.

378. As alleged in detail below, the documents incorporated by reference into the Offering Memorandum, and, therefore, the Offering Memorandum, itself, contained materially false and misleading statements and omissions of material fact concerning Countrywide's lending and underwriting practices prior to and throughout the Relevant Period and misstated Countrywide's financial position.

379. As a result of Defendants' misrepresentations and omissions of material facts concerning the true financial status of Countrywide, as detailed herein, Plaintiffs purchased Debentures at artificially inflated prices during the Relevant Period. In response to the gradual emergence of the truth regarding Countrywide's operations and financial condition, the prices of the Debentures fell precipitously, causing Plaintiffs to sustain significant damages.

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

380. As discussed above, prior to and during the Relevant Period, Defendants knew that the Company was offering high-risk mortgage loans, primarily to non-creditworthy borrowers, without requiring supporting documentation to verify the borrower's income or collateral on the loan. In many cases these loans were for amounts equal to 100% of the value of the home.

381. Notwithstanding Countrywide's known imprudent lending practices prior to and throughout the Relevant Period, Defendants made numerous material misrepresentations and omissions, discussed below, that artificially inflated the prices of the Debentures at the time that they were first offered, and continued to cause prices of the Debentures to be artificially inflated until the previously

Case MDL No. 2265 Document 1-12 Filed 05/23/11 Page 117 of 283

misrepresented and omitted material facts were fully disclosed at the end of the Relevant Period.

**A. Material Misrepresentations and Omissions Of Material Fact In The 2006 Form 10-K**

382. On March 1, 2007, Countrywide filed the Company's 2006 Form 10-K. Defendants Mozilo and Sieracki signed the 2006 Form 10-K, which was incorporated by reference into the Offering Memorandum.

383. As alleged below, the 2006 Form 10-K contained numerous categories of materially false and misleading information. The 2006 Form 10-K also falsely represented that Countrywide's financial statements were prepared in conformity with GAAP.

**1. Countrywide's Loan Quality**

384. In the 2006 Form 10-K, Defendants represented that Countrywide's prime loan portfolio was comprised of loans to "prime credit quality" borrowers:

> Prime Mortgage Loans -- These are prime credit quality first-lien mortgage loans secured by single-family residences.
>
> Prime Home Equity Loans -- These are prime credit quality second-lien mortgage loans, including home equity lines of credit, secured by single-family residences.

385. Defendants also represented in the 2006 Form 10-K that the majority of Countrywide's mortgage loan production for the year ending December 31, 2006 consisted of "prime" mortgages, as follows:

| **Product** | **(in millions)** |
|---|---|
| Prime Mortgage | $374,029 |
| Prime Home Equity | $47,876 |

Case MDL No. 2265 Document 1-12 Filed 05/23/11 Page 118 of 283

| | |
|---|---|
| Nonprime Mortgage | $40,596 |

386. Defendants further claimed in the 2006 Form 10-K that the Company's access to the secondary mortgage market as a source for long-term capital was safe because the Company produced and sold "quality mortgages[:]"

> Our strategy is to ensure our ongoing access to the secondary mortgage market by consistently producing quality mortgages and servicing those mortgages at levels that meet or exceed secondary mortgage market standards. We make significant investments in personnel and technology to ensure the quality of our mortgage loan production.

387. The above statements in the 2006 Form 10-K, and explicitly incorporated into the Offering Memorandum, were materially false and misleading when made because Defendants misrepresented and/or failed to disclose, among other things, that: (i) a material amount of loans sold to investors were not "prime" quality loans -- rather, a substantial portion of purported "prime" home equity loans and pay-option ARMs were provided to borrowers with FICO scores below 660; (ii) Defendants misclassified subprime loans as "prime" loans in the Company's publicly filed financial statements; (iii) as a result of the Company's imprudent lending standards, the Company's loans sold in the secondary market did not actually meet secondary mortgage market standards, let alone exceed them; and (iv) Countrywide violated its own stated underwriting and lending policies. As alleged above in ¶¶ 310, 313, 317, 322-25, 328-45, and 347-352 and below in ¶¶ 491-495, 546-549, 556, 559, 652-54, and 684-778, Defendants knew and/or acted with deliberate recklessness in disregarding that their statements were materially false and misleading at the time that they were made.

388. Defendants also failed to disclose the true creditworthiness of the borrowers to whom Countrywide provided loans. Specifically, by reporting only the "average" FICO score, rather than the actual score, Defendants concealed that a material portion of borrowers in the Company's purported "prime" loan portfolio actually had subprime credit scores.

389. With respect to the inherently risky loan types at issue in this action, the 2006 Form 10-K stated that the average original FICO scores for pay-option ARMs and HELOCs, purportedly "prime" quality loans, were 718 and 733, respectively, as of December 31, 2006. This representation was materially misleading when made. As Defendant Mozilo admitted in a June 1, 2006 e-mail to Defendant Sambol and others "at least 20% or more of [Countrywide's] pay option loans [were] at a FICO of 700 or less. It is clear that the lower FICO borrowers are going to experience a payment shock which is going to be difficult if not impossible for them to manage."

390. The above statements in the 2006 Form 10-K, explicitly incorporated into the Offering Memorandum, concerning borrower credit scores in the Company's purported "prime" loan portfolio were also materially false and misleading when made because, Defendants misrepresented and/or failed to disclose, among other things, that: (i) Countrywide improperly classified loans to unqualified borrowers whose credit scores were as low as 500 as "prime" loans; (ii) although pay-option ARM loans were only meant for the most creditworthy borrowers, Countrywide offered such loans to unqualified borrowers with little, or no, income documentation; (iii) as a result, Countrywide's "prime" loans were not prime at all; and (iv) the Company had significantly greater exposure to subprime loans than represented to investors. As alleged above in ¶¶ 310, 313, 317, 322-25, 328-45, and 347-352 and below in ¶¶ 491-495, 546-549, 556, 559, 652-54, and 684-778, Defendants knew and/or acted with deliberate recklessness in disregarding

that their statements were materially false and misleading at the time that they were made.

### 2. Countrywide's Credit and Loan Underwriting Practices

391. In the 2006 Form 10-K, Defendants claimed that "[u]nderwriting guidelines and investment objectives are adjusted based on management's assessment of the results of performance monitoring." Defendants further represented that Countrywide employed "prudent" lending practices and underwriting standards in originating various loan types, in part, so the Company could sell them in the secondary market:

> Our underwriting guidelines for non-conforming mortgage loans, Prime Home Equity Loans, and Nonprime Mortgage Loans have been designed so that these loans are salable in the secondary mortgage market. We developed these guidelines to meet the requirements of private investors, rating agencies and third-party credit enhancement providers.

392. The above statements concerning Countrywide's lending and underwriting practices were materially false and misleading when made because: (i) the Company's loans were not of salable quality; (ii) Defendants significantly increased production of subprime loans held-for-sale that they knew did not meet secondary market standards; (iii) Defendants approved loans that did not meet Countrywide's stated underwriting standards by, among other ways, overriding low FICO scores; (iv) Countrywide's mortgage underwriting was in violation of mandatory Interagency Guidance; and thus (v) the Company's loan portfolio did not meet investor or rating agency requirements. As alleged above in ¶¶ 310, 313,

317, 322-25, 328-45, and 347-352 and below in ¶¶ 491-495, 546-549, 556, 559, 652-54, and 684-778, Defendants knew and/or acted with deliberate recklessness in disregarding that their statements were materially false and misleading at the time that they were made.

393. These statements were also materially false and misleading when made because as alleged below in ¶¶ 685, 703, 716-18 Defendants knew at the time they filed the 2006 Form 10-K that Countrywide had an undisclosed practice of granting "exceptions" to approve loans to borrowers who did not meet the Company's stated underwriting standards.

394. In the 2006 Form 10-K, the Company also misleadingly characterized its underwriting policies and procedures for determining who Countrywide should extend loans to. In this regard, Defendants claimed that Countrywide "manage[d] credit risk through credit policy, underwriting, quality control and surveillance activities." Defendants further claimed:

> Our credit policy establishes standards for the determination of acceptable credit risks. Those standards encompass borrower and collateral quality, underwriting guidelines and loan origination standards and procedures.
>
> Borrower quality includes consideration of the borrower's credit and capacity to pay. We assess credit and capacity to pay through the use of credit scores, application of a mortgage scorecard, and manual or automated underwriting.
>
> * * *

> . . . We help to ensure that our origination standards are met by employing accomplished and seasoned management, underwriters and processors and through the extensive use of technology. We also employ proprietary underwriting systems in our loan origination proeess that improve the consistency of underwriting standards, assess collateral adequacy and help to prevent fraud, while at the same time increasing productivity.

395. The 2006 Form 10-K similarly assured investors that, with respect to Countrywide's Banking Segment: "Banking Operations manages credit risk through the establishment of underwriting standards, which include assessing both a borrower's quality and the adequacy of collateral securing the loan."

396. The above statements coneerning borrower quality and repayment capacity were materially false and misleading when made because Countrywide: (i) originated a significant amount of non-traditional, high-risk loans with little or no documentation (e.g., approximately 80% of pay-option ARM loans and home equity loans were low doc loans in 2006); (ii) provided inherently risky loans to borrowers, regardless of their credit score, in order to generate more fees and secure market share; (iii) as a result of the above, did not adequately consider either an applicant's creditworthiness and/or ability to repay the loan in providing mortgage loans; (iv) violated the Company's own underwriting and lending policies; and (v) violated mandatory Interagency Guidance relating to underwriting its high-risk loans. As alleged above in ¶¶ 310, 313, 317, 322-25, 328-45, and 347-352 and below in ¶¶ 491-495, 546-549, 556, 559, 652-54, and 684-778, Defendants knew

Case MDL No. 2265 Document 1-12 Filed 05/23/11 Page 123 of 283

and/or acted with deliberate recklessness in disregarding that their statements were materially false and misleading at the time that they were made.

397. Countrywide also purportedly customized the Company's underwriting standards to the specific non-traditional loans it generated. With respect to pay-option ARM loans, arguably the riskiest non-traditional loan type, Defendants claimed in the 2006 Form 10-K that such loans were "prudently underwritten." There was no reasonable or good faith basis for this statement. Among other things, in a September 26, 2006 e-mail to Defendants Sambol and Sieracki, Defendant Mozilo recognized that pay-option ARMs posed a risk to the Company and that Countrywide was "flying blind on how these loans will perform in a stressed environment." Further, as the Company's Managing Director for Public Affairs admitted in the May 2007 Letter to the OTS' Chief Counsel, the loans were underwritten based upon the borrowers' ability to pay the introductory "teaser" rate, rather than the rates that would apply shortly thereafter. This letter further revealed that: (i) 60% of the borrowers for these products would not have qualified based upon the higher rates that dominated the life of the loan; and (ii) 25% of such borrowers would not have qualified for "any other product" that the Company offered.

398. The 2006 Form 10-K also assured investors that the Company's underwriting standards for pay-option ARMs conformed to secondary market standards:

> Our underwriting standards conform to those required to make the pay-option ARM loans salable into the secondary market at the date of the funding, including a requirement that the borrower meet secondary market debt-service ratio tests based on the borrower making the fully amortizing loan payment

Case MDL No. 2265 Document 1-12 Filed 05/23/11 Page 124 of 283

and assuming the loan's interest rate is fully indexed.

399. With respect to piggyback or second loans, Defendants misrepresented in the 2006 Form 10-K that "[w]here a proposed loan's combined loan-to-value ratio is higher than a specified level, which is usually 80% for conventional loans, we generally require the borrower to supplement the collateral with primary mortgage insurance." The foregoing statements concerning piggyback or second loans misrepresented and concealed material facts. Among other things, Defendant Mozilo confessed in an April 17, 2006 e-mail to Defendant Sambol and others: "In all of my years in the business I have never seen a more toxic product . . . the FICOs are below 600, below 500 and some below 400 compounded by the fact that these are 100% loans which must always be written off in the event of foreclosure."

400. The above statements concerning the quality of pay-option ARM and piggyback loans were also materially false and misleading when made because: (i) the pay-option ARM loans were not "prudently underwritten" (i.e., the loans were provided to borrowers with subprime characteristics and without requiring documents verifying income); (ii) the pay-option ARM loans were not of salable quality; (iii) Countrywide admittedly did not evaluate the borrowers' ability to repay pay-option ARM loans on the "fully indexed" interest rate, but rather, used the lowest, introductory rate; (iv) Countrywide admittedly did not require primary mortgage insurance and, instead offered piggyback loans in lieu of private mortgage insurance; and (v) Countrywide violated mandatory Interagency Guidance relating to underwriting its high-risk loans. As alleged above in ¶¶ 310, 313, 317, 322-25, 328-45, and 347-352 and below in ¶¶ 491-495, 546-549, 556, 559, 652-54, and 684-778, Defendants knew and/or acted with deliberate recklessness in disregarding that their statements were materially false and misleading at the time that they were made.

### 3. Countrywide's Portfolio of Loans Held for Investment

401. In the 2006 Form 10-K, Defendants represented that the Company's "investment criteria" for Countrywide's LHI resulted in a "high quality investment portfolio" and the Company's LHI were properly reported at fair value.

402. The 2006 Form 10-K reported gross LHI for the period-ended December 31, 2006 of $78.3 billion and represented that the Company's policy for valuing LHI considered estimated credit losses:

> Loans Held for Investment
>
> Loans are classified as held-for-investment based on management's intent and ability to hold the loans for the foreseeable future or to maturity. Loans held for investment are carried at amortized cost reduced by a valuation allowance for estimated credit losses incurred in the portfolio as of the balance sheet date.

403. In the 2006 Form 10-K, Defendants also represented that Countrywide "reviews its portfolio of loans held for investment for concentrations of loans that might contain disproportionate credit risk" and the Company's LHI were properly adjusted to reflect such "credit losses incurred as of the balance sheet date." The 2006 Form 10-K also represented that Countrywide "manage[d] mortgage credit risk principally by securitizing substantially all mortgage loans that [it] produced, and by retaining only high credit quality mortgages in [its] loan portfolio."

404. In making the foregoing statements regarding LHI, Defendants misrepresented and omitted material facts concerning known risks that the Company faced. As Defendant Mozilo proclaimed in a May 18, 2006 e-mail to Defendants Sambol and Sieracki: "as for pay-options the bank faces potential unexpected losses because higher rates will cause these loans to reset much earlier

than anticipated and as result [sic] causing mortgagors to default due to the substantial increase in their payments." During the Relevant Period, pay-option ARMs comprised a substantial portion of the Company's LHI.

405. Defendants' statements concerning the valuation of Countrywide's LHI were also materially false and misleading when made because: (i) the Company's LHI were not stated at fair value due to Countrywide's failure to adequately consider rising delinquencies and defaults on the loans underlying Countrywide's LHI portfolio; and, accordingly (ii) the Company's LHI were significantly overstated during the Relevant Period. Thus, as alleged in Section IX below, contrary to Defendants' Relevant Period statements, Countrywide's financial statements were not prepared in accordance with GAAP. As alleged above in ¶¶ 305-06, 310, 313, 317, 322-25, 328-45, and 347-352 and below in ¶¶ 489-95, 546-49, 556, 559, 595-614, 652-54, and 684-778, Defendants knew and/or acted with deliberate recklessness in disregarding that their statements were materially false and misleading at the time that they were made.

**4. Countrywide's Allowance for Loan Losses**

406. According to the 2006 Form 10-K, in the Company's allowance for loan losses, the Company's "critical" accounting policy factored credit losses into the reserve calculation:

> Credit Quality and Loan Impairment
>
> The Company provides for incurred losses on loans with an allowance for loan losses. The allowance for loan losses is a valuation allowance established to provide for estimated incurred credit losses in the portfolio of loans held for investment as of the balance sheet date. The allowance for loan losses is evaluated on a periodic basis

> by management and is based on a variety of factors, including historical default and loss rates for similar loans originated by the Company estimates of collateral value for individually evaluated loans and evaluations of the effect of current economic and market conditions . . . .
>
> A loan is considered impaired when, based on current information and events, it is probable that the Company will be unable to collect the scheduled payments of principal or interest when due according to the contractual terms of the loan agreement. The Company's loan portfolio is comprised primarily of large groups of homogeneous loans made to consumers that are secured by residential real estate.
>
> * * *
>
> Once a loan is acquired and included in the Company's portfolio of loans held for investment, Countrywide assesses loan credit quality and estimates its allowance requirement based on whether the loan is individually evaluated or part of a pool of homogeneous loans:
>
> Homogeneous loans, such as mortgage loans and repurchased loans, are evaluated

> based on the loans' present collection status (delinquency, foreclosure and bankruptcy status). Our estimate of the required allowance for these loans is developed by estimating both the rate of default of the loans and the amount of loss in the event of default.

407. Defendants further represented in the 2006 Form 10-K that the Company's "allowances and provisions for credit losses are adequate pursuant to generally accepted accounting principles" and that the Company "continually assess[ed] the credit quality of our portfolios of loans held for investment to identify and provide for losses incurred." The 2006 Form 10-K reported an allowance for loan losses and related provision for loan losses of $236.7 million and $233.8 million, respectively, for the year-ended December 31, 2006. As was later revealed during the July 24, 2007 and October 26, 2007 Conference Calls and in the Company's 2007 Form 10-K, filed after the Relevant Period, Defendants' methodology for calculating loan loss reserves was inadequate and, therefore, did not justify such assertions.

408. Defendants' statements concerning the adequacy of the Company's reserves were materially false and misleading when made because Countrywide's reserve methodology and calculation ignored: (i) the Company's change in lending practices beginning in 2004 to offer non-traditional, high-risk loans; (ii) the Company's significant increase in production of subprime loans; (iii) the significant decline in home prices; and (iv) drastic increases in loan delinquencies and defaults. As alleged above in ¶¶ 305-06, 310, 313, 317, 322-25, 328-45, and 347-365 and below in ¶¶ 489-95, 546-49, 556, 559, 595-614, 652-54, and 684-778, Defendants knew and/or acted with deliberate recklessness in disregarding that their statements were materially false and misleading at the time that they were made.

409. As a result of the above misstatements, the Company's allowance and provision for loan losses were understated and net income was overstated during the Relevant Period. Accordingly, contrary to the foregoing representations, the Company's financial statements were not prepared in accordance with GAAP, as described in more detail below in Section IX.

### 5. Countrywide's Valuation and Impairment of Retained Interests in Loans Sold

410. Defendants represented in the 2006 Form 10-K that Countrywide valued the Company's retained interest in securitizations by "allocating the carrying value of the underlying mortgage loans between securities or loans sold and the interests [the Company] continue[s] to hold, based on their relative fair values" using a "discounted cash flow model and extensive analysis of current market data . . . including "mortgage prepayment speeds, discount rates, and for retained interests containing credit risk, the net lifetime credit losses." The 2006 Form 10-K also stated that the Company's retained interests were backed by "quality mortgages."

411. For the year-ended December 31, 2006, the 2006 Form 10-K reported total retained interests of $3.04 billion. With respect to the Company's retained interests, Defendants also reported in the 2006 Form 10-K as follows:

| **Interests retained in securitization accounted for as available-for-sale securities:** | **December 31, 2006 (in thousands)** |
|---|---|
| Prime home equity line of credit transferor's interest | $144,346 |
| Prime home equity residual securities | $40,766 |
| Interests retained in securitization accounted for as trading securities: | |
| Prime home equity residual securities | $737,808 |
| Prime home equity line of credit transferor's interest | $553,701 |

412. With respect to impairment of retained interests, the 2006 Form 10-K represented that "[c]redit risk is an integral consideration in the valuation of retained interests."

413. Defendants' statements concerning retained interests and HELOCs above were materially false and misleading when made because the Company admitted during the July 24, 2007 Conference Call that Countrywide overstated the value of retained interests by intentionally failing to consider the increased risk from the following in estimating their fair value: (i) production of inherently high-risk loans; (ii) rising delinquencies and defaults on those underlying loans; (iii) borrower credit risk; and (iv) current market data regarding severely depressed home values.

414. Defendants' statements were also materially false and misleading because Defendants failed to disclose that: (i) Countrywide's purported "prime" home equity loans and HELOC portfolio was not really of "prime" quality because the Company had provided such loans to subprime borrowers; and (ii) the Company provided home equity loans to borrowers without requiring documentation to verify borrower asset and income levels. As alleged above in ¶¶ 300-02, 310, 313, 317, 322-25, 328-45, and 347-65 and below in ¶¶ 489-95, 546-49, 556, 559, 615-26, 652-54, and 684-778, Defendants knew and/or acted with deliberate recklessness in disregarding that their statements were materially false and misleading at the time that they were made.

415. Accordingly, Countrywide's retained interests and earnings were overstated throughout the Relevant Period, in violation of GAAP, as described in more detail below in Section IX.

### 6. Countrywide's Valuation and Impairment of MSRs

416. According to the 2006 Form 10-K, the valuation of Mortgage Servicing Rights (MSRs) is "based on the present value of cash flow streams that are closely linked to the expected life of the underlying loans." In calculating the

Case MDL No. 2265 Document 1-12 Filed 05/23/11 Page 131 of 283

fair value of its MSRs, Countrywide stated in the 2006 Form 10-K that the Company valued MSRs using a "discounted cash flow model and extensive analysis of current market data," based on cash flow assumptions and prepayment assumptions that take into account market factors and historical performance.

417. In addition, Defendants claimed in the 2006 Form 10-K that "[c]hanges in the value of [MSR] assets are reflected in current period earnings for MSRs and retained interests accounted for as trading securities."

418. In Countrywide's 2006 Form 10-K, Defendants further stated the Company records impairment on its MSRs when recovery of the value is unlikely:

> For purposes of performing that MSR impairment evaluation, the Company stratified its servicing portfolio on the basis of certain risk characteristics including loan type (fixed-rate or adjustable-rate) and note rate.
>
> * * *
>
> Management periodically reviewed the various impairment strata to determine whether the value of the impaired MSRs in a given stratum was likely to recover. When management deemed recovery of the value to be unlikely in the foreseeable future, a write-down of the MSRs in the stratum to the estimated recoverable value was charged to the valuation allowance.

Case MDL No. 2265 Document 1-12 Filed 05/23/11 Page 132 of 283

419. Misrepresenting the viability of the MSR valuation model, Defendants also contended in the 2006 Form 10-K that the model satisfied the Company's model validation policies:

> The cash flow model and underlying prepayment and interest rate models used to value the MSRs are subjected to validation in accordance with the Company's model validation policies. This process includes review of the theoretical soundness of the models and the related development process, back testing of actual results to model predictions, benchmarking to commercially available models and ongoing performance monitoring.

420. For the year-ended December 31, 2006, Countrywide reported MSRs of $16.2 billion and no impairment of MSR assets. Instead, the Company recorded an increase in the fair value of MSRs of $432 million for 2006.

421. The statements concerning Countrywide's valuation and impairment of MSRs were materially false and misleading when made because, in estimating impairment and the fair value of MSRs, Countrywide ignored rising delinquencies and defaults on the loans underlying the Company's MSR portfolio that resulted from Countrywide's origination of non-traditional, inherently risky loans. As a result of the above increased delinquencies and defaults, the Company's MSR portfolio was significantly overvalued because Countrywide would never be able to collect the amounts due on the underlying loans. As alleged above in ¶¶ 298-302, 310, 313, 317, 322-25, 328-45 and 347-65 and below in ¶¶ 546-49, 556, 559-60, 615-31, and 684-778, Defendants knew and/or acted with deliberate recklessness in

disregarding that their statements were materially false and misleading at the time that they were made.

422. In addition, by failing to value Countrywide's MSRs properly throughout the Relevant Period, Couutrywide overstated the value of its MSRs and understated net income, in violation of GAAP, as detailed below in Section IX. As a result of the Company's inability to collect on the underlying loans, the Company was experiencing significant undisclosed liquidity problems during the Relevant Period.

**7. Countrywide's "Representations and Warranties"**

423. With respect to Countrywide's liability under the representations and warranties made in connection with the sale of loans to the secondary market, the 2006 Form 10-K stated:

> . . . In the event of a breach of such representations and warranties, we may be required to either repurchase the mortgage loans with the identified defects or indemnify the investor or insurer.
>
> * * *
>
> We attempt to limit our risk of incurring these losses by structuring our operations to ensure consistent production of quality mortgages and servicing those mortgages at levels that meet or exceed secondary mortgage market standards.

424. The 2006 Form 10-K also stated that the Company properly considered losses arising from breaches of representations and warranties in setting reserves:

> Other Mortgage Loans Held for Investment
>
> Other loans held for investment are held in our Mortgage Banking Segment and include loans we have repurchased—either to remedy a violation of a representation or warranty made in a loan sale, to minimize the cost of servicing a severely delinquent loan insured or partially guaranteed by the FHA or VA or in connection with a clean-up call. We record such loans at fair value when they are repurchased and any resulting loss is charged against the liability we established when the loans were sold. . . . Subsequent losses that may result from deteriorations in the credit quality of the loans are included in our provision for loan losses.

425. Defendants further claimed in the 2006 Form 10-K that the Company calculates its liability for representation and warranty obligations based upon lifetime credit losses, as follows:

> Valuation of Liabilities Incurred in Sale of Loans
>
> We incur liabilities in our loan sales and securitizations through representations and warranties we make or through other recourse provisions, such as corporate guarantees. . . When credit risk is retained through liabilities incurred in the sale or securitization of loans, the lifetime credit

losses are estimated as follows and are discounted at a risk-free rate of return.

426. Defendants further represented that "[o]ur process for estimating lifetime credit losses benefits from the extensive history and experience we have developed from our mortgage loan servicing portfolio."

427. For the year-ended December 31, 2006, the 2006 Form 10-K reported total liability for representations and warranties and a related provision for losses on representations and warranties of $390.2 million and $290.4 million, respectively, as a component of the income statement's gain on sale of loans and securities.

428. The statements concerning Countrywide's liabilities for representations and warranties were materially false and misleading when made because the Company ignored the following in estimating such liabilities: (i) the increased credit risk associated with the production of inherently high-risk loans; (ii) rising delinquencies and defaults on these underlying non-traditional loans; (iii) borrower credit risk; and (iv) current market data regarding severely depressed home values.

429. Defendants' statements were also materially false and misleading because they were already in violation of numerous undisclosed representations and warranties made in connection with the loans sold, including, among others: (i) Countrywide's ownership of the loan; (ii) the loan's compliance with any applicable loan criteria (e.g., loan balance limits, property type, delinquency status) established by the buyer; and (iii) the loan's compliance with applicable local, state and federal laws. In addition, unbeknownst to investors, Countrywide was subject to stiff repayment penalties that required Countrywide to repurchase loans after only 30 days of delinquency. As alleged above in ¶¶ 310, 313, 317, 322-25, 328-45, 347-52, and 366-69 and below in ¶¶ 523, 557-58, 632-39, and 684-778, Defendants knew and/or acted with deliberate recklessness in disregarding that their statements were materially false and misleading at the time that they were made.

430. Thus, Countrywide's liability for representations and warranties and its provision for related losses were understated and retained interests and net income were overstated, as reported in the 2006 Form 10-K, in violation of GAAP, as detailed below in Section IX.

**8. Countrywide's Liquidity**

431. Defendants represented in the 2006 Form 10-K that the Company had implemented a Liquidity Management Plan (the "LMP") to "ensure that [the Company] maintain[s] adequate, appropriate and cost-effective sources of liquidity under all market conditions."

432. The 2006 Form 10-K further detailed the key elements of the LMP:

> We diversify our financing programs, credit providers, dealers and debt investors to reduce reliance upon any one source of liquidity. Finally, we assess all sources of financing based upon their reliability, recognizing that certain of our financing programs are sensitive to temporary market disruptions and therefore may not always be available to us.

433. The above statements concerning Countrywide's liquidity risk and risk management were materially false and misleading when made because Defendants failed to disclose that the Company did not: (i) adequately diversify financing programs in order to sufficiently mitigate liquidity risk; (ii) have sufficient liquidity to meet downturns in the mortgage markets and fulfill its financial obligations; and (iii) implement safeguard mechanisms to at least ensure sufficient contingent liquidity.

434. The above statements were further materially false and misleading because, as Defendants disclosed in the Second Quarter 2007 Form 10-Q,

Case MDL No. 2265 Document 1-12 Filed 05/23/11 Page 137 of 283

Countrywide was experiencing liquidity problems by the third quarter of 2006 as a result of rising loan delinquencies and defaults in connection with Countrywide's origination of non-traditional, high-risk loans. As alleged above in ¶¶ 305-306, 310, 313, 317, 322-25, 328-45, and 347-69 and below in ¶¶ 479, 510-511, and 684-778, Defendants knew and/or acted with deliberate recklessness in disregarding that their statements were materially false and misleading at the time that they were made.

### 9. Countrywide's Internal Controls

435. Defendants claimed in the 2006 Form 10-K to ensure that the Company's underwriting standards were met through various control procedures:

> . . . We help to ensure that our origination standards are met by employing accomplished and seasoned management, underwriters and processors and through the extensive use of technology. We also employ proprietary underwriting systems in our loan origination process that improve the consistency of underwriting standards, assess collateral adequacy and help to prevent fraud, while at the same time increasing productivity.
>
> We supplement our loan origination standards and procedures with a post-funding quality control process. Our Quality Control Department is responsible for completing loan audits that may consist of a re-verification of loan documentation, an

Case MDL No. 2265 Document 1-12 Filed 05/23/11 Page 138 of 283

> underwriting and appraisal review, and, if necessary, a fraud investigation. We also employ a pre-and post-funding proprietary loan performance evaluation system. This system helps to identify fraud and poor performance of individuals and business entities associated with the origination of our loans. The combination of this system and our audit results allows us to evaluate and measure adherence to prescribed underwriting guidelines and compliance with laws and regulations.

436. The above statements regarding Countrywide's control procedures were materially false and misleading because the Company's proprietary system did not: (i) ensure that loan origination standards were met; or (ii) improve the consistency of underwriting standards. As admitted in McMurray's August 6, 2007 e-mail, the Company had "long followed a guiding principal of 'matching' (products, guidelines, etc.) and no brokering." As a result of the Company's matching strategy, no loan was too risky for Countrywide, and any putative underwriting guidelines were subverted to sales.

437. Similarly, in his April 13, 2006 e-mail, to defendants Sambol and Sieracki, Defendant Mozilo admitted that he had "observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus a pricing of those loan [sic]." Moreover, Countrywide originated "exception" loans in violation of the Company's stated underwriting standards. As alleged above in ¶¶ 310, 313, 317, 322-25, 328-45, and 347-52 and below in ¶¶ 491-95, 546-49, 556, 559, 663-75, and 684-778, Defendants knew and/or acted with deliberate recklessness in disregarding

that their statements were materially false and misleading at the time that they were made.

438. Defendants further misrepresented in the 2006 Form 10-K that the Company maintained adequate controls over Countrywide's financial statements and operations as follows:

(1) Evaluation of Disclosure Controls and Procedures

> We have conducted an evaluation, with the participation of our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our disclosure controls and procedures . . . as of the end of the period covered by this annual report as required by paragraph (b) of Rules 13a-15 and 15d-15 under the Exchange Act. Based on their evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective in ensuring that material information relating to the Company, including our consolidated subsidiaries, is made known to the Chief Executive Officer and Chief Financial Officer by others within those entities during the period in which this annual report on Form 10-K was being prepared.

(2) Management's Report on Internal Control Over Financial Reporting

> Management is responsible for establishing and maintaining adequate internal control over financial reporting for the Company.
>
> The Company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America.
>
> * * *
>
> In making its assessment of internal control over financial reporting, management used the criteria established in "Internal Control-Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on this assessment, management concluded that the Company's internal control over financial reporting was effective as of December 31, 2006.

439. The 2006 Form 10-K also included certifications signed by Defendants Mozilo and Sieracki, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, which represented that the Company's financial statements did not contain material

Case MDL No. 2265 Document 1-12 Filed 05/23/11 Page 141 of 283

misstatements or omissions, and that the Company employed internal disclosure controls over financial reporting and related disclosures.

440. In this regard, the 2006 Form 10-K contained a certification signed by Defendant Mozilo, which stated:

> I, Angelo R. Mozilo, certify that:
>
> 1. I have reviewed this annual report on Form 10-K of Countrywide Financial Corporation;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> * * *
>
> 5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely

Case MDL No. 2265 Document 1-12 Filed 05/23/11 Page 142 of 283

affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

441. The 2006 Form 10-K contained a separate certification signed by Defendant Sieracki, which contained a verbatim reproduction of Defendant Mozilo's certification statements above.

442. Moreover, the 2006 Form 10-K contained certifications signed by Defendant Mozilo, which stated in pertinent part that:

In connection with the Annual Report on Form 10-K of Countrywide Financial Corporation . . . for the period ended December 31, 2006 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Angelo R. Mozilo, Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

443. The 2006 Form 10-K also contained an identical certification pursuant to 18 U.S.C. § 1350, as adopted pursuant to Section 906 of the Sarbancs-Oxlcy Act of 2002, signed by Defendant Sieracki.

444. The above certifications and statements concerning Countrywide's internal controls and the accuracy and completeness of the 2006 Form 10-K were materially false and misleading when made because Countrywide's internal controls were ignored and/or severely deficient and, thus, allowed the Company to: (i) provide high-risk loans to unqualified borrowers, often without the required documentation necessary to evaluate the borrower's true credit risk and ability to repay the loan; (ii) maintain inadequate reserves for loan losses; and (iii) understate liabilities and losses and overstate assets and net income. Accordingly, Defendauts did not maintain a system of adequate controls as represented in the 2006 Form 10-K, in violation of GAAP, as detailed below in Section IX. As alleged above in ¶¶ 310, 313, 322-25, 328-45, and below in ¶¶ 491-95, 546-49, 556, 559, 663-75, and 684-778, Defendants knew and/or acted with deliberate recklessness in disregarding that their statements were materially false and misleading at the time that they were made.

**10. Countrywide's Pnrported Risk Factors**

445. In its 2006 Form 10-K, Countrywide disclosed certain boilerplate risk factors that "may" impact the Company's future financial and operating results. These risk factors were materially incomplete and therefore, false and misleading when made because they only warned of possible impacts to the Company when, in fact, Defendants knew that these purported risk factors were already impacting Countrywide. With regard to credit losses, the Company stated:

> We may experience credit losses due to downward trends in the economy and in the real estate market.



1475577v1/010471

Our profitability in our Mortgage Banking, Banking and Capital Markets Segments is impacted by the ahility of our customers to repay their loans. These loans are underwritten in accordance with prescribed guidelines . . . . worsening economic and real estate market conditions could negatively impact the value of the credit subordinated securities we retain and increase our liahilities under our corporate guarantees and representations and warranties.

Likewise, worsening economic conditions increase the risk that our borrowers will not be able to repay our portfolio loans, and worsening real estate market conditions increase the risk that the value of the properties securing our loans will be insufficient to repay amounts owing to us in the event onr borrowers default on the loans. Another factor that may contribute to higher delinquency and default rates is the increase in monthly payments on adjustable rate mortgage loans. Any increase in prevailing market interest rates may result in increased payments for borrowers who have adjustable rate mortgage loans. Moreover,

> with respect to hybrid mortgage loans after their initial fixed rate period, and with respect to mortgage loans with a negative amortization feature which reach their negative amortization cap, borrowers may experience a substantial increase in their monthly payment even without an increase in prevailing market interest rates.

446. The above statements concerning the Company's risk of credit losses were materially false and misleading when made because Defendants knew, but failed to disclose, that these purported risks had already occurred as a result of Countrywide's undisclosed imprudent lending practices (described in Section IV above), which caused severe losses in the Company's loan portfolio given drastically rising borrower delinquencies and defaults. Defendants were further aware that the Company was experiencing increased losses from piggyback loans because those loans were insufficiently collateralized, in part, as a result of deteriorating housing market conditions. Thus, this purported risk concerning potential credit losses had already become a reality.

447. For example, in his April 4, 2006 e-mail to Defendant Sambol and others, Defendants Mozilo acknowledged that because over 70% of pay-option ARM borrowers "have opted to make the lower payment it appears that it is just a matter of time that we be faced with a substantial amount of resets and therefore much higher delinquencies." Moreover, the known risks associated with the Company's pay-option ARMs were so great that Mozilo advised in a June 1, 2006 e-mail that the Company should be looking to sell off as many of these products as possible and "take a careful look at our reserves and assume the worst."

448. With regard to Countrywide's reliance on the accuracy and completeness of information provided by loan applicants, the Company disclosed the following risk factor in its 2006 Form 10-K:

> In deciding whether to extend credit or enter into other transactions with customers and counterparties, we may rely on information furnished to us by or on behalf of customers and counterparties, includiug financial statements and other financial information. We also may rely on representations of customers and counterparties as to the accuracy and completeness of that information and, with respect to financial statements, on reports of independent auditors.
>
> * * *
>
> Our financial condition and results of operations could be negatively impacted to the extent we rely on customer information that is not complete or accurate.

449. The above statements concerning Defendants' reliance on borrower representations were materially false and misleading when made because Defendants already knew that certain loan documentation was falsified. For example, Defendant Mozilo stated in a June 1, 2006 e-mail to Defendant Sambol and others that "the majority of pay options being originated by us, both wholesale and retail, are based upon stated income. There is also some evidence that the information the borrower is providing us relative to their income does not match up

with IRS records." In addition, Defendants knew but did not disclose that Countrywide's employees encouraged and assisted loan applicants in reporting falsely inflated income levels to qualify for certain loans and, thus, the Company actively manipulated such information in order to facilitate unwarranted loan approvals and boost loan sale volumes. As alleged above in ¶¶ 310, 313, 317, 322-25, 328-45, and 347-52 and below in ¶¶ 491-95, 546-49, 556, 559, 663-75, and 684-778, Defendants knew and/or acted with deliberate recklessness in disregarding that their statements concerning purported risk factors were materially false and misleading at the time that they were made.

### B. Material Misrepresentations and Omissions Of Material Fact In The First Quarter 2007 Form 10-Q

450. On May 9, 2007, the Company filed the First Quarter 2007 Form 10-Q with the SEC. Defendants Sambol and Sieracki signed the First Quarter 2007 Form 10-Q, which was incorporated by reference into the Offering Memorandum.

451. The First Quarter 2007 Form 10-Q made the same types of materially false and misleading statements as those contained in the 2006 Form 10-K concerning Countrywide's: (i) loan quality; (ii) credit and loan underwriting policies and practices; (iii) allowance for loan loss reserves; (iv) valuation and impairment of retained interests; (v) impairment on MSRs; (vi) representations and warranties; (vii) liquidity; (viii) internal controls; and (ix) risk factors discussed above in ¶¶ 382-449.

452. The First Quarter 2007 Form 10-Q also falsely represented that Countrywide's financial statements were prepared in conformity with GAAP, a representation that was materially false and misleading when made for the reasons alleged below in Section IX.

### 1. Countrywide's Loan Quality

453. In the First Quarter 2007 Form 10-Q, Defendants represented that the overwhelming majority of Countrywide's mortgage loan production for the quarter ending March 31, 2007 consisted of "prime" mortgages, as follows:

| Product | (in millions) |
|---|---|
| Prime Mortgage | $96,544 |
| Prime Home Equity | $10,539 |
| Nonprime Mortgage | $7,881 |

454. Referring to Countrywide's portfolio of mortgage loans originated or purchased for investment, the First Quarter 2007 Form 10-Q stated that "[w]e assess a loan's quality by considering the borrower's credit profile and the quality of collateral securing the loan."

455. Also, the First Quarter 2007 Form 10-Q reported only the misleading "Average original FICO score[s]," rather than the actual FICO score distribution, which would have alerted investors of the true extent of risk contained in the Company's loan portfolio.

456. Defendants knew and/or acted with deliberate recklessness in disregarding that the above-referenced statements concerning the quality of Countrywide's loan portfolio and borrower creditworthiness were materially false and misleading when made for the reasons stated above in ¶¶ 387 and 390.

### 2. Countrywide's Credit and Loan Underwriting Practices

457. In the First Quarter 2007 Form 10-Q, Defendants stated the following concerning Countrywide's credit risk management:

> We actively manage credit risk to maintain credit losses within levels that achieve our profitability and return on capital objectives while meeting our expectations for consistent financial performance.

458. With respect to the Company's underwriting standards and risk management relating to pay-option ARMs, the First Quarter 2007 Form 10-Q explained:

> We manage the credit risk relating to pay-option ARM loans through a variety of methods, including active borrower communications both before and after funding, through our underwriting standards. Our underwriting standards conform to those required to make the pay-option ARM loans salable into the secondary market at the date of funding, including a requirement that the borrower meet secondary market debt-service ratio tests based on the borrower making the fully amortizing loan payment and assuming the loan's interest rate is fully indexed.

459. Defendants knew and/or acted with deliberate recklessness in disregarding that the above-referenced statements were materially false and misleading when made for the reasons stated above in ¶¶ 392-93, 396 and 399-400.

### 3. Countrywide's LHI and Allowance for Loan Losses

460. In the First Quarter 2007 Form 10-Q, Countrywide falsely reported the value of its LHI for the quarter ended March 31, 2007 as $75.2 billion, net of an

allowance for loan losses. This figure was significantly overstated given the rising delinquencies and defaults on loans underlying Countrywide's LHI portfolio and the Company's failure to account for estimated future losses, as it claimed in the 2006 Form 10-K.

461. Also in the First Quarter 2007 Form 10-Q, Defendants falsely assured investors that Countrywide's allowance for credit losses, which included the allowance for loan losses, was adequate. In this regard, Defendants represented that the Company's "investment criteria have provided us with a high quality investment portfolio and that our credit losses should stay within acceptable levels."

462. With respect to the Company's evaluation of one of its "critical accounting policies," its allowance for loan losses, the First Quarter 2007 Form 10-Q stated:

> The provision for loan losses and the related allowance for loan losses are affected by many factors, including economic conditions (for example, housing prices, interest rates and unemployment rates), the borrower's credit profile, the loan's payment requirements, loan seasoning and prepayments and the level of purchased credit enhancement.

463. In addition, Countrywide stated the Company's loan loss reserves and provision for loan losses as of March 31, 2007 were $374.4 million and $151.9 million, respectively. These amounts were dramatically understated.

464. A substantial portion of the Company's LHI consisted of pay-option ARMs, which Defendants knew were poorly underwritten and experiencing heightened defaults. Defendants knew and/or acted with deliberate recklessness in

disregarding that the above-referenced statements were materially false and misleading when made for the reasons stated above in ¶¶ 404-405 and 408-09.

**4. Countrywide's Retained Interests and Related Impairment of Retained Interests in Loans Sold**

465. The First Quarter 2007 Form 10-Q stated the following purported fair values for the Company's retained interest assets:

| | **March 31, 2007 (in thousands)** |
|---|---|
| Interests retained in securitization accounted for as available-for-sale securities: | |
| Prime home equity line of credit transferor's interest | $101,686 |
| Prime home equity residual securities | $25,842 |
| Interests retained in securitization accounted for as trading securities: | |
| Prime home equity line of credit transferor's interest | $679,389 |
| Prime home equity residual securities | $591,434 |

466. The First Quarter 2007 Form 10-Q also reported impairment of retained interests and provision for impairment of $429.6 million and $284.7 million, respectively for the quarter-ended March 31, 2007. Moreover, the First Quarter 2007 Form 10-Q stated that the $429.6 million impairment included a $135.3 million charge related to subordinated interests on prime home equity lines of credit securitizations and a $231.0 million charge related to nonprime residual interests. The First Quarter 2007 Form 10-Q further stated that the charges "were driven by increased estimates for future losses on the loans underlying these securities as well as increased market yield requirements for nonprime securities."

467. With respect to total credit losses realized for the first quarter of 2007 related to securitized loans, Defendants stated: (i) $85.0 million purportedly related to nonprime and prime securitizations; (ii) $42.9 million related to repurchased or indemnified loans; and (iii) $36.3 million for credit losses related to prime home equity securitizations with retained residual interest.

468. Defendants knew and/or acted with deliberate recklessness in disregarding that the above-referenced statements were materially false and misleading for the reasons stated above in ¶¶ 413-15. In addition, Defendants' statements were materially false and misleading when made because the Company did not properly evaluate estimated credit losses in determining the fair value of subordinated interests, as alleged below in Section IX.

**5. Countrywide's Valuation and Impairment of MSRs**

469. In reporting on the value of Countrywide's MSRs for the first quarter of 2007, one of the Company's "critical accounting policies," the First Quarter 2007 Form 10-Q falsely reported MSRs of $17.4 billion, an increase of $179 million for the quarter-ended March 31, 2007.

470. The Company further claimed in the First Quarter 2007 Form 10-Q that the Company expected "to incur no significant declines in value of MSRs other than recovery of [its] investment through the realization of cash flows."

471. Defendants knew and/or acted with deliberate recklessness in disregarding that the above-referenced statements were materially false and misleading when made for the reasons stated above in ¶¶ 421-22. In addition, there was no reasonable basis for the statements in light of the unprecedented default levels in the downward spiraling housing market.

**6. Countrywide's "Representations and Warranties"**

472. As in the 2006 Form 10-K, Defendants made identical misrepresentations in the First Quarter 2007 Form 10-Q concerning Countrywide's

liability under its representations and warranties for the sale of loans into the secondary market:

> . . . In the event of a breach of such representations and warranties, we may be required to either repurchase the mortgage loans with the identified defects or indemnify the investor or insurer.
>
> * * *
>
> We attempt to limit our risk of incurring these losses by structuring our operations to ensure consistent production of quality mortgages and servicing those mortgages at levels that meet or exceed secondary mortgage market standards.

473. The Company disclosed its stated policy for recording representation and warranty liability as follows:

> We make provisions for losses that may arise from breaches of representations and warranties when we record the sale of these loans and we adjust our estimates for losses on these loans quarterly. We record such loans at fair value when they are repurchased and any resulting loss is charged against the liability we established when the loans were sold.

474. In the First Quarter 2007 Form 10-Q, Defendants also falsely claimed that "[e]xpected future credit losses are considered in the determination of the fair value of the subordinated interests."

475. For the period-ended March 31, 2007, the First Quarter 2007 Form 10-Q reported a total liability resulting from breaches of representations and warranties of $365.3 million.

476. Defendants knew and/or acted with deliberate recklessness in disregarding that the above-referenced statements were materially false and misleading when made for the reasons stated above in ¶¶ 428-29.

### 7. Countrywide's Liqnidity

477. With respect to Countrywide's liquidity and capital resources, the First Quarter 2007 Form 10-Q stated that:

> . . . nonprime loans and related securities became much less liquid. However, such assets represent only a small portion of our total assets. The substantial majority of our assets continue to experience ample liquidity in the marketplace. As such, we do not expect the reduction in liquidity for nonprime loans to have a significant adverse effect on our ability to effectively meet our financing requirements.

478. Defendants further assured investors in the First Quarter 2007 Form 10-Q that the Company had adequate financing:

> . . . We establish reliable sources of liquidity sized to meet a range of potential future funding requirements. We currently have $94.4 billion in available sources of

> short-term liquidity, which represents a decrease of $2.0 billion from Decemher 31, 2006. We believe we have adequate financing capacity to meet our currently foreseeable needs.

479. Defendants knew and/or recklessly disregarded that their statements were materially false and misleading when made for the reasons stated above in ¶¶ 433-34. The above statements concerning Countrywide's liquidity risk and risk management were also materially false and misleading when made because, as Defendants admitted in the Second Quarter 2007 Form 10-Q, Countrywide was already facing liquidity constraints as of the third quarter of 2006. Thus, Defendants did not have a reasonable basis for their putative belief that Countrywide had adequate financing capacity as of the first quarter of 2007.

### 8. Countrywide's Internal Controls

480. With respect to the Company's internal controls and procedures, the First Quarter Form 10-Q stated that:

> . . . The Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective in ensuring that information required to be disclosed by the Company, including our consolidated subsidiaries in the reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, by others within those entities during the period in which this

quarterly report on Form 10-Q was being prepared.

481. The First Quarter 2007 Form 10-Q contained virtually identical certifications by Mozilo and Sieracki as contained in the 2006 Form 10-K (¶¶ 440-43), which were materially false and misleading and/or omitted material facts. Specifically, like the 2006 Form 10-K certifications, the First Quarter 2007 Form 10-Q certifications falsely represented that the quarterly report did not contain any misstatements or omissions, and that the Company had implemented effective internal disclosure controls and procedures to ensure that material information regarding the Company was known.

482. Defendants knew and/or acted with deliberate recklessness in disregarding that the above-referenced certifications were materially false and misleading when made for the reasons stated above in ¶ 444.

### 9. Countrywide's Purported Risk Factors

483. The First Quarter 2007 Form 10-Q also incorporated by reference the same risk factors contained in the 2006 Form 10-K and described above in ¶¶ 445 and 448. Defendants knew and/or acted with deliberate recklessness in disregarding that the risk factors in the First Quarter 2007 Form 10-Q were materially false and misleading when made for the same reasons stated above in ¶¶ 446-47 and 449.

## VII. DEFENDANTS' PARTIAL DISCLOSURES OF PREVIOUSLY MISREPRESENTED AND/OR CONCEALED MATERIAL FACTS AND CONTINUING MATERIAL MISREPRESENTATIONS AND OMISSIONS

484. Beginning on July 24, 2007, Defendants gradually disclosed previously misrepresented and/or omitted material facts concerning the Company's imprudent lending practices and financial condition. As Defendants made partial corrective disclosures during the remainder of the Relevant Period, the Debentures'

value declined in a series of material steps. Specifically, the Series A Debentures dropped from $963.72 per Debenture on July 23, 2007 to $760.45 per Debenture by the end of the Relevant Period on November 21, 2007, and the Series B Debentures fell from $963.83 per Debenture on July 23, 2007 to $721.12 per Debenture on November 21, 2007.

485. Each partial disclosure of previously misrepresented and/or omitted material facts removed a portion of the artificial inflation in the price of Countrywide's Debentures caused by Defendants' material misrepresentations and/or omissions and directly caused Plaintiffs to suffer damages. However, as set forth below, these decreases in price were often tempered by continuing false and misleading statements Defendants frequently made contemporaneously with or shortly after adverse information about the Company was revealed.

**A. The July 24, 2007 Press Release aud Couference Call**

486. As with their Debenture purchases prior to July 24, 2007, Plaintiffs' purchases of the Debentures during the period from July 24, 2007 through November 21, 2007 were made at artificially inflated prices caused by Defendants' material misrepresentations and omissions. As alleged below, although the value of the Debentures declined upon each partial disclosure of the truth, the prices of the Debentures remained artificially inflated until the Company's true financial condition became known on November 21, 2007 -- the end of the Relevant Period.

487. The July 24, 2007 Press Release announced the Company's Second Quarter 2007 financial results, and the Company conducted a conference call that same day (the "July 24, 2007 Conference Call") to discuss the results with analysts. In the July 24, 2007 Press Release, the Company substantially lowered its 2007 earnings estimate to between $2.70 and $3.30 per share of common stock from its previous estimate of between $3.50 and $4.30 per share. Countrywide also unexpectedly announced that the Company had taken a $417 million impairment

Case MDL No. 2265 Document 1-12 Filed 05/23/11 Page 158 of 283

charge on its "investments in credit-sensitive retained interests" as a result of "softening home prices . . . and [rising] delinquencies and defaults."

488. The July 24, 2007 Press Release stated in relevant part:

> [The $417 million impairment charge] included $388 million, or approximately $0.40 in earnings per diluted share based on a normalized tax rate, of impairment on residual securities collateralized by prime home equity loans. The impairment charges on these residuals were attributable to accelerated increases in delinquency levels and increases in the estimates of future defaults and loss severities on the underlying loans.

489. Countrywide also reported in the July 24, 2007 Press Release a $293 million charge to the Company's provision for losses on LHI in the second quarter, driven primarily by a charge of $181 million on prime home equity loans held-for-investment.

490. During the July 24, 2007 Conference Call, Defendants partially disclosed previously misrepresented and/or concealed material facts. With respect to the provision for losses on LHI, in a supplemental presentation (the "July 24, 2007 Presentation") to the July 24, 2007 Conference Call, Defendants admitted that Countrywide changed its policy for recognizing charge-offs because the Company's prior methodology for determining allowances for loan losses was unreliable and failed to properly consider losses that were probable as a result of the Company's reckless lending practices. Specifically, Defendants admitted that the Company changed its reserve methodology to "accelerate the timing of charge-offs" of LHI,

resulting in an increase to charge-offs of approximately $30 million in the second quarter of 2007.

491. In the July 24, 2007 Conference Call, Defendants made a series of admissions with respect to the Company's loan underwriting practices and accounting for loan losses. Specifically, Defendants revealed that Countrywide used a broad definition of "prime" loan, including in its statement disclosing impairment charges in "credit-sensitive retained interests," that actually encompassed borrowers with FICO scores as low as 500, well below industry standards.

492. In this regard, Countrywide's Senior Managing Director and Chief Risk Officer, John McMurray stated that the definition of prime "covers a very vast spectrum" and referred to "prime loan[s] with FICOs in the low 500s." This was the first time Countrywide disclosed to investors that its definition of "prime" loan was inconsistent with the industry-wide definition. McMurray further indicated that "a prime loan with FICOs in the low 500s is going to he over 30 times more likely to be seriously delinquent than a prime loan with an 800 FICO."

493. In addition, during the July 24, 2007 Conference Call, McMurray made partial disclosures concerning Countrywide's lending practices, including an admission that the Company improperly provided low or no documentation loans to borrowers, which, in part, led to the inevitable increase in delinquencies and defaults. In this respect, McMurray stated: "The takeaway is . . . documentation matters: the less documentation, the higher the serious delinquency, all else equal." Notably, the July 24, 2007 Presentation materials showed that as of the end of the second quarter of 2007, 80% of Countrywide's pay-option ARM loans in the Company's portfolio were low documentation loans.

494. McMurray also admitted on the July 24, 2007 Conference Call that the higher CLTV reduced documentation loans in the home equity portfolio "are disproportionately contributing to charge-offs and delinquencies." According to

McMurray, many of those charge-offs and delinquencies "stem from the higher concentration of piggyback financing that we did and that . . . we have in the port[folio] . . . ."

495. Countrywide also partially revealed inadequacies in its loan underwriting guidelines and internal controls, which resulted in poor loan quality, during the July 24, 2007 Conference Call. In particular, Kevin Bartlett, the Company's Chief Investment Officer ("CIO"), stated that the Company has "made many changes to [Countrywide's] product offerings, pricing, underwriting guidelines and processes in order to improve the quality and secondary market execution of our production." Defendants also disclosed that the Company's automated underwriting system needed to be "recalibrated."

496. In response to Countrywide's initial partial disclosures during the July 24, 2007 Conference Call regarding the impairment charge, the Company's previously undisclosed highly reckless lending and underwriting practices, and other adverse facts, the Debentures' value declined significantly: the Series A Debentures fell $23.49 per Debenture, from $963.72 per Debenture on July 23, 2007 to $940.23 per Debenture on July 26, 2007. The Series B Debentures fell $20.46 per Debenture, from $963.83 on July 23, 2007 to $943.37 per Debenture on July 26, 2007. This represented a 5.2% decline in the price of the Series A Debentures, and a 4.2% decline in the price of the Series B Debentures since the Offering date.

497. As alleged below, despite the partial disclosures during the July 24, 2007 Conference Call, the representations in the July 24, 2007 Press Release remained materially false and misleading and omitted materials facts concerning, among other things, Countrywide's: (i) loan quality and underwriting guidelines; (ii) reported financial results and accounting practices; (iii) exposure to losses based upon the representations and warranties that the Company made in connection with loans sold on the secondary market; and (iv) liquidity. These continuing

Case MDL No. 2265 Document 1-12 Filed 05/23/11 Page 161 of 283

misrepresentations and omissions of material fact caused the Debentures' prices to remain artificially inflated.

### 1. Continuing Misrepresentations and Omissions Regarding Countrywide's Loan Quality and Underwriting Practices

498. In the July 24, 2007 Press Release, the Company claimed that it was tightening its credit guidelines, particularly related to subprime and prime home equity loans and other subprime product offerings. Countrywide also represented that it had eliminated several of the Company's riskiest loan types, including adjustable-rate products:

> Management has taken, and is continuing to take, a number of actions in response to changing market conditions. These include tightening of credit guidelines, particularly related to subprime and prime home equity loans; further curtailment of subprime product offerings, including the recent elimination of certain adjustable rate products; risk-based pricing adjustments; use of mortgage insurance for credit enhancement; and expense reduction initiatives.

499. The foregoing statements in the July 24, 2007 Press Release regarding the tightening of credit guidelines and elimination of certain high-risk loan products were materially false and misleading because, as Defendants would begin to admit in the October 26, 2007 Press Release and Conference Call: (i) Countrywide did not do a "wholesale revamping and tightening" of programs and guidelines until the third quarter of 2007; and (ii) Countrywide had not entirely eliminated high-risk

loans like subprime home equity loans, subprime Hybrid ARMs and reduced documentation loans with a CLTV greater than 90%. Indeed, Countrywide continued to originate high-risk loans throughout the second and third quarters of 2007. As alleged above in ¶¶ 387, 390, 392-93, 396, and 399-400, Defendants knew and/or acted with deliberate recklessness in disregarding that their statements were materially false and misleading at the time that they were made.

### 2. Continuing Misrepresentations and Omissions Regarding the Value of Countrywide's LHI, MSRs and Retained Interests in Securitized Loans

500. With respect to the Company's reported financial results and related accounting practices, the July 24, 2007 Press Release reported the following false and misleading financial results for the quarter-ended June 30, 2007: (i) LHI (net of allowance of $512.9 million) - $74.1 billion; (ii) MSRs at fair value - $20.1 billion; and (iii) Retained Interests - $2.7 billion. These reported financial results were materially false and misleading when made because the LHI, MSR, and retained interest figures were each overstated given Countrywide's failure to adequately consider rising delinquencies and defaults on the inherently high-risk loans underlying these portfolios.

501. In response to a question during the July 24, 2007 Conference Call on whether Defendants used a mark-to-market methodology or a mark-to-model methodology in valuing retained interests, Kevin Bartlett (CIO) responded:

> Well, it is a bit of a combination of both. [T]he assets are carried at market value, and the way we do that is we approximate it by using models that many in the industry would use as well. We use . . . discount rates speeds and loss assumptions that we believe the market would employ.

Bartlett then stated that the Company was "comfortable" with its valuation methods for retained interests despite the lack of liquidity in the market.

502. Defendants knew and/or acted with deliberate recklessness in disregarding that the above-referenced statements concerning the Company's second quarter 2007 reported financial results were materially false and misleading for the reasons stated above in ¶¶ 404-05, 408-09, 413-15, and 421-22. The above-referenced statements were also materially false and misleading when made because as alleged below in Section IX, the Company's liabilities and allowance for loan losses were understated as a result of Countrywide's failure to fully recognize known losses in the Company's loan portfolio.

### 3. Continuing Misrepresentations and Omissions Regarding Countrywide's Liquidity

503. With respect to the Company's liquidity risks, Countrywide stated in the July 24, 2007 Press Release that the challenging market environment would allow Countrywide to further leverage its strong liquidity position, as follows:

> Notwithstanding current environmental factors and their near-term impact on earnings, management believes that the Company is well positioned to capitalize on opportunities during this transitional period in the mortgage business, which management believes will enhance the Company's long-term earnings growth prospects. Countrywide expects to leverage the strength of its capital and liquidity positions, superior business model, and best-in-class workforce to emerge in a superior

Case MDL No. 2265 Document 1-12 Filed 05/23/11 Page 164 of 283

> competitive position coming out of the current housing down cycle.

504. The Company further claimed in the July 24, 2007 Press Release that integration of its business lines would enhance its access to capital:

> . . . the ongoing integration of the Company's bank and mortgage company is expected to enhance its business model through operational efficiencies, reduced funding costs, and enhanced liquidity among other competitive advantages.

505. Defendants knew and/or acted with deliberate recklessness in disregarding that their statements were materially false and misleading when made for the reasons stated above in ¶¶ 433-34. Defendants' statements during the July 24, 2007 Press Release concerning Countrywide's strong liquidity position were also materially false and misleading when made because Countrywide was, in fact, facing liquidity constraints at that time, which would be disclosed only days later on August 9, 2007. Thus, Defendants still had not fully disclosed the true extent of the Company's credit and liquidity risk exposure as a result of years of reckless mortgage lending and underwriting practices.

**B. The August 2, 2007 Press Release and August 6, 2007 Form 8-K**

506. In an attempt to restore investor confidence, the Company issued the August 2, 2007 Press Release, entitled "Countrywide Comments on Its Strong Funding Liquidity and Financial Condition." In the August 2, 2007 Press Release, Defendant Sieracki reassured investors that the Company's financial position remained strong, stating that "[o]ur mortgage company has significant short-term funding liquidity cushions and is supplemented by the ample liquidity sources of our bank." Sieracki also stated in relevant part:

> . . . Our liquidity planning proved highly effective earlier during 2007 when market concerns first arose about subprime lending, and remains so today. We place major emphasis on the adequacy, reliability and diversity of our funding sources.

507. A few days later, Countrywide filed the August 6, 2007 Form 8-K with the SEC in order to further reinforce its liquidity assurances made in the August 2, 2007 Press Release. Defendant Sieracki signed the August 6, 2007 Form 8-K. The August 6, 2007 Form 8-K contained Countrywide's "Liquidity Sources" schedule as of June 30, 2007, which misleadingly reported that the Company's net available liquidity was $186.5 billion.

508. Defendants knew and/or acted with deliberate recklessness in disregarding that their statements were materially false and misleading when made for the reasons stated above in ¶¶ 433-34 and 505. Defendants' statements in the August 2, 2007 Press Release and the August 6, 2007 Form 8-K were also materially false and misleading when made because Countrywide was, in fact, facing severe liquidity constraints and unknown prospects for continued liquidity at that time, which would be disclosed only days later on August 9, 2007.

509. In response to the materially false and misleading assurances of stability set forth in the August 6, 2007 Form 8-K, the price of the Series A Debentures rose $12.44 per Debenture to $918.28 per Debenture on August 7, 2007, and the price of the Series B Debentures rose $18.04 per Debenture to $907.22 per Debenture on August 7, 2007.

### C. Continuing Misrepresentations and Omissions of Material Fact In The Second Quarter 2007 Form 10-Q

510. Only three days later, on August 9, 2007, Countrywide filed its Second Quarter 2007 Form 10-Q with the SEC, signed by Defendants Sambol and Sieracki.

In the Second Quarter 2007 Form 10-Q, Defendants disclosed for the first time that the Company was facing liquidity funding issues, directly contradicting the Company's statements made just days before.

511. For example, shedding light on the Company's true liquidity risk, the Second Quarter 2007 Form 10-Q stated that:

> In the third quarter [of 2006] through the filing date of the Form 10-Q, funding liquidity in the financial sector was constrained primarily due to changes in the secondary mortgage market investor demand. Various mortgage lenders have experienced operating difficulties and have extended asset-based commercial paper facilities or filed for bankruptcy protection. These events have further constrained funding liquidity in the sector.

Nevertheless, the Company continued to misrepresent its liquidity status by stating that:

> We believe we have adequate funding liquidity to accommodate these marketplace changes in the near term; however, the secondary market and funding liquidity situation is rapidly evolving and the potential impact on the Company is unknown.

512. Moreover, despite the partial disclosures during the Second Quarter 2007 Form 10-Q, Defendants also continued to make materially false and misleading statements concerning Countrywide's: (i) loan quality; (ii) credit and underwriting practices; (iii) valuation and impairment of MSRs; (iv) representation

and warranty liabilities; and (v) internal controls. These continuing misrepresentations and omissions of material fact caused the Debentures prices to remain artificially inflated.

**1. Countrywide's Loan Quality**

513. In the Second Quarter 2007 Form 10-Q, Defendants once again represented that the majority of Countrywide's mortgage loan production for the quarter ending June 30, 2007 consisted of "prime" mortgages:

| Product | (in millions) |
|---|---|
| Prime Mortgage | $113,846 |
| Prime Home Equity | $10,596 |
| Nonprime Mortgage | $5,721 |

514. Referring to Countrywide's portfolio of mortgage loans originated or purchased for investment, as with the First Quarter 2007 Form 10-Q, the Second Quarter 2007 Form 10-Q similarly stated that "[w]e assess a loan's quality by considering the borrower's credit profile and the value of collateral securing the loan."

515. The Second Quarter 2007 Form 10-Q also misleadingly reported only the "Average original FICO score[s]," rather than the actual FICO score distribution, which would have alerted investors of the heightened risk contained in the Company's loan portfolio.

516. Defendants knew and/or acted with deliberate recklessness in disregarding that the above-referenced statements concerning the quality of Countrywide's loan portfolio and borrower creditworthiness were materially false and misleading when made for the reasons stated above in ¶¶ 387 and 390.

Case MDL No. 2265 Document 1-12 Filed 05/23/11 Page 168 of 283

**2. Countrywide's Credit and Loan Underwriting Practices**

517. In the Second Quarter 2007 Form 10-Q, Defendants stated the following concerning Countrywide's credit risk management:

> We actively manage credit risk to maintain expected credit losses within levels that achieve our profitability and return on capital objectives.

Defendants knew and/or acted with deliberate recklessness in disregarding that the above-referenced statements concerning Countrywide's risk management were materially false and misleading when made for the reasons stated above in ¶¶ 392-93, 396, and 399-400.

**3. Countrywide's Valuation and Impairment of MSRs**

518. In reporting on the value of Countrywide's MSRs -- one of the Company's "critical accounting policies" -- the Second Quarter 2007 Form 10-Q falsely reported MSRs of $20 billion, an increase of $2.6 billion for the quarter-ended June 30, 2007.

519. The Company further claimed in the Second Quarter 2007 Form 10-Q that it expected "to incur no significant declines in the value of MSRs other than recovery of [its] investment through the realization of cash flows."

520. Defendants knew and/or acted with deliberate recklessness in disregarding that the above-referenced statements were materially false and misleading when made for the reasons stated above in ¶¶ 421-22. In addition, the above-referenced statements were materially false and misleading when made because at the time, there was no reasonable basis to believe that the value of MSRs would not further decline in light of the known downturn in the mortgage market and the escalating default levels.

### 4. Countrywide's "Representations and Warranties"

521. Defendants made similar misrepresentations in the Second Quarter 2007 Form 10-Q concerning Countrywide's liability under the representations and warranties made in connection with loans sold to the secondary market as in the 2006 Form 10-K and the First Quarter 2007 Form 10-Q:

> . . . In the event of a breach of such representations and warranties, we may be required to either repurchase the mortgage loans with the identified defects or indemnify the investor or insurer.
>
> * * *
>
> We attempt to limit our risk of incurring these losses by structuring our operations to ensure consistent production of quality mortgages and servicing those mortgages at levels that meet secondary mortgage market standards.

522. The Company disclosed its stated policy for recording representation and warranty liability as follows:

> We make provisions for losses that may arise from breaches of representations and warranties when we record the sale of these loans and we adjust our estimates for losses on these loans quarterly. We record repurchased loans at fair value when they are repurchased and any resulting loss is charged against the liability.

523. Defendants' discussion of representation and warranty liabilities misrepresented and omitted material facts. Among other things, an August 6, 2007 e-mail that McMurray authored in connection with the Second Quarter 2007 Form 10-Q Sarbanes-Oxley certifications revealed that: "delinquencies and defaults will likely increase and there will likely be more loans 'eligible' for repurchase or indemnification." McMurray's observations were particularly applicable to poorly underwritten pay-option ARMs and HELOCs that Countrywide had off-loaded based upon the directions in Defendant Mozilo's June 1, 2006 and September 26, 2006 e-mails.

524. In the Second Quarter 2007 Form 10-Q, Defendants also falsely claimed that "[e]stimated credit losses over the expected lifetime of the security are considered in the valuation of [the Company's] subordinated interests."

525. For the period-ended June 30, 2007, the Second Quarter 2007 Form 10-Q falsely reported a total liability resulting from breaches of representations and warranties of $431.8 million.

526. Defendants knew and/or acted with deliberate recklessness in disregarding that the above-referenced statements were materially false and misleading when made for the reasons stated above in ¶¶ 428-30.

### 5. Countrywide's Iuternal Controls

527. With respect to the Company's internal controls and procedures, the Second Quarter 2007 Form 10-Q stated that:

> The Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective as of the end of the period covered by the Report.

528. The Second Quarter 2007 Form 10-Q contained virtually identical certifications by Mozilo and Sieracki as contained in the 2006 Form 10-K (¶¶ 440-

43). Specifically, like the 2006 Form 10-K certifications, the Second Quarter 2007 Form 10-Q certifications falsely represented that the quarterly report did not contain any misstatements or omissions, and that the Company had implemented effective internal disclosure controls and procedures to ensure that material information regarding the Company was known.

529. Defendants knew and/or acted with deliberate recklessness in disregarding that these representations were materially false and misleading when made for the reasons stated above in ¶ 444.

**6. Countrywide's Risk Factors**

530. The Second Quarter 2007 Form 10-Q incorporated by reference the same risk factors contained in the 2006 Form 10-K and described above in ¶¶ 445 and 448. Defendants knew and/or acted with deliberate recklessness in disregarding that the risk factors in the Second Quarter 2007 Form 10-Q were materially false and misleading when made for the same reasons stated above in ¶¶ 446-47 and 449.

531. In response to the disclosures of previously misrepresented and/or concealed material facts in the Second Quarter 2007 Form 10-Q, the Series A Debentures fell another $31.05 per Debenture, from $927.54 per Debenture on August 8, 2007 to $896.49 per Debenture on August 14, 2007, and the Series B Debentures fell another $12.54 per Debenture, from $918.13 per Debenture on August 8, 2007 to $905.59 per Debenture on August 14, 2007. This represented a 9.6% decline in the price of the Series A Debentures, and an 8.1% decline in the price of the Series B Debentures since the Offering date.

532. Countrywide's July 24, 2007 Press Release and Second Quarter 2007 Form 10-Q partially revealed facts concerning, among other things, the Company's loan quality, underwriting and liquidity that suggested that Defendants previous statements on these subjects had been inaccurate. However, as noted above, these documents also contained positive statements on these subjects, as well as

continued misstatements on the valuation of the Company's LHI, MSRs, and retained interests, the Company's representations and warranties in connection with securitizations, and its internal controls and risk factors. In the same regard, the August 2, 2007 Press Release and August 6, 2007 Form 8-K contained statements that specifically portrayed Countrywide's liquidity as more than adequate. All of the foregoing statements were part of a pattern by Defendants of issuing countervailing false and/or misleading positive statements contemporaneously with or shortly after any negative information about the Company that became public, in order to assuage investors' fears and continue to prop up the price of the Company's securities – including the Debentures. As set forth below, this pattern continued through the end of the Relevant Period.

### D. The August 16, 2007 Press Release

533. As a result of Countrywide's increasing, yet largely undisclosed, liquidity crisis, the Company announced in the August 16, 2007 Press Release that it drew its entire $11.5 billion emergency credit facility in order to "supplement[] its liquidity funding position." Defendant Sambol assured investors that this was among the "decisive steps" Countrywide had taken to "enable the Company to meet its funding needs and continue growing its franchise. Defendant Sambol also stated in the press release that Countrywide was further tightening the Company's underwriting standards for loans that are not eligible to be sold in the secondary market to Fannie Mae and Freddie Mac, and thereby admitted that the Company's prior statements regarding its supposedly adjusted underwriting standards were materially false and misleading because Countrywide's mortgage underwriting standards still exposed the Company to significant credit risk.

534. The August 16, 2007 Press Release continued to misrepresent Countrywide's inadequate liquidity at the time. By announcing its draw down of the credit facility, Countrywide falsely reassured investors that the Company would have sufficient capital resources to meet further market downturns. In fact,

Countrywide was facing a severe liquidity crisis that would be fully revealed at the end of the Relevant Period. Defendants knew and/or acted with deliberate recklessness in disregarding that their statements concerning liquidity in the August 16, 2007 Press Release were materially false and misleading when made. Among other things, for more than a year prior to August 2007, Defendants were aware that Countrywide's troubled loan portfolio would cause a liquidity crisis as delinquencies and defaults continued too escalate. *See* ¶¶ 684-778, *infra*.

535. In response to disclosures concerning Countrywide's previously misrepresented credit quality and liquidity (as the Company would thereafter report with greater specificity), and after temporary support in the trading prices of the Debentures due to the availability of additional credit lines, the Series B Debentures fell another $10.97 per Debenture, from $830.33 per Debenture on August 15, 2007 to $819.36 per Debenture on August 16, 2007. This represented a 16.9% decline in the price of the Series B Debentures since the Offering date.

536. Demonstrating that Countrywide's liquidity crisis was even deeper than Defendants conceded, on August 22, 2007, just six days after the Company announced the $11.5 billion liquidity boost, Countrywide announced that it also received a $2 billion strategic equity investment from Bank of America. In particular, Bank of America invested $2 billion in the form of non-voting convertible preferred securities with a 7.25% annual yield, with the hope that the investment "will be a step toward a return to a more normal liquidity in the mortgage markets." The announcement of Bank of America's capital infusion gave the Debentures a temporary boost in price. The Series A Debentures increased from $883.78 per Debenture on August 22, 2007 to close at $914.87 on August 23, 2007 and the price of the Series B Debentures increased from $864.25 on August 22, 2007 to close at $904.24 on August 23, 2007.

### E. The September 7, 2007 Press Release

537. On September 7, 2007, Countrywide issued the September 7, 2007 Press Release detailing the Company's "plan of action to address changing market conditions." The Company stated that it expected tbe plan to, among other things, "enhance and strengthen Countrywide's business model by delivering greater and more stable liquidity, reduced borrowing costs and greater operational efficiencies." Countrywide also announced workforce reductions of up to 10,000 to 12,000 positions, or 20% of its workforce, over the three months following the press release. This announcement came only six weeks after McMurray's statements during the July 24, 2007 Conference Call that the purported "growth in the sales force . . . at a one to two-year high" was a "leading indicator" that the Company held a "strong capital position."

538. The September 7, 2007 Press Release was materially false and misleading as it continued to misrepresent the true extent of Countrywide's liquidity crisis at the time. Contrary to its reassurance that the Company was taking remedial steps to address its financial condition, the truth was that Countrywide could not contain the losses stemming from its poorly underwritten mortgage loan portfolio. Defendants knew *(see, e.g.*, ¶¶ 684-778, *infra*) at the time of the September 7, 2007 Press Release that the Company had a severe liquidity crisis that would place it on the brink of bankruptcy.

539. Following the September 7, 2007 Press Release, the Series A Debentures fell another $5.73 per Debenture, from $896.30 per Debenture on September 7, 2007 to $890.57 per Debenture on September 11, 2007, and the Series B Debentures fell another $4.62 per Debenture, from $872.88 per Debenture on September 7, 2007 to $868.26 per Debenture on September 11, 2007. This represented a 10.2% decline in the price of the Series A Debentures, and an 11.9% decline in the price of the Series B Debentures since the Offering date.

Case MDL No. 2265 Document 1-12 Filed 05/23/11 Page 175 of 283

**F. The October 24, 2007 Form 8-K**

540. After the market closed on October 24, 2007, Countrywide filed a Form 8-K with the SEC announcing the sudden departure of Henry G. Cisneros, former secretary of Housing and Urban Development, from the Company's Board of Directors. In addition to Michael E. Dougherty and Kathleen Brown, Cisneros was the third member of Countrywide's Board to resign during 2007. Snch resignations were unusual for the Countrywide Board of Directors as only one other Board member had resigned between 2003 and 2006.

541. Also after the market closed on October 24, 2007, The Wall Street Journal published an article entitled "Countrywide's New Scare -- 'Option ARM' Delinquencies Bleed Into Profitable Prime Mortgages," detailing pay-option ARM loans (the "October 24, 2007 Wall Street Journal article"). According to the October 24, 2007 Wall Street Journal article, pay-option ARM loans that were classified as "prime" when they were originated, were defaulting at a rapid pace. In this regard, the October 24, 2007 Wall Street Journal article revealed for the first time that Countrywide had given pay-option ARM loans to "riskier and riskier borrowers" even though such loans were created as "a niche product targeted mainly to people with very strong credit."

542. Notably, those were the same loan products over which Defendant Mozilo expressed clear concerns in a June 1, 2006 e-mail to Defendant Sambol, among others, noting that such loans were ripe for escalating defaults. Mozilo knew that such loans would cause the Company financial difficulties and advised that "we should take a careful look at our reserves now and begin to assume the worst."

543. In response to this news, revealing Defendants' misrepresentations and omissions of material fact concerning Countrywide's loan origination and underwriting standards, the Series A Debentures fell another $15.86 per Debenture, from $866.02 per Debenture on October 24, 2007 to $850.16 per Debenture on

October 25, 2007, and the Series B Debentures fell another $12.59 per Debenture, from $840.47 per Debenture on October 24, 2007 to $827.88 per Debenture on October 25, 2007. This represented a 14.3% decline in the price of the Series A Debentures, and a 16% decline in the price of the Series B Debentures since the Offering date.

### G. The October 26, 2007 Press Release and Conference Call

544. On October 26, 2007, Countrywide issued the October 26, 2007 Press Release announcing the Company's third quarter 2007 financial results and conducted a conference call (the "October 26, 2007 Conference Call") with analysts discussing the Company's disappointing results.

545. Specifically, in the October 26, 2007 Press Release, Countrywide reported the Company's first quarterly loss in 25 years of $1.2 billion, or $2.85 per share. The significant issues during the third quarter included a $1 billion write-down of Countrywide's loans and mortgage-backed securities purportedly as a result of disruptions in the capital markets during the third quarter. In addition, the Company increased its loan loss provision to $934 million in the third quarter, compared to only $293 million in the prior quarter and $38 million in the third quarter of 2006, to provide additional reserves for losses in the Company's home equity and pay-option ARM loans.

546. In the October 26, 2007 Press Release, the Company claimed that during the quarter it had "significantly tightened its loan program underwriting guidelines, and began the process of right-sizing operations for today's lower volume mortgage market." During the October 26, 2007 Confercuce Call, Defendant Sambol further admitted that the tightening focused primarily on limiting higher LTV loans, loans to lower FICO score borrowers and reduced documentation loans, "particularly when these risk factors exist in combination." Sambol also stated that the Company "instituted very significant enhancements into

Case MDL No. 2265 Document 1-12 Filed 05/23/11 Page 177 of 283

operating controls as well" during the third quarter. These changes were obviously made to address significant deficiencies in those controls.

547. In the "3Q 2007 Earnings Supplemental Presentation," discussed during the October 26, 2007 Conference Call (the "October 26, 2007 Presentation"), Defendants admitted that Countrywide continued to originate some of the riskiest types of loans throughout the second and third quarters of 2007, in direct contradiction to Defendants' statements in the July 24, 2007 Press Release that the Company had ceased originating risky loans, including adjustable-rate products.

548. In this regard, the October 26, 2007 Presentation disclosed that Countrywide originated both "Prime Home Equity" loans and "Hybrid ARMs" to subprime borrowers with FICO scores of less than 660 during the second quarter of 2007, and continued to originate these high-risk loans with reduced documentation and CLTVs greater than 90% during the third quarter of 2007.

549. With respect to "Pay-Option ARMs," the Defendants also disclosed in the October 26, 2007 Presentation that Countywide continued to originate these loans to subprime borrowers with FICO scores of less than 660 and even continued to offer the loans with reduced documentation and CLTVs greater than 80% during the second and third quarters of 2007. Throughout the Relevant period, Defendants knew that these loans presented unacceptable and undisclosed risks. For example, Defendant Mozilo's June 1, 2006 e-mail to Defendant Sambol and others acknowledged that borrowers with FICO scores of 700 or less "are going to experience a payment shock which is going to be difficult if not impossible for them to manage."

550. The October 26, 2007 Press Release also disclosed that the Company increased this provision for "representations and warranties" liabilities to $291 million, compared to only $79 million in the second quarter of 2007 and $41 million in the third quarter of 2006. Defendants further stated that the increased

provision was the result of "increased expectations of further representation and warranty claims on loans sold and securitized resulting from higher levels of expected future defaults."

551. The statements in the October 26, 2007 Press Release regarding the representations and warranties continued to be materially false and misleading because, as Countrywide would reveal in its Third Quarter 2007 Form 10-Q, Countrywide's lending practices continued to violate, among other things: (i) applicable loan criteria; (ii) applicable local, state and federal laws; and (iii) the Company's obligation to repurchase loans that resulted in early payment defaults.

552. Also in the October 26, 2007 Press Release, Countrywide made knowingly false claims that the Company had sufficient liquidity to leverage a return to profitability in the fourth quarter of 2007. Specifically, Defendant Mozilo stated in the October 26, 2007 Press Release that the Company "laid the foundation for a return to profitability in the fourth quarter." Expanding upon his assurances, Mozilo claimed:

> Countrywide has responded decisively and taken the steps we believe are necessary to address the current challenging market environment. During the quarter, the Company stabilized its liquidity, strengthened its capital position, significantly tightened its loan program and underwriting guidelines, and began the process of right-sizing operations for today's lower volume mortgage market.

553. As a result of Defendants' assurances regarding the Company's future profitability, the Series A Debentures increased $57.86 per Debenture to $908.02

per Debenture on October 26, 2007, and the Series B Debentures increased $44.94 per Debenture to $872.82 per Debenture on October 26, 2007.

554. Defendants' claims that Countrywide was poised to return to profitability in the fourth quarter of 2007 were materially false and misleading when made because, as Defendants admitted during the October 26, 2007 Presentation, the Company was still originating high-risk affordability loans throughout the third quarter of 2007, despite the severe deterioration in the credit and real estate markets. As a result of Defendants' continued imprudent lending practices throughout the first three quarters of 2007, Defendants knew that the Company was experiencing and would continue to suffer liquidity constrains given the significant increases in loan delinquencies and foreclosures to date. Thus, Defendants' statements regarding future profitability had no reasonable basis.

### H. The Third Quarter 2007 Form 10-Q

555. On November 9, 2007, Countrywide filed its Third Quarter 2007 Form 10-Q with the SEC, signed by Defendants Sambol and Sieracki. The Third Quarter 2007 Form 10-Q contained virtually identical certifications by Mozilo and Sieracki as in the 2006 Form 10-K (¶¶ 440-43), which Defendants knew and/or acted with deliberate recklessness in disregarding were materially false and misleading when made for the reasons stated above ¶ 444. The Third Quarter 2007 Form 10-Q contained a series of disclosures directly related to Countrywide's prior misrepresentations and omissions.

556. The Third Quarter 2007 Form 10-Q reiterated Defendant Sambol's admissions during the October 26, 2007 Conference Call regarding Countrywide's eleventh-hour "wholesale revamping and tightening" of the Company's lending and underwriting guidelines. In particular, Defendants admitted in the Third Quarter 2007 Form 10-Q that Countrywide "significantly changed [its] underwriting standards" in the third quarter of 2007. The Third Quarter 2007 Form 10-Q further

disclosed that the decline in loan production during the third quarter was largely attributable to the tightening of underwriting standards:

> The tightening of underwriting and loan program guidelines included reductions in the availability of reduced documentation loans and loans on investor-owned properties and reduction in the maximum loan-to-value or combined loan-to-value ratio. The impact of these changes was most significant to Nonprime Mortgage, Prime Home Equity and non-conforming prime mortgage loans.

557. Also in the Third Quarter 2007 Form 10-Q, Countrywide disclosed for the first time the specific nature of the representations and warranties the Company provided to investors when it sold loans. This information was material as Countrywide previously acknowledged it had obligations to purchase loans that were sold if Countrywide breached any of those representations or warranties. Specifically, it was revealed in the Third Quarter Form 10-Q that these representations and warranties included: "the loan's compliance with any applicable loan criteria (e.g., loan balance limits, property type, delinquency status) established by the buyer," and "the loan's compliance with applicable local, state and federal laws."

558. Countrywide further disclosed for the first time in the Third Quarter 2007 Form 10-Q that, with respect to its representations and warranties, Countrywide agreed to repurchase a loan when there was an early payment default:

> Market conditions and credit-rating agency requirements may also impact representations and warranties and the other provisions we may agree to in loan sales.

> For example, in some transactions, such as sales of nonprime and second-lien loans, we may agree to repurchase a loan if a payment default occurs within a specified period of time (e.g., 30 days) after sale.

559. Countrywide also disclosed for the first time the percentage of holders of its pay-option ARM loans that were not even making full interest payments. Specifically, the Third Quarter 2007 Form 10-Q stated: "[d]uring the nine months ended September 30, 2007, 76% of borrowers elected to make less than full interest payments, an increase from 66% during the nine months ended September 30, 2006." In his April 4, 2006 e-mail to Defendant Sambol and others, Defendant Mozilo noted that "more than 70% of pay-option ARM borrowers had elected to make lower payment selections, Mozilo further noted that this trend portended "much higher delinquencies" that could cause countrywide to "face both financial and regulatory consequences." Nevertheless, the percentage of borrowers not even making full interest payments was not disclosed by the Company in its prior publicly disseminated statements during the Relevant Period.

560. Countrywide also disclosed the same significant decline in the reported fair value of its MSRs that it had represented only one quarter earlier were not expected to experience any significant decline.

> We recorded decreases in the fair value of the MSRs in the quarters ended September 30, 2007 and 2006 of $830.9 million and $1,125.1 million, respectively, primarily as a result of decreasing mortgage rates during both quarters which increased expected future prepayment speeds.

561. In marked contrast, Countrywide had reported significant increases in the fair value of its MSRs for the quarters ended June 30, 2007 and March 31, 2007, of $1,327.4 million and $978.3 million, respectively.

562. In an attempt to bolster its financial condition, the Company also reported in the Third Quarter 2007 Form 10-Q that Countrywide had secured additional cash during the quarter to finance its operations by, among other things, negotiating $13 billion in repurchase facilities. Further, despite reporting a loss for the quarter of $1.2 billion, Countrywide reiterated its commitment to return to profitability in the fourth quarter of 2007. Thus, Defendants continued to conceal the full financial consequences of Countrywide's lending practices from investors.

563. Following these representations as well as Countrywide's securing of additional funds, which helped reassure purchasers of the Debentures regarding the Company's financial condition, the Series A Debentures softly retreated in price by $2.52 per Debenture, from $860.85 per Debenture on November 9, 2007 to $858.33 per Debenture on November 12, 2007. Similarly, the Series B Debentures fell $4.78 per Debenture, from $837.52 per Debenture on November 9, 2007 to $832.74 per Debenture on November 12, 2007. This represented a 13.5% decline in the price of the Series A Debentures, and a 15.5% decline in the price of the Series B Debentures since the Offering date.

**I. The November 13, 2007 Press Release**

564. On November 13, 2007, Countrywide issued a press release (the "November 13, 2007 Press Release") announcing the Company's operational report for the first month of the fourth quarter, October 2007. In the November 13, 2007 Press Release, Countrywide reported a massive 43.2% increase in delinquencies and a 54.7% increase in foreclosures in the Company's loan portfolio as compared to October 2006.

565. In response to Countrywide's disconcerting operational results, which were caused by its misrepresented and concealed lending and underwriting

standards, the Series A Debentures fell another $29.96 per Debenture, from $863.46 per Debenture on November 13, 2007 to $833.50 per Debenture on November 16, 2007. The Series B Debentures similarly fell another $33.61 per Debenture, from $837.21 per Debenture on November 13, 2007 to $803.60 per Debenture on November 16, 2007. This represented a 16% decline in the price of the Series A Debentures, and a 18.5% decline in the price of the Series B Debentures since the Offering date.

### J. Countrywide Rumored as Headed for Bankruptcy

566. Beginning on November 19, 2007, various news agencies, including Bloomberg News, Reuters and The New York Times, began reporting that Countrywide faced imminent bankruptcy because the Company continued to face higher delinquencies and foreclosures, which would force it to recognize more losses in coming quarters. Investors in Countrywide's credit default swaps (financial instruments offered to bondholders to insure against default) began demanding upfront payment to take on the risk that the nation's biggest home lender might not pay its debts.

567. Similarly, a November 19, 2007 article entitled "Liquidity Concerns Plague Countrywide," appearing on TheStreet.com, reported, among other things, that "[i]nvestors are getting mixed messages from Countrywide itself. The firm reported a greater-than-expected $1.2 billion loss in the third quarter, but management said it would return to profitability in the fourth quarter." This article further noted that Mozilo's statements to the Company's investors were inconsistent with concerns expressed to legislators: "[t]o investors, he says the company will return to profitability. To Washington lawmakers, Mozilo says the worst is not over as he argues that the government has not done enough to stem the tide of defaults and home price depreciation that's led his mortgage business to face its current funding problems."

568. These disclosures revealed that the Company was in far more financial distress than previously reported. Thus, on November 20, 2007, the Series A Debentures dropped from a closing price of $806.82 per Debenture on November 19, 2007 to a closing price of $787.06 per Debenture on November 20, 2007. The Series B Debentures similarly fell from $789.65 per Debenture on November 19, 2007 to $744.32 per Debenture on November 20, 2007. In response to the bankruptcy rumors, shortly before the markets closed on November 20, 2007, Countrywide issued a press release stating that the Company had "ample liquidity and capital" and that "Countrywide Bank, the Company's primary operating entity, has sufficient liquidity available to meet its projected operating and growth needs and has accumulated significant contingent liquidity in response to evolving market conditions." Despite Countrywide's press release, the price of the Debentures continued to decline. On November 21, 2007, the last day of the Relevant Period, the Series A Debentures dropped to a closing price of $760.45 per Debenture and the Series B dropped to a closing price of $721.12 per Debenture. This represented a 23.3% decline in the price of the Series A Debentures and a 26.8% decline in the price of the Series B Debentures since the Offering date.

## VIII. POST-RELEVANT PERIOD EVENTS

### A. Federal and State Investigations Into Defendants' Conduct

569. On March 7, 2008, the House Committee on Oversight and Government Reform (the "House Committee") held a hearing on excessive CEO pay and the mortgage crisis at which Defendant Mozilo was a witness (the "March 7, 2008 Congressional Hearing"). Prior to the hearing, Countrywide provided internal Company documents related to Mozilo's compensation and severance packages. After reviewing the Company's e-mails, Board minutes and other internal documents, the House Committee voiced concerns about the terms and negotiation of Mozilo's compensation agreements as well as his stock sales since

October 2006. The House Committee also questioned whether the actions of Mozilo and the Board advanced the interests of Countrywide.

570. On June 4, 2009, the SEC filed the SEC Action charging Mozilo with insider trading and each of the Individual Defendants with securities fraud. The Court denied Defendants' motions to dismiss and motions for summary judgment against the SEC's Complaint. On October 15, 2010, the Court approved a record financial settlement between the Individual Defendants and the SEC. Defendant Mozilo's financial penalty of $22.5 million (plus $45.0 million in disgorgement) under the SEC Settlement is the largest ever to be paid to the SEC by a senior executive of a public company.

571. In announcing the SEC Settlement, Robert Khuzami, Director of the SEC's Division of Enforcement stated that:

> Mozilo's record penalty is the fitting outcome for a corporate executive who deliberately disregarded his duties to investors by concealing what he saw from inside the executive suite – a looming disaster in which Countrywide was buckling under the weight of increasing risky mortgage underwriting, mounting defaults, and delinquencies, and a deteriorating business model.

572. The Illinois Attorney General has also investigated Countrywide as part of the state's "expanding inquiry into dubious lending practices that have trapped borrowers in high-cost mortgages they can no longer afford." Lisa Madigan, the Illinois Attorney General, subpoenaed documents in September 2007 from Countrywide relating to its loan origination practices. Deborah Hagan, Chief of the Consumer Protection Division of the Illinois Attorney General's office,

stated that Countrywide's brokers were "pushing mortgages with low 'teaser' interest rates, which reset after the first month to much higher payments." The Illinois Attorney General's Office filed and ultimately settled a lawsuit against Countrywide and others in connection with these lending practices.

573. The Attorneys General of California, North Carolina, and Florida, among others, have also investigated Countrywide's lending practices, particularly the Company's aggressive lending to unqualified borrowers. As a result of these and other investigations, and various lawsuits arising out of them, Countrywide consented to a broad foreclosure relief and loan modification program throughout the United States addressing the high-risk loans originated by the Company.

574. On June 7, 2010, the Federal Trade Commission ("FTC") announced a $108 million settlement with Countrywide to redress allegedly illegal mortgage servicing fees the Company charged to borrowers during the Relevant Period. The FTC complaint asserted that Countrywide formed subsidiaries to systematically charge struggling borrowers inflated fees for default-related services on pay-option ARMs and other high-risk loans which exceeded the actual cost of those services. Among other things, the FTC alleged that Countrywide deliberately imposed marked-up fees for property inspections, title reports, foreclosure trustees, and property preservation services that were neither reasonable nor appropriate to protect Countrywide's interest in the properties or loans.

575. The FTC also alleged that Countrywide made false statements in bankruptcy court filings regarding amounts owed in the pre and post-petition periods by borrowers who filed for Chapter 13 bankruptcy protection. In addition to the monetary settlement, Countrywide entered into a comprehensive Consent Judgment and Order with the FTC which prohibits the Company from further engaging in unlawful business practices related to the Company's mortgage servicing rights.

### B. Bank of America Agrees to Pnrchase Countrywide and the Company Continues to Suffer Under the Weight of its Misrepresented Imprudent Lending

576. On January 11, 2008, Bank of America announced a definitive agreement to purchase Countrywide in an all-stock transaction for the fire-sale price of $4 billion, or $7.16 per share. Under the terms of the announced agreement, Countrywide shareholders would receive .1822 of a share of Bank of America common stock in exchange for each share of Countrywide common stock. The deal closed on July 1, 2008.

577. On January 29, 2008, Countrywide announced disappointing fourth quarter and year-end 2007 financial results. The Company reported a $422 million loss, or $0.79 per share. Countrywide further announced the Company's first annual net loss in more than 30 years of $704 million, or $2.03 per share. The credit-related costs impacting the Company's fourth quarter 2007 results included a $1.9 billion increase in reserves from credit losses and a $690 million impairment charge primarily related to the Company's home equity loan securitizations. Countrywide also reported an impairment loss of $394 million as a result of the decline in fair value of its LHI portfolio.

578. On February 4, 2008, S&P placed its "Strong" residential loan, subprime, subordinate-lien and special servicer rankings assigned to Countrywide on "CreditWatch Negative." S&P stated that the ratings reflected the increased scrutiny of Countrywide's servicing practices hy various federal and state enforcement agencies.

579. On February 23, 2008, The Wall Street Journal reported criticism of Bank of America's choice to appoint Defendant Sambol to lead the combined consumer mortgage business (the "February 23, 2008 Wall Street Journal article"). According to the February 23, 2008 Wall Street Journal article, Bank of America's choice is "raising some eyebrows" considering Sambol reportedly "brushed aside warnings . . . that [Countrywide's] lending standards were too lax" and "was

Case MDL No. 2265 Document 1-12 Filed 05/23/11 Page 188 of 283

'willing to cut corners to get market share.'" Sambol retired soon after the merger between Bank of America and Countrywide was completed.

## IX. DEFENDANTS' GAAP AND INTERNAL CONTROL VIOLATIONS

580. As alleged above, during the Relevant Period, the Company issued financial statements that were materially misstated and not presented in accordance with GAAP. Defendants Mozilo and Sieracki also repeatedly signed sworn certifications regarding Countrywide's compliance with GAAP and the adequacy of the Company's internal controls, which were materially misleading, as these sworn certifications misrepresented that Countrywide maintained an adequate system of financial reporting.

581. The SEC requires that publicly-traded companies such as Countrywide present their financial statements in accordance with GAAP. GAAP are those principles recognized by the accounting profession as conventions, rules and procedures necessary to define accounting practices at a particular time.

582. SEC regulation S-X (17 C.F.R. § 210.4-01 (a)(1)) provides that financial statements filed with the SEC which are not presented in accordance with GAAP "will be presumed to be misleading, despite footnotes or other disclosures." Regulation S-X also requires that interim financial statements comply with GAAP, with the exception that interim financial statements need not include disclosures, which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.01-01(a).

583. The responsibility for preparing financial statements (which include the footnotes to the financial statements) in conformity with GAAP and Generally Accepted Auditing Standards ("GAAS") rests with corporate management, as set forth in Section 110.03 of the American Institute of Certified Public Accountants ("AICPA") Auditing Standards:

> The financial statements are management's responsibility. . . Management

> is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and related assets, liabilities and equity are within the direct knowledge and control of management . . . Thus, the fair presentation of financial statements in conformity with [GAAP] is an implicit and integral part of management's responsibility.

584. Each of the improper accounting practices in which the Company engaged, as well as Defendants' misrepresentations and omissions, standing alone, was a material breach of GAAP, Company policy, and/or SEC regulations.

585. As discussed below, Countrywide's 2006 Form 10-K, First Quarter 2007 Form 10-Q, Second Quarter 2007 Form 10-Q and Third Quarter 2007 Form 10-Q (collectively, the "False and Misleading Financial Statements") violated GAAP by misrepresenting that Countrywide: (i) engaged in prudent underwriting and lending practices and produced quality loans that were salable in the secondary market; (ii) adequately reserved for losses on LHI; (iii) recorded the Company's subordinated retained interest assets and mortgage servicing rights at "fair value;" (iv) adequately accrued for losses resulting from breaches of representations and warranties; and (v) maintained sufficient internal controls over its financial statement reporting process to ensure the Company's financial statements were reported in compliance with GAAP.

586. In addition, the False and Misleading Financial Statements violated GAAP because they failed to adequately disclose the risks associated with Countrywide's imprudent lending and underwriting practices.

**A. Defendants Misstated the Company's Allowance for Loan Losses and Earnings by Failing to Reserve for Losses Arising From Probable Delinquencies and Defaults**

587. GAAP, specifically AICPA Statement of Position ("SOP") No. 01-6, Accounting by Certain Entities (Including Entities With Trade Receivables) That Lend to or Finance the Activities of Others ("SOP 01-6"), requires that loans held for investment (LHI) be carried at amortized cost, and reduced by an allowance for estimated loan losses which have occurred in the portfolio:

> Loans and Trade Receivables Not Held For Sale
>
> Loans and trade receivables that management has the intent and ability to hold for the foreseeable future or until maturity or payoff should be reported in the balance sheet at outstanding principal adjusted for any chargeoffs, the allowance for loan losses (or the allowance for doubtful accounts), and any deferred fees or costs on originated loans, and any unamortized premiums or discounts on purchased loans. (Footnotes omitted).

588. A loan is impaired, according to Statement of Financial Accounting Standards ("FAS") 114, Accounting by Creditors for Impairment of a Loan "when, based on current information and events, it is probable that a creditor will be unable to collect all amounts due according to the contractual terms of the loan

agreement," which includes both the contractual interest payments and contractual principal payments. FAS 114, ¶ 8.

589. When an entity determines that a loss has occurred and, as a result, an asset is impaired, FAS No. 5, Accounting for Contingencies ("FAS 5") requires the entity to record an allowance for estimated losses and a corresponding charge against income if, as of the balance sheet date, the losses are both "probable" and "reasonably estimable." FAS 5, ¶¶ 8, 22.

590. Specifically, with respect to loss contingencies relating to the collectability of receivables, FAS 5 states that an accrual shall be made even though particular receivables that are uncollectible may not be identifiable, as follows:

> The assets of an enterprise may include receivables that arose from credit sales, loans, or other transactions. The conditions under which receivables exist usually involve some degree of uncertainty about their collectability, in which case a contingency exists. . . Losses from collectible receivables shall be accrued when both conditions [losses are probable and estimable] in paragraph 8 are met. Those conditions may be considered in relation to individual receivables or in relation to groups of similar types of receivables. If the conditions are met, accrual shall be made even though the particular receivables that are uncollectible may not be identifiable.

591. In the 2006 Form 10-K, Defendants admitted that "[o]ur senior management is actively involved in the review and approval of our allowance for

loan losses," yet falsely represented in the 2006 Form 10-K that, with respect to Countrywide's allowance for loan losses, "[w]e continually assess the credit quality of our portfolios of loans held for investment to identify and provide for losses incurred."

592. As alleged herein, during the Relevant Period, Countrywide originated and held investments in inherently risky loans (e.g., interest-only, home equity and pay-option ARM loans) provided primarily to non-creditworthy borrowers, without requiring supporting documentation to verify the borrower's income or collateral on the loan in order to report escalating loan volume and make Countrywide appear more profitable.

593. Countrywide's imprudent lending practices, coupled with rapidly declining home values, caused a dramatic increase in the Company's delinquencies and defaults during the Relevant Period. As demonstrated in Defendants Mozilo's April 4, May 18, June 1, and September 26, 2006 e-mails discussed herein, Defendants were well-aware of these problems. Defendants, however, failed to adequately accrue for these known losses in the False and Misleading Financial Statements, as set forth below, and falsely represented that "our allowances and provisions for credit losses are adequate pursuant to generally accepted accounting principles."

594. As discussed below, Defendants violated GAAP by failing to consider at least the following factors in calculating reserves reported in the False and Misleading Financial Statements, resulting in significant losses to the Company and investors: (i) the Company's undisclosed, improper lending practices of providing high-risk loans largely to subprime borrowers without requiring supporting documentation or collateral; (ii) significant declines in home values; and (iii) rising delinquencies and defaults resulting from the Company's imprudent lending practices. Losses caused by the above factors were not only probable, they had already occurred.

### 1. Defendants Violated GAAP by Failing to Adequately Increase Countrywide's Allowance For Loan Losses Resulting From the Company's Shift to Origination of High-Risk Loans and Declining Home Values

595. Prior to the Relevant Period, Defendants materially increased the Company's loans held for investment through production of the undisclosed, inherently high-risk loans, particularly pay-option ARMS and HELOCs, in order to increase revenue and earnings.

596. As demonstrated in the chart below, Defendants more than doubled Countrywide's LHI from 2003 to 2006, almost 70% of which consisted of pay-option ARM loans, home equity lines of credit (HELOCs) and nonprime loans.

| (in billions) | 2006 | 2005 | 2004 | 2003 |
|---|---|---|---|---|
| Loans HFI, gross | $78.3 | $70.1 | $39.8 | $26.4 |
| Pay Option ARM loans | $32.9 | $26.1 | $4.7 | N/A |
| Pay-option ARMs % of LHI | 42.0% | 37.2% | 11.8% | N/A |
| HELOCs | $20.2 | $15.0 | $11.4 | N/A |
| HELOCs as % of LHI | 25.8% | 21.4% | 28.6% | N/A |
| Nonprime Loans | $0.1 | $0.1 | $0.02 | N/A |
| Nonprime Loans as % of LHI | .13% | .14% | .50% | N/A |

597. According to Countrywide's own stated reserve methodology in the 2006 Form 10-K and First Quarter 2007 Form 10-Q, in calculating the Company's reported allowance for loan losses, Defendants failed to adequately consider Countrywide's shift to originating inherently high-risk affordability loans that comprised a significant portion of the Company's LHI portfolio. Rather, Defendants, by their own admission, performed analyses based upon "historical default and loss rates for similar loans originated by the Company . . . ."

598. In addition, Defendants misstated the Company's allowance for loan losses in the False and Misleading Financial Statements by failing to adequately

accrue for losses that occurred as a result of rapidly declining home values beginning in late 2005. Such declining home values were insufficient to cover the principle balances of loans, in particular, loans that financed 90% or more of the home's original value. Thus, as Defendant Mozilo's 2006 e-mails referenced herein demonstrate, Defendants knew losses related to home price declines were "probable."

599. As set forth in the chart below, Defendants maintained Countrywide's allowance for loan losses at a constant rate of approximately 0.3% through 2006. Even in the first and second quarters of 2007, when Defendants began to increase reserves, those reserves were woefully inadequate because, as discussed above, Defendants admittedly were still originating high-risk loans to subprime borrowers with FICO scores of less than 660 during the second and third quarters of 2007.

| **Quarter** | **LHI ($000s) (gross)** | **Allowance For Loan Losses ($000s)** | **Allowance For Loan Losses as % of LHI** |
|---|---|---|---|
| 2Q07 | $74,569,443 | $512,094 | **0.69%** |
| 1Q07 | $75,551,461 | $374,367 | **0.50%** |
| 4Q06 | $78,346,811 | $261,054 | **0.33%** |
| 3Q06 | $81,004,695 | $207,987 | **0.26%** |
| 2Q06 | $79,991,180 | $183,581 | **0.23%** |
| 1Q06 | $74,279,882 | $172,271 | **0.23%** |

600. Defendants' failure to adequately consider in the Company's allowance for loan losses, estimated losses from the material increase in such high-risk loans and drastically declining home values, caused Countrywide's allowance for loan losses and related provisions for loan losses in the False and Misleading Financial Statements to be understated and net income to be overstated, in violation of GAAP.

601. In the second quarter of 2007, Countrywide was forced to change its reserve methodology to properly consider changes in underwriting standards and declining home values, thereby admitting the Company's prior reserve methodology was unreliable. Specifically, under the new reserve methodology, the Company's Annual Report on Form 10-K for period ending December 31, 2007, filed with the SEC on February 29, 2008 (the "2007 Form 10-K") disclosed that the Company adjusted reserves:

> [T]o reflect our assessment of environmental factors not yet reflected in the historical data underlying our loss estimates, such as trends in real estate values, local and national economical trends, changes in underwriting standards and changes in the regulatory environment.

602. Despite the change in Countrywide's methodology for estimating its allowance for loan losses, however, the Second Quarter 2007 Form 10-Q was still materially false and misleading because, as discussed above, the Company continued to originate high-risk affordability loans to subprime borrowers until at least the third quarter of 2007.

### 2. Defendants Violated GAAP by Failing to Adequately Increase the Allowance for Loan Losses for Rising Delinquencies and Defaults

603. As Countrywide continued to increase the Company's investment in high-risk loans (<u>see</u> chart in Section IX.A.1. above), delinquencies and pending foreclosures from loan defaults rose drastically.

604. Specifically, as demonstrated in the chart below, overall delinquencies increased significantly prior to and during the Relevant Period, particularly in Countrywide's non-prime loans:

| | **Year-ending December 31,** |
|---|---|

| | 2007 | 2006 | 2005 | 2004 |
|---|---|---|---|---|
| Total Delinquencies | 6.96% | 5.02% | 4.61% | 3.83% |
| Nonprime | 27.29% | 19.03% | 15.20% | 11.29% |
| Prime Home Equity | 5.92% | 2.93% | 1.57% | .79% |
| Pay-option ARMs delinquent 90 days or more | 5.7% | .65% | .10% | .02% |

605. Pending foreclosures from loan defaults similarly increased prior to and throughout the Relevant Period, as demonstrated in the chart below.

| | Year-ending December 31, | | | |
|---|---|---|---|---|
| | 2007 | 2006 | 2005 | 2004 |
| Total Pending Foreclosures | 1.04% | .65% | .44% | .42% |
| Nonprime Foreclosures | 5.54% | 3.53% | 2.03% | 1.74% |
| Prime Home Equity Foreclosures | .12% | .12% | .06% | .03% |

606. As disclosed iu the 2006 Form 10-K, Countrywide's allowance for loan losses methodology had a liberal charge-off policy, which did not provide for any quantitative or objective criteria for charging-off uncollectible loans. Rather, the Company's allowance for loan losses policy provided management with sole discretion in determining when to charge-off uncollectible loans in Countrywide's financial statements. Specifically, the Company's allowance for loan loss policy allowed Defendants to manipulate and defer the timing of when the Company recorded charge-offs for uncollectible loans to "when management believes the loss is confirmed."

607. This liberal and highly discretionary allowance for loan loss and charge-off policy allowed Defendants to conceal the true risk exposure of the Company's loan quality and manipulate the timing of reported earnings and delinquency statistics in the False and Misleading Financial Statements. Accordingly, the stated reserve policy and reported reserves contained in the False

and Misleading Financial Statements were predicated on a reserve policy and reserves that were unreliable.

608. GAAP does not permit the establishment of allowances that are not supported by appropriate analyses. *See* Audit and Accounting Guide ("AAG") -- Depository and Lending Institutions: Banks and Savings Institutions, Credit Unions, Finance Companies and Mortgage Companies ("AAG -- Depository and Lending Institutions"). The SEC, in Staff Accounting Bulletin No. 102, describes the common elements that should be included in any allowance for loan loss methodology, including consideration of: (i) "all known relevant internal and external factors that may affect loan collectability;" (ii) "modif[ication] for new factors affecting collectability;" (iii) "the particular risks inherent in different kinds of lending;" and (iv) "current and reliable data." Defendants' loan loss reserve methodology was inconsistent with both the GAAP and SEC guidelines.

609. As shown above, notwithstanding dramatically rising delinquencies and defaults, prior to and throughout the Relevant Period, Defendants maintained the Company's allowance for loan losses at a constant rate as a percentage of assets held-for-investment of approximately 0.3% through 2006. As discussed above, even though Defendants increased the Company's reserves in 2007, the Company's reserves were still woefully inadequate as a result of Countrywide's continuing imprudent lending practices.

610. By failing to properly factor rising delinquencies and necessary charge-offs in the Company's allowance for loan losses reported in the False and Misleading Financial Statements and providing management with sole discretion to control the timing of charge-offs, the Company's reserves and the provision for loan losses reported in the False and Misleading Financial Statements were materially understated and net income was overstated, in direct violation of GAAP.

611. Moreover, Defendants admitted in Countrywide's 2007 Form 10-K that the Company's prior allowance for loan loss methodology was unreliable and,

accordingly, changed its allowance for loan loss policy to adopt a 180-day charge-off standard, as follows:

> Loan losses are charged against the allowance when management believes the loss is confirmed. We make an initial assessment of whether a charge-off is required on our mortgage loans no later than the 180th day of delinquency.

This change limited management's prior discretion by implementing quantitative and objective criteria for charging-off uncollectible loans.

612. Defendants also disclosed in the 2007 Form 10-K that the Company changed the Company's reserve policy to take into account loans that are "expected to migrate to 90 or more days past due within the twelve-month period," rather than the prior policy of considering only loans that have already become 90 days past due.

613. In addition, as a result of Defendants' undisclosed imprudent lending practices, Defendants, in a move that was long overdue, disclosed in the 2007 Form 10-K that the Company added a new component to the Company's allowance for loan losses methodology to account for instances where Countrywide modified terms of contractual loan obligations to avoid borrower defaults:

> We classify these loans as troubled debt restructurings. Troubled debt restructurings may include changing repayment terms, reducing the stated interest rate, reducing the loan's principal balance or accrued interest, or extending the maturity date of the loan. Upon completion of a troubled debt restructuring, we establish a

valuation allowance to recognize the impairment of the loan.

614. According to Defendants, the new reserve policy, implemented beginning in the second quarter of 2007, accelerated the recording of loan losses that would otherwise have been recorded in future quarters. The Company's allowance for loan losses for the second quarter of 2007, however, was still grossly inadequate, because Defendants continued to originate inherently high-risk loans to subprime borrowers until at least the third quarter of 2007.

**B. Defendants Misstated Earnings by Failing to Timely Record Impairment on Retained Interests and MSRs**

615. The Company materially overstated credit-sensitive subordinated retained interest assets, MSRs, net gain on sale of loans and net income, while at the same time understating the Company's liability for future draw obligations on securitization of HELOCs in the False and Misleading Financial Statements. Countrywide did this by failing to record known impairment losses on the underlying loans resulting from Defendants' failure to consider the true deterioration in the Company's loan portfolio, as well as the inherent unreliability of Countrywide's methodology for calculating impairment losses.

**1. Subordinated Retained Interests and Liability For Future Draw Obligations on HELOCs**

616. Under GAAP, specifically FAS 140, subordinated retained interests must be reported at fair value on the balance sheet at the time of the sale or securitization. The fair value of the Company's subordinated retained interests were impacted by estimated credit losses over the expected lifetime of the securities.

617. FAS 140, as amended by FAS 156, Accounting for Servicing of Financial Assets ("FAS 156"), provides guidance on recording interest retained at the time of sale or securitization. In the event retained interests are subordinated by more senior interests, as was often the case with Countrywide, FAS 140, as

amended by FAS 156, requires that such subordinated interests be considered when determining the fair value of retained interests:

> If the retained interests that continue to be held by a transferor are subordinate to more senior interests held by others, that subordination may concentrate most of the risks inherent in the transferred assets into the interests that continue to be held by a transferor and shall be taken into consideration in estimating the fair value of the retained interests. FAS 140, ¶ 59, as amended by FAS 156.

618. The ongoing value of retained interests is governed by FAS No. 115, Accounting for Certain Investments in Debt and Equity Securities ("FAS 115"). FAS 115 requires that investments classified as either trading or available-for-sale, such as Countrywide's retained interests, be measured at fair value and that an entity review the fair value of available-for-sale securities for "other than temporary" impairment on a quarterly basis.

619. According to FAS 115, as amended by FAS 130, Reporting Comprehensive Income and FAS 133, Accounting for Derivative Instruments and Hedging Activities, "other than temporary" impairment occurs "if it is probable that the investor will be unable to collect all amounts due according to the contractual terms of a debt security not impaired at acquisition." Thus, subordinated retained interests are impacted by, among other things, estimated credit losses from delinquencies and loan defaults. If it is determined that impairment has occurred, under FAS 115, the cost basis of the retained interest must be written down to fair value with a corresponding charge against earnings.

620. As demonstrated in the chart in Section IX.A.2 above, the performance of Countrywide's non-traditional, high-risk affordability loans (e.g., pay-option ARM loans, home equity loans, HELOCs, stated income loans) that served as collateral to the Company's retained interests deteriorated rapidly. Defendants, however, failed to adequately consider losses from rising delinquencies and defaults in determining the Company's credit loss assumptions used to measure the fair value of subordinated retained interests in the False and Misleading Financial Statements.

621. Defendants also improperly relied upon historical loan performance, which did not reflect the impact of the Company's undisclosed imprudent lending practices (e.g., stated income and piggyback loans) in analyzing its assumptions to determine whether retained interests were impaired in the False and Misleading Financial Statements. Notably, the actual delinquency and default statistics, discussed in the chart in Section IX.A.2, were significantly higher than the credit loss assumptions used in the Company's fair valuation of its retained interests.

622. For example, as demonstrated in the chart below, total actual delinquencies in 2005 were more than double the weighted average net lifetime credit loss assumptions used in determining the fair value of retained interests. Even worse, in 2006 when home values were declining at the highest rate in decades, and the Company was originating high-risk loans, Defendants decreased the Company's credit loss assumptions used to determine the fair value of retained interests at the time of sale/securitization.

623.

| | **Year-ending December 31,** | | | |
|---|---|---|---|---|
| | **2007** | **2006** | **2005** | **2004** |
| Total Delinquencies | 6.96% | 5.02% | 4.61% | 3.83% |
| **Key Assumptions Used in Determining Fair Value Of Retained Interests at the Time of Securitization** | | | | |

| | | | | |
|---|---|---|---|---|
| Weighted-average net lifetime credit losses | 2.4% | 1.9% | 2.0% | 2.7% |
| **Key Assumptions Used in Determining Fair Value of Retained Interests at Certain Dates** | | | | |
| Weighted-average net lifetime credit losses | 10.9% | 2.7% | 1.7% | N/A |

624. In the second quarter of 2007, Countrywide changed its approach to valuing retained interests to consider the credit quality of, and losses occurring in, the Company's underlying loan portfolio, as it was required to do pursuant to relevant GAAP. As a result of this change in approach, the Company increased its credit loss assumption used to determine the fair value of the existing retained interest portfolio four-fold.

625. Despite the Company's purported change in approach to valuation of retained interests, Countrywide's retained interest assets were still grossly overstated in the second quarter of 2007, given Countrywide's continued origination of high-risk loans.

626. In addition, Defendants failed to fully consider the Company's imprudent lending practices and resulting increased delinquencies and defaults, as well as monumentally declining home prices in estimating the Company's liability for subsequent draw obligations on HELOCs that were in rapid amortization status as a result of persistent borrower delinquencies and defaults. GAAP required the Company to report such liabilities at "fair value." Defendants, however, failed to adequately increase liabilities for losses that occurred on HELOCs in the False and Misleading Financial Statements, in violation of GAAP.

**2. Mortgage Servicing Rights**

627. As discussed above, when Conntrywide sold mortgage loans, it generally received cash from the sale and retained the right to service the underlying loans, which arose from contractual agreements between Countrywide

and the purchasers of its loans. Under these contractual arrangements, Countrywide performed its mortgage servicing functions (i.e., collecting and remitting loan payments) in exchange for servicing fees received from the monthly payments made by borrowers.

628. Under GAAP, specifically FAS 140, as amended by FAS 156, Countrywide was requested to report mortgage servicing rights at fair value on the balance sheet at the time of sale. FAS 140, ¶¶ 10-11, 13, as amended by FAS 156. FAS 140 further requires that subsequent to the sale/securitization of the loans, an entity may measure such asset using either the amortization method or the fair value measurement method. According to Countrywide's filings with the SEC, Countrywide elected to account for its MSRs under the fair value measurement method, beginning January 1, 2006. Under the fair value measurement method, servicing assets are measured at fair value at each reporting date and changes in fair value are reported in earnings in the period in which the changes occur. FAS 140, ¶13A, as amended by FAS 156.

629. In the False and Misleading Financial Statements, the Company disclosed that the fair value of its MSRs was derived from the net positive cash flows associated with the servicing contracts, which incorporate prepayment and discount rate assumptions. Because net cash flows used to estimate the fair value of MSRs are directly impacted by borrower delinquencies and defaults on the underlying loans, the fair value of MSRs is dependent upon the credit quality of the underlying loans.

630. As demonstrated above in the chart in Section IX.A.1., Countrywide significantly increased origination of high-risk affordability loans prior to and during the Relevant Period, primarily to non-creditworthy borrowers, without requiring supporting documentation to verify the borrower's income or collateral on the loan. These undisclosed imprudent lending practices exposed Countrywide to significant credit losses from borrower delinquency and defaults.

Case MDL No. 2265 Document 1-12 Filed 05/23/11 Page 204 of 283

631. Defendants, however, failed to properly consider the impact of losses arising from such increased delinquencies and defaults in estimating the fair value of Countrywide's MSR assets in the False and Misleading Financial Statements. Instead, Countrywide held the assumptions the Company used to value MSRs constant until the third quarter of 2007, when the Company shocked investors with its announcement of an $830.9 million reduction in the value of MSRs, thereby admitting that its prior valuations were inflated.

### C. Defendants Misstated Liabilities and Earnings by Failing to Adequately Accrue for Losses Resulting From Breaches of Representations and Warranties

632. Countrywide also retained credit risk in the form of liabilities arising from the representations and warranties the Company made to purchasers of its loans. Such representations and warranties included, among others, the representation that the loans complied with applicable loan criteria, such as delinquency status and loan limits, as well as compliance with applicable laws.

633. GAAP, specifically, FAS 140, required Countrywide to recognize liabilities incurred in the sale/securitization of a financial asset at fair value. Specifically, FAS 140, as amended by FAS 156, provides:

> Upon completion of a transfer of financial assets that satisfies the conditions to be accounted for as a sale (paragraph 9), the transferor (seller) shall:
>
> * * *
>
> (c) Initially measure at fair value assets obtained and liabilities incurred in a sale (paragraphs 68-70) or, if it is not practicable to estimate the fair value of an asset or a liability, apply alternative measures . . . ; and



1475577v1/010471

(d) Recognize in earnings any gain or loss on the sale. FAS 140, ¶ 11, as amended by FAS 156.

(Footnotes omitted)

634. The fair value of the Company's liability for representations and warranties was based on the key assumptions of default rates and loss severity (i.e., the value of the liability was impacted by loan delinquencies and defaults).

635. Thus, at the time of securitization, Countrywide was required to estimate potential claims by investors against the Company for breaches of representations and warranties made in connection with the sale of those securities. In the event a subsequent breach of a representation and/or warranty occurred after securitization, the Company was required to either repurchase the loan or indemnify the investor and recognize a corresponding liability and charge against income (as a component of gain or loss on the sale of securities) for investor claims when those losses were "probable" and "estimable."

636. In the False and Misleading Financial Statements, Defendants failed to adequately consider known representations and warranty breaches and related losses resulting from Countrywide's undisclosed improper lending practices that were both "probable" and "reasonably estimable" (the two criteria under FAS 5). For example, as discussed above, Defendants admitted in the May 2007 Letter to the OTS that Countrywide evaluated borrower capacity to repay the loan at the low, introductory "teaser" interest rate, rather than the fully-amortized interest rate.

637. In addition, Defendants were aware at the time of securitization that the terms of the Company's high-risk loans violated applicable loan criteria because such loans were provided to borrowers with low credit scores who made little or no down payment. Moreover, as reflected in Defendant Mozilo's 2006 e-mails referenced below in ¶¶ 683-97, Defendants knew that the loans the Company was selling and/or repackaging into securities for sale had higher instances of

delinquency and default given Countrywide's undisclosed lending criteria and, thus, it was highly probable Countrywide would have to cure imminent breaches of its representations and warranties.

638. Defendants reported in the Company's Third Quarter 2007 Form 10-Q that Countrywide had increased its provision for representations and warranties by an alarming $291.5 million to account for increased liability from breached representations and warranties. The $291.5 million third quarter 2007 charge represented a 611.0% increase from the $41.0 million reported in the same quarter in the prior year. Notably, of the $291.5 million provision, the Company reported $177.3 million, or 60% related to prime loans and $67.1 million related to nonprime loans. This disparity demonstrated the true extent of the Company's exposure to losses in its purported "prime" loan portfolio as a result of the improper lending practices described above.

639. Defendants' failure to timely record liabilities and related losses resulting from known breaches of representations and warranties that were "probable" and "estimable," caused the Company's liabilities and loss on sale of loans to be understated and net income to be overstated in the False and Misleading Financial Statements, in violation of GAAP. Defendants' fraud also served to conceal the true credit quality and financial performance of Countrywide's loan portfolio.

**D. Defendants' Failnre to Disclose the True Risk Arising from the Company's Inherently High-Risk Loan Practices Violated GAAP and SEC Regulations**

640. The undisclosed improper lending practices that Countrywide engaged in prior to and during the Relevant Period violated of the most fundamental principles of financial reporting articulated by GAAP and SEC Regulations. Specifically, in addition to the accounting violations noted above, the Company presented its financial statements in a manner that also violated at least the GAAP provisions set forth below.

641. Defendants violated the concept that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (Statement of Financial Accounting Concepts ("FASCON") No. 1, Objectives of Financial Reporting by Business Enterprises ("FASCON 1"), ¶ 34)).

642. Defendants violated the concept that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (FASCON 1, ¶ 40).

643. Defendants violated the concept that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general. (FASCON 1, ¶ 50).

644. Defendants violated the concept that financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASCON 1, ¶ 42).

645. Defendants violated the concept that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (FASCON No. 2, Qualitative Characteristics of Accounting Information, ("FASCON No. 2"), ¶¶ 58-59)).

646. Defendants violated the concept of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASCON 2, ¶ 79).

647. Defendants violated the concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. (FASCON 2, ¶¶ 95, 97).

648. Defendants violated the concept that footnote disclosures in financial statements is "essential to understanding the information recognized in financial statements and has long been viewed as an integral part of financial statements prepared in accordance" with GAAP. (FASCON 5, Recognition and Measurement in Financial Statements of Business Enterprises, ¶ 7).

649. In addition, SEC Regulation S-K required Countrywide to disclose in the Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") section of its periodic filings with the SEC "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." 17 C.F.R. § 229.303.

650. Regulation S-K also required Defendants to disclose in the Company's MD&A section, a discussion of "significant economic changes," "unusual or infrequent events or transactions" and "known trends or uncertainties," such as major changes in lending practices, significantly increasing delinquencies and loan defaults and rapid declines in the market (e.g., declining home values) that would materially affect the Company's financial statements:

651. In violation of these principles, during the Relevant Period, Defendants reassured investors that the Company was producing "quality" loans, employing "prudent underwriting practices" and otherwise was not affected by the current subprime market decline because the Company's subprime exposure was purportedly minimal.

652. As alleged herein, Defendants knew of the heightened risk of default in a variety of their poorly underwritten products, particularly pay-option ARMs and piggyback loans. For example, Defendant Mozilo conceded in an April 4, 2006 e-mail to Defendant Sambol and others that pay-option ARM delinquency data:

> [c]ould portend serious problems with this product. Since over 70% have opted to make the lower payment it appears that it is just a matter of time that we will be faced with a substantial amount of resets and therefore much higher delinquencies. We must limit this product to high FICOs otherwise we could face both financial and regulatory consequences.

653. Defendant Mozilo's April 17, 2006 e-mail likewise noted that the Company's "sub-prime second business" presented "financial and reputational risks," which led Mozilo to conclude "[i]n all my years in the business I have never seen a more toxic product."

654. Similarly, Defendant Mozilo's June 1, 2006 e-mail to Defendant Sambol and others noted that the "majority of pay options being originated by us, both wholesale and retail, are based upon stated income." Mozilo further acknowledged that the information that borrowers provided concerning income "does not match up with IRS records." For this reason, Mozilo advised off-loading these loans and taking "a careful look at our reserves and begin[ing] to assume the worst." Mozilo reiterated those concerns in his September 26, 2006 e-mail to Defendants Sambol and Sieracki noting that the Company's pay-option portfolio presented palpable credit risk.

655. While Defendants clearly knew that escalating defaults in the loans that Countrywide originated and/or held as LHI would directly harm Countrywide

and its access to the secondary mortgage markets, Defendants failed to disclose these known trends and uncertainties in the Company's 2006 Form 10-K or any of the quarterly filings during the Relevant Period. Such disclosures should have been made in the MD&A disclosures of their filings. The SEC has made clear that MD&A disclosures are designed to (i) give the investor the opportunity to see the company through the eyes of management; (ii) enhance the overall financial disclosure and provide true context within which financial information should be analyzed; and (iii) provide information about the quality of, and potential variability of a Company's earnings and cash flow, so that investors can ascertain the likelihood that past performance is indicative of future performance.

656. Under Item 303 of Regulation S-K, disclosure of known trends or uncertainties is required if either: (i) the trend or uncertainty is reasonably likely to occur; or (ii) if management cannot determine whether the trend or uncertainty is reasonably likely to occur, disclosure must be made unless it is not reasonably likely that the trend or uncertainty will have a material effect on the registrant's financial condition or results of operations. According to the SEC, "reasonably likely" is a lower threshold than "more likely than not" and means less than a 50% likelihood of occurrence.

657. In addition to the above principles concerning financial statement disclosure, GAAP also provides specific guidance on required disclosures concerning loss contingencies and exposure to risk, including credit risk. Specifically, FAS 5 requires disclosure of loss contingencies that have been recorded in the financial statements, or, a reasonable possibility that a loss may have been incurred, in order for the financial statements to not be misleading.

658. Additionally, AICPA Statement of Position No. 94-6, Disclosure of Certain Significant Risks and Uncertainties ("SOP 94-6"), requires disclosure of risks and uncertainties existing as of the date of those financial statements in the following areas: (a) nature of operations; (b) use of estimates in the preparation of

financial statements; (c) certain significant estimates; and (d) current vulnerability due to certain concentrations.

659. With respect to the above areas, SOP 94-6 ¶ 21 requires disclosure of an entity's current vulnerability from concentration of risks and uncertainties, where:

a. The concentration exists at the date of the financial statements.

b. The concentration makes the enterprise vulnerable to the risk of a near-term severe impact.

c. It is at least reasonably possible that the events that could cause the severe impact will occur in the near term.

660. FASB Staff Position ("FSP") SOP 94-6-1, Terms of Loan Products That May Give Rise to a Concentration of Credit Risk ("FSP SOP 94-6-1"), issued in December 2005, tailored the guidance in SOP 94-6, described above, to specific disclosure requirements for entities that originate, hold, guarantee, service or invest in loan products whose terms may give rise to a concentration of credit risk. In this regard, SOP 94-6-1 states, in relevant part:

> The terms of certain loan products may increase a reporting entity's exposure to credit risk and thereby may result in a concentration of credit risk . . . either as an individual product type or as a group of products with similar features . . . Possible shared characteristics on which significant concentrations may be determined include, but are not limited to:
>
> a. Borrowers subject to significant payment increases

b. Loans with terms that permit negative amortization

c. Loans with high loan-to-value ratios.

661. In violation of SOP 94-6 and SOP 94-6-1, Defendants failed to disclose in the False and Misleading Financial Statements the Company's true credit risk, and exposure to significant losses from its deteriorating loan portfolio and imprudent lending practices.

662. Accordingly, as described above, Defendants failed to disclose the Company's improper lending practices in either Countrywide's MD&A section or in the footnotes to the False and Misleading Financial Statements, reflecting known trends in the Company's loan portfolio, as well as the concentration of credit risk and loss contingencies. Defendants' failure to make such disclosures violated the most basic principles of financial reporting under GAAP and SEC Regulations.

**E. Defendants' Internal Control Violations**

663. During the Relevant Period, Defendants falsely represented in the False and Misleading Financial Statements that Countrywide had "extraordinary compliance and controls in place."

664. In addition, during the Relevant Period, Defendants concealed a chronic and systematic breakdown of the Company's internal accounting controls, thereby allowing the Company to, among other things, significantly relax its lending standards to provide inherently risky loans (e.g., pay-option ARM and piggyback loans) primarily to non-creditworthy borrowers, without requiring supporting documentation to verify the borrowers' income or collateral on the loans. The Company's imprudent lending practices resulted in dramatically rising delinquencies and defaults during the Relevant Period.

665. As a result of Defendants' failure to maintain effective internal control over financial reporting, they were able to mask the significant undisclosed risk in the Company's loan portfolio in the False and Misleading Financial Statements by

misclassifying subprime loans as prime loans, and by manipulating and deferring the timing of when Countrywide recorded losses resulting from delinquent and/or defaulting loans.

666. As the SEC has explained, internal controls are fundamental and critical for a public company "to accomplish the objectives of accurately recording, processing, summarizing and reporting financial data . . . ." 15 U.S.C. § 78m(b)(2). Specifically, the SEC requires a public company to: (a) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets of the issuer; and (b) devise and maintain a system of internal accounting controls . . . . " 15 U.S.C. § 78m(b)(2). Indeed, a lack of fundamental internal controls, as here, under GAAP constitutes a "material weakness" that should immediately be disclosed to investors.

667. The Individual Defendants were also subject to a series of requirements regarding the Company's internal controls over financial reporting.

668. Generally accepted auditing standards ("GAAS") set forth the role of a company's management in an audit of that company's financial statements. As noted above, Auditing Standard ("AU") § 110, Responsibilities and Functions of the Independent Auditor ("AU § 110"), states that management's responsibility includes establishing and maintaining internal controls "that will, among other things, record, process, summarize, and report transactions (as well as events and conditions consistent with management's assertions embodied in the financial statements." AV § 110.03 (Footnotes omitted).

669. The Individual Defendants were further required under Rule 302 of the Sarbanes-Oxley Act of 2002 to provide certifications relating to the Company's internal control over financial reporting.

670. Additionally, Section 404 of the Sarbanes-Oxley Act of 2002 required Defendants to assess and report on the effectiveness of the Company's internal control over financial reporting, as described in Public Company Accounting

Oversight Board (the "PCAOB") Auditing Standard ("AS") No. 2, An Audit of Internal Control over Financial Reporting Performed in Conjunction With an Audit of Financial Statements ("AS 2"), as follows:

> Section 404(a) of the Sarbanes-Oxley Act requires the management of a public company to assess the effectiveness of the company's internal control over financial reporting as of the end of the company's most recent fiscal year and to include in the company's annual report to shareholders management's conclusion, as a result of that assessment, about whether the company's internal control is effective.

See AS 2, Section B.

671. AS 2 defines internal controls over financial reporting as those policies and procedures that:

> 1. Pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company;
>
> 2. Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company, and;
>
> 3. Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use

Case MDL No. 2265 Document 1-12 Filed 05/23/11 Page 215 of 283

> or disposition of the company's assets that could have a material affect on the financial statements.

*See id.*

672. The Company's most senior executive management, comprised in substantial part of the Individual Defendants herein, embraced a "tone at the top" of generating loans regardless of the borrowers' creditworthiness or adequacy of collateral in order to maximize profits and personal compensation. The purported control environment created by the Individual Defendants focused on loan volumes rather than loan quality, resulting in the ineffective internal controls described in detail herein. Such imprudent lending practices created a control environment contributing to the Company's failure to properly recognize and record losses resulting from, and the undisclosed risks inherent in, such improper lending practices. These practices ultimately culminated in the Company recording billions of dollars of losses from delinquencies and defaulting loans in 2007.

673. Furthermore, Defendants' failure to identify such control deficiencies (e.g., material weaknesses) existing at the Company rendered Management's Report on Internal Control over Financial Reporting in the False and Misleading Financial Statements materially false and misleading, and contributed to the Company's issuance of materially false and misleading financial statements in violation of GAAP.

674. As Defendants would admit in the second quarter of 2007, however, the Company's utter lack of internal controls allowed Defendants to conceal the true risks in the Company's loan portfolio by, among other ways, misclassifying subprime loans as prime loans. In addition, Defendants conceded in the second and third quarters of 2007 that Countrywide's underwriting guidelines and internal controls were wholly inadequate and, accordingly, the Company "made many changes to [Countrywide's] product offerings, pricing, underwriting guidelines, and

processes, in order to improve the quality and secondary market execution of [its] production."

675. Defendants' representations during the Relevant Period concerning the Company's internal controls over loan underwriting and financial reporting violated the foregoing auditing standards and rendered the Company's financial statements materially false and misleading.

## X. ADDITIONAL SCIENTER ALLEGATIONS

676. As alleged herein, each of the Defendants acted with scienter in that each Defendant knew or acted with deliberate recklessness in disregarding that the public statements and documents issued and disseminated in the name of the Company were materially false and misleading, knew that such statements and documents would be issued and disseminated to the investing public, and knowingly and substantially participated and/or acquiesced in the issuance or dissemination of such statements and documents.

677. Each of the Individual Defendants also had the opportunity to commit and participate in the wrongful conduct complained of herein. Each was a senior executive officer and/or director of Countrywide and thus controlled the information disseminated to the investing public in the Company's press releases, SEC filings and communications with analysts. As a result, each Individual Defendant could falsify the information that reached the public about the Company's business and performance.

678. In the SEC Action, counsel for Defendant Mozilo publicly filed a document entitled "Countrywide Financial Corporation Disclosure Controls and Procedures" (the "Disclosure Guidelines"), which were effective as of April 2004. The Disclosure Guidelines confirmed certain responsibilities that the Individual Defendants had with respect to publicly disclosing the Company's financial information during the Relevant Period.

679. Among other things, the Disclosure Guidelines established a Disclosure Committee, which included Defendant Sieracki during the Relevant Period. The Disclosure Committee reported to Defendant Mozilo and others during the Relevant Period. The Disclosure Guidelines also required Countrywide "to disclose on a timely basis any information that would be expected to affect the investment decision of a reasonable investor or to alter the market price of the Company's securities."

680. With regard to financial reporting, the Disclosure Guidelines provided that the Individual Defendants were responsible for reviewing and commenting on drafts of Countrywide's: (i) earnings releases; (ii) periodic filings on Forms 10-Q; and (iii) annual reports on Forms 10-K.

681. Throughout the Relevant Period, each of the Individual Defendants acted intentionally or with deliberate recklessness in participating in and orchestrating the fraudulent schemes alleged herein to conceal the true nature and extent of the Company's loss exposure. Such actions and Defendants' misrepresentations and omissions related thereto artificially inflated the Debentures' value and allowed Countrywide to pursue its aggressive growth strategy and maintain its high credit rating, and allowed the Individual Defendants to profit from their improper insider sales and massive incentive-based compensation. The scienter of the Individual Defendants may be imputed to Countrywide as the Individual Defendants were among Countrywide's most senior officers and were acting within the scope of their employment when engaging in the misconduct alleged herein.

### A. Internal Company Documents Demonstrate The Individual Defendants' Knowledge of the Risks That Countrywide's Overly Aggressive and Poorly Underwritten Loans Posed to the Company

682. During the Relevant Period, the Individual Defendants acted intentionally or with deliberate recklessness in disregarding the impact that the

Case MDL No. 2265 Document 1-12 Filed 05/23/11 Page 218 of 283

inherently risky loans the Company was providing to non-creditworthy borrowers – often without obtaining supporting documentation needed to verify the borrower's income or collateral on the loan – had on the accuracy of the Company's public statements.

683. Defendants also knew that Countrywide had amassed a significant portion of impaired high-risk loans on the Company's balance sheet that posed severe threats to Countrywide's financial performance and liquidity throughout the Relevant Period.

684. Certain internal communications in which the Individual Defendants discussed, among other things, the risks that Countrywide's undisclosed lending practices posed to the Company, are now publicly available. As set forth in ¶¶ 685-709 below, these communications support a strong inference that the Individual Defendants acted intentionally or with deliberate recklessness when making the public statements that Plaintiffs allege herein were materially false and misleading.

685. Each of the Individual Defendants was acutely aware of early problems created by Countrywide's undisclosed lending practices. For example, Countrywide's Chief Risk Officer John McMurray sent an e-mail dated May 22, 2005 to Defendant Sambol warning of the risks arising from the Company's loan "exceptions" policy. In the e-mail, McMurray stated that "exceptions are generally done at terms even more aggressive than our guidelines," and "[g]iven the expansion in guidelines and growing likelihood that the real estate market will cool, this seems like an appropriate juncture to revisit our approach to exceptions . . . ." McMurray went on to identify the specific credit risks associated with Countrywide's exception loans: "Many of the exception transactions we do are structured as a piggy-back transaction where we're providing a second lien. . . .A disadvantage is that we're taking much of the credit risk through our second [lien]." McMurray also cautioned that "we will see higher rates of default on the riskier transactions and third parties coming back to us seeking a repurchase or

indemnification based on an alleged R&W [Representations and Warranties] breach as the rationale." Thus, as early as May 2005, Defendant Sambol was aware of the credit risks stemming from Countrywide's aggressive loan underwriting practices which routinely deviated from the Company's stated underwriting guidelines.

686. Defendant Sieracki also had knowledge at this time of the credit risks associated with Countrywide's loan underwriting practices. For example, on June 28, 2005, Sieracki attended a Countrywide Corporate Credit Risk Committee meeting during which Stan Kurland, Countrywide's Chief Operating Officer at the time, stated that the Company was "taking too much balance sheet risk" from its loan portfolio. Specifically, Sieracki was informed that Countrywide was originating mortgages for non-owner occupied second home purchases at 95% CLTV ratios, which was an exception to the Company's existing loan underwriting guidelines. Countrywide's Chief Operating Officer stated at this meeting that the Company appeared to "have unacceptable risk on our balance sheet from this type of loan."

687. Defendant Mozilo was also aware early on of the risks posed by Countrywide's failure to comply with its loan underwriting guidelines. For example, on March 27, 2006 Defendant Mozilo sent an e-mail to Defendants Sambol and Sieracki, among others, following a meeting held earlier that day during which Defendants discussed numerous failures surrounding the origination of subprime loans that Countrywide sold to HSBC. Countrywide was later obligated to repurchase these loans from HSBC based upon the loans' poor performance.

688. According to Defendant Mozilo's March 27, 2006 e-mail, the Company's piggyback loans, which enabled borrowers to finance 100% of the value of their homes, were "the most dangerous product in existence and there can be nothing more toxic." Based upon the Company's pattern of ignoring its own weak underwriting guidelines, Defendant Mozilo noted that these loans were

experiencing early payment defaults, and that the Company should be looking to "reduce the loans of this type on our balance sheet." Defendant Mozilo further warned that the Company needed to make sure that it was "originating these loans in a manner which takes us out of harms [sic] way and that loans are sold in a manner to avoid further and unnecessary exposure to the Company."

689. On April 4, 2006, Defendant Mozilo sent an e-mail to Defendant Samhol and others addressing recent delinquency rate statistics for Countrywide's pay-option ARM products. Upon review of this information, Defendant Mozilo conceded that "[t]his is important data that could portend serious problems with this product . . . it appears that it is just a matter of time that we will be faced with a substantial amount of resets and therefore much higher delinquencies . . . we could face both financial and regulatory consequences." As with the Company's poorly underwritten HELOCS, Defendants knew that Countrywide's pay-option ARMs were issued to borrowers who simply could not afford the products, making widespread defaults and resulting financial consequences inevitable.

690. Continuing to note concerns for Countrywide's financial health based upon the risky loan products that the Company underwrote, Defendant Mozilo sent an e-mail to Defendants Sambol and Sieracki on April 13, 2006 acknowledging "unacceptable conduct" including "serious disregard for process, compliance with guidelines and irresponsible behavior" in connection with Countrywide's origination of subprime "piggyback" second mortgages.

691. Mozilo's April 13, 2006 e-mail also noted that these loans required further attention to ascertain "our future expectations as to losses" based upon the "losses incurred to date." Defendant Mozilo acknowledged that he was seeking "concrete assurances that we are not facing a continuous catastrophe" because, among other things, he had "personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of the loans originated versus the pricing of those loan

[sic]." Mozilo also stated in the e-mail that in his "conversations with Sambol he calls the 100% sub prime second [] [mortgages] as the 'milk' of the business," but that Mozilo "consider[ed] that product line to be the poison of ours."

692. Defendant Mozilo was particularly concerned with Countrywide's practice of extending HELOCS to borrowers with poor credit, which he knew, but failed to disclose, was occurring at a dangerously high rate. On April 17, 2006, Defendant Mozilo sent an e-mail to Defendants Sambol and Sieracki noting that Countrywide's subprime "piggyback" second mortgages were the most "toxic product[s]" that he had ever confronted and that the FICO scores for borrowers were "below 600, below 500 and some below 400," which Mozilo recognized would likely lead to "financial and reputational risks." Mozilo further noted, "[w]ith real estate values coming down and interest rates rising this product will become increasingly worse." For this reason, Mozilo requested a review of, among other things, "the compensation to the sales force in light of the overwhelmi[n]g hits taken by the Company on this product."

693. On May 18, 2006, Defendant Mozilo sent an e-mail to Defendants Sambol and Sieracki regarding efforts to reduce risk at the Company. In this e-mail, Defendant Mozilo recognized that HELOCS and pay-option ARM loans presented a known risk of losses for the Company because of the heightened risk of default. In this regard, Defendant Mozilo stated, "[w]ith interest rates continuing to rise unabated [HELOCS] will become increasingly toxic in that mortgagors will be and are facing substantially higher payments then [sic] when the loan was originated. We should attempt to efficiently off loan [sic] this product … the bank faces potential unexpected losses because higher rates will cause these loans to reset much earlier than anticipated and as result [sic] causing mortgagors to default due to the substantial increase in their payments."

694. On May 19, 2006, Defendant Mozilo sent an e-mail to Defendants Sambol and Sieracki following up on the concerns he expressed the day before over

Countrywide's portfolio of poorly underwritten loans. Specifically, Defendant Mozilo stated, "I believe the payoptions [sic] continue to present a longer term problem unless rates are reduced dramatically from [the current] level and there are no indications, absent another terrorist attack, that this will happen."

695. Defendant Sambol shared Mozilo's concern about the risks created by Countrywide's portfolio of pay-option ARM loans. A May 26, 2006 e-mail from Carlos Garcia, an executive at Countrywide Bank, N.A., indicated that he had spoken with Defendant Sambol regarding the Company's pay-option ARM portfolio and that Sambol "believes historical payoption performance trends can help disclose problems but are not sufficient/capable of providing comfort." The e-mail went on to state that with respect to Countrywide's pay-option ARMS, "Sambol is concerned about payment shock at recast and inability to absorb increased payments thru income or refi (due to low equity)." Sambol also stated to Garcia that he "believes high cltv [combined loan-to-value ratio] loans with no mi [mortgage insurance], particularly those with high dti [debt-to-income ratio] are risky." Despite these concerns, Defendants did not disclose these risks or change their loan underwriting practices.

696. In addition to their knowledge that Countrywide's riskiest loans were extended to borrowers with substandard credit, the Individual Defendants also knew that the Company relied upon stated income, or no documentation, underwriting in connection with making these loans. A June 1, 2006 e-mail from Defendant Mozilo to Defendant Sambol and others confirms not only the extent of no-documentation loans, but also that the Individual Defendants knew borrowers were providing affirmatively false information on their mortgage applications. In this regard, Defendant Mozilo admitted, "the majority of pay options being originated by us, both wholesale and retail, are based upon stated income. There is also some evidence that the information that the borrower is providing us relative to their income does not match up with IRS records."

697. In his June 1, 2006 e-mail, Defendant Mozilo also expressed concerns over the heightened risks of default in the Company's pay-option ARM portfolio based upon the poor credit scores of Countrywide's borrowers. Specifically, Defendant Mozilo observed that "at least 20%" of Countrywide's pay-option ARM loans were written to borrowers with a FICO score of "700 or less" and that the "lower FICO borrowers are going to experience a payment shock which is going to be difficult if not impossible for them to manage."

698. Based upon these known risks, Defendant Mozilo warned that "since we know or can reliably predict what's going to happen in the next couple of years it is imperative that we address the issue now." Among other things, Defendant Mozilo urged, "we should comb the assets to assess the risks that we face on FICOs under 700 and determine if we can sell them out of the bank and replace them with higher quality paper." Mozilo concluded the e-mail by advising, "we should take a careful look now at our reserves and begin to assume the worst."

699. On September 26, 2006, Defendant Mozilo sent an e-mail to Defendants Sambol and Sieracki expressing his escalating concerns over the risks that Countrywide's portfolio of pay-option ARMs posed to the Company's financial health. Defendant Mozilo admitted that Countrywide had "no way, with any reasonable certainty, to assess the real risk of holding these loans" and that the Company was "flying blind on how these loans will perform in a stressed environment."

700. Based upon these concerns over the Company's pay-option ARM portfolio, Defendant Mozilo urged the other Individual Defendants to "sell all newly originated products and begin rolling off the bank balance sheet, in an orderly manner, pay options currently in their port." Defendant Mozilo made clear that, in his opinion, the time was right for the Company to start dumping these products because "pay options are currently mispriced in the secondary market and that spread could disappear quickly if there is an foreseen [sic] headline event such

as another lender getting into deep trouble with this product or because of a negative investor occurrence."

701. Defendant Mozilo reiterated his desire to unload Countrywide's portfolio of pay-option ARMs in an e-mail dated January 29, 2007 which instructed Defendants Sieracki and Sambol, among others, to "explore with KPMG the potential of selling out (one time transaction because of the tarred reputation of PayOptions) the bulk to [sic] the PayOptions on the Bank's balance sheet and replace them with HELOCS." Mozilo's knowledge of the increased default risks presented by Countrywide's pay-option ARM loans, and his efforts to sell off these loans to mitigate such risks, demonstrates a belief that the Company's pay-option ARMs were not "prudently underwritten" as Defendants had represented in the 2006 Form 10-K.

702. As alleged herein, despite his grave concerns over the impact that Countrywide's pay-option ARM portfolio would have upon the Company, Defendant Mozilo adopted a stock trading plan on October 27, 2006 that enabled him to sell a staggering 350,000 shares per month. Defendant Mozilo then deliberately increased his selling activity to as much as 580,000 shares per month as market conditions worsened and Countrywide's misrepresented and undisclosed exposure grew.

703. Defendants Sambol and Sieracki also had independent knowledge of the large percentage of mortgage loans originated by Countrywide as "exceptions" to the Company's loan underwriting guidelines, as well as the credit risks created by this growing volume of subprime loans. Both Sambol and Sieracki attended a Corporate Credit Risk Committee meeting on June 22, 2006 during which they were informed that 23% of the Company's subprime first lien loans originated in the first quarter of 2006 were "originated as an exception." The presentation during this meeting also indicated that a significant percentage of the Company's 100% financing loans were originated as "exceptions" to "ineligible borrowers."

704. In addition, Defendants Sambol and Sieracki attended a Corporate Credit Risk Committee meeting on March 12, 2007 during which Countrywide's Credit Risk Management Department reported that 12% of thc loans reviewed through the Company's internal quality control process were rated severely unsatisfactory or high risk. An additional 14% of the audited Countrywide loans were reportcd to have document deficiencies. These poor ratings were attributed to loans with debt-to-income, loan-to-value, or FICO scores that were outside of Countrywide's stated underwriting guidelines.

705. On May 29, 2007, Defendants Sambol and Sieracki attended another Countrywide Credit Risk Management Committee meeting during which they were informed that although the Company had purportedly tightened loan underwriting guidelines, "loans continue[d] to be originated ontside guidelines" without "formal guidance or governance." It was reported that such originations came primarily from Countrywide's Secondary Structured Loan Desk. The Credit Risk Management Committee recommended that the Secondary Structured Loan Desk "cease to grant exceptions where there is no major competitor offering the guidelinc." Thus, hoth Sambol and Sieracki were aware of the Company's ongoing loan "exceptions" practice even as Countrywide was announcing a tightcning of its Ioan underwriting guidelines at that time.

706. Defendants Sambol and Sieracki were also awarc of the significant undisclosed risks posed by Countrywide's "matching" strategy for loan underwriting. In an e-mail from John McMurray that was received by Defendant SamboI on November 2, 2006, Sambol was informed of MeMurray's ongoing concerns with Countrywide's practice of "matching" the loan underwriting standards of market competitors. McMurray's e-mail acknowledged that "the company's policy is: 'we match whatever anyonc else has out in the market,'" and he was concerned that "[w]hen this approach is done across lenders, across products and across guidelines, the composite set of guidclines will be the most aggressive

credit in the market." McMurray went on to express concern that "[w]ith this approach, our credit policy is ceded, on both a product-by-product as well as a item-by-item basis, to the most aggressive lenders in the market."

707. McMurray reiterated these concerns in a subsequent e-mail to Sambol dated February 2, 2007 that set forth a comprehensive set of recommendations to improve Countrywide's risk management in light of the Company's underwriting practices. In the e-mail, McMurray expressly warned Sambol that he did not believe Countrywide's "matching" strategy for loan underwriting "would play well with regulators, investors, rating agencies, etc." Despite knowing that Countrywide was using the most aggressive and high risk loan underwriting practices in the industry, Defendant Sambol did nothing to correct the assertion in Countrywide's Relevant Period SEC filings that its pay-option ARM loans were "prudently underwritten," and that credit risk was effectively managed through the Company's underwriting activities.

708. An August 6, 2007 e-mail from McMurray to Defendant Sieracki and others sent in connection with preparing the Sarbanes-Oxley certification for Countrywide's financial statements for the second quarter of 2007 also reveals that the Company's loans were not "prudently underwritten" as claimed in, among other statements, the 2006 Form 10-K or the 2007 First Quarter Form 10-Q. Instead, McMurray's e-mail stated that Countrywide had "long followed a guiding principles [sic] of 'matching' (products, guidelines, etc.) and no brokering." In other words, as noted above, the Company would "match" any loan that a competitor was offering and would not broker out any prospective loan as being too risky for Conntrywide to extend.

709. Moreover, Defendants Sambol and Sieracki rebuffed McMurray's repeated attempts to include greater risk disclosures in the 2006 Form 10-K and Second Quarter 2007 Form 10-Q in light of the Company's loan portfolio and underwriting guidelines. For example, McMurray's handwritten notes from a

February 26, 2007 meeting indicate that Sieracki informed McMurray that Sambol "slashed" certain of McMurray's proposed revisions to the Company's risk disclosures in the 2006 Form 10-K. According to McMurray's notes, Defendant Sambol particularly cut McMurray's proposed disclosures concerning "widened guidelines for affordability." Defendants Sambol and Sieracki also rejected McMurray's attempts to include more detail regarding Countrywide's credit risk management, loan quality, and widened loan underwriting guidelines in the Second Quarter 2007 Form 10-Q.

710. As discussed further below, these facts demonstrate that the Individual Defendants knew or acted with deliberate recklessness in disregarding that the Company's public statements – particularly in the 2006 Form 10-K and First Quarter 2007 Form 10-Q – concerning the quality of Countrywide's loan portfolio the Company's loan underwriting practices and credit risk exposure were materially false and misleading when made to investors. Despite their knowledge of the heightening risks in Countrywide's loan portfolio and loan underwriting practices, Defendants deliberately concealed this information. Because Defendants never materially decreased the Company's portfolio of poorly underwritten loans, or tightened its loan underwriting guidelines, the risks to Countrywide noted throughout 2005, 2006, and 2007 only intensified during the Relevant Period.

**B. The Individual Defendants Knew That Countrywide Had Substantially Loosened its Lending Standards to Provide High-Risk Affordability Loans to Sub-Prime Borrowers**

711. The Individual Defendants caused the Company to originate the inordinately risky loan products, largely to unqualified borrowers, in order to generate higher fees and meet Defendant Mozilo's aggressive growth strategy of increasing market share to an unprecedented 30%.

712. According to the August 26, 2007 New York Times article, a former financial executive at Countrywide explained that "[t]o the extent that more than 5 percent of the market was originating a particular product, any new alternative

mortgage product, then Countrywide would originate it." This former Countrywide financial executive characterized this practice as "the proverbial race to the bottom." Moreover, as noted above, an August 6, 2007 e-mail from McMurray confirms that Countrywide "has long followed a guiding principles [sic] of 'matching' (products, guidelines, etc.) and no brokering. The Countrywide menu is a composite of what has been offered in the industry."

713. On February 23, 2008 The Wall Street Journal reported that Defendant Sambol pushed to offer loans requiring no money down and minimal proof of income for people with weak credit. These loans to non-creditworthy borrowers multiplied the undisclosed risk to the Company's already high-risk affordability loans. According to the February 23, 2008 Wall Street Journal article, when told by Countrywide's risk managers that the Company's underwriting standards were too lax, Defendant Sambol reportedly brushed aside such warnings, stating that being too cautious would turn Countrywide into a "nice, little boutique."

714. The Individual Defendants were aware that Countrywide was originating and approving a substantial amount of high-risk loans, particularly to unqualified borrowers, without requiring any documentation verifying income or collateral on the loans. Indeed, Defendant Mozilo's June 1, 2006 e-mail to Defendant Sambol and others admitted that "[t]here is some evidence that the information the borrower is providing us relative to their income does not match up with IRS records." As a result of these undisclosed imprudent lending practices, Countrywide began experiencing significant losses from borrower defaults and delinquencies.

715. The Individual Defendants knew that Countrywide originated loan products without conducting adequate underwriting, which exposed the Company to materially greater losses through at least the following ways, prior to and during the Relevant Period: (i) internal Company reports describing exceptions to the Company's underwriting and lending practices and detailing the particular loan

types and borrower characteristics; (ii) Countrywide's practice of unconditionally approving non-qualifying, subprime loans in order to meet mandatory Company loan volume approval requirements; (iii) the Individual Defendants' duties as officers of the Company and as members of committees responsible for monitoring and managing credit risk and valuing loan assets and related allowance for loan losses; and (iv) market factors indicating declining home prices and drastic increases in subprime borrower defaults.

**1. The "Exception Processing System" Revealed Countrywide's Significant Credit Risk Exposure From Production of High-Risk Affordability Loans**

716. A power-point presentation document, entitled "Countrywide CMD Structured Loan Desk," filed publicly in United States v. Partow, No. 06-CR-00104 HRH (D. Alaska) (the "Countrywide Presentation Document"), summarized the "objectives" of the Company's Exception Processing System. The Countrywide Presentation Document demonstrates that Countrywide routinely originated and approved loans through the Exception Processing System that violated the Company's lending and underwriting standards throughout the Relevant Period.

717. Specifically, the Countrywide Presentation Document lists the "objectives" of the Exception Processing System, which included, among other objectives, the Company's goal to: (i) [a]pprove virtually every borrower and loan profile with pricing add on when necessary; (ii) identify alternative program to meet borrower needs; (iii) leverage FSLI [Full Spectrum Lending] for all subprime opportunities; and (iv) process and price exceptions on standard products for high-risk borrowers.

718. Moreover, according to the Countrywide Presentation Document, the Exception Processing System permitted exceptions for, among other factors, borrower credit scores, loan-to-value ratio and loan amounts.

### 2. The Individual Defendants Knew That Countrywide Unconditionally Approved High-Risk Affordability Loans to Non-Qualified Borrowers to Materially Boost the Company's Loan Volume

719. Mark Zachary ("Zachary"), a former Countrywide Regional Vice President during 2006 and 2007 responsible for managing Countrywide's CWKB Home Loans Houston Division ("CWKB"), filed a complaint in the United States District Court for the Southern District of Texas captioned Mark Zachary v. Countrywide Financial Corp., et al., Civil Action No. 08-CV-00214. CWKB was a 50-50 joint venture between Countrywide and KB Home Loans. Among other things, Zachary alleges that to further increase production of subprime loans, Countrywide had a practice where executives at the highest levels of CWKB instructed employees, such as Zachary, to unconditionally approve 10% of the backlog of inventory of loan applications each day so builders could start constructing homes.

720. Yet, when Zachary reviewed such applications, credit scores and borrower information provided on an internal report called the Homes Not Authorized ("HNA") report, as well as other internal Company reports, these documents did not support loan approval. Zachary learned that such loans were being approved without underwriter review. These approvals lacking underwriter review were known as "Shadow Approvals."

721. Zachary alleges that he began questioning Countrywide executives in September 2006 regarding the Company's underwriting and appraisal procedures. During a May 2007 conference call, Zachary brought his concerns to the attention of executives in Countrywide's Employee Relations Department and Risk Management Department.

722. Zachary alleges that, to further increase its loan volume, Countrywide also had a practice of putting borrowers into "stated income" or "no income, no asset" verification loans in order to artificially inflate the borrowers' income to

Case MDL No. 2265 Document 1-12 Filed 05/23/11 Page 231 of 283

allow the borrowers to afford more expensive homes. Defendants were able to conceal this fraud because no written proof was required to verify the accuracy of the borrowers' income.

723. Zachary alleges that in some instances, the loan officer would tell applicants what income amount was required to qualify for a certain loan amount. Since no documentation verifying income was required, the borrowers could lie about their income and obtain loans at higher loan amounts. Zachary alleges that he brought these issues to the attention of his superiors in November 2006. According to Zachary, some loan officers even assisted loan applicants in falsifying their loan applications. Moreover, Zachary recalled that on at least one occasion, a potential borrower known to Zachary complained that a loan officer filled in an income amount that the buyer did not meet.

### 3. Countrywide Failed To Comply With Underwriting Regulations Issued By Federal Bank Regulatory Agencies

724. During the Relevant Period, Countrywide failed to comply with mandatory federal bank regulatory guidance governing underwriting standards for the inherently high-risk, non-traditional loans that Countrywide was originating -- in particular, pay-option ARM loans, stated income loans and piggyback mortgage loans.

725. Defendants were required to adhere to the "Interagency Guidance on Nontraditional Mortgage Product Risks" ("Interagency Guidance") issued by the Federal Reserve Board, and the OTS. The Interagency Guidance provided specific guidelines requiring that an institution originating pay-option ARM loans analyze a borrower's repayment capacity including "an evaluation of the ability to repay the debt at final maturity at the fully-indexed rate, assuming a fully-amortizing repayment schedule." The guidance also contained steps which must be taken with respect to loans that have additional risk-layering features, such as reduced

documentation programs and simultaneous second liens, such as Countrywide's stated income and piggyback loans.

726. Despite Countrywide's clear obligation to follow the Interagency Guidance when originating its inherently high-risk loans, Defendants originated pay-option ARM loans to the riskiest borrowers based on the lower, introductory teaser interest rates, rather than the fully-indexed, fully amortized rates.

727. On July 10, 2007, the federal bank regulatory agencies issued their final interagency statement to address issues related to certain subprime mortgage products and lending practices ("the Interagency Statement"). The Interagency Statement supplemented the Interagency Guidance that Countrywide failed to follow.

728. The Interagency Statement highlighted areas fraught with risks, including, among others, "the following lending practices of concern: (1) initial payments based on an introductory interest rate that is substantially lower than the fully-indexed rate; (2) very high or no limits on payment or interest-rate increases; (3) limited documentation of a borrower's income; and (4) substantial prepayment penalties and/or prepayment penalties that extend beyond the initial interest rate adjustment period."

729. As of July 2007, even after the final Interagency Statement was issued, Countrywide's product list stated that the Company was still originating loans of as much as $500,000 to non-creditworthy borrowers as long as the loan represented no more than 70% of the appraised value on the subject property. These loans were made even if the borrower had a credit score as low as 500, had been 90 days late on a current mortgage payment twice in the last 12 months, had filed for personal bankruptcy protection, or had faced foreclosure or default notices on his or her property.

730. Despite Defendants' false public assurances set forth in Sections VI and VII above, Defendants' intentionally violated the Interagency Guidance and

Interagency Statement and actively concealed such violations during the Relevant Period.

### 4. The Individnal Defendants Closely Monitored Countrywide's Lending Practices and Credit Risk Exposure During the Relevant Period

731. During the Relevant Period, the Individual Defendants were directly involved in managing all aspects of Countrywide's core business operations, including: (i) setting the Company's loan origination, lending and underwriting guidelines; (ii) managing Countrywide's credit and liquidity risk; (iii) setting reserves for loan losses; and (iv) ensuring adequate internal controls.

732. The Individual Defendants managed the Company's business operations through their duties as the highest-level officers of the Company. Additionally, the Individual Defendants served on numerous committees of the Countrywide Board of Directors that were responsible for overseeing, monitoring and strategizing about the Company's business activities and credit risk management.

733. Each of the Countrywide Board committees described below reported its findings directly to the Compauy Board, of which Defendants Mozilo and Sambol were members during the Relevant Period. These committees included the: (i) Credit Committee; (ii) Asset/Liability Committee; (iii) Earnings Forecasting Committee; (iv) Finance Committee; and (v) Audit and Ethics Committee.

734. Accordingly, the Individual Defendants, who were the most senior officers of the Company directly responsible for Countrywide's lending practices, credit risk management and investments were each intimately involved in the Company's day-to-day operations and, thus, were aware of the Company's high-risk lending and underwriting practices that violated the Company's own underwriting and lending guidelines.

**a. Credit Committee**

735. According to the 2006 Form 10-K, "Management's Credit Committee comprised of our Chief Risk Officer and other senior executives, has primary responsibility for setting strategies to achieve our credit risk goals and objectives."

736. In particular, the Credit Committee Charter mandates that the Credit Committee perform specific duties and responsibilities. Among other duties and responsibilities, the Credit Committee shall "review, assess and monitor the Company's policies and activities" with respect to "(1) credit risk management activities, including the credit risk management strategies, policies, controls, systems and methodology of the Company and its subsidiaries; (2) methodology of loan loss reserves and adequacy of loan loss reserve levels; and (3) actual and projected credit losses in all of the Company's activities and across all of its portfolios."

737. The Credit Committee reported to the Company's Board of Directors, of which Defendants Mozilo and Sambol were members. Accordingly, Defendants were aware of the Company's significant credit risk resulting from the Company's inherently risky loans, prior to and during the Relevant Period.

**b. Asset/Liability Committee**

738. The Company's Asset/Liability Committee (the "ALCO Group"), "comprised of several of [the Company's] senior financial executives, ultimately determine[d] the valuation of . . . retained interests" and was chaired by Defendant Sieracki and Kevin Bartlett, Countrywide's CIO.

739. The ALCO Group had two sub-committees: the (i) Pipeline and (ii) Portfolio Risk Management sub-committees. Kevin Bartlett, stated during the September 13, 2006 Investor Forum that he attended "all of [the Portfolio Management subcommittee] meetings," which met daily. During the subcommittee meetings, the committee members made "day-to-day, tactical hedging decisions" concerning the Company's credit risk.

740. According to the 2006 Form 10-K, incorporated into the Offering Memorandum by reference, "[o]ur senior management is actively involved in the review and approval of our allowance for loan losses" and "senior financial management exercises extensive and active oversight" of the process.

741. As reflected in an August 6, 2007 e-mail authored by John McMurray, Defendants Sambol and Sieracki attended special ALCO meetings during the summer of 2007 to discuss, among other things, HELOC and subprime valuations.

742. Thus, the Individual Defendants were clearly aware throughout the Relevant Period, of Countrywide's credit risk exposure and actively reviewed the Company's allowance for loan losses on a regular basis.

**c. Earnings Forecasting Committee**

743. Countrywide also maintained an Earnings Forecasting Committee that met on a weekly basis. Kevin Bartlett stated during the September 13, 2006 Investor Forum that:

> the primary purpose of this group is [to] look at . . . [the Company's] financial forecasts for the current quarter, the remaining quarters for the year and for the next entire year. We update those forecasts weekly, and the primary benefit is that we size the macro-hedge, a component of our operation. So we get a sense of how production is performing, how the total company is going to perform in different environments.

* * *

Case MDL No. 2265 Document 1-12 Filed 05/23/11 Page 236 of 283

> We employ an integrated approach, it's comprehensive. Our tolerance levels are set by the Board, and then management makes tactical decisions inside those tolerances to make modifications to our activities. It's based on sophisticated modeling. And as I mentioned on a previous slide it's supported by an experienced management team.

744. Moreover, with respect to liquidity, executive management reviewed, at least monthly, the Company's compliance with liquidity requirements:

> To ensure compliance with the LMP, CHL, CSC, and Countrywide Bank are required to maintain adequate contingent liquidity regardless of conditions and to diversify funding sources. Each business unit has detailed metrics which are appropriate to its business line. The metrics are compared with actual performance positions and reported to executive management monthly.

745. Accordingly, the Individual Defendants actively monitored the Company's liquidity needs and compliance on at least a monthly basis and, thus, were aware of liquidity issues as they arose.

**d. Finance Committee**

746. Countrywide also maintained a Finance Committee, which met ten times in 2006 and continued to meet regularly in 2007. The Finance Committee was responsible for reviewing, assessing and monitoring the Company's activities

Case MDL No. 2265 Document 1-12 Filed 05/23/11 Page 237 of 283

with respect to the following finance and market risk-related matters, among others, during the Relevant Period:

(i) capital structure;

(ii) liquidity;

(iii) capital adequacy;

(iv) reserves;

(v) long-term financing strategy and plans;

(vi) the Company's policies relating to liquidity management and capital structure; and

(vii) mortgage loan sales and securitizations, and the Company's secondary marketing objectives, strategies, policies, procedures and controls relating to such activities.

747. The Finance Committee also reviewed matters related to equity purchases, "taking into account the quantity and quality of consolidated assets, earnings, potential earnings, availability of retained earnings, projected growth rates, liquidity and capital requirements and such other matters that the Committee deems appropriate."

748. Thus, the Individual Defendants, in particular, Defendants Mozilo and Sambol, who sat directly on the Countrywide Board to which the Finance Committee reported, were aware of issues concerning the Company's liquidity reserves and related financial matters.

**e. Audit and Ethics Committee**

749. Countrywide also maintained an Audit and Ethics Committee during the Relevant Period, which met fourteen times per year. The Audit and Ethics Committee was responsible for assisting the Board in overseeing the integrity of the

Company's financial statements, the financial reporting processes of the Company, the Company's internal audit function and the performance thereof, the Company's system of internal controls, and the Company's Code of Business Ethics.

750. The Charter of the Audit and Ethics Committee outlines these areas of responsibility as follows:

> 9. **Risk Management**. The Committee shall discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures and liabilities, including the Company's risk management policies.
>
> 10. **Risk Assessment**. The Committee shall discuss with management the Company's major risk exposures and the systems management utilizes to assess, monitor and control such exposures through the enterprise, including the Company's risk assessment policies.
>
> * * *
>
> 22. **Internal Audit Reports**. The Committee shall review the significant reports to management prepared by the internal auditing department and management's responses.
>
> 23. **Internal Audit Department**. At least once each year, the Committee shall

> review (a) the internal audit department responsibilities budget and staffing, (b) the scope of the internal audit program and any changes thereto, (c) the risk assessment methodology proposed by the internal audit department, (d) the results of the internal audit program, and (e) any procedures for implementing accepted recommendations made by the independent auditor. Periodically, the Committee shall review the internal audit department's adherence to the audit plan.

751. Thus, the Individual Defendants, in particular, Defendants Mozilo and Sambol who sat directly on the Countrywide Board to which the Audit and Ethics Committee reported, were aware of the Company's major financial risk exposure during the Relevant Period and actively monitored the steps management took to manage risk.

### 5. The Individual Defendants Knowingly Ignored Numerous Market Warnings of Accelerated Delinquencies and Defaults and Rapidly Declining Home Values

752. The Individual Defendants, as industry experts with decades of mortgage lending experience, were charged with managing the business operations of the largest mortgage lender in the country, and were keenly aware of all aspects and major developments that occurred in the mortgage lending market.

753. Specifically, as a result of the Individual Defendants' knowledge, experience and positions as the highest-level executive officers at Countrywide, they were clearly aware of at least the following market facts alerting them by no later than mid-2006 that Countrywide's undisclosed imprudent lending practices,

would result in imminent and substantial losses to the Company: (i) home prices began a steep decline beginning in late 2005, indicating that borrowers who became delinquent, particularly those with piggyback loans, would have insufficient equity in their homes to refinance or sell the home; (ii) subprime delinquencies and foreclosures were increasing at extraordinary rates; and (iii) Countrywide's competitors were recording record-level write-downs and/or closing shop.

754. Despite this knowledge, Countrywide continued to provide inherently risky loans primarily to non-creditworthy borrowers, without requiring supporting documentation to verify the borrower's income or collateral on the loan prior to and during the Relevant Period. Defendants engaged in these practices while assuring investors that the Company produced quality loans. Despite the Company's increased origination of high-risk loans that likely would, and did, cause massive losses to the Company, Defendants misrepresented that Countrywide's reserves were "adequate," when those reserves were grossly understated.

**a. The Individual Defendants Kuew That Steep Declines in Home Prices, Beginning In Late 2005, Would Lead to Heighteued Loan Defaults**

755. According to the <u>Standard & Poors Case-Shiller Home Price Index</u> (the "Case-Shiller Home Price Index"), home prices began their rapid decent beginning in mid-2005 to late 2005, and continued to decline throughout the Relevant Period. The Case-Shiller Home Price Index measures the residential housing market, tracking changes in the value of the residential real estate market in 20 metropolitan regions across the United States.

756. Specifically, the Case-Shiller Home Price Index showed the following decline in home prices:




757. In August 2006, the Case-Schiller Home Price Index reported that the price of homes in ten major U.S. Metro areas declined by the most in more than a decade and overall home values experienced the biggest housing price decline since December 1995.

758. At the same time home prices were declining, the introductory "teaser" rates on a material amount of Countrywide's ARM loan portfolio, which comprised approximately one-half of Countrywide's loans, were about to reset to much higher rates that non-creditworthy borrowers, whom Defendants targeted for years, could not afford. Accordingly, the Individual Defendants knew that it was highly likely that a significant portion of the Company's piggyback, pay-option ARMs and other low documentation loans would become delinquent. As a result of unprecedented decline in home values, borrowers would be unable to escape foreclosure by refinancing or selling their homes, as they had done in the past, because such borrowers had little or no equity in the home, particularly with respect to piggyback loans.

759. Defendants' e-mails demonstrate their knowledge of the negative impact that the Company's slipshod underwriting practices would have upon Countrywide and its borrowers. For example, Defendant Mozilo's April 4, 2006 e-mail to Defendant Sambol and others noted that growing delinquencies in the Company's pay-option portfolio posed "serious problems" that could cause Countrywide to "face both financial and regulatory consequences." Further, Defendant Mozilo's June 1, 2006 e-mail to Defendant Sambol and others acknowledged that Countrywide's extension of pay-option loans to subprime borrowers were subject to likely rate increases that would cause "a payment shock which is going to be difficult if not impossible for them to manage." For this reason, Mozilo recognized that Countrywide "should take a careful look at [its] reserves and begin to assume the worst."

760. As the housing market continued its downward trend, Defendants' concerns over the Company's portfolio of poorly written pay-option ARM loans intensified. In his September 26, 2006 e-mail to Defendants Sambol and Sieracki, Defendant Mozilo stated "[w]e have no way, with any reasonable certainty, to assess the real risk of holding these loans on our balance sheet." Mozilo further confessed "we are flying blind on how these loans will perform in a stressed environment of higher unemployment, reduced values and slowing home sales."

761. Defendants' concerns with holding risky and poorly underwritten loans in the midst of the faltering housing market led Defendant Mozilo to instruct Defendant Sambol and others to begin unloading such loans in order to mitigate the Company's almost certain resulting losses. In Defendant Mozilo's June 1, 2006 e-mail, he advised, among other things, "[s]ince we know or can reliably predict what's going to happen in the next couple of years [regarding pay-option loans] it is imperative that we address the issue now." Mozilo's strategy for attempting to mitigate the known risks of pay-option ARMs included "comb[ing] the [Company's] assets to assess the risks that we face on FICO's [sic] under 700 and

determine if we can sell them out of the Bank and replace them with higher quality paper." Similarly, Defendant Mozilo's September 26, 2006 e-mail to Defendants Sambol and Sieracki suggested "rolling off the Bank balance sheet" pay-option ARMs because Countrywide was "flying blind on how these loans will perform."

762. Despite Defendants' knowledge and internal warnings, Countrywide did not reduce its origination of pay-option ARMs and other poorly underwritten loans during the Relevant Period. Further, Countrywide never reduced its inventory of damaging pay-option ARMs. Thus, Defendants knew the Company would experience significant losses on unavoidable foreclosures from borrower defaults as a result of the Company's undisclosed imprudent lending practices and the borrowers' inability to refinance or sell their homes.

### b. The Individual Defendants Knew of Rising Delinquencies and Foreclosures in the Company's Subprime Loan Portfolio Duriug the Relevant Period

763. By late 2005, all market indicators confirmed that subprime borrowers with weak credit had gone deep into debt from entering into mortgages with no down payment and with variable interest rates that reset after as early as two years. Accordingly, an increasing number of subprime borrowers began to default on their loans as short-term teaser interest rates expired and interest rates reset to double-digit figures, leaving those borrowers with large increases in monthly payments.

764. In this regard, according to the MBAA's National Delinquency Survey, in the fourth quarter of 2005, average delinquencies were 4.7%, as compared to 4.38% only one year prior and 4.44% in the prior quarter. Similarly, U.S. home foreclosures rose 25% in 2005, according to RealtyTrac. RealtyTrac purports to be the nation's number one database of pre-foreclosure, auction and Real Estate Owned Properties and the second largest real estate website in its category.

765. By the second quarter of 2006, the MBAA stated in a September 13, 2006 report (the "September 2006 MBAA Report") that "increases in delinquency

Case MDL No. 2265 Document 1-12 Filed 05/23/11 Page 244 of 283

rates for subprime loans, particularly for subprime ARMs" were apparent. In the September 2006 MBAA Report, the MBAA predicted a further slowing of the housing market and resulting increases in delinquencies.

766. Defendants knew that escalating defaults would negatively impact Countrywide -- especially based upon its HELOC and pay-option ARM holdings. In this regard, Defendants Mozilo's May 18, 2006 e-mail to Defendants Sambol and Sieracki warned:

> . . . we must pay special attention to HELOCs and pay options. With interest rates continuing to rise unabated HELOCs will become increasingly toxic in that mortgagors will be and are facing substantially higher payments that [sic] when the loan was originated.
>
> * * *
>
> As for pay options the Bank faces potential unexpected losses because higher rates will cause these loans to reset much earlier than anticipated and as result [sic] causing mortgagors to default due to the substantial increase in their payments.

767. The next day, on May 19, 2006, Defendant Mozilo reiterated his concern in an e-mail to Defendants Sambol and Sieracki indicating that the Company's subprime portfolio would wreak havoc on Countrywide: "the payoptions [sic] continue to present a longer term problem unless rates are reduced dramatically from this level and there are no indications, absent another terrorist attack, that this will happen."

768. Consistent with rapidly deteriorating subprime market conditions, internal Company documents cited in the August 26, 2007 New York Times article also showed that, by mid-2006, as a result of Countrywide's undisclosed imprudent and lax lending practices, subprime defaults had started running far higher than projected by the Company's computer model. According to a February 23, 2008 Wall Street Journal article, Countrywide's risk analysts communicated the rising defaults to Defendant Sambol who brushed their concerns aside.

769. By the third quarter of 2006, RealtyTrac reported in its "Q3 2006 U.S. Foreclosure Market Report" that foreclosures in the third quarter increased by an astounding 17% as compared to the second quarter of 2006, and by 43% since the third quarter of 2005. Then, in November 2006, UBS AG reported that borrowers with subprime loans were falling behind on their payments at a record pace. By the fourth quarter of 2006, delinquencies hit a four-year high and foreclosures hit record levels, prompting lenders to seek bankruptcy protection or simply close.

770. Not surprisingly, Countrywide reported, for the year-ended December 31, 2006, that 5.02% of the loans in Countrywide's servicing portfolio were delinquent, as compared to 4.11% in July 2006. Notably, according to the MBAA, the industry-wide rate of delinquencies in late 2006 was 4.95%.

771. On March 13, 2007, the MBAA issued the results of the National Delinquency Survey for 2006, reporting further rising delinquencies in the fourth quarter of 2006. Specifically, according to the National Delinquency Survey, delinquencies on residential properties were 4.95%, up 28 basis points from the third quarter of 2006 and up 25 basis points from one year prior, as a result of "increases in delinquencies for all major loan types, most notably for subprime and FHA loans."

772. Despite increasing delinquencies and defaults in Countrywide's loan portfolio, and the crashing subprime market, Countrywide continued to originate highly risky loans during the Relevant Period. Defendants failed to fully reveal the

Case MDL No. 2265 Document 1-12 Filed 05/23/11 Page 246 of 283

true extent of the Company's known loss exposure or record such losses in the Company's financial statements, in violation of GAAP, as alleged above in Section IX.

**c. The Individual Defendants Knew That Competing Mortgage Companies Were Collapsing as a Result of the Rise in Defaults and Delinquencies on Subprime Loans**

773. The Individual Defendants were also aware that numerous competing mortgage companies that engaged in subprime lending had started feeling the effects of the credit crunch in 2006, eventually leading them to file for bankruptcy in 2006 and early 2007. The shutdown of major mortgage firms across the industry was a clear manifestation of the financial impact that rising delinquencies and defaults would have on subprime lenders, like Countrywide.

774. In his September 26, 2006 e-mail to Defendants Sambol and Sieracki, Defendant Mozilo encouraged Countywide to begin off-loading the Company's pay-option ARMs to take advantage of market conditions before another subprime lender went belly up. In this regard, Mozilo stated:

> It appears to me that pay options are currently mispriced in the secondary market and that spread could disappear quickly if there is an unforeseen headline event such as another lender getting into deep trouble with this product or because of a negative investor occurrence.

Yet, the Company concealed that the failing market was battling its loan portfolio. Instead, Defendants represented that Countrywide had sufficient reserves to cover loan losses and adequate liquidity to run its operations.

775. On February 7, 2007, Countrywide competitor New Century, the second-largest subprime lender in the United States at that time, announced it

would restate financial results for the first three quarters of 2006 to correct improper accounting for loan repurchase losses due to increasing trends in early-payment defaults of subprime loans. New Century eventually filed for bankruptcy in April 2007, a few months after its restatement was announced. Also, in February 2007, HSBC Holdings PLC shut down its subprime operations and reported a major loss of $10.6 billion from subprime operations. Other subprime lenders, including ResMAE, Ownit and Mortgage Lenders Network USA filed for bankruptcy protection around this time.

776. In spite of this industry-wide collapse, Defendants attempted to differentiate Countrywide from the competition, and claimed that the Company was not significantly involved in subprime lending, unlike its failed competitors, as described above in ¶ 657. In this regard, Defendants continued to miscategorize loans provided to subprime borrowers as "prime" in order to boost loan volume, while withholding the true extent of its growing exposure to delinquencies and defaults on its loans.

777. Those misrepresentations directly contradicted Defendants' knowledge of the imminent problems that the Company faced from its subprime loan portfolio. For example, Defendant Mozilo's June 1, 2006 e-mail to Defendant Sambol and others warned:

> Since we know or can reliably predict what's going to happen in the next couple of years it is imperative that we address the issue now. First and foremost, the Bank should not be accumulating any loans below 680 unless the LTV is 75% or lower. Secondly we should comb the assets to assess the risks that we face on Fico's [sic] under 700 and determine if we can sell them

> out of the Bank and replace them with higher quality paper. Thirdly we should take a careful look at our reserves and begin to assume the worst.

778. Defendants, nevertheless, failed to increase Countrywide's reserves to a sufficient level to cover the Company's exposure to these miscategorized subprime loans. Defendants' eventual admission of insufficient loan loss reserves and miscategorization of subprime loans as "prime" reflected the truth that the Company was indeed more like its fallen competitors, such as New Century, than it had initially represented.

### C. Defendants Were Motivated to Commit the Fraud Alleged Herein

#### 1. The Individual Defendants Were Motivated to Commit the Fraud Alleged Herein to Profit From Insider Sales

779. During the Relevant Period, the Individual Defendants were motivated to engage in the fraudulent practices detailed herein so that they could sell their personally held shares of Company common stock at artificially inflated prices.

780. Notwithstanding the Individual Defendants' duty not to sell Countrywide common stock under these circumstances, or to disclose the non-public, inside information prior to selling their stock, each of the Individual Defendants sold Countrywide stock during the Relevant Period at prices that were artificially inflated by Defendants' materially false and misleading statements and omissions. In total, Countrywide insiders sold approximately 2,338,615 shares of Countrywide common stock for proceeds of approximately $71.3 million during the Relevant Period.

781. Defendant Mozilo, alone, sold approximately 2,299,588 shares of Countrywide stock for proceeds of approximately $69.8 million during the Relevant Period at artificially inflated prices, as detailed below:

## ANGELO R. MOZILO, CHAIRMAN AND CEO
## RELEVANT PERIOD SALES

| Date | No. of Shares Sold | Price Per Share | Proceeds |
|---|---|---|---|
| 5/18/2007 | 70,000 | $41.14 | $2,879,513 |
| 5/21/2007 | 46,000 | $40.64 | $1,869,518 |
| 5/31/2007 | 46,000 | $39.80 | $1,830,883 |
| 6/1/2007 | 70,000 | $39.01 | $2,730,497 |
| 6/4/2007 | 70,000 | $39.15 | $2,740,332 |
| 6/6/2007 | 46,000 | $39.06 | $1,796,769 |
| 6/8/2007 | 70,000 | $37.95 | $2,656,759 |
| 6/11/2007 | 70,000 | $37.67 | $2,636,991 |
| 6/13/2007 | 70,000 | $37.81 | $2,647,008 |
| 6/14/2007 | 46,000 | $37.83 | $1,740,240 |
| 6/15/2007 | 46,000 | $37.99 | $1,747,673 |
| 6/18/2007 | 46,000 | $38.48 | $1,770,149 |
| 6/19/2007 | 46,000 | $38.90 | $1,789,432 |
| 7/11/2007 | 70,000 | $35.68 | $2,497,929 |
| 7/12/2007 | 46,000 | $36.45 | $1,676,700 |
| 7/13/2007 | 70,000 | $36.64 | $2,565,073 |
| 7/16/2007 | 70,000 | $35.83 | $2,508,436 |
| 7/18/2007 | 46,000 | $34.32 | $1,578,587 |
| 7/20/2007 | 70,000 | $34.12 | $2,388,253 |
| 7/23/2007 | 70,000 | $34.22 | $2,395,099 |
| 7/25/2007 | 46,000 | $30.52 | $1,404,035 |
| 7/27/2007 | 46,000 | $29.59 | $1,360,979 |
| 7/31/2007 | 46,000 | $29.89 | $1,374,922 |
| 8/1/2007 | 30,000 | $28.16 | $844,893 |
| 8/7/2007 | 110,000 | $28.06 | $3,086,666 |

| Date | No. of Shares Sold | Price Per Share | Proceeds |
|---|---|---|---|
| 8/8/2007 | 92,000 | $28.74 | $2,643,997 |
| 8/13/2007 | 46,000 | $28.40 | $1,306,400 |
| 10/8/2007 | 139,918 | $20.14 | $2,818,368 |
| 10/9/2007 | 139,918 | $19.87 | $2,780,632 |
| 10/10/2007 | 139,918 | $18.74 | $2,622,623 |
| 10/11/2007 | 139,918 | $18.36 | $2,569,160 |
| 10/12/2007 | 139,916 | $18.38 | $2,571,642 |
| **Total** | **2,299,588** | | **$69,830,158** |

782. Defendant Mozilo's sales of Countrywide stock during the Relevant Period were made pursuant to Rule 10b5-1 plans, which purportedly allow corporate insiders to sell stock without any direct involvement. Most executives adopt a plan and stick with it -- not Mozilo. Instead, amid rapidly rising delinquencies and foreclosures in Countrywide's loan portfolio during the fourth quarter of 2006, Mozilo began a series of Rule 10b5-1 plan manipulations while in possession of non-public material information.

783. Specifically, on October 27, 2006, Defendant Mozilo adopted a stock trading plan that called for selling 350,000 shares per month (the "October Plan") at the same time the Board authorized a share repurchase program of up to $2.5 billion. Rather than use Countrywide's cash to finance the stock buy-back program, the Company used investors' money by issuing debt secnrities to finance $1 to $2 billion of the stock repurchases. The stock buy-back had a significant effect on Countrywide's stock. Indeed, when the plan was announced on October 24, 2006, Countrywide's stock price was $37.33 per share. By February, Countrywide's stock had increased in value to an all-time-high of $45.03 per share.

784. At the time that he established the October Plan, Mozilo possessed material non-public information concerning, among other things, the risks to the Company that its portfolio of pay-option ARMs presented, as detailed in Mozilo's April 17, June 1, and September 26, 2006 e-mails.

785. Mozilo did not stop there. When other mortgage lenders were being pressured by the slumping housing market and rising loan defaults, Mozilo continued to manipulate his so-called "passive" stock plans. According to publicly filed documents, Mozilo adopted a trading plan on November 13, 2006, pursuant to which he sold 97,999 shares of Countrywide stock in late November 2006 and early December 2006 (the "November Plan").

786. On December 12, 2006, Mozilo filed a new stock trading plan that allowed him to sell an additional 115,000 shares each month (the "December Plan," together with the October and November Plans, the "2006 Plans"). Soon after, when Countrywide's stock price reached an all-time high of $45.03 on February 2, 2007, Mozilo revised the December Plan, doubling the number of additional shares he was authorized to sell under the December Plan to 230,000 a month. In total, Mozilo was able to sell 580,000 shares each month as a result of the 2006 Plans.

787. During the March 7, 2008 Congressional Hearing, Mozilo's only explanation for the massive exercise of his vested options between November 2006 and the end of 2007 was to "reduce [his] holdings because of [his] retirement." This excuse is inconsistent with the facts. Just days before adopting his October Plan, Mozilo signed an agreement on October 20, 2006 to continue his employment for more than three years.

788. Experts and investors have been extremely critical of Mozilo's suspicious trading and Rule 10b5-1 plan manipulations. As reported in a September 29, 2007 Los Angeles Times article, experts commented that, although trading plans usually protect executives against allegations that they traded on inside information, Mozilo weakened his insider trading defense by making

changes in a relatively short period of time. Experts have further stated that Mozilo's trading "stands out" and "raises a slew of red flags" because he adopted a new trading plan several weeks after the October Plan, revised that plan approximately only month later, a leading independent source for analysis of North America corporate governance and executive compensation and then revised the December Plan about seven weeks thereafter.

789. In this regard, Nell Minow, editor of the Corporate Library, stated that Mozilo's decision to adopt several trading plans in late 2006 and then to change the December Plan in February 2007, "stands in sharp contrast to what her organization typically sees." Retired SEC enforcement attorney, Hilton Foster, also stated "[w]hat sets off alarms is when insiders step up their stock purchases in advance of a run-up, or accelerate their sales before the stock tanks."

790. Mozilo's trading after October 2006 was also one of the main areas of concern at the March 7, 2008 Congressional Hearing. With respect to Mozilo's stock trading plans and "good timing," the House Committee Chairman, Rep. Henry Waxman, stated: "what is most unusual about these sales may be that they occurred at the same time that Countrywide decided to spend $2.5 billion to buy its stock back." In asking Mozilo to explain how his sales helped the shareholders, Waxman stated: "You were using shareholder and borrowed money to buy back Countrywide stock and keep the price up at the same time you were selling your own personal shares."

791. Nell Minow of the Corporate Library was also a witness at the March 7, 2008 Congressional Hearing. When asked about Mozilo's stock sales occurring at the same time Countrywide was buying back stock, Minow found that "to be possibly the most deeply concerning of all facts that have come about his pay package."

792. On June 4, 2009, the SEC commenced the SEC Action against Defendants Mozilo, Sambol and Sieracki for their alleged violations of the federal

securities laws. The lawsuit was the culmination of an extensive investigation by the SEC into the conduct of the Individual Defendants prior to and during the Relevant Period. The SEC complaint charges Defendant Mozilo with significant insider trading during the Relevant Period and modification of his Rule 10b5-1 sales plans while in the possession of material, nonpublic information.

793. In the SEC Action, the Commission alleges, among other things, that Defendant Mozilo: (i) possessed material non-public information when he established his 10b5-1 plans; (ii) amended certain of his 10b5-1 plans while possessing material non-public information; and (iii) recognized proceeds exceeding $139 million based upon stock sales and option exercises from November 2006 through October 2007. The Court denied Defendant Mozilo's motion to dismiss the SEC's insider trading claim against him.

794. As demonstrated below, Defendant Sambol sold 36,125 shares of Countrywide stock for proceeds of approximately $1.3 million during the Relevant Period at artificially inflated prices. All of Defendant Sambol's Relevant Period sales were suspicious because they were made pursuant to a Rule 10b5-1 plan adopted on May 20, 2007, just four days after the start of the Relevant Period. As demonstrated by, among other things, the May 18, June 1 and September 26, 2006 e-mails that he received from Defendant Mozilo, Defendant Sambol established his 10b5-1 plan while in possession of material non-public information.

**DAVID SAMBOL, PRESIDENT AND COO:**
**<u>RELEVANT PERIOD SALES</u>**

| Date | No. of Shares Sold | Price Per Share | Proceeds |
|---|---|---|---|
| 6/6/2007 | 6,375 | $38.99 | $248,571 |
| 6/14/2007 | 6,375 | $37.79 | $240,883 |
| 6/19/2007 | 6,375 | $38.45 | $245,127 |
| 6/27/2007 | 4,250 | $35.96 | $152,813 |
| 7/3/2007 | 4,250 | $37.02 | $157,330 |
| 7/13/2007 | 4,250 | $36.50 | $155,131 |
| 7/19/2007 | 4,250 | $35.26 | $149,855 |
| **Total** | **36,125** | | **$1,349,710** |

795. During the Relevant Period, Defendant Sieracki sold approximately 2,902 shares of his Countrywide stock for proceeds of approximately $113,000, while in possession of material information about Countrywide which had not been disclosed to the investing public, including Plaintiffs.

**2. The Individual Defendants Were Motivated to Engage in Massive Stock Buy-Back Programs in Order to Inflate the Company's Stock Price and Conceal the Company's True Loss Exposure**

796. In order to inflate Countrywide's stock price to maximize the proceeds of their insider selling, Defendants caused Countrywide to engage in two stock buy-back programs -- one in November 2006 and a second in May 2007.

797. On October 24, 2006, Countrywide announced that it would engage in the Company's first-ever share buy-back program starting in November 2006. Pursuant to this stock buy-back program, Countrywide purchased 60 million shares of its common stock on the open market for $39 per share, or $2.4 billion in total. As noted above, the Company did not use its own cash to repurchase the stock. Rather, Defendants financed the acquisition using investor money, through the issuance of junior subordinated debentures.

798. On May 16, 2007, the beginning of the Relevant Period, Countrywide announced that it would consummate the May 2007 Debentures Offering, the proceeds of which were used, in part, to fund the Company's second buy-back of up to 23 million additional shares of Countrywide common stock for approximately $900 million.

799. The Individual Defendants were further motivated to engage in the stock buy-back programs to make the Company appear financially healthier than competitors in light of a rapidly deteriorating credit market. The two buy-back programs served as an indicator of Countrywide's supposed financial health and helped to conceal the Company's true bleak financial condition.

800. The buy-back programs portrayed Countrywide as financially strong by showing more favorable financial ratios to generate investor confidence in the Company. Specifically, when the Company repurchased its shares on the open market, it reduced the number of shares outstanding, which led to an increase in earnings per share ("EPS"), a strong indicator of shareholder value. An increase in EPS also leads to a lower price-earnings ratio, another positive market indicator. A company engaging in a buy-back program also reduces the value of its assets on its balance sheet, resulting in an increase of Return on Assets and Return on Equity ("ROE"). The market views such increases positively.

801. As a result, these strong market indicators drove the Company's share prices up. Indeed, on October 30, 2006, before the commencement of Countrywide's first buy-back program, National Mortgage News reported that "analysts [] said Countrywide's share buyback will help to support the stock."

802. Moreover, as noted above, Defendant Mozilo suspiciously altered his 10b5-1 trading plan around the time of significant stock repurchases by the Company, when Countrywide stock was selling at an all-time high.

### 3. The Individual Defendants Were Motivated to Artificially Inflate the Value of Countrywide's Stock To Receive Massive Incentive-Based Compensation

803. The Individual Defendants were further motivated to conceal the Company's true subprime exposure to maximize their own compensation, which was based almost exclusively upon the Company's financial performance.

804. The Proxy Statement on Form 14A filed with the SEC on April 27, 2007 for the period ended December 31, 2006 (the "2006 Proxy") disclosed that 80 to 90% of the Individual Defendants' total compensation was based almost exclusively on Countrywide's diluted EPS. By failing to disclose, or recklessly disregarding, the true nature of the Company's subprime risk exposure and avoiding credit rating downgrades, which would substantially limit the Company's access to funding for new loans, Defendants were able to achieve their EPS and ROE goals. Accordingly, the Individual Defendants profited personally from enormous incentive awards and bonuses tied to the Company's expanding subprime loan originations.

805. Defendant Mozilo's total compensation for 2007 was $10.8 million. On top of his $1.9 million salary, Mozilo's received $7.6 million in performance-based restricted stock units and stock options and $1.3 million in other compensation in 2006.

806. Defendant Mozilo's historical compensation was exorbitant. His total compensation for 2006 was $51.8 million. In comparison, CEOs of significantly larger, global financial institutions such as BofA Securities, Citigroup Inc. and JPMorgan Chase & Co. in 2006 were paid $28 million, $26 million and $39 million, respectively. In addition to his $2.9 million salary for 2006, Defendant Mozilo received $1.1 million in stock awards, $23 million in option awards, $20.5 million in incentive awards and bonuses and $654,166 in other compensation.

807. According to the 2006 Proxy, Defendant Mozilo's annual incentive award for 2006 was calculated by multiplying the previous year's incentive

Case MDL No. 2265 Document 1-12 Filed 05/23/11 Page 257 of 283

payment by a ratio equal to the current year's EPS divided by the immediately preceding year's EPS. This formula was designed to compensate Defendant Mozilo for year-over-year EPS growth.

808. Commenting on Defendant Mozilo's compensation, the Corporate Library reiterated its "very high concern" rating on Countrywide. In this regard, the Corporate Library stated "any board which can make such poor decisions about a CEO's compensation package is almost certain to [be] making poor decisions elsewhere in its range of responsibilities."

809. The negotiation of Mozilo's October 20, 2006 Extension Agreement was another concern discussed at the March 7, 2008 Congressional Hearing, which revealed that Countrywide hired Ross Zimmerman of Exequity in 2006 to give, "compensation advice" to the Board regarding Defendant Mozilo. Zimmerman concluded that Mozilo's pay was significantly inflated.

810. Instead of following the advice of the consultant it hired, Countrywide's Board hired and paid for another compensation consultant, John England from Towers Perrin, to represent Mozilo's interests in negotiating his 2007 compensation. Even though Countrywide was paying for this additional consultant, documents produced for the March 7, 2008 Congressional Hearing showed that England was, in fact, acting as a personal advisor to Mozilo. In particular, in an e-mail from England to Mozilo, England expressed his concern that the Board's proposal lowered Mozilo's maximum opportunity by lowering the target bonus and reducing the maximum bonus.

811. Defendant Sambol was also handsomely rewarded for concealing the true credit risks and resulting losses to the Company. Sambol's total compensation for 2007 was $10.4 million. In addition to his $1.4 million salary, Sambol received $5.8 million in performance-based restricted stock units and stock options, a promotion cash bonus of $2.6 million, and $600,000 in other compensation.

812. Sambol's total compensation for 2006 was almost $12 million. On top of his $1.2 million salary, Defendant Sambol received $26,118 in stock awards, $5.1 million in option awards, $5.3 million in incentive awards and bonuses and $461,194 in other compensation in 2006. According to the 2006 Proxy, Defendant Sambol's incentive award for 2006 was based entirely on Countrywide's financial performance as determined by EPS and return on equity.

813. Defendant Sieracki's approximate compensation for 2007 was $2.9 million. In 2006, Defendant Sieracki received total compensation of $2.6 million, including his $658,333 salary, $593,660 in option awards, $856,350 in incentive awards and bonuses and $497,702 in other compensation. According to the 2006 Proxy, Defendant Sieracki's incentive award for 2006 was tied to the Company's EPS performance.

## XI. LOSS CAUSATION

814. During the Relevant Period, leading financial firms, including Banc of America Securities LLC, Lehman Brothers Inc., Citigroup (together, the Joint Book Running Managers), Credit Suisse First Boston, J.P. Morgan Chase & Co., Merrill Lynch & Co., Morgan Stanley & Co., Inc., Piper Jaffray & Co., and UBS Warburg LLC acted as market makers for the Debentures (the "Market Makers"). Numerous times every day, the Market Makers disseminated real-time bid and ask quotes to investors such as Plaintiffs, which constituted firm offers to buy or sell the Debentures at the quoted prices.

815. During the course of any given trading day during the Relevant Period, the Market Makers executed transactions in the Debentures that demonstrated investor interest to buy and sell the Debentures at a given price, based on available information concerning Countrywide. This enabled the Market Makers to adjust and reissue their bid and ask prices during the course of the day. Moreover, the Market Makers adjusted their price quotes based on public

information about Countrywide, including statements released by the Company and media reports.

816. In addition to public information, many of the financial institutions acting as Market Makers in the Debentures during the Relevant Period also employed equity and fixed-income analysts who covered Countrywide's securities, including the Debentures. Consequently, when there was an analyst downgrade of Countrywide, such as the downgrade described in sub-paragraph 819(e) below, the Market Makers accordingly adjusted their Debenture price quotes downward.

817. The Market Makers' timely bid and ask price quotes, based on transactions and publicly available information, had the effect of efficiently pricing the Debentures for investors. Accordingly, the material misrepresentations and omissions detailed above in Sections VI and VII had the effect of creating and maintaining prices for the Debentures throughout the Relevant Period at a level materially greater than the price would have been if Countrywide had timely disclosed its true financial condition, exposure to credit losses, and liquidity problems. As set forth above in Section VII, even during the period between July 24, 2007 and November 21, 2007 when Countrywide and public reports gradually began to disseminate facts concerning Countrywide's true financial condition, Defendants repeatedly issued contemporaneous countervailing false and/or misleading positive statements to assuage investor concerns regarding the Company. In this regard, the misrepresentations and omissions of material fact that did not result in an upward movement in the prices of the Debentures served to maintain the Debentures' prices at artificially inflated levels.

818. Including but not limited to the examples below, the value of the Debentures periodically declined in direct response to Defendants' partial disclosures and/or media reports that exposed as false and misleading Defendants' previous misrepresentations and/or omissions of material fact as set forth in Sections VI and VII above. The gradual revelation of the truth by Countrywide and

the media concerning, among other things, Countrywide's business and operations, the quality of its loan portfolio, its reckless underwriting standards, losses on its held mortgages and retained interests, and its liquidity position, incrementally removed portions of the artificial inflation in the price of the Debentures. Nevertheless, in many cases, decreases in the price of the Debentures was partially mitigated by the contemporaneous countervailing false and/or misleading positive statements by Countrywide that maintained the illusion of financial health and/or promised investors that the Company had made the necessary steps to return to profitability and capitalize on market conditions. Plaintiffs relied on these continuing false and misleading positive statements as part of the total mix of information available when investing in the Debentures during the Relevant Period.

819. The following partial disclosures by Defendants and reports by the media, among others, gradually revealed that Defendants' statements concerning Countrywide's business and financial condition bad been false and misleading, causing the price of the Debentures to fall, even while often being accompanied by contemporaneous false positive statements by Defendants that mitigated the price decreases in the short term:[4]

(a) As discussed above in Section VII, in its July 24, 2007 Press Release, Countrywide announced that it was substantially reducing its 2007 earnings estimate and disclosed a pending $417 million impairment charge. The Company attributed the impairment charge to softening home prices, "accelerated increases in delinquency levels," and "loss severities" on home equity loans underlying

---

[4] The figures set forth in ¶ 819 reflect the approximate decrease in the value of the Debentures collectively owned by Plaintiffs as of the day before the partial corrective disclosure and/or public report was issued. The figures do not reflect realized losses from actual sales in the periods directly following the disclosures, nor do they account for purchases and/or sales on the day of the disclosures.

mortgage securities in which Countrywide retained interests. The Company also disclosed a $181 million charge from losses on its LHI, driven by losses on putatively prime home equity. In addition, during its July 24, 2007 Conference Call, Countrywide made a number of partial disclosures concerning its loans and loan underwriting, including how it broadly defined "prime" loans and changed policy for recognizing charge-offs. However, at the same time, the Company made countervailing false and misleading positive statements concerning, among other things, changes it had purportedly made to its products and underwriting to improve the quality of its loan production. These disclosures, coupled with the contemporaneous positive statements, did not reveal the true extent of problems with Countrywide's loans, underwriting, liquidity and credit exposure, but did indicate to the market that Defendants' prior statements concerning the Company's loans and lending had not been entirely inaccurate, and that the Company's financial condition had deteriorated. As a result, the partial disclosures in the July 24, 2007 Press Release caused the price of the Series A Debentures to fall $23.49 per Debenture, from $963.72 per Debenture at close on July 23, 2007 to $940.23 per Debenture on July 26, 2007. The price of the Series B Debentures fell $20.46 per Debenture, from $963.83 at close on July 23, 2007 to $943.37 per Debenture on July 26, 2007. The foregoing decreases in the price of the Debentures due to these disclosures caused the collective value of the Series A and Series B Debentures owned by Plaintiffs as of July 23, 2007 to decrease by approximately $13,265,037.90 and $8,615,276.34, respectively;[5]

(b) On July 27, 2007, just a few days after Countrywide's first partial corrective disclosures, American Home Mortgage Investment Corp. ("AHM"), one

---

[5] The decreases in value of the Debentures held by each individual Plaintiff on the dates discussed in ¶ 819 are set forth in Exhibit U hereto.

of Countrywide's peer lenders, announced that it was delaying payment of a planned quarterly dividend in order to preserve cash and other liquid assets. On the following trading day, July 30, 2007, a number of financial publications, including The Wall Street Journal, reported that AHM was facing margin calls from warehouse lenders due to write-downs to the value of its loan portfolio. A number of these reports concerning AHM's financial troubles, which the company attributed to disruptions in the housing and credit markets, drew a connection to Countrywide's July 24, 2007 disclosures of impairment charges, which Countrywide had also attributed to market conditions. Later in the day on July 30, 2007, after a freefall in the price of AHM common stock given fears that AHM was on the brink of bankruptcy, the NYSE halted trading of the stock. During the following two trading days, amid concerns that, in spite of Countrywide's representations concerning its continued financial health and quality loan portfolio, Countrywide was exposed to the same liquidity problems that AHM was facing, the price of the Series A Debentures fell $9.63 per Debenture, from $941.79 per Debenture at close on July 30, 2007 to $932.16 per Debenture on August 1, 2007. The price of the Series B Debentures fell $14.57 per Debenture, from $942.76 at close on July 30, 2007 to $928.19 per Debenture on August 1, 2007. The foregoing decreases in the price of the Debentures due to these disclosures caused the collective value of the Series A and Series B Debentures owned by Plaintiffs as of July 30, 2007 to decrease by approximately $5,171,406.30 and $5,918,028.03, respectively;

(c) In response to concerns about Countrywide's liquidity brought on by AHM's financial crisis, Countrywide took the unusual step of issuing the August 2, 2007 Press Release wherein it "commented . . . on the continuing adequacy of its funding liquidity and the strength of its financial condition." In the press release, Defendant Sieracki stated that the Company's finances "remain[ed] strong" and touted the fact that Moody's Investors Services and S&P "re-affirmed their ratings

and stable outlook for Countrywide." However, the news was not all positive. Also on August 2, 2007, bond insurer MBIA, Inc. revealed to investors that delinquencies were rising among certain subprime home loans underlying securitization transactions MBIA insured for Countrywide. The rising delinquencies reportedly caused excess spread of triggers to trip on three MBIA-insured Countrywide transactions. Countrywide's assurances concerning its liquidity and financial condition only partially allayed investor fears that undisclosed problems in its loan portfolio would expose the Company to the liquidity problems faced by AHM. As a consequence, during the following two trading days, the price of the Series A Debentures fell an additional $31.37 per Debenture, from $932.16 per Debenture at close on August 1, 2007 to $900.80 per Debenture on August 3, 2007. The price of the Series B Debentures fell an additional $33.78 per Debenture, from $928.19 at close on August 1, 2007 to $894.41 per Debenture on August 3, 2007. The foregoing decreases in the price of the Debentures due to these disclosures caused the collective value of the Series A and Series B Debentures owned by Plaintiffs as of August 1, 2007 to decrease by approximately $15,840,908.90 and $12,200,626.62, respectively;

(d) On August 9, 2007, Countrywide issued its Second Quarter 2007 Form 10-Q, wherein the Company for the first time acknowledged that the impact of secondary market and liquidity funding disruptions on the Company's liquidity going forward was "unknown." Although the Second Quarter 2007 Form 10-Q continued to make materially false and misleading statements about, among other things, the Company's loan quality and credit and underwriting practices, the disclosure of potential liquidity problems that contrasted with Defendants' previous statements caused the price of the Series A Debentures to fall $31.05 per Debenture, from $927.54 per Debenture at close on August 8, 2007 to $896.49 per Debenture on August 14, 2007. The price of the Series B Debentures fell $12.54 per Debenture, from $918.13 per Debenture at close on Augnst 8, 2007 to $905.59

per Debenture on August 14, 2007. The foregoing decreases in the price of the Debentures due to this disclosure caused the collective value of the Series A and Series B Debentures owned by Plaintiffs as of August 8, 2007 to decrease by approximately $15,664,853.00 and $4,219,446.66, respectively;

(e) On August 15, 2007, certain analysts downgraded Countrywide due to the Company's liquidity concerns first disclosed in the Second Quarter 2007 Form 10-Q. Merrill Lynch downgraded the Company's common stock to "sell" on "fear that the acceleration of margin calls and forced asset sales in the capital markets could lead to more problems for CFC to finance its mortgage operations." The analysts' downgrades, which cast doubt on Countrywide's previous statements concerning its operations and liquidity funding, caused the price of the Series A Debentures to fall another $48.40 per Debenture, from $896.49 per Debenture at close on August 14, 2007 to $848.09 per Debenture on August 15, 2007. The price of the Series B Debentures to fell another $75.26 per Debenture, from $905.59 per Debenture at close on August 14, 2007 to $830.33 per Debenture on August 15, 2007. The foregoing decreases in the price of the Debentures due to the analysts' downgrades, coupled with the disclosures concerning Countrywide's liquidity, caused the collective value of the Series A and Series B Debentures owned by Plaintiffs as of August 14, 2007 to decrease by approximately $24,154,988.00 and $24,457,919.54, respectively;

(f) In response to growing concerns by investors about Countrywide's liquidity, on August 16, 2007, Countrywide issued its press release announcing that it had "supplemented its liquidity funding position by drawing on an $11.5 billion credit facility." Defendant Samhol assured investors that this was among the "decisive steps" the Company had taken to "enable the Company to meet its funding needs and continue growing its franchise." These reassurances concerning steps Countrywide had taken to shore up its liquidity going forward called into question the accuracy of its previous statements and assurances concerning

liquidity, causing the price of the Series B Debentures to fall another $10.97 per Debenture, from $830.33 per Debenture at close on August 15, 2007 to $819.36 per Debenture on August 16, 2007. The foregoing decrease in the price of the Series B Debentures due to continued liquidity concerns caused the collective value of the Series B Debentures owned by Plaintiffs as of August 15, 2007 to decrease by approximately $3,707,629.63;[6]

(g) On August 22, 2007, Countrywide announced a $2.0 billion strategic equity investment from Bank of America that further bolstered its liquidity and caused a temporary bump in the price of the Debentures. However, in the ensuing few days, a number of publications questioned whether the strategic investment had been necessary for Countrywide's very survival, including The New York Times in an August 26, 2007 article entitled "Inside the Countrywide Lending Spree." The lengthy article detailed the lax lending standards at the Company, including the fact that the Company "would lend to a borrower even if the person had a credit score as low as 500, . . . had been 90 days late on a current mortgage payment twice in the last 12 months, . . . had filed for personal bankruptcy protection," or "if the borrower had faced foreclosure or default notices on his or her property." These facts contradicted Defendants' previous statements concerning the quality of Countrywide's loans and lending. During the following two trading days, these inconsistencies, coupled with continuing doubts about the Company's liquidity, caused the price of the Series A Debentures to fall $10.12 per Debenture, from $913.29 at close on August 24, 2007 to $903.18 per Debenture on August 28, 2007. The price of the Series B Debentures fell $12.07 per Debenture, from $890.64 at

[6] Although the Series A Debentures traded as low as $811.25 per Debenture on August 16, 2007 (well below the August 15, 2007 closing price of $848.09), the closing price on August 16, 2007 is not available to calculate the collective reduction in value of Series A Debentures held by Plaintiffs on August 16, 2007.

Case MDL No. 2265 Document 1-12 Filed 05/23/11 Page 266 of 283

close on August 24, 2007 to $878.56 per Debenture on August 28, 2007. The foregoing decreases in the price of the Debentures due to these disclosures caused the collective value of the Series A and Series B Debentures owned by Plaintiffs as of August 24, 2007 to decrease by approximately $5,186,297.60 and $4,075,785.53, respectively;

(h) On September 7, 2007, Countrywide announced it was taking remedial steps to address its financial condition, including reducing its workforce by 20%. Countrywide's announcement, which revealed that the Company's previous statements concerning its financial health were inaccurate, but also continued to conceal the true extent of the Company's financial problems, caused the price of the Series A Debentures to fall $5.73 per Debenture, from $896.30 per Debenture at close on September 7, 2007 to $890.57 per Debenture on September 11, 2007. The price of the series B Debentures fell $4.62 per Debenture, from $872.88 per Debenture at close on September 7, 2007 to $868.26 per Debenture on September 11, 2007. The foregoing decreases in the price of the Debentures due to this announcement caused the collective value of the Series A and Series B Debentures owned by Plaintiffs as of September 6, 2007 to decrease by approximately $2,985,788.40 and $1,650,028.38, respectively;

(i) On October 11, 2007, Countrywide issued a press release reporting its September 2007 operational results. In the press release, Defendant Sambol reported that Countrywide's mortgage loan production for the third quarter of 2007 was down 27% from the previous quarter, which he attributed in part to "more restrictive underwriting." Defendant Sambol also reported that nevertheless the "delinquency rate as a percentage of loans serviced continued to increase in September." In the same vein, on October 16, 2007, The New York Times published an article stating that "[b]orrowers who took out loans in the first six months of 2007 are falling behind on payments faster than homeowners who took out loans [in 2006]." The article, citing a new research report by investment bank

Friedman, Billings and Ramsey ("FBR") (which was also a Market Maker for the Debentures), suggested that the accelerated defaults were due to a failure of some mortgage lenders to tighten lending standards until well into 2007. The FBR report and the article specifically identified Countrywide as an industry leader which "did not significantly tighten standards until August." Countrywide's press release and The New York Times article, which cast doubt on Defendants' previous statements concerning the quality of Countrywide's loans and the adjustment of its loan underwriting standards, caused the price of the Series A Debentures to fall $31.38 per Debenture, from $927.49 per Debenture at close on October 10, 2007 to $896.11 per Debenture on October 17, 2007. The price of the Series B Debentures fell $12.15 per Debenture, from $897.71 per Debenture at close on October 10, 2007 to $88.56 per Debenture on October 17, 2007. The foregoing decreases in the price of the Debentures due to these disclosures caused the collective value of the Series A and Series B Debentures owned by Plaintiffs as of October 10, 2007 to decrease by approximately $17,679,178.20 and $5,130,689.85, respectively;

(j) On October 23, 2007, Countrywide announced it was instituting a refinance and loan modification program "to reach out to borrowers at-risk of default" on approximately $16 billion in loans to 82,000 borrowers facing rate adjustments through the end of 2008. This announcement, which partially revealed the extent of Countrywide's exposure to risky pay-option ARM loans, thereby partially contradicting Defendants' earlier statements about the Company's putative loan quality and high lending standards, caused the caused the price of the Series A Debentures to fall $21.05 per Debenture, from $887.07 per Debenture at close on October 22, 2007 to $866.02 per Debenture on October 24, 2007. The price of the Series B Debentures fell $16.62 per Debenture, from $856.69 per Debenture at close on October 22, 2007 to $840.47 per Debenture on October 24, 2007. The foregoing decreases in the price of the Debentures due to this announcement caused the collective value of the Series A and Series B Debentures owned by Plaintiffs as

Case MDL No. 2265 Document 1-12 Filed 05/23/11 Page 268 of 283

of October 22, 2007 to decrease by approximately $14,418,176.45 and $7,350,676.98, respectively;

(k) After the market closed on October 24, 2007, The Wall Street Journal published an article entitled "Countrywide's New Scare -- 'Option ARM' Delinquencies Bleed Into Profitable Prime Mortgages," which disclosed that Countrywide had been extending pay-option ARM loans – loans which the Company classified as "prime" – to "riskier and riskier borrowers" even though such products were designed for customers with strong credit. These revelations, which contradicted Defendants' previous statements that Countrywide's pay-option ARM borrowers were creditworthy, caused the price of the Series A Debentures to fall $15.86 per Debenture, from $866.02 per Debenture at close on October 24, 2007 to $850.16 per Debenture on October 25, 2007. The price of the Series B Debentures fell $12.59 per Debenture, from $840.47 per Debenture at close on October 24, 2007 to $827.88 per Debenture on October 25, 2007. The foregoing decreases in the price of the Debentures due to these revelations caused the collective value of the Series A and Series B Debentures owned by Plaintiffs as of October 24, 2007 to decrease by approximately $11,680,061.14 and $5,467,572.61, respectively;

(l) On October 31, 2007, several media outlets, including The New York Times, reported that the New England Teamsters and Trucking Industry Pension Fund had filed a shareholder derivative lawsuit against Countrywide's executives, including Defendant Mozilo, and its Board of Directors alleging gross mismanagement for improperly using $2.0 billion in cash to repurchase Company stock. According to the complaint, the share buyback scheme allowed executives to sell shares of Countrywide worth $842 million at artificially inflated prices from April 2004 to October 2007 at the expense of ordinary shareholders. The revelation that management was allegedly engaged in a scheme to artificially inflate the Company's common stock price in order to unload their personal holdings cast

doubt on the accuracy of Defendants' previous statements concerning the Company's business and financial condition, causing the price of the Series A Debentures to fall $34.51 per Debenture, from $895.76 per Debenture at close on October 31, 2007 to $861.25 per Debenture on November 1, 2007. The price of the Series B Debentures fell $19.63 per Debenture, from $862.95 per Debenture at close on October 31, 2007 to $843.32 per Debenture on November 1, 2007. The foregoing decreases in the price of the Debentures due to this revelation caused the collective value of the Series A and Series B Debentures owned by Plaintiffs as of October 31, 2007 to decrease by approximately $26,489,496.39 and $7,062,461.77, respectively;

(m) On November 9, 2007, Countrywide issued its Third Quarter 2007 Form 10-Q which disclosed, among other things, that 76% of its pay-option ARM borrowers were electing to make less than full interest payments, and that the Company may have repurchase obligations on nonprime and second-lien loans that experience early defaults. The Company's disclosures concerning its troubled loan portfolio contradicted Defendants earlier statements concerning the Company's loan quality and potential repurchase obligations. However, because the Company also reported that it "significantly changed [its] underwriting standards" in the previous quarter, had secured additional funds to finance operations, and would return to profitability in the fourth quarter, the price of the Series A Debentures fell only $2.52 per Debenture, from $860.85 per Debenture at close on November 9, 2007 to $858.33 per Debenture on November 12, 2007. The price of the Series B Debentures fell only $4.78 per Debenture, from $837.52 per Debenture at close on November 9, 2007 to $832.74 per Debenture on November 12, 2007. The foregoing decreases in the price of the Debentures due to these disclosures in the Third Quarter 2007 Form 10-Q caused the collective value of the Series A and Series B Debentures owned by Plaintiffs as of November 8, 2007 to decrease by approximately $2,072,344.68 and $1,996,442.62, respectively;

(n) On November 13, 2007, Countrywide issued a press release reporting, among other things, a massive 43.2% increase in delinquencies and a 54.7% increase in foreclosures in the Company's loan portfolios compared to a year earlier. As a result of the significant spike in troubled loans, which contradicted Defendants' previous statements concerning the high quality of the Company's loan portfolio, the price of the Series A Debentures fell $29.96 per Debenture, from $863.46 per Debenture at close on November 13, 2007 to $833.50 per Debenture on November 16, 2007. The price of the Series B Debentures fell $33.61 per Debenture, from $837.21 per Debenture at close on November 13, 2007 to $803.60 per Debenture on November 16, 2007. The foregoing decreases in the price of the Debentures due to these disclosures caused the collective value of the Series A and Series B Debentures owned by Plaintiffs as of November 12, 2007 to decrease by approximately $24,465,306.04 and $11,656,922.69, respectively;

(o) On November 19, 2007, news agencies including Bloomberg News, Reuters and The New York Times began reporting that Countrywide faced imminent bankruptcy because of higher delinquencies and foreclosures in its loan portfolio. Also on November 19, 2007, TheStreet.com reported that, while the Company was telling investors that it would return to profitability in the fourth quarter 2007, Mozilo was stating to regulators that the worst was yet to come. These public reports about Countrywide's condition caused the closing price of the Series A Debentures to fall $19.79 per Debenture, from $806.82 per Debenture on November 19, 2007 to $787.03 per Debenture on November 20, 2007, and the closing price of the Series B Debentures to fall $45.33 per Debenture, from $789.65 per Debenture on November 19, 2007 to $744.32 per Debenture on November 20, 2007. The foregoing decreases in the price of the Debentures due to the bankruptcy fears caused the collective value of the Series A and Series B Debentures owned by Plaintiffs as of November 18, 2007 to decrease by approximately $16,278,046.61 and $15,835,083.57, respectively; and

(p) In response to the bankruptcy rumors about the Company, shortly before the markets closed on November 20, 2007, Countrywide issued a press release stating that the Company had "ample liquidity and capital" and that "Countrywide Bank, the Company's primary operating entity, has sufficient liquidity available to meet its projected operating and growth needs and has accumulated significant contingent liquidity in response to evolving market conditions." Despite the press release, on November 21, 2007, the Series A Debentures dropped another $26.58 per Debenture to a closing price of $760.45 per Debenture and the Series B dropped another $23.20 per Debenture to a closing price of $721.12 per Debenture. The foregoing decreases in the price of the Debentures due to continued bankruptcy fears caused the collective value of the Series A and Series B Debentures owned by Plaintiffs as of November 19, 2007 to decrease by approximately $22,065,094.62 and $8,417,632.80, respectively.

820. Throughout the Relevant Period, Plaintiffs purchased Countrywide Debentures at prices artificially inflated by Defendants' misrepresentations and omissions of material fact alleged herein. Plaintiffs suffered damages when they sold the Debentures at a loss after the Debentures' value declined as Defendants and/or public reports, including but not limited to the foregoing, gradually revealed the truth about Countrywide's financial condition. All told, beginning on July 24, 2007, the gradual disclosures during the Relevant Period which revealed Defendants' previous statements to have been false and/or misleading caused the Debentures' price to decline in a series of material steps. Specifically, the price of the Series A Debentures dropped from $963.72 per Debenture at close on July 23, 2007 to $760.45 per Debenture by the end of the Relevant Period on November 21, 2007. The Series B Debentures fell from $963.83 per Debenture at close on July 23, 2007 to $721.12 per Debenture on November 21, 2007.

821. Plaintiffs collectively lost millions of dollars as they sold Debentures at a loss after Defendants and/or public reports revealed the truth concerning

Countrywide's previously misrepresented and/or concealed facts, thereby removing the inflation in the price of the Debentures. Defendants' materially false and misleading statements in their press releases, SEC filings and other public statements during the Relevant Period proximately caused Plaintiffs' losses.

## XII. GROUP PLEADING

822. The Individual Defendants are liable for the materially false and misleading statements pleaded herein that were issued by, in the name of, or sponsored by the Company. Those statements were each "group-published" information, and the result of the collective actions of the Individual Defendants, each of whom was intimately involved in the day-to-day operations of Countrywide.

823. The Individual Defendants were involved in drafting, reviewing and/or disseminating the materially false and misleading statements issued by Countrywide and approved or ratified those statements, and, therefore, adopted them as their own. Accordingly, it is appropriate to treat the Individual Defendants as a group for pleading purposes.

## XIII. NO STATUTORY SAFE HARBOR

824. The statutory safe harbor for certain forward-looking statements under the Private Securities Litigation Reform Act of 1995 does not apply to the misrepresentations and omissions alleged in this Complaint. Many of the statements were not specifically identified as "forward-looking statements" when made. To the extent that any statements were identified as forward-looking statements, Defendants' failed to include meaningful cautionary language that specifically identified the important then-present factors that could and did cause actual results to differ materially from those in the purportedly forward-looking statements.

825. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statement pleaded herein, Defendants are liable nonetheless

because at the time each of the misrepresentations was made, the particular speaker(s) knew that the statement was materially false or misleading at that time, and/or the forward-looking statement was authorized and/or approved by an executive officer of Countrywide who knew that the statement was materially false and misleading when made.

826. Any warnings or other cautionary language contained in the press releases and other public statements described herein were generic, "boilerplate" statements of risk that would affect any similar company, and failed to disclose the specific problems affecting the Company. As such, any forward-looking statements complained of herein were not accompanied by meaningful cautionary language. Any relevant purported risk disclosures were, in fact, false and misleading in and of themselves, by virtue of the fact that the events which the risk disclosures purported to warn against as contingencies had already become a reality or a certainty.

## XIV. TOLLING OF THE STATUTE OF LIMITATIONS

827. The statutes of limitations with respect to Plaintiffs' federal claims herein were tolled no later than October 30, 2007 by the filing of the class action complaint in Argent Classic Convertible Arbitrage Fund L.P. v. Countrywide Financial Corp., et al., 07-cv-07097 (C.D. Cal.), in which the federal claims herein were asserted against the Defendants on behalf of a putative class, of which Plaintiffs were members, until class certification of those claims was denied on December 9, 2009.

## XV. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### Violation of § 10(b) of The Securities Exchange Act of 1934 and Rule 10b-5 Promulgated Thereunder Against All Defeudants

828. Plaintiffs repeat and reallege each and every paragraph above as if fully set forth herein.

829. The Series A Debentures and Series B Debentures are "securities" within the meaning of the Exchange Act.

830. During the Relevant Period, Defendants used the means and instrumentalities of interstate commerce, including the U.S. mails and interstate telephone communications to: (i) deceive Plaintiffs as alleged herein; (ii) artificially inflate and maintain the market price of the Countrywide Debentures; and (iii) cause Plaintiffs to purchase the Debentures at artificially inflated prices that did not reflect their true value.

831. Defendants, individually and in concert, directly and indirectly, by the use of means and instrumentalities of interstate commerce, including the U.S. mails and interstate telephone communications: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiffs, in violation of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued as primary participants in the wrongful and illegal conduct charged herein. The Individual Defendants also are sued as controlling persons of Countrywide, as alleged below in Plaintiffs' Second Claim for Relief.

832. The Individual Defendants' primary liability, and controlling person liability, arises from the following facts, among others: (i) the Individual Defendants were high-level executives and directors at the Company during the Relevant Period; (ii) the Individual Defendants were privy to and participated in the creation, development and reporting of the Company's materially false and misleading statements and omissions of material facts, including, without limitation, those contained in Countrywide's SEC filings, internal budgets, plans, projections and reports; and (iii) the Individual Defendants were aware of the

Company's dissemination of information that they either knew, or recklessly disregarded, was materially false and misleading.

833. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with deliberate reckless was in disregarding the truth by failing to ascertain and to disclose such facts, even though such facts were readily available to them. Defendants' material misrepresentations and omissions were made knowingly, or with deliberate recklessness, and for the purpose and effect of concealing the truth with respect to Countrywide's policies, operations, business, performance and prospects and supporting the artificially inflated price of its Debentures.

834. The dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, artificially inflated the market price of Countrywide Debentures during the Relevant Period. In ignorance of the fact that the market prices of Countrywide Debentures were artificially inflated, and relying directly on the materially false and misleading statements made by Defendants, or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed by Defendants during the Relevant Period, Plaintiffs purchased Countrywide Debentures during the Relevant Period at artificially inflated prices. As the truth eventually emerged, the price of the Countrywide Debentures fell.

835. Had Plaintiffs known the truth with respect to Countrywide's business, operations, performance and prospects, which Defendants concealed and misrepresented, Plaintiffs would not have purchased the Countrywide's Debentures or would not have purchased such Debentures at the prices they paid.

836. By virtue of the foregoing, Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

837. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their transactions in the Company's Debentures during the Relevant Period.

## SECOND CLAIM FOR RELIEF

### Violation of § 20(a) of The Securities Exchange Act of 1934 Against the Individual Defendants

838. Plaintiffs repeat and reallege each and every paragraph above as if fully set forth herein.

839. During the Relevant Period, the Individual Defendants, as senior executive officers and directors of Countrywide, exercised day-to-day control over the management of the Company and had regular access to non-public information about the Company's business, operations, performance and prospects through access to internal corporate documents and information, conversations and connections with other corporate officers and employees, attendance at management meetings and the Company's Board of Directors, and committees thereof, and reports and other information provided to them in connection therewith.

840. The Individual Defendants, because of their high-level positions with the Company, controlled and/or possessed the authority to control the content of the various SEC filings, press releases and other public statements made by the Company during the Relevant Period. By reason of their high-level management and Board positions, the Individual Defendants had the ability and opportunity to review copies of Countrywide's SEC filings, reports and press releases alleged herein to be materially false and misleading, prior to, or shortly after, their issuance, or to prevent their issuance or cause them to be corrected.

841. Given their possession of the information described above, the Individual Defendants knew or recklessly disregarded the risks associated with originating subprime loans and, consequently, the liability the Company faced as a

result of sharply rising default and delinquency rates associated with these types of loans. Accordingly, Defendants knew or recklessly disregarded that the statements complained of herein were materially false and misleading, and/or omitted material facts, when made.

842. Each of the Defendants is liable as a direct participant and primary violator with respect to the wrongdoing complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and directors, were "controlling persons" within the meaning of § 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein, and exercised the same. Because of their positions of control, the Individual Defendants were able to, and did, directly and indirectly, control the day-to-day conduct of Countrywide's business and its public statements.

843. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, SEC filings and other statements alleged by Plaintiffs to have been materially false and misleading prior to and/or shortly after those statements were issued. The Individual Defendants had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

844. In particular, as set forth in more detail above, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company through, among other ways, their: (i) duties as the highest-level officers of the Company; (ii) positions on numerous Board committees directly responsible for overseeing, monitoring and strategizing about the Company's business activities, credit risk management, allowance for loan losses and compliance with liquidity requirements; (iii) receipt of reports from the Exception Processing System informing them of exceptions to underwriting and lending guidelines; and (iv) attendance at regular meetings informing them of the

Company's significant credit risk exposure and resulting losses from the Company's undisclosed imprudent lending practices. Therefore, the Individual Defendants are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

845. As set forth above, Countrywide and the Individual Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5, thereunder, by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are also liable pursuant to § 20(a) of the Exchange Act.

846. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their transactions in the Company's Debentures during the Relevant Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment:

A. Awarding compensatory damages in favor of Plaintiffs against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

B. Awarding Plaintiffs their costs and expenses in this action, including counsel fees and expert fees; and

C. Such other and further relief as the Court may deem just and proper.

Dated: February 24, 2011

MARC M. SELTZER (54534)
RYAN C. KIRKPATRICK (243824)
**SUSMAN GODFREY L.L.P.**
ANDREW J. ENTWISTLE
ARTHUR V. NEALON
ROBERT N. CAPPUCCI
JONATHAN H. BEEMER
JOSHUA K. PORTER
**ENTWISTLE & CAPPUCCI LLP**

By: ______________________________
Ryan C. Kirkpatrick
Attorneys for Plaintiffs

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs hereby demand a trial by jury of all of the claims asserted in this Complaint so triable.

Dated: February 24, 2011

MARC M. SELTZER (54534)
RYAN C. KIRKPATRICK (243824)
**SUSMAN GODFREY L.L.P.**
ANDREW J. ENTWISTLE
ARTHUR V. NEALON
ROBERT N. CAPPUCCI
JONATHAN H. BEEMER
JOSHUA K. PORTER
**ENTWISTLE & CAPPUCCI LLP**

By: ______________________________
Ryan C. Kirkpatrick
Attorneys for Plaintiffs

# PROOF OF SERVICE

I, the undersigned, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 1901 Avenue of the Stars, Suite 950, Los Angeles, California 90067-6029.

On February 24, 2011, I served the foregoing document(s) described as follows:

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - JURY TRIAL DEMANDED

on the interested parties in this action by placing true copies thereof enclosed in sealed envelopes addressed as stated on the attached service list, as follows:

_XX_ BY MAIL:

I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would he deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

_____ BY PERSONAL SERVICE:

I caused to be delivered such envelope by hand to the offices of the addressee.

_____ BY FEDERAL EXPRESS OR OVERNIGHT COURIER

_____ BY FAX

I served by facsimile as indicated on the attached service list.

_XX_ BY ELECTRONIC MAIL

I caused said documents to be prepared in portable document format (PDF) for e-mailing and served by electronic mail as indicated on the attached service list.

Executed on February 24, 2011, at Los Angeles, California

_XX_ (Federal) I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Eloisa Ball
(Type or Print Name) (Signature)

Case MDL No. 2265 Document 1-12 Filed 05/23/11 Page 282 of 283

**SERVICE LIST**

**PLAINTIFF'S COUNSEL**

MARC M. SELTZER (54534)
mseltzer@susmangodfrey.com
RYAN C. KIRKPATRICK (243824)
rkirkpatrick@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

ANDREW J. ENTWISTLE (pro hac vice)
aentwistle@entwistle-law.com
ARTHUR V. NEALON (pro hac vice)
anealon@entwistle-law.com
ROBERT N. CAPPUCCI (pro hac vice)
rcappucci@entwistle-law.com
JONATHAN H. BEEMER (pro hac vice)
jbeemer@entwistle-law.com
JOSHUA K. PORTER (pro hac vice)
jporter@entwistle-law.com
ENTWISTLE & CAPPUCCI LLP
280 Park Avenue, 26th Floor West
New York, NY 10017
Telephone: (212) 894-7200
Facsimile: (212) 894-7272

*Attorneys for Plaintiff*
*Centaur Classic Convertible Arbitrage Fund Ltd., et al,*

**DEFENDANTS' COUNSEL**

BRIAN E. PASTUSZENSKI (pro hac vice)
bpastuszenski@goodwinprocter.com
LLOYD WINAWER (157823)
lwinawer@goodwinprocter.com
JOHN O. FARLEY (pro hac vice)
jfarley@goodwinprocter.com
BRIAN C. DEVINE (222240)
bdevine@goodwinprocter.com

*Attorneys for Defendant*
*Countrywide Financial Corporation*

DAVID SIEGEL (101355)
dsiegel@irell.com
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
*Attorneys for Defendant*
*Angelo R. Mozilo*

MICHAEL C. TU (186793)
mtu@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street, Suite 3200
Los Angeles, California 90017
*Attorneys for Defendant*
*David Sambol*

SHIRLI FABBRI WEISS (079225)
shirli.weiss@dlapiper.com
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101-4297
*Attorneys for Defendant*
*Eric P. Sieracki*